**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | CIVIL CASE NO. |
| Plaintiff, ) | 05-10887-JLT |
| ) | HON. JOSEPH L. TAURO |
| v. ) | |
| ) | |
| ZERO STAGE CAPITAL VI, L.P. ) | |
| ) | |
| Defendant. ) | |

**RECEIVER'S NOTICE OF RECOMMENDED DISPOSITION AND PRIORITY**
**OF CLAIMS RECEIVED IN RESPONSE TO THE CLAIMS BAR DATE**

**I.      INTRODUCTION**

Pursuant to this Court's Order entered November 4, 2005 ("Bar Date Order"), the U.S. Small Business Administration ("SBA"), as Receiver ("Receiver) for Zero Stage Capital VI, L.P. ("Zero Stage VI"), solicited claims against Zero Stage VI, the receivership estate, and assets or funds in the possession of the Receiver. The Receiver's solicitations were made by direct mailings of the Notice of the claims bar date to known prospective claimants, and by publication of the Notice once each week for two weeks in *The Boston Herald*. A true copy of the Affidavit of Publication of the Notice is attached as **Exhibit A** hereto and incorporated by reference herein, and is submitted for filing with the Court. The Bar Date was established as January 20, 2006.

The Bar Date Order and Notice pursuant thereto required all claims to be submitted to Maurice J. Whalen, Principal Agent for the Receiver, by the Claims Bar Date.   In response to the Receiver's solicitations, twenty (20) claims were

received from twenty (20) claimants on or before the Claims Bar Date. No other claims have been received as of the date of this report.

In accordance with paragraph 7 of the Bar Date Order and paragraph 5 of the <u>Memorandum in Support of Receiver's Motion for an Order Approving Form and Manner of Notice to Claimants and Establishing a Claims Bar Date</u>, the Receiver submits this Report to the Court and recommends approval of the following order and priority of claims to funds and other assets of the receivership estate:

First, authorized administrative expenses of the receivership estate.

Second, approval of payment to SBA of the principal amount of Participating Securities issued to it in the amount of $93,205,000, to be paid over by the Receiver as funds become available, while reserving sufficient funds for operation of the receivership.

Third, after all of the amounts above have been paid in full, and assuming there are no profits, then a return of capital to be distributed to all Private Limited Partners on a pro rata basis up to their respective paid-in capital contribution levels, as funds become available, while reserving sufficient funds for operation of the receivership.

However, in the event there are profits, then in accordance with 13 C.F.R. § 107.1505, any Earned Prioritized Payments, earned Adjustments, earned Charges, and Profit Participation allocated to SBA under §107.1520 shall have priority over any return of capital to private limited partners.

Fourth, after all of the amounts above have been paid in full, then deferred management fees and expenses may be paid to Zero Stage Capital Corp. ("ZSC") in the total amount of $3,925,335.71.

Fifth, in the event that there are remaining profits that have not been used to pay any of the above items, then such residual profit distributions will be made to SBA for any newly accrued Prioritized Payments, its Profit Participation, and to the Private Limited Partners and General Partners, in accordance with the Agreement of Limited Partnership and SBA's Regulations.

The following claims are recommended to be denied:

1)    William F. Shea, LLC's claim for $82,500 in fees.

2)    Ronald Finlayson's claim for $1,047,680 in fees.

3)    McNamara, Koenig and McCarthy's claim for services and expenses incurred after the date of the Receivership Order, in the amount of $29,929.87.

4)    McNamara, Koenig and McCarthy's claim for services and expenses incurred before the date of the Receivership Order, in the total amount of $81,236,

5)    ZSC's claim for Section 3(a) fess/expenses in the amount of $1,204,237.

6)    ZSC's claim for Section 3(b) fees/expenses in the amount of $841,783.

7)    ZSC's claim for "Post Receivership" expenses of $105,882.

## II.    **RECEIVERSHIP BACKGROUND**

Zero Stage VI was licensed by SBA as a Small Business Investment Company ("SBIC") pursuant to Section 301(c) of the Small Business Investment Act of 1958, as amended (the "Act"). Section 308(c) of the Act, 15 U.S.C. §687(c), empowers SBA to prescribe regulations to carry out the provisions of the Act and to govern the operations of SBICs.  SBA has promulgated such regulations, which are codified at Title 13 of the Code of Federal Regulations, Part 107 (the "Regulations").  Zero Stage VI's SBIC License Application contains an acknowledgment that it would be operated in accordance with the Act and the Regulations.

SBA provided Zero Stage VI with $93,205,000.  Private Limited Partners and the General Partner provided another $50,000,000, for a total capitalization

of $143,205,000.[1]  By March 31, 2005, Zero Stage VI's own management booked losses for Zero Stage VI of about $100,000,000.

On or about April 25, 2005, the United States, on behalf of the SBA, filed a Complaint against Zero Stage VI based on its violation of 13 C.F.R. §§107.1830(b) and 507(a).  SBA had determined that Zero Stage VI failed to cure a condition of Capital Impairment, as that term is defined under the Regulations.  The Court, being duly advised of the merits, and upon the consent of SBA and Zero Stage VI, entered a Consent Judgment and Order (hereinafter referred to as the "Receivership Order") on May 4, 2005.

Pursuant to its Receivership Order, this Court took exclusive jurisdiction of Zero Stage VI and all of its assets, and appointed the SBA as permanent Receiver for the purpose of liquidating all of Zero Stage VI's assets and satisfying claims of creditors in the order of priority as determined by this Court (Receivership Order, ¶ 1).

III.    **NOTICE AND RECOMMENDED PRIORITY OF CLAIMS**

A.    **CLAIMS FOR WHICH THE RECEIVER RECOMMENDS APPROVAL, IN THE FOLLOWING ORDER AND PRIORITY**

1.    **Receiver's Authorized Administrative Expenses**

Paragraph 5 of the Receivership Order authorizes the Receiver to incur and pay expenses of administering the Receivership Estate.  Paragraph 10 sets forth the order and priority of administrative expenses and Receiver's Certificates.  Administrative claims are paid on a current basis. All presented and due invoices for administrative expenses authorized by the Receiver have been

---

[1] $49,500,000 from private limited partners and $500,000 from the general partner.

paid to date.  The Receiver has issued no Receiver's Certificates of Indebtedness to date.  The Receiver will continue to pay administrative expenses on a first priority basis.

### 2.    SBA's Participating Securities/Preferred Limited Partnership Interest of $93,205,000

Section 303 of the Act, 15 U.S.C. §683, authorizes SBA to provide leverage to licensed SBICs.  Pursuant thereto, SBA provided funds to Zero Stage VI through the purchase of the following Participating Securities, a form of leverage, as those terms are defined under the Regulations, in the total principal amount of $93,205,000 as follows:

| DATE | AMOUNT |
|------|--------|
| March 26, 1999 | $18,000,000 |
| July 30, 1999 | 10,000,000 |
| October 25, 1999 | 15,000,000 |
| December 10, 1999 | 7,000,000 |
| February 3, 2000 | 12,000,000 |
| March 10, 2000 | 8,800,000 |
| June 16, 2000 | 15,000,000 |
| October 13, 2000 | 4,905,000 |
| November 28, 2001 | 2,500,000 |
| | $93,205,000 |

The Participating Securities, in the form of a Preferred Limited Partnership interest in Zero Stage VI, are subject to and incorporated by reference in the Regulations.  Each Participating Security has a mandatory redemption maturity

date of 10 years.  In addition to its right to be repaid the principal amount, SBA also has rights to Prioritized Payments, Adjustments, Charges and Profit Participation.  13 C.F.R. §§ 107.1500 and 107.1520.  SBA has accrued in excess of $27,243,859 in Prioritized Payments that would become due and payable to the extent there are any profits.

By statute, regulation and the limited partnership agreement of Zero Stage VI, SBA's Participating Securities are senior in priority to the contributions of the private limited partners.[2]  ZSC has expressly agreed in writing that ZSC's claims are subordinated to SBA's.[3]  See **Exhibit H**, Tabs 9, 10 and 12.

### 3.    Claims of Private Limited Partners and Equity Claims

Sixteen (16) claims were submitted by Private Limited Partners of Zero Stage VI.

The following chart lists the names of the limited partners who submitted claims and the amounts of each claim.

| CLAIMANT | AMOUNT OF CLAIM |
| --- | --- |
| Business Development Company of Rhode Island | $500,000.00 |
| Beacon Mutual Insurance Company | $1,000,000.00 |
| New Alliance Bank (f/k/a New Haven Savings Bank) | $5,000,000.00 |
| Bank Rhode Island | $150,000.00 |
| DanversBank (f/k/a Danvers Savings | $250,000.00 |

---

[2] See the Receiver's Memorand of Law for citations.

[3]. In Statement of Financial Accounting Standards No.150, the Financial Accounting Standards Board has determined that mandatorily redeemable securities such as Participating Securities are to be treated as debt, not equity, for accounting purposes.   SBA has indicated that it is reserving its right to defend its priority in receiving payments for its Participating Securities on that basis if the Court does not approve the Receiver's recommendations in full.

| Bank) | |
|---|---|
| New Hampshire Retirement System | $10,000,000.00 |
| Key Community Development Corporation | $1,000,000.00 |
| Rockland Trust Company | $1,500,000.00 |
| James Soloman, Jr. | $250,000.00 |
| Fleet Development Ventures, LLC | $1,000,000.00 |
| Citizens-Union Savings Bank | $500,000.00 |
| Plant N.V. | $100,000.00 |
| MBNA Community Development Corporation | $3,000,000.00 |
| Textron, Inc. | $200,000.00 |
| Sovereign Bank | $1,630,837.00 |
| Citizens Bank of Massachusetts | $450,000.00 and $50,000 for US Trust's LP interest (Citizen's acquired USTrust) |

The above list represents only a fraction of the total number of limited partners of Zero Stage VI. The total amount of capital contributed by private limited partners was $49,500,000. Strictly speaking, the Bar Date was not set up to solicit claims by limited partners. However, in order to provide a complete recommendation for order and priority of claims, it makes sense to place private limited partners in their proper place. The Receiver recommends that any residual assets be paid to all of the Private Limited Partners of Zero Stage VI (whether they specifically submitted a claim or not) in accordance with the official books and records of Zero Stage VI that identify the limited partners, applicable law and regulations governing the SBIC program, and the provisions contained in Zero Stage VI's Limited Partnership Agreement, after payment in full of amounts due for administrative expenses, Receiver's Certificates, approved creditor

claims, and SBA's Participating Securities. [4]  However, by regulation, in the (unlikely) event there are any profits, then the return of capital to private limited partners is subordinated to other claims of SBA in accordance with 13 C.F.R. § 107.1505.

4.    **Zero Stage Capital Company, Inc.** – $3,925,335.71 waived management fees and expenses

ZSC submitted claims against the receivership estate for previously waived management fees and certain alleged "reimbursable out-of-pocket" expenses derived from an accounting allocation of ZSC-incurred expenses. More specifically, ZSC claims $7,941,477 of management fees minus $4,016,141.29 of fees forfeited on April 28, 2005 due to SBA's finding of self-dealing by former management, for a reduced total $3,925,335.71.[5]  Although not required by the Bar Date Order, upon receipt and review of this claim and its incomplete supporting material, the Receiver posed 21 direct questions to counsel for ZSC by letter dated February 15, 2006.[6] The questions were intended to elicit clarification and any existing substantive support for the various claims which appear on their face to be unreasonable and unfounded.  ZSC provided a response by letter on March 15, 2006.[7]  That response provided no

---

[4] In reality, it does not appear that the assets of Zero Stage VI will even come close to repaying SBA in full, and therefore the likelihood of payments to private limited partners is extremely remote.

[5] See **Exhibit H** Receivership Claim of Zero Stage Capital Company, Inc.  ZSC's other claims are discussed below.

[6] See **Exhibit I**, letter dated February 15, 2006 to Donald K. Stern, et al.

[7] See **Exhibit J**, Response to Receiver's February 15, 2006 Letter.

additional substantive support for the claims. For the following reasons, the Receiver recommends approval of payment to ZSC of $3,925,335.71, to be made only after payment of all of the above claims in full.

In August 2003, ZSC began a waiver of its management fees for Zero Stage VI "until both our existing SBA obligations have been satisfied and our investors have received distributions equal to their total investment in the fund."[8] That waiver continued to be reported as such in financial statements of Zero Stage VI and ZSC from 2003 forward to 2005.  Therefore, ZSC consistently acknowledged through its financial reporting to SBA and others (including Zero Stage VI's limited partners) that those fees were not payable by Zero Stage VI, and that fact was taken into consideration in evaluating the continuing performance of Zero Stage VI and ZSC.  Further, on May 4, 2005, Paul M. Kelly, Chairman and CEO of ZSC, signed a letter agreement dated April 28, 2005,[9] resolving issues arising from the violation of certain SBA regulations which contributed to the receivership of Zero Stage VI.   Paragraph numbered 2 in that letter reads in part as follows:

> This amount (the $4,016,141.29 forfeited) is waived permanently and in its entirety.  Management fees accrued in excess of this amount may be deferred until such time as SBA is paid in full Licensee's Participating Securities and all accrued Prioritized payments.

To be accrued, management fees would need to be earned and not deferred. As of May 4, 2005, there were no such earned fees identified or

---

[8] See **Exhibit H**, Tab 9.

[9] See **Exhibit H**, Tab 12.

claimed by ZSC.  Further, even if previously waived fees were resurrected in

some form, their payment clearly would be subordinated by the April 28/May 4,

2005 agreement until "SBA is paid in full Licensee's Participating Securities and

all accrued Prioritized payments."  Zero Stage VI owes SBA $93,205,000 for the

principal amount of Participating Securities and over $27,000,000 in accrued

Prioritized Payments.[10]  In addition, ZSC separately agreed to waive all fees until

after all of the private limited partners received full repayment of their capital

contributions.   See **Exhibit H**, Tab 9.  Accordingly, the Receiver recommends

that ZSC's claim for waived management fees aggregating $3,925,335.71 be

paid only after all administrative expenses have been satisfied and SBA and the

private limited partners have been repaid in full in the total amount of

$169,948,859.

> ### B.    CLAIMS RECOMMENDED TO BE DENIED
>
> **1.    William F. Shea L.L.C.** - $82,500 for consulting fees charged to Apex Medical, Inc. between August 9, 2001 and July 22, 2002.  Mr. Shea made no claim for any priority with respect to any other class of claimants.

Mr. Shea's stated grounds for his claim are that he believed Zero Stage VI

acquired all the assets of Apex Medical, Inc. ("Apex") and that at the time Apex

owed Shea $82,500 for consulting services.  In support of his claim, Shea

submitted a list of six invoices totaling $82,500.[11]   The Receiver contacted Mr.

Shea by email January 20, 2006, telephone on February 2, 2006 and letter dated

---

[10] Accrued, but not earned, Prioritized Payments are defined as "Accumulated Prioritized Payments" and distinguished from "Earned Prioritized Payments" in 13 C.F.R. § 107.1520.

[11] See **Exhibit B**, Claim of William F. Shea, LLC.

February 15, 2006 inquiring further into the basis for the claim against Zero Stage VI.[12]  In the February 2 telephone discussion Mr. Shea reported he thought Zero Stage VI took responsibility for his claim upon purchasing the assets of Apex. Upon request, he could then provide no further support for his claim and did not respond to the letter of February 15, 2006.  The Receiver explored the Shea claim with ZSC, the investment management company of Zero Stage VI, and ZSC reported that it has no knowledge of Mr. Shea and confirms that neither Zero Stage VI nor any of the other Zero Stage-affiliated funds ever acquired the remaining assets of Apex.[13]

Zero Stage VI invested $3,286,892 in Apex in the form of preferred and common stock and promissory note debt between February 1, 1999 and April 1, 2002.  Zero Stage VI's equity ownership percentage represented approximately 36% of Apex.  The entire investment was written off the books of Zero Stage VI on September 16, 2002, almost three years prior to the commencement of the receivership.   Since that time there has been no recovery of any part of that investment or any transaction that could be construed to expose Zero Stage VI to the Shea claim.  Accordingly, the Receiver recommends denial of the claim of William Shea LLC for $82,500.

---

[12] See **Exhibit C** email dated January 20, 2006; Letter dated February 15, 2006 to William F. Shea.

[13] See **Exhibit D**, March 20, 2006 email from Tedeschi to Whalen.

**2. Ronald Finlayson** - $1,047,680 for alleged failure to delineate Mr. Finlayson's relationship with Zero Stage VI as an employment relationship and for breach of covenants related to success and/or performance fees during the period from 2001 through 2005. [14] Mr. Finlayson made no claim for any priority with respect to any other class of claimants.

Zero Stage VI is an investment company that has no employees. Its assets are managed by ZSC, under a management agreement dated June 9, 1998. See **Exhibit H**, Tab 2. To be classified as an employee of Zero Stage VI, the Receiver understands that Mr. Finlayson, at a minimum, needed to be shown to be (1) under the presumed control and direction of Zero Stage VI in performing services and that any services he performed were not carried out with independence and autonomy from Zero Stage VI; (2) Mr. Finlayson's work and services were not outside the usual course of business of Zero Stage VI; and (3) Mr. Finlayson was not working routinely in an established trade, occupation, profession or business independent of Zero Stage VI.

Mr. Finlayson was an independent consultant engaged by ZSC to work with portfolio companies of a number of the ZSC-managed funds, including but not limited to Zero Stage VI. He was engaged by ZSC to conceptualize and facilitate strategic changes within various portfolio companies that would enhance value or facilitate an exit, and provide skills not otherwise available within the various ZSC-managed funds, including Zero Stage VI. His primary prior experience had been in government affairs and relations. Mr. Finlayson

---

[14] See **Exhibit E**, January 19, 2006 letter Re: Ronald Finlayson v. Zero Stage Capital.

generally issued monthly invoices to ZSC – not to Zero Stage VI.[15] Accordingly, it is clear that (1) Mr. Finlayson was not under the presumed control and direction of Zero Stage VI in performing services and that services he performed were carried out with independence and autonomy from Zero Stage VI; (2) Mr. Finlayson's work and services were outside the usual course of business of Zero Stage VI; and (3) Mr. Finlayson was working routinely in an established trade, occupation, profession or business independent of Zero Stage VI.

No supporting detail or justification for the $1,047,680 calculation has been provided by Mr. Finlayson or otherwise discovered.  His claim therefore does not meet the minimum criteria required by the Bar Date Order that each claim provide sufficient information for evaluation by the Receiver.

The Receiver tried, without success, to contact counsel for Mr. Finlayson, who had submitted the claim on his behalf.  The Receiver left a voice mail message on February 2, 2006 and followed up with a letter dated February 15, 2006 setting forth six specific questions relative to Mr. Finlayson's services and his claim.[16]  No response was received to either inquiry.   The Receiver inquired of ZSC personnel by email relative to Mr. Finlayson's claim and its background

---

[15] Those invoices were allocated for payment by ZSC to the various funds for whose portfolio companies he provided services.  Invoices received for the periods ending between July 2001 and December 2003 were allocated by ZSC between Zero Stage VI and Zero Stage Capital V on a 50-50% basis.   Invoices for periods ending between January 2004 and May 2005 were allocated by ZSC for payment between Zero Stage VI and three affiliated Zero Stage Capital VII funds by formula based on the number of portfolio companies Mr. Finlayson provided service for each fund.

[16] See **Exhibit F**, Letter dated February 15, 2006 to Mark T. Collins.

and has reflected the substance of their response within the preceding paragraphs.[17]

Having completed its investigation and found no relevant supporting information, the Receiver recommends denial of the claim of Ronald Finlayson for $1,047.680.

3.    **McNamara Koenig & McCarthy** – post-receivership fees of $29,929.87

As part of its claim submitted to the Receiver, McNamara Koenig & McCarthy submitted fees incurred after entry of the Receivership Order.  Those fees could not have been incurred by Zero Stage VI.  Under the terms of the Receivership Order, McNamara Koenig & McCarthy's representation of Zero Stage VI was terminated and dismissed.  <u>Receivership Order</u>, ¶ 2.  The Receiver did not rehire that firm and Zero Stage VI was no longer a client after May 4, 2005.  Any fees incurred thereafter must have been for work for some other client.  In addition, see the discussion of Zero Stage VI as a "client" (or non-client) in the next section.

4.    **McNamara Koenig & McCarthy** - $81,236.00 for services rendered and expenses incurred February 1, 2005 through May 3, 2005

This claim was submitted with copies of supporting invoices detailing time and expense charges for $111,165.87 for services rendered and expenses between February 1, 2005 through May 31, 2005.  As noted in the immediately preceding section, $29,929.87 of those charges relate to the period after the May

---

[17]    See **Exhibit G**, Email dated February 10, 2006 Tedeschi to Whalen.

4, 2006 creation of the receivership on which date the engagement of that firm

had terminated.  Upon review the Receiver finds the remaining balance of this

claim, for services rendered prior to May 4, 2006, is not properly supported for

the following reasons:

First, like the post-receivership invoices, the pre-receivership invoices

clearly contain services clearly rendered to ZSC for its own benefit and not for

Zero Stage VI.  Some examples include (emphasis added):

| | |
|---|---|
| 4/12/2005 | MJR "Apex - Review 2002 financing binder to determine whether *ZSC has a security interest* in Apex's intellectual property…" |
| 4/16/2005 | JLK "Conference with TT regarding *expense allocation.*" |
| 4/21/2005 | (multiple entries for multiple people) "…allocation of Fund VI expenses to be submitted to SBA for *reimbursement…*" [i.e., reimbursement to *ZSC*]. |
| 4/27/2005 | JLK "…revise cover letter and expenses analysis and forward." |
| 4/28/2005 | MJR "…implications regarding *ZSC* control of board seats if SBA receiver takes over management of Fund VII [sic]…" (emphasis added) |
| 4/29/2005 | MJR "…consequences *to ZSC* of SBA taking over management of Fund VI." (emphasis added) |

Plus, there are numerous references to "management fee" and other "SBA"

issues which were really for the benefit of ZSC, not Zero Stage VI.  Expense

allocation, management fee and SBA issues were all items of concern to ZSC's

bottom-line and all such legal services were provided to ZSC for ZSC's primary

benefit, not for the benefit of Zero Stage VI.  In essence, it appears that that

McNamara Koenig & McCarthy is attempting to bill Zero Stage VI for work it did

on what is in essence ZSC's claim in this Claims Bar Date Procedure.

Second, McNamara Koenig & McCarthy has no standing to make any

claims.  In its claim submitted to the Receiver, McNamara Koenig & McCarthy

originally stated that its claim was "based on fees for legal services provided

*to*…Zero Stage Capital VI, L.P…." See **Exhibit L** (emphasis added).  However,

subsequent to its claims submission, McNamara Koenig & McCarthy has

disavowed Zero Stage VI as ever being a client.  See **Exhibit M**, letter dated

September 19, 2006.  Therefore, it never could have rendered legal services "to"

Zero Stage VI.  Rather, it appears McNamara Koenig & McCarthy now claims it

is owed money from Zero Stage VI through ZSC.  McNamara Koenig & McCarthy

must therefore seek reimbursement from ZSC, not Zero Stage VI, based upon

ZSC's claims.  ZSC's claims for "Section 3(b) Expenses" include the McNamara

Koenig & McCarthy claims, in any event, and submission of them by both ZSC

and McNamara Koenig & McCarthy amounts to double billing.

### 5.    ZSC Subsumed Section 3(a) Expenses - $1,204,237

ZSC, in the submission supporting its claim, states that it believed that,

notwithstanding the waiver and deferral of certain amounts of management fees,

the SBA would be willing to reimburse reasonable out-of-pocket expenses arising

under Section 3(a) of the management agreement, which otherwise would have

been paid with proceeds of the management fee.  In other words, if the fees were

permanently deferred (as they were), ZSC claims, as a second bite of the apple,

reimbursement for expenses that would have been paid with proceeds of the

management fee. ZSC's calculation totals $1,204,237 over the period 2002

through the fiscal year 2005.

Any reimbursement based upon some allocation of Section 3(a) expenses

would in effect be a partial reimbursement of the waived management fees. There is

no justification provided to support such a contention.

Section 3(a) of the management agreement reads as follows:

> Except as provided in Section 3 (b) below, ZSC will bear all costs
> and expenses incurred in connection with the services described in
> Section 2 above, including without limitation (i) all salaries and
> expenses of ZSC employees, (ii) all office, travel, business
> development, equipment rental, bookkeeping equipment and
> supplies as may reasonably be required by the Partnership, and (iii)
> all expenses associated with the development, investigation, and
> monitoring of investments.

Section 3(a) clearly states ZSC will bear all costs and expenses without

limitation, other than expenses covered by Section 3(b).[18] Management fees are

not discussed in the Management Agreement until Section 4 thereof.

Section 3(a) costs and expenses are the basic, ordinary and necessary

costs and expenses of the management company (i.e. ZSC) and include

expenses such as automobile expense, miscellaneous, office construction,

equipment rent, office rent, parking and operating expenses. They are not

unusual or "out-of-pocket" expenses although such expenses on occasion may

be included. The reimbursable "out-of-pocket" expenses claim arises from a

somewhat novel theory that suggests that ordinary and necessary expenses of

ZSC can be "allocated" to Zero Stage VI through an elaborate accounting

---

[18] Discussed separately in other sections of this Recommendation.

exercise and thereby become reimbursable "out-of-pocket" expenses of Zero Stage VI.

In fact, the claimed Section 3(a) expenses are merely an accounting calculation which lists expenses incurred by ZSC in each of the fiscal years 2002 - 2005, and applies allocation percentages ranging from 25 – 45% to calculate what ZSC claims are "expenses apportioned to [Zero Stage] VI".  No rationale is provided for the notion that such expenses are in any way reimbursable as "third party" or "out-of-pocket", or expenses properly related to Zero Stage VI, nor is any rational justification provided to support the alleged reasonableness of the selected allocation percentages.

Reimbursable out-of-pocket expenses of Zero Stage VI would necessarily be expenses incurred for and directly related to Zero Stage VI and would not include expenses that would have been incurred by ZSC absent the existence of Zero Stage VI.   Expenses such as rent/parking/operating expense, telephone, insurance, interest and similar expenses would have been incurred by ZSC whether or not Zero Stage VI was operating, and therefore, essentially arbitrary allocations of those expenses to Zero Stage VI is unfounded and improper. Neither SBA nor the Receiver agreed to any such allocation.

For all the reasons discussed above, the Receiver recommends denial of ZSC's claim for subsumed Section 3(a) expenses.  In the event the Court decides to allow any part of this claim, the Receiver recommends that such allowance be subordinated to SBA's claim for the reasons stated above.

6.     **ZSC "Reimbursable" Expenses (pursuant to Section 3(b) of the Management Agreement)** $841,783

Section 3(b) of the Management Agreement states in pertinent part as follows:

> ZSC shall have no responsibility for the following costs and expenses relating to the Partnership and/or its business activities, all of which shall be born by the Partnership:
>
> . . .
>
> (iii) charges for specialized outside consultants, including investment bankers and other professionals;
> (iv) charges for outside lawyers and independent public accountants.

In accordance with Section 3(b), during the years 2002 through 2004, $329,409, $393,525, and $456,464, respectively of total professional and other expenses including consulting, legal and accounting charges, were incurred by and paid by Zero Stage VI. Zero Stage VI was thereby directly charged, and paid, among other things, for the consulting services Ronald Finlayson provided to portfolio companies of Zero Stage VI; the accounting and tax services provided to Zero Stage VI by the independent accounting firms; and for legal services provided to Zero Stage VI by McNamara, Koenig & McCarthy and other law firms. Fees and expenses for all of these activities have therefore already been paid in full. This fact is reflected on the financial statements of Zero Stage VI – prepared by the same principals as ZSC - which show no residual amounts due to support this claim by ZSC. Indeed, the law firm of McNamara, Koenig & McCarthy now claims that Zero Stage VI was never its client.

Over and above theses expenses already borne and paid by Zero Stage VI, ZSC now claims that portions of other consulting, legal and accounting charges borne by ZSC should be allocated to and paid by Zero Stage VI as reasonable "out-of-pocket" expenses.  As support for its claim, ZSC provides another accounting calculation which lists totals of consulting, legal and professional and office supplies expenses incurred by ZSC (not by Zero Stage VI) in each of the fiscal years 2002 - 2005, and applies allocation percentages ranging from 30% to as much as 75% to  apportion such expenses to Zero Stage VI.[19]  Footnotes to the schedules state that the expense items found to be related to ZSC-managed funds other than Zero Stage VI were adjusted; the allocated expenses relate to "invoices that were related to services provided for [Zero Stage] VI or ZSC Mgt. Company" and further disclose that "the percentages were determined by (1) reviewing supporting detail and (2) interviews with Management for the purpose of estimating effort spent on behalf of Zero Stage VI. See **Exhibit H, Tab H,** Ted Tedeschi memo regarding apportionment allocations."[20]

---

[19] See **Exhibit H**, Tab 18.

[20] A closer look at the information provided by ZSC in support of this claim for allocations of Section 3(b) expenses discloses some alarming facts.  As examples, a total of 2002 consulting fee of $467,026 is reduced by $57,400 to $409,626 of which 45% or $184,331 is claimed to be reimbursable out-of-pocket expense of Zero Stage VI.  Supporting that claim we find 3 invoices totaling $222,929 of which one invoice is for $200,000 from Bain & Co. for "consulting work on establishing new fund..  That invoice is clearly unrelated to Zero Stage VI. No other invoices are presented in support of the $467,026 of expenses. No explanation is provided for the $57,400 reduction.  No rationale is presented in support of the 45% allocation.  We therefore have an unsupported claim for $184,331.

Similarly, we are presented with 2002 legal firm invoices totaling $463,180 in alleged support for $292,094 of legal and professional expenses which are reduced by $217,471 to $74,623 of which 45% or $33,580, is claimed to be reimbursable out-of-pocket expenses of Zero Stage VI.  A close look at the various invoices indicates that service matters include DBAB; DBAB Litigation and Deutsche Banc and handwritten notes indicate "charge to new markets fund receivable."  There is

Similar to the claimed Section 3(a) expense calculation discussed in the previous section of this Recommendation, this is an accounting exercise providing no reliable support for the notion that any of these Section 3(b) expenses are in any way reimbursable or out-of-pocket expenses of Zero Stage VI. Indeed, discarding charges directly attributable to other funds and allocating significant portions of the remainder to Zero Stage VI fails as a valid basis for a claim. Further, vague suggestions of discussions with management relative to effort spent provide insufficient justification for alleged "out-of-pocket" consulting, legal or accounting expenses being attributed to Zero Stage VI.

The cited Tedeschi memorandum[21] is of particular interest. Mr. Tedeschi, counsel for ZSC, provides the memorandum "to provide some additional context" for the expense allocation review.  He informs us that his attention became increasingly focused on Zero Stage VI in 2002-2003 when it became clear the fund was "in distress"[22]; that, among the matters, ZSC undertook a comprehensive review of the management of each portfolio company and the internal monitoring of the investments by various ZSC personnel. According to

---

no indication of any relevance to Zero Stage VI and indeed the invoices seem clearly to relate to the creation of Zero Stage Capital VII and related matters.  No explanation is provided for the $217,471 reduction nor for the 45% allocation. Again, we have an unsupported claim.
As a last example, we have 2005 legal firm invoices totaling $262,271 presented as support for $17,541 of legal and professional expenses of which 75% or $13,156 is claimed as reimbursable out-of-pocket expense of Zero Stage VI.  A close look at the various invoices discloses that, of the $262,271 total, $66,243 had previously been charged to and paid by Zero Stage VI. Therefore invoices already paid in part by Zero Stage VI have been presented by the claimant as support for this claim. No explanation or rationale is provided on this issue nor is any rationale provided for the relationship, if any, between the $262,271 of presented invoices and the $17,541 of expenses of which 75% are claimed.

[21] See **Exhibit  H**, Tab 19.

[22] See **Exhibit H**, Tab 13.  SBA identified serious violations of SBA's regulations that occurred in that time period, including self-dealing in violation of SBA's conflict of interest regulations.

Tedeschi, both were found to be lacking in material respects necessitating wholesale internal changes at ZSC. As a result the ZSC CFO, four partners and one consultant were terminated by ZSC.  This reorganization was necessitated by management weaknesses at ZSC independent of Zero Stage VI portfolio company issues.   A closer look at the facts reveals that the personnel terminations were stimulated more by an internal ZSC dispute involving the formation of a separate entity as general partner for the developing Zero Stage Capital VII fund (a separate entity) and a dissatisfaction with the loyalty and performance of certain ZSC personnel, rather than any specific problems solely related to Zero Stage VI.[23]

Accordingly, it appears that the ZSC management attention to Zero Stage VI, prior to the discovery that it was in distress, was seriously deficient.  ZSC has been under control of the same management, Paul M. Kelly, Chairman and CEO, since before the formation of Zero Stage VI, and therefore any material deficiencies in the performance by ZSC of its responsibilities under its management agreement with Zero Stage VI were the sole responsibility of ZSC management.  Claiming that the Zero Stage VI receivership estate should now reimburse ZSC for expenses incurred by ZSC in attempting to correct material deficiencies in its own management performance is unsupported and inappropriate.[24]

_____

[23] See **Exhibit H**, Tab 10.

[24] The Memorandum in support of the claim and the March 15 response letter refer to the expense claim calculations having been made by a firm of independent accountants.  However, a close reading of the accountants' report discloses that the firm did not perform any independent work but merely performed certain procedures assigned to it by ZSC to "assist [ZSC] with respect to the allocation reimbursement schedule" and further state "…we make no representation

Now that McNamara Koenig & McCarthy has disavowed Zero Stage VI as a client, there is no basis for ZSC claiming reimbursement from Zero Stage VI for legal services.  As the manager of Zero Stage VI, ZSC had fiduciary duties to ensure that all investments and transactions of Zero Stage VI were lawful and appropriate.  The Zero Stage VI could have hired its own legal counsel to protect its interests directly.  It chose not to do so.

Instead, ZSC took upon itself to obtain its own legal counsel.  That legal counsel was necessarily for ZSC's benefit.  In the event of malpractice, Zero Stage VI would have no claim against McNamara Koenig & McCarthy because it was not the client.  The client was ZSC.  Having obtained, for itself, the privity of an attorney-client relationship with McNamara Koenig & McCarthy, ZSC cannot now claim that Zero Stage VI must pay for it.  Nowhere does the Management Agreement obligate Zero Stage VI to pay ZSC for ZSC's "outside lawyers," which is exactly what the law firm of McNamara Koenig & McCarthy was.  Also, as shown above under the discussion concerning the actual bills of McNamara Koenig & McCarthy, it appears that ZSC is seeking reimbursement of the

---

regarding the sufficiency of the procedures described below either for the purpose for which this report has been requested or for any other purpose."   In reality, all the accounting firm was retained by ZSC to do was to provide accounting staff for a project that consisted of checking to see that certain invoices were paid, compiling bank statements, checks and invoices in binders, providing accounting services in preparing schedules and related administrative procedures. The accounting firm did not make the decisions as to whether, why and what percentage of expenses should be allocated to Zero Stage VI.

The March 15 response letter states that a representative of the accounting firm met with the Receiver's Principal Agent "at some length" on June 15, 2005 and addressed many of the questions raised by the Receiver in its February 15, 2006 letter. In fact, the Receiver's Principal Agent met with Mr. Hines and Mr. Tedeschi on that date for about two hours during which Mr. Hines explained his procedures and there was a spirited discussion concerning the relevance and appropriateness of the procedures followed and their results, during which the Receiver's Agent attempted to make very clear that he saw no basis for the allocation approach and questioned whether any expenses incurred by ZSC to correct management errors that occurred under the continuing leadership of Paul M. Kelly were in any way reimbursable by the Zero Stage VI receivership estate.

expenses it incurred in preparing its own claim in the Claims Bar Date Procedure. That is not, and cannot be, a legitimate expense of the Receivership Estate.

Finally, in its  March 15, 2006 Response to the Receiver's February 15, 2006 Letter,[25] ZSC makes reference to discussions with and representations allegedly made by SBA personnel  relative to possible reimbursement of justified out-of-pocket payments to third parties made by ZSC on behalf of Zero Stage VI. However, other than the broad unsupported claims discussed previously herein, ZSC has provided no specific identification of, or detail support for, any such third party payments.  Consequently, there is no basis for the Receiver to consider whether any such claim meets the minimum criteria required by the Bar Date Order that each claim provide sufficient information for evaluation by the Receiver.[26]

---

[25]  See **Exhibit J**.

[26]  The claim of McNamara, Koenig & McCarthy for $81,236 of legal services rendered to Zero Stage VI, for which the Receiver recommends  approval, is an example of invoices that, had they been paid by ZSC,  would have qualified as identified out-of-pocket third party payments and then could have been claimed by ZSC. But those invoices were not paid by ZSC, they were paid by Zero Stage VI.

It also should be noted that approximately $20,000 of that $81,236 claim, for which the receiver recommends approval, represents charges for services, including consultation on the waived management fee/section 3(a) and 3(b) expense items and the accounting allocations, and consultations on SBA matters and negotiations.  These services arguably were provided for ZSC the benefit of  rather than Zero Stage VI.  However, given the size of the amounts involved, and the Receiver's intent to be as fair and reasonable as possible and to properly control its administrative costs, the Receiver has chosen not to expend additional time and costs to challenge those amounts.

Also, the 2004 tax returns for Zero Stage VI were prepared by Feeley & Driscoll, an accounting firm first engaged by ZSC, during late 2005 and the Receivership paid that firm $15,770 for its services.  Had such services been paid for by ZSC, they would clearly have qualified as identified out-of-pocket third party payments which could be claimed by ZSC. However they were not paid by ZSC, they were paid by Zero Stage VI.

For all the reasons discussed above, the Receiver recommends denial of the ZSC claim for so-called reimbursable expenses pursuant to section 3(b) of the Management Agreement.  In the event the Court decides to allow any part of this claim, the Receiver recommends that such allowance be subordinated to SBA's claim for the reasons stated above.

### 7.    ZSC "Post Receivership" Expenses - $105,882

As part of its claim, ZSC submitted a schedule showing the allocation of monthly base compensation for May and June 2005 for management members and staff of ZSC to Zero Stage VI based on a suggested estimate of time allegedly devoted to Zero Stage VI in those first months of the receivership's existence. These services, if any, were post receivership and therefore are claims for administrative expenses, not Bar Date Claims.  The Receiver offered possible reimbursement for use of administrative staff only, and then only to the extent properly documented and submitted to the Receiver.  The Receiver did not authorize and did not agree to the purported expenses submitted by ZSC. Therefore, they are not authorized administrative expenses properly incurred under the Receivership Order.[27]

---

[27] ZSC provided no description for any specific services requested or provided during this period. ZSC administrative personnel did provide reasonable support to the Receiver in gathering and shipping documents to Washington, DC for the Receiver, which was a requirement of the Receivership Order.  Otherwise, the Receiver's Principal Agent met with management at ZSC headquarters on June 3, 2005, for roughly 3 hours, and June 15, 2005 for another 2-3 hours.  After those meetings, which were attended at least in part only by Matthew Kelly, Ed Wang and Ted Tedeschi, no other meetings were held with the Receiver's Principal Agent.  We know of no services requested or provided by Van Chu or Matthew Fong during this period. The June 3 meeting consisted primarily of a discussion of Zero Stage VI portfolio companies and related matters, as required by the Receivership Order, Paragraph 3. The June 15 meeting was substantially devoted to a discussion of the allocation accounting exercise for ZSC.  The only subsequent assistance requested of ZSC management was responses to a small number of email questions from time to time since that date.  The concept of obtaining post-receivership assistance from ZSC was discussed at both meetings, ZSC subsequently produced two draft invoices for

## IV.    CONCLUSION

The Receiver's recommendations are summarized in the following table:

| Claimant | Priority Level | Amount |
|---|---|---|
| SBA as Receiver | First | Administrative Expenses, as incurred |
| SBA | Second | $93,205,000, as funds become available |
| Private Limited Partners | Third, provided there are no profits.  In the event of profits, see priority under 13 C.F.R. 107.1505 | $49,500,000, after above claims paid in full |
| ZSC | Fourth | $3,925,335.71, after all above claims are paid in full |
| SBA, General Partner, Private Limited Partners | Fifth | In the event of further profits, such profits to be divided in accordance with SBA Regulations and the limited partnership agreement |
| All Other Claims | None | Denied |

The Receiver recommends that this Court establish a summary procedure

and require claimants contesting the disposition of their claims to file a Motion in

---

unsupportable time charges and rates and on June 29 and July 26, 2005 renounced any effort to properly document invoices as too time consuming and waived any further charges for the May and June period.  See **Exhibit K**.

opposition and a Brief in Support of their Motion within thirty (30) days of the date

claimants are served with the Court's Order.

Respectfully submitted,

Dated: <u>November 2, 2006</u>     <u>/s/ Maurice J. Whelan</u>
Maurice J. Whalen
Principal Agent for the Receiver
U.S. Small Business Administration, as
Receiver for Zero Stage Capital VI, L.P.
Invotex Group
1100 Connecticut Avenue, N.W., Suite 710
Washington, DC 20036
Telephone: (202) 370-2400
Facsimile: (202) 419-1816

EXHIBITS ATTACHED TO
RECEIVER'S NOTICE AND DETERMINATION OF CLAIMS RECEIVED IN
<u>RESPONSE TO THE CLAIMS BAR DATE</u>

Exhibit A    Affidavit of Publication of Notice in *The Boston Herald*

B    Claim of William F. Shea LLC

C    Email dated January 20, 2006; Letter dated February 15, 2006 to William F. Shea

D    Email dated March 20, 2006 Tedeschi to Whalen

E    Letter dated January 19, 2006 re: Ronald Finlayson v. Zero Stage Capital

F    Letter dated February 15, 2006 to Mark T. Collins Esq.

G    Email dated February 10, 2006, Tedeschi to Whalen

H    Receivership Claim of Zero Stage Capital Company, Inc.

I    Letter dated February 15, 2006 to Donald K. Stern, et. al.

J    Response to Receiver's February 15, 2006 Letter

K    Emails dated June 29 and July 26, 2005 from Wang and Tedeschi

L    Claim of McNamara, Koenig & McCarthy

M    Letter from McNamara Koenig & McCarthy, September 19, 2006

## CERTIFICATE OF SERVICE

     I HEREBY CERTIFY that on the 2nd day of November, 2006, I electronically filed the foregoing **Receiver's Notice of Recommended Disposition and Priority of Claims Received in Response to the Claims Bar Date** with the Clerk of the Court for the United States District Court for the District of Massachusetts using the ECF System which will send notification to the following registered participants of the ECF System as listed on the Court's Notice of Electronic Filing.:

Michael J. Sullivan
United States Attorney
c/o Rayford A. Farquhar
Assistant U.S. Attorney
U.S. Attorney's Office
District of Massachusetts
One Courthouse Way, Suite 9200
Boston, MA 02110

Donald K. Stern, Esq.
Julia Forest-Davies
Jason L. Watkins
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
*Attorney for Zero Stage Capital Company, Inc.*

Charles A. Lovell
Partridge Snow & Hahn LLP
180 South Main Street
Providence, RI 02903

**And by mailing a copy of same on November 2, 2006 to the following, via First Class Mail:**

Thomas W. Rigby, Esq.
Office of General Counsel
U.S. Small Business Administration
409 Third Street
Seventh Floor
Washington, DC 20416

Mr. John L. Koenig, Esq.
McNamara Koenig & McCarthy, PC
65 William Street, Suite 250
Wellesley, MA  02481

Charles A. Lovell, Esq.
Partridge Snow & Hahn, LLP
180 South Street
Providence, RI  02903
Re: The Beacon Mutual Ins. Co.

Joseph T. O'Leary
Sovereign Bank
75 State Street
Mail Code:  MA1 SST 04-10
Boston, MA  02109

Christopher K. Pfirrman, Esq.
Sovereign Bank
Legal Department
75 State Street
Mail Code:  MA1 SST 0401
Boston, MA  02109

Mr. James Sloman, Jr.
68 Old Concord Road
Belmont, MA  02478

David J. Stanland
Chief Investment Officer
NewAlliance Bank
195 Church Street
New Haven, CT  06510

Mr. Donald C. McQueen
Executive Vice President
Bank Rhode Island
One Turks Head Place,  16th Floor
Providence, RI  02903

Mr. Donald Brannelly
Assistant Vice President
Danversbank
One Conant Street
Danvers,  MA  01923

Ms. Heather Fritzky
New Hampshire Retirement System
4 Chenell Drive
Concord, NH  03301-8509

Mr. Alan P. Cleveland, Esq.
Sheehan Phinney Bass & Green, P.A.
1000 Elm Street
Manchester, NH  03105-3701
Re:  New Hampshire Retirement System

Ms. Rosalyn A. Ciulla
Key Community Development
Corporation
127 Public Square
Mailcode OH-01-27-0700
Cleveland, OH  44114

Ms. Kristin E. Richner, Esq.
Squire, Sanders & Dempsey, LLP
41 North High Street
Columbus, OH  43215
Re:  Key Community Dev. Corp.

Mr. Edward H. Seksay
General Counsel
Rockland Trust Company
288 Union Street
Rockland, MA  02370

G. Wirtz
Managing Director
PLANT N.V.
Roosbroekstraat 2
B-1541 Sint-Pieters-Kapelle (Herne)
Belgium

Mr. William B. Franklin
Managing Director
Fleet Development Ventures, LLC
231 S. LaSalle Street, 12th Floor
Chicago, IL  60604

Mr. William Udovich
Bank of America, N.A.
Legal Department
IL1-231-07-17
231 S. LaSalle Street
Chicago, IL  60697
Re: Fleet Development Ventures, LLC

Mr. Scott Sullivan
Finance Manager
Citizens Bank of Massachusetts
28 State Street, 15th Floor
Boston, MA  02109

Mr. James F. Wallace
Senior Vice President & CFO
Citizens-Union Savings Bank
4 South Main Street
Fall River, MA  02721

Mr. Richard Nadeau, Jr.
Nadeau & Simmons, P.C.
56  Pine Street
Providence, RI  02903
Re:  Business Dev. Co. of RI

President
Business Development Co. of R.I.
40 Westminster Street, Suite 702
Providence, RI  02903

William F. Shea, LLC
48 Leyland Road
West Hartford, CT  06117

Mr. John D. Hazelton
Senior Vice President
MBNA Community Development
Corporation
1100 North King Street
Wilmington, DE  19884

Ms. Karen Jessey
Investment Counsel
Textron, Inc.
40 Westminster Street
Providence, RI  02903

Mr. Mark T. Collins, Esq.
325 Boston Post Road
Millbrook II
Sudbury, MA  01776
Re: Finlayson

Mr. Jason L. Watkins, Esq.
Bingham McCutchen LLP
150 Federal Street
Boston, MA  02110-1726
Re: Zero Stage Capital Company, Inc.

Mr. Paul M. Kelley
Managing Director and CEO
Zero Stage Capital Company, Inc.
265 Franklin Street
Boston, MA  02110

/s/ Stacey P. Nakasian

# EXHIBIT A

# PUBLISHER'S CERTIFICATE

Commonwealth of Massachusetts  }  ss.
County of Suffolk

On this _16th_ day of _December_ A.D. 20 _05_ personally appeared before the undersigned, a Notary Public, within and for

the said county, _Suffolk_

of the _Boston Herald_ a newspaper published by Boston Herald, Inc., in Boston, County of Suffolk, in the Commonwealth of Massachusetts, and who being duly sworn, states on oath that the

_SBA Receiver for Zero Stage Capital_ advertisement was published in said newspaper in its issues of

_Dec 9, 16_ A.D. 20 _05_

_Barbara Gullotti_

Subscribed and sworn to before me this _16th_

day of _December_ A.D. 20 _05_

_Valerie Delano_

Notary Public





VALERIE MARIE DELANO
Notary Public
Commonwealth of Massachusetts
My Commission Expires Mar 24, 2011

# EXHIBIT B

*Called 2/2*
*left VM*
*(Re: email*
*response?*
*2/3 Spoke to Shea*
*who links ZSC*
*took our to asset*
*and his debt!*
*Told him I*
*would invest.*

**William F. Shea L. LC.**
48 Ledyard Rd. · West Hartford, CT 06117
TEL: 860.523.9180 · CELL: 860.508.5645 · FAX: 860.523.9181 · E-MAIL: WmShea@aol.com

SBA, Receiver for Zero Sage Capital VI L.P.
Attention: Maurice J. Whalen, Principal Agent
666 11th Street, N.W., Suite 200
Washington, D.C. 20001-4542

January, 19, 2006

Dear Mr. Whalen,

This is in response to your notice to all creditors or claimants of Zero Stage Capital, VI, L.P. The information is as follows:

Claimant:

>   William F. Shea, LLC
>   48 Ledyard Rd.
>   West Hartford, CT 06117
>
>   Telephone:  860-523-9180
>   Fax:         860-523-9181

Amount of Claim:

>   $ 82,500.00

Grounds:

>   Zero Stage acquired all assets of APEX Medical, Inc. At the time APEX owed $82,500.00 in Consulting Fees which are still outstanding. Copies of correspondence are attached.

Date:

>   Invoices outstanding date from 8/9/01 through 7/22/02.

Attachments:

>   Listing and dates of all outstanding invoices.

Please advise if any other documentation is required and I would be pleased to provide the necessary documentation.

I would appreciate learning the status of this at your earliest convenience.

Sincerely,

William F. Shea

**William F. Shea L.L.C.**
31 HASTINGS TURN • AVON, CT 06001
TEL: 860.675.7599 • CELL: 860.508.5546 • FAX: 860.673.4407 • E-MAIL: WmShea@aol.com

Dr. Nadar Yaghoubi
Zero Stage Capital
17th Floor
101 Main Street
Cambridge, MA 02142-1519

December 8, 2003

Re:  APEX Medical, Inc.

Dear Nadar,

I am writing to follow up on the status of APEX Medical since we last communicated some eighteen months ago.  At that time I believe the Board of APEX decided to put the company "on ice" and wait for more favorable market conditions. I'd be interested to know if anything has changed since that time.

As you know I have a Consulting Engagement Agreement with APEX to assist in a Transaction.  The terms of that engagement consist of a Transaction Fee and a Consulting Fee.  While the time period for the Transaction Fee has passed, the Consulting Fee is still owed. For your reference I've attached copies of the outstanding invoices which total $82,500.

Under the terms of the Agreement the $82,500 is due at the time of a Transaction by APEX Medical, Inc.  This is the reason for my current inquiry as to the status of APEX. Are the assets of APEX still "on ice" or is there a Transaction contemplated or consummated?

I look forward to hearing from you and would be pleased to be of assistance in way appropriate.

Sincerely,

William F. Shea

Cc:  James E. Sluetz
     John Kuchta

**APEX Medical, Inc.**
Invoice Summary
William F. Shea, LLC
December 8, 2003

| Invoice Number | Date | Amount |
| --- | --- | --- |
| AM0001 | 8/9/01 | $12,500.00 |
| AM0002 | 9/30/01 | $12,500.00 |
| AM0003 | 12/31/01 | $12,500.00 |
| AM0004 | 2/28/02 | $20,000.00 |
| AM0005 | 3/29/02 | $12,500.00 |
| AM0006 | 7/22/02 | $12,500.00 |
| Total Outstanding | | $82,500.00 |

```
                              ********************
                              ***   RX REPORT   ***
                              ********************

        RECEPTION OK

        JOB NO.              6208
        DESTINATION ADDRESS  860  673 4407
        PSWD/SUBADDRESS
        DESTINATION ID
        ST. TIME             01/19 18:05
        USAGE T              01'23
        PGS.                    5
        RESULT               OK
```

# FAX

RECIPIENT :  **Mr. Maurice J. Whalen, Principal Agent**
COMPANY :  **SBA, Receiver For Zero Stage Capital VI, L.P.**
FAX NUMBER:  **202-638-4311**

SENT BY :  Bill Shea
FAX NUMBER :  860-523-9181
VOICE NUMBER: 860-523-9180


DATE :  January 19, 2006
TIME :  6:00 PM
TOTAL PAGES:  5

MESSAGE:

   Attached is the claim against Zero Stage Capital VI, L.P. by William F. Shea, LLC.

   Please call with any questions.

Regards,

Bill Shea

# EXHIBIT C

## Maurice Whalen

**From:**    Maurice Whalen
**Sent:**    Friday, January 20, 2006 9:18 AM
**To:**      'WmShea@aol.com'
**Subject:** Apex / Zero Stage

Good Morning Mr. Shea:

I received your faxed claim against the Zero Stage Capital VI Receivership and, although I haven't yet had time to investigate the Apex situation, I have a couple of questions/comments:

1. I believe Apex may be still "on ice" but if, as you say, Zero Stage acquired the assets of Apex, how would they thereby become liable for any of the Apex debts?

2. You provided a listing of invoices but no copies of the invoices detailing services rendered. If you believe you have an actionable claim against Zero Stage VI, please provide copies of the invoices and whatever documentation you might have suggesting Zero Stage VI should be liable for any Apex debts.

Don't hesitate to call me if you wish to discuss this matter.

Thank you.
Moe
  -

Maurice J. Whalen, CPA
Ellin & Tucker, Chartered
Suite 250
655 Fifteenth Street NW
Washington, DC 20005-5701
202-638-0902 X3606
202-638-4311 Fax
mwhalen@etnet.com

2/2/2006

U.S. Small Business Administration

**SBA**

*Championing America's Entrepreneurs*

bb

February 15, 2006

Mr. William F. Shea
48 Ledyard Rd.
West Hartford, Connecticut  06117

RE:    *United States of America v. Zero Stage Capital VI, L.P.*,
         Case No. 05-10887 (JLT), USDC for the District of Massachusetts

Dear Mr. Shea:

I have received your letter of January 19, 2006 stating your claim for $82,500 against Zero Stage Capital VI, LP ("Zero Stage") on the grounds that Zero Stage allegedly acquired all the assets of APEX Medical, Inc. ("APEX") and that at the time APEX owed $82,500 in consulting fees to William F. Shea, LLC which are still outstanding.

Upon completion of its preliminary review, the Receiver has found the documentation and other information provided in support of this claim to be significantly deficient.  To allow us to properly review the substance and propriety of the claim, please provide us with copies of any and all documents and other information supporting the claim including, but not limited to, the following:

1. Any and all documents and other information, upon which you rely, supporting the claim that Zero Stage acquired all the assets of APEX;

2. Any and all documents and other information, upon which you rely, supporting the claim that APEX owes or owed $82,500 to William F. Shea LLC, including but not limited to copies of invoices alleged to be outstanding from August 9, 2001 through July 22, 2002;

3. Any and all documents and other information, upon which you rely, supporting the claim that Zero Stage is in any way liable for any debts of APEX, including the claimed $82,500.

Please provide this information as promptly as possible and in any event no later than March 15, 2006 to:

Maurice J. Whalen
Principal Agent for the Receiver
U.S. Small Business Administration as Receiver
  for Zero Stage Capital VI, L.P.
666 Eleventh Street, N.W., Suite 200
Washington, D.C.  20001
Direct Dial:  (202) 638-0902
mwhalen@etnet.com

Failure to properly and timely respond to this request could cause the Receiver to recommend to the Court that this claim be denied as unsupported. You should also remember that the Court has established January 20, 2006 as the claims bar date, and the Receiver has no power to extend it. Finally, it should be clearly understood that the mere receipt of a response to this request shall not cause the Receiver to recommend to the Court that all or any part of this claim be paid in full or in part.

Thank you.

Very truly yours,

U.S. SMALL BUSINESS ADMINISTRATION
  as Receiver for Zero Stage Capital VI, L.P.


By:   _____
       MAURICE J. WHALEN
       Principal Agent for the Receiver

# EXHIBIT D

# Maurice Whalen

**From:**    Ted Tedeschi [ttedeschi@zerostage.com]
**Sent:**    Monday, March 20, 2006 4:59 PM
**To:**      Maurice Whalen
**Subject:** RE: Claim of William Shea against Fund VI receivership (Apex Medical)

Dear Moe,

I am doing well, especially since my wife and I just welcomed our sixth grandchild (and first boy).  Hope you are fit and happy too.

We have no knowledge of Mr. Shea, nor do I think that you are missing anything. Finally, our records do not indicate that any Zero Stage affiliated fund ever acquired the assets of Apex.

Glad to be of assistance.

Best regards.  Ted

Theodore Tedeschi, Special Counsel
Zero Stage Capital
265 Franklin Street, 18th Floor
Boston, MA 02110
Phone: (617) 876-5355, ext. 123
Fax: (617) 876-1248
www.zerostage.com

**From:** Maurice Whalen [mailto:mwhalen@etnet.com]
**Sent:** Monday, March 20, 2006 2:11 PM
**To:** Ted Tedeschi
**Cc:** thomas.rigby@sba.gov
**Subject:** Zero Stage Claims

Hello Ted:

I sincerely hope all is well with you.

I am trying to wrap up a number of claims against the receivership, other than the ZSC claim, and need your help on a small matter.

William Shea of West Hartford CT apparently consulted with Apex Medical between August 2001 and July 22, 2002 and apparently submitted to them some six invoices totaling $82,500.  He filed a claim against the receivership estate, submitting as support a schedule listing invoice numbers, dates and amounts for six invoices totaling $82,500 and the statement that Zero Stage acquired all the assets of Apex and at the time his $82,500 was and still is outstanding.

I find no evidence of any transaction that could in any way expose Fund VI to such a claim. More specifically I notice that the Fund VI equity investment apparently never exceeded 36%; the full investment was written off by Fund VI on Sept 16, 2002 and, although there were discussions over the past nine months with the former president of Apex relative to possible recoverable value for certain patents, there have been no transactions and Apex apparently died a quiet death.

Am I missing anything?  Do you or your colleagues know of any basis for Shea's claim?

Thanks for your assistance.
Moe

4/19/2006

Maurice J. Whalen, CPA
Ellin & Tucker, Chartered
Suite 250
655 Fifteenth Street NW
Washington, DC 20005-5701
202-638-0902 X3606
202-638-4311 Fax
mwhalen@etnet.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Regulations have been issued that apply to certain tax advice provided by professionals who practice before the Internal Revenue Service.  Unless stated to the contrary, this communication is not intended to provide such advice and therefore cannot be relied on to avoid penalties.**

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to which they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

4/19/2006

# EXHIBIT E

*Called 2/2/06*
*FFH 1:55PM*
*Voicemail*

LAW OFFICES OF
# MARK T. COLLINS
325 BOSTON POST ROAD
MILLBROOK II
SUDBURY, MASSACHUSETTS 01776
TELEPHONE (978) 443-7677
FACSIMILE (978) 440-7676

SBA, Receiver for Zero Stage Capital VI, LP                    January 19, 2006
Attention: Maurice J. Whalen, Principal Agent
666 11th Street, N.W., Suite 200
Washington, D.C. 20001-4542

### *Re: Ronald Finlayson v. Zero Stage Capital*

Dear Mr. Whalen:

Please be advised that I represent Ronald J. Finlayson of 48 Churchill Street, Newton, MA, in his various claims against Zero Stage Capital VI, LP, (Zero Stage) including, but not limited to, Mr. Finlayson's claim presented to your office with this letter in response to your Notice to all Creditors or Claimants of Zero Stage Capital VI, L.P., which references an order of the U.S. District Court for the District of Massachusetts, dated November 4, 2005.

Please be further advised that Mr. Finlayson demands One Million Forty-Seven Thousand Six Hundred Eighty ($1,047,680) Dollars for unlawful failure, pursuant to state and federal law, including but not limited to the Massachusetts Independent Contractor Law, the Employee Income and Security Act, the Code of Massachusetts Regulations, the Internal Revenue Code, and advisory opinions of the Attorney General of the Commonwealth of Massachusetts, to delineate Mr. Finlayson's relationship with Zero Stage as an employment relationship with the myriad protections and obligations associated with employee status and for breach of covenants related to success and/or performance fees.

These obligations ran continuously from 2001 through 2005. They are supported by documents, upon which we rely, submitted, or to be submitted, by or to Zero Stage, its claimants, and the Receiver, in addition to documents in the possession, custody or

control of Zero Stage Capital Company, Inc., Paul M. Kelley, Matthew M. Kelley, Gordon B. Baty, Theodore Tedeschi, Edwin J. Wang, and their agents, affiliates and assigns.  See also the enclosed Advisory from the Attorney General Chapter 193 of the Acts of 2004 Amendments to Massachusetts Independent Contractor Law, M.G.L. c. 149 sec. 148 2004/2.


Respectfully,

Mark T. Collins

# An Advisory from the Attorney General
## Chapter 193 of the Acts of 2004
## Amendments to Massachusetts
## Independent Contractor Law, M.G.L. c. 149 sec. 148
## 2004/2

Pursuant the Attorney G.L. c. General issues the following23, § 1 (b), the Office of Advisory:

INTRODUCTION

On July 19, 2004, "An Act Further Regulating Public Construction in the Commonwealth" ("The Act") was signed into law. Chapter 193 of the Acts of 2004. Because the bill contained an emergency preamble, it became effective immediately. The Act replaces the existing law regulating the use of independent contractors. G.L. c. 149, § 148B.

Employers that improperly classify employees as independent contractors deprive these workers of proper Social Security contributions, worker's compensation insurance and other benefits, while also unfairly reducing employers' state and federal tax withholding, and related obligations.[1] This practice disadvantages those businesses that bear higher costs in complying with the law. In this way, independent contractor misclassification undermines fair market competition.

Massachusetts' legislature has manifested its interest in preventing independent contractor misclassification by amending the law, first enacted in 1990, which creates the

---

[1] State and federal law regulate employers' payroll tax obligations. See M.G.L. c. 62B, ' 2; 26 U.S.C.' 3102. Employers transacting business in Massachusetts who pay "wages taxable to a resident or nonresident individual shall deduct and withhold a tax from such wages for each payroll period." 830 CMR 62B.2.1(4)(a)(1). Such employers Ashall withhold amounts determined according to tables prepared by the Commissioner. 830 CMR 62B.2.1(4)(a)(3). Massachusetts Department of Revenue, Massachusetts Circular M. Employers must deduct taxes from their employees and are liable for26 U.S.Cthe unemployment's compensation law require employer payment. and worker ' 3102(a), (b). In addition, state M.G.L. c. 151A, ' 14 (requiring employers to make contributions for employee unemployment insurance); M.G.L. c. 152, ' 25A (requiring employers to provide worker's compensation insurance).

presumption of employment in Massachusetts. M.G.L. c. 149, § 148B (the "Independent Contractor Law"). See St. 1990 c. 464. The amendments are contained in An Act Further Regulating Public Construction in the Commonwealth, Chapter 193 of the Acts of 2004, effective July 19, 2004. The Act to Protect the Tips and Wages of Certain Workers, Chapter 125 of the Acts of 2004, effective September 8, 2004, increases the potential sanctions for violations of the Independent Contractor Law.

The Attorney General is authorized under the law to issue a civil citation or institute criminal prosecution for both intentional and unintentional violations of the Independent Contractor Law. M.G.L. c. 149, § 27C (a ) (1), et seq. Upon criminal conviction, or following three civil citations for intentional violations, employers may be debarred from public works projects for up to two years. M.G.L. c. 149, § 27C (b) (3). Employees also may institute private actions for themselves and others similarly situated for treble damages, attorneys' fees and costs. M.G.L. c. 149, § 150.

The Independent Contractor Law excludes far more workers from independent contractor status than are disqualified under the traditional state and federal law tests, including the 20 Factors Test set forth in Internal Revenue Service ("IRS") Revenue Ruling 87-41, the Fair Labor Standards Act ("FLSA") and

the Massachusetts common law. As a result, Massachusetts employers will need to reexamine many of their work relationships to ensure that they are complying with the law.

## I. Distinguishing Employees from Independent Contractors Under State Wage and Worker's Compensation Law

The Independent Contractor Law creates a presumption that a work arrangement is an employer-employee relationship unless the party receiving the services can overcome the legal presumption of employment by establishing that three factors are present. First, the worker must

2

be free from the presumed employer's control and direction in performing the service, both under a contract and in fact. Second, the service provided by the worker must be outside the employer's usual course of business. And, third, the worker must be customarily engaged in an independent trade, occupation, profession or business of the same type.[2] M.G.L. c. 149, § 148B.

This rigid, three-part test is unlike the well-established IRS, FLSA, National Labor Relations Act ("NLRA") and state law tests, which have flexible criteria that must be balanced according to the circumstances of the work arrangement. Since the independent contractor tests contain "no shorthand formula or magic phrase that can be applied to find the answer, . . . all the incidents of the relationship must be assessed and weighed with no one factor being decisive."

NLRB v. United Insurance Co. of America, 390 U.S. 254, 258 (1968); Chase v. Independent Practice Association, 31 Mass. App. Ct. 661, 665 (1991) ("In the employment context, a master-servant relationship is determined by a number of factors"); Dykes v. DePuy, Inc., 140 F.3d 31, 37 (1st Cir. 1998). In contrast, the Independent Contractor Law requires proof that the worker meets all three of its requirements. Otherwise the worker is deemed an employee for purposes of Massachusetts' worker's compensation and wage laws.

### 1. Freedom from Control

First, a worker must be free from "control and direction" in the execution of his or her job. M.G.L. c. 149, § 148B (a) (1). The analysis of this factor is similar to the common law, IRS

---

[2] Historically, Massachusetts courts relied on many of the same factors used by the IRS in its "20 factors test" to distinguish independent contractors from employees in the wage and hour context. See Commonwealth v. Savage, 31 Mass. App. Ct. 714 (1991) (real estate broker who scheduled her own work hours, bought her own supplies and worked from home deemed an independent contractor). Note, however, that because the broker worked in the employer's normal trade, Savage likely would not have overcome presumption of employment set forth in M.G.L. c. 149, § 148B.

A similar, but not identical test exists in the unemployment insurance statutes. M.G.L. c. 151A, § 2, et seq. See Athol Daily News v. Bd. of Review of Div. Of Employment & Training, 439 Mass. 171 (2003) (newspaper deliverer who bought papers from company, worked for different employers and worked away from the business was independent contractor); Boston Bicycle Couriers, Inc. v. Dep. Dir. of Div. of Employment & Training, 56 Mass. App. Ct. 473 (2002 ) (bike messengers were not independent contractors). As noted below, the factors in 151A, § 2 differ from the Independent Contractor Law.

3

and FLSA control and economic realities tests. An employment contract or job description indicating that a worker is free from supervisory direction or control is a prerequisite, but is insufficient by itself under the Independent Contractor Law. To be free from an employer's direction and control, a worker's activities and duties must actually be carried out with independence and autonomy. For example, an independent contractor completes the job using his or her own approach without instruction and also dictates the hours that he or she will work on the job. Savage, 31 Mass. App. Ct. at 717-18 ; Brigham's Case, 348 Mass. 140 (1964) (worker was employee under the worker's compensation law because the employer "had the right to control employee in the performance of the details of his work."); I.R.S. Revenue Ruling 87-4, 1987-1 C.B.; IRS Publication 15-A, Employer's Supplemental Tax Guide.

### 2. Service Outside the Usual Course of Employer's Business

To qualify as an independent contractor, the worker's job or service also must be performed "outside the usual course of business of the employer." M.G.L. c. 149, § 148B (a) (2). Hence, a worker who performs the same type of work that is part of the normal service delivered by the employer may not be treated as an independent contractor. Cf. Canning's Case, 28 3 Mass. 196 (1933) (pipe fitter hired to install steam pipes in factory was engaged in the usual course of the employer's business, therefore, he was an employee entitled to worker's compensation coverage).[3]

### 3. Independent Trade, Occupation or Business

The worker must work routinely in an "independently established trade, occupation, profession or business." M.G.L. c. 149, § 148B (a) (3). The particular service in question must be "similar in nature" to the "independently established trade, occupation, profession or

---

[3] Note that state unemployment statutes permit independent contractors to work either outside of the employer's normal course of business or away from the worksite, unlike the Independent Contractor Law. M.G.L. c. 151A, § 2 (b).

4

business" of the worker. M.G.L. c. 149, § 148B (a) (3). An independent contractor must represent him or herself to the public as "being in business to perform the same or similar services." I.R.S. Revenue Ruling 87-41, Factor 12(c). Furthermore, an independent contractor often has a financial investment in a business that is related to the service he or she is currently performing for the employer. I.R.S. Revenue Ruling 87-41, Factor 14. Ordinarily, an independent contractor has characteristics of an independent business enterprise. See Fair Labor Standards Handbook, Tab 200 ¶ 217, August 1998.

An employer's failure to withhold taxes, contribute to unemployment compensation, or provide worker's compensation may not be considered when analyzing whether an employee has been appropriately classified as an employee or independent contractor. M.G.L. c. 149, § 148B (b). Hence, an employer's subjective belief that a worker should be an independent contractor may have limited relevance under the Independent Contractor Law. Similarly, the amendments to the Independent Contractor Law deem irrelevant the status of a worker as a "sole proprietor or partnership," for the purpose of obtaining worker's compensation insurance. M.G.L. c. 149, § 148B (c).

### II. Violations of the Presumption of Employment Statute

An employer violates the statute when two acts occur. First, the employer must classify or treat a worker

as an independent contractor although the worker does not meet each of the criteria in the three-factor test identified on pages 2-5, *supra*.

Second, in receiving services from the worker, the employer must violate one or more of the laws enumerated in the Independent Contractor Law, including several of the following wage and hour, taxation, and worker's compensation statutes:

5

- Any of the wage and hour laws set forth in M.G.L. c. 149
- The minimum wage law set out in M.G.L. c. 151, §§ 1A, 1B and 19; 455 CMR 2.01, et seq.
- The state overtime law set forth in M.G.L. c. 151, §§ 1, 1A, 1B and 19
- The law requiring employers to keep true and accurate employee payroll records, and to furnish the records to the Attorney General upon request as required by M.G.L. c. 151, § 15
- Provisions requiring employers to take and pay over withholding taxes on employee wages. M.G.L. c. 62B
- The worker's compensation provisions punishing knowing misclassification of an employee. See M.G.L. c. 152, § 14.[4]

In addition to providing for imposition of substantial civil and criminal penalties, the law permits the Attorney General to debar from public works certain violators of the Independent Contractor Law. M.G.L. c. 149, § 27C (a) (3). The length of debarment depends upon the nature and number of violations.

### Debarment Resulting from a Criminal Conviction

|  | First Offense | Subsequent Offense |
|---|---|---|
| Violation without intent: | 6-month debarment | 3-year debarment |
| Willful violation: | 5-year debarment | 5-year debarment |

---

[4] Compare M.G.L. c. 152, § 14(3) (requiring an employer to "knowingly" misclassify an employee in order to violate the worker's compensation provision) with M.G.L. c. 149, §§ 27C(a)(1) & (2), (b)(1) & (2) (providing penalties for both intentional and unintentional employee misclassifications). A criminal conviction for intentionally misclassifying an employee in order to avoid worker's compensation premiums carries a state prison sentence of up to five years, a jail sentence between six months to two and a half years and/or a fine between $1,000 and $10,000. M.G.L. c. 152, § 14(3).

6

### Debarment Resulting from a Civil Citation

| Three intentional citations | 2 year debarment |
|---|---|
| Failure to comply with civil citation or administrative order | 1 year debarment |

M.G.L. c. 149, § 27C(a)(3).[5]

Violations also carry a potential maximum penalty of up to $50,000 per civil violation, as well as prison time and criminal fines for criminal violations. The Independent Contractor Law creates broad liability for both business entities and individuals, including corporate officers, and those with management responsibility over affected workers.[6]

The Attorney General views the misclassification of employees as a serious violation of state law. Where appropriate, the Attorney General will enforce aggressively the provisions of the Independent Contractor Law.

---

[5] A willful or showed reckless disregard violation occurs when an for whether its conduct isemployer either knew prohibited. Secretary of Labor v. Richland Shoe Co., 486 U.S. 128, 133-35 (1988). See Commonwealth v. Armand, 411 Commonwealth v. Redmond Mass. 167, 170 (1991); , 53 Mass. App. Ct. 1, 4 (2001).

[6] Compare Commonwealth v. Cintolo, 415 Mass 358 (1993) (permitting only "persons" to be charged).

7

# EXHIBIT F



February 15, 2006

Mark T. Collins, Esquire
325 Boston Post Road
Millbrook II
Sudbury, Massachusetts 01776

      RE:   *United States of America v. Zero Stage Capital VI, L.P.,*
             Case No. 05-10887 (JLT), USDC for the District of Massachusetts

Dear Mr. Collins:

I have received your letter of January 19, 2006 stating that you represent Ronald J. Finlayson ("Finlayson") in his various claims against Zero Stage Capital VI LP ("Zero Stage").

Upon completion of it's preliminary review, the Receiver has found the documentation and other information provided in support of this claim to be significantly deficient. To allow us to properly review the substance and propriety of the Finlayson claims, please provide us with copies of any and all documents and other information supporting his claims including, but not limited to, the following:

1. Any and all documents and other information, upon which you rely, supporting the claims that Finlayson had a relationship with Zero Stage and that Zero Stage unlawfully failed to delineate Finlayson's relationship with Zero Stage as an employment relationship and for breach of covenants related to success and/or performance fees;

2. Any and all documents and other information, upon which you rely, supporting the $1,047,680 demanded from Zero Stage as a consequence of such alleged unlawful failure and alleged breach of covenants;

3. Any and all documents and other information, upon which you rely, supporting the claims that these obligations ran continuously from 2001 through 2005;

4. Any and all documents and other information, upon which you rely, supporting the claims that Finlayson was not free from the presumed control and direction of Zero Stage in performing services and that any services he performed were not carried out with independence and autonomy from Zero Stage;

5. Any and all documents and other information upon which you rely supporting the claim that Finlayson's work and services were not outside the usual course of business of Zero Stage;

6. Any and all documents and other information, upon which you rely, supporting the claim that Finlayson was not working routinely in an established trade, occupation, profession or business independent of Zero Stage.

You should also identify any other claims Finlayson may believe exist against Zero Stage, in addition to the described alleged unlawful failure and breach of covenants claims, and provide any and all documents and other information, upon which you rely, supporting such claims, being mindful that the Court has established January 20, 2006 as the claims bar date and the Receiver has no power to extend it.

Please provide this information as promptly as possible and in any event no later than March 15, 2006 to:

> Maurice J. Whalen
> Principal Agent for the Receiver
> U.S. Small Business Administration as Receiver
> for Zero Stage Capital VI, L.P.
> 666 Eleventh Street, N.W., Suite 200
> Washington, D.C. 20001
> Direct Dial: (202) 638-0902
> mwhalen@etnet.com

Failure to properly and timely respond to this request could cause the Receiver to recommend to the Court that this claim be denied. It should be clearly understood that the mere receipt of a response to this request shall not cause the Receiver to recommend to the Court that all or any part of this claim be paid in full or in part.

Thank you.

Very truly yours,

U.S. SMALL BUSINESS ADMINISTRATION
as Receiver for Zero Stage Capital VI, L.P.

By:    _____
       MAURICE J. WHALEN
       Principal Agent for the Receiver

# EXHIBIT G

## Maurice Whalen

**From:**     Ted Tedeschi [ttedeschi@mkmlegal.com]
**Sent:**     Friday, February 10, 2006 10:07 AM
**To:**        Maurice Whalen
**Cc:**        'John Koenig'
**Subject:** Re: Your e-mail of 2/1/06 to John Koenig re: Ron Finlayson claim against Fund VI Receivership

Dear Moe:

Ron Finlayson was an independent contractor/consultant to the Zero Stage funds.

As far as I have been able to determine, there was no written agreement with him.

He was tasked primarily to work independently with a number of portfolio companies* to conceptualize and facilitate strategic changes that would enhance value or facilitate an exit. Ron's primary relevant background was in government affairs and relations. This is not a skill set that Zero Stage had or has in house. Ron discharged his engagement with a great deal of flexibility and independence. He was provided an office at Zero Stage Capital Company, Inc. as an accommodation, but was not micromanaged or even managed to any real degree as would an employee. I don't think that his claim against VI for "unlawful failure/... to delineate... (his relationship with Zero Stage (Fund VI (as an employment relationship....)" I am guessing that Ron is making a claim like this because he did not pay taxes, or pay enough taxes, on his consulting income.

Most of his time was spent working with LiveWave, where he was very helpful. He also worked on Axxis (Fuel Spot), Jenzabar, and World Winner.

He was paid from the funds a total of $10,000 per month, which was allocated to VI and the other funds in varying amounts.

If I can be of further assistance, please let me know.

Regards.

Theodore Tedeschi, Esq.
McNamara Koenig & McCarthy, PC
65 William Street, Suite #250
Wellesley, Massachusetts 02481
Ph:  (781) 431-1700, Ext. 11
Fax: (781) 431-1304
ttedeschi@mkmlegal.com

3/13/2006

# EXHIBIT H

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL CASE NO. 05-10887-JLT |
| | ) | HON. JOSEPH L. TAURO |
| v. | ) | |
| | ) | |
| ZERO STAGE CAPITAL VI, L.P., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**RECEIVERSHIP CLAIM OF ZERO STAGE CAPITAL COMPANY, INC.**

TO:    SBA, Receiver for Zero Stage Capital VI, L.P.
       Attention:  Maurice J. Whalen, Principal Agent
       666 11th Street, NW, Suite 200
       Washington, D.C.  20001-4542

Zero Stage Capital Company, Inc. ("Zero Stage"), by and through its undersigned attorneys, pursuant to the Notice to All Creditors or Claimants of Zero Stage Capital VI, L.P. ("Fund VI") issued by the U.S. Small Business Administration as Fund VI's receiver (the "SBA" or the "Receiver"), and as approved by an Order of this Court dated November 4, 2005, hereby submits this claim against Fund VI in receivership (the "Claim").  In support thereof, Zero Stage states as follows:

1.    CLAIMANT'S NAME:

      Zero Stage Capital Company, Inc.,
      ATTN:  Paul M. Kelley, Managing Director and CEO
      265 Franklin Street, Boston, MA  02110
      Tel: 617-876-5355
      Fax: 617.876.1248

2.    **AMOUNT OF CLAIM:**

(a)    Management Fee (1/1/2002 through 6/30/2003):    **$3,297,791.00**

(b)    Management Fee (7/1/2003 through 5/3/2005):    **$4,643,686.00**

      **Total Management Fees Claimed** (inclusive
      of out-of-pocket expenses borne by Zero Stage
      pursuant to section 3(a) of Management Agreement):    **$7,941,477.00**

(c)    Reimbursable expenses (pursuant to section
      3(b) of Management Agreement):    **$841,783.00**

(d)    *Less* Waiver of certain management fees accrued
      as of April 15, 2005, pursuant to letter agreement
      dated April 28, 2005:    **($4,016,141.29)**

      **Total Pre-Receivership Claim:**    **$4,767,118.71**

(e)    Post-receivership expenses:    **$105,882.00**

(f)    **TOTAL CLAIM**    **$4,873,000.71**

3.    SPECIFIC GROUNDS FOR EACH CLAIM:  See attached Memorandum in Support of Claim and exhibits.

4.    DATE OBLIGATION WAS INCURRED:  See attached Memorandum in Support of Claim and exhibits.

5.    OTHER DOCUMENTS OR MATERIALS WHICH SUPPORT CLAIM:  See attached Memorandum in Support of Claim and exhibits.

6.    Zero Stage expressly reserves the right to amend or supplement this Claim at any time in any manner or respect whatsoever.

*[Remainder of page intentionally left blank]*

**ZERO STAGE CAPITAL
COMPANY, INC.,**

**By its attorneys,**

Donald K. Stern, BBO # 479420
Julia Frost-Davies, BBO # 630590
Jason L. Watkins, BBO # 658560
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110
Tel: (617) 951-8000
Fax: 617.951.8736

-and-

John L. Koenig, BBO # 565620
McNAMARA KOENIG &
McCARTHY, PC
65 Williams Street
Wellesley, MA 02481
Tel: (781) 431-1700 x24
Fax: 781.237.8120

Dated: January 19, 2006

## MEMORANDUM IN SUPPORT OF CLAIM

### BACKGROUND OF BASES FOR CLAIM

Zero Stage Capital VI, L.P. ("Fund VI") is a Massachusetts limited partnership formed pursuant to that certain Agreement of Limited Partnership, dated as of June 9, 1998 (as amended, the "Partnership Agreement"). Zero Stage Capital Associates VI, LLC, a Massachusetts limited liability company ( "ZSCA VI"), is the general partner under the Partnership Agreement. A copy of the Partnership Agreement is attached hereto as Exhibit 1.

Fund VI was licensed by the U.S. Small Business Administrations (the "SBA") as a Small Business Investment Company (an "SBIC") on November 30, 1998.

As contemplated by section 4.01(a) of the Partnership Agreement, and consistent with section 107.510 of title 13 of the Code of Federal Regulations (hereinafter, 13 CFR § __), ZSCA VI caused Fund VI to enter into that certain Management Agreement (the "Management Agreement"), dated as of June 9, 1998, with Zero Stage Capital Company, Inc. ("Zero Stage"), whereby Zero Stage was retained to provide investment management and related services to Fund VI. A copy of the Management Agreement is attached hereto as Exhibit 2. Since its founding in 1981, Zero Stage has been the organizer, investment advisor, and manager of seven venture capital funds investing in technology-based companies, totaling approximately $400 million in capital.   -                                        -

Pursuant to section 4(a) of the Management Agreement, Zero Stage's fee for services provided under the Management Agreement is calculated as two and one-half percent (2.5%), on an annual basis, of total commitments to the Fund, plus any recoveries from investments previously written off, less the cost of certain write-offs, liquidations and distributions in kind (the "Management Fee"). The Management Fee is to be computed quarterly and paid to Zero Stage in advance on the first day of such calendar quarter. Management Agreement § 4(b).

Pursuant to section 3(a) of the Management Agreement, Zero Stage is to bear the costs of certain "Management Expenses." The list of "Management Expenses" accords with the definition of that term as set forth in 13 CFR § 107.520(a). The Management Agreement therefore contemplates that Zero Stage would pay such "Management Expenses" incurred in connection with management services provided to Fund VI (the "3(a) Expenses") from the earned Management Fee.

Costs and expenses related to the business activities of Fund VI which are to be borne by Fund VI, and not by Zero Stage, pursuant to section 3(b) of the Management Agreement, are:

    (i)     taxes or other governmental charges other than Zero Stage's income taxes

    (ii)    interest on money borrowed by Fund VI;

    (iii)   charges for specialized outside consultants, including investment bankers and other professionals;

(iv)    charges for outside lawyers and independent accountants;[1]

(v)    transaction costs for buying, selling, transferring, disposing of, restructuring or otherwise dealing with Fund VI's investments;

(vi)    costs and expenses incurred in connection with the organization of Fund VI and the offering and sale of limited partnership interests in Fund VI, including selling commissions, if any;

(vii)    costs and expenses incurred in connection with Fund VI's qualification as an SBIC, and the maintenance of such qualification as an SBIC;

(viii)    the cost of services provided by any Associate (as that term is defined in the SBIC Act) of Fund VI which is not part of the normal process of making and monitoring venture capital financings; and

(ix)    the cost of preparing, printing and distributing all reports to the partners of Fund VI and of conducting any meeting of partners.

(collectively, the "3(b) Expenses").

As a long-time manager of various SBA funds and a participant in SBA programs, it is Zero Stage's experience that the allocation of expenses under section 3 of the Management Agreement is typical of the relationships established by SBIC companies and their investment advisors or managers. In accordance with 13 CFR § 107.510, the SBA specifically agreed to and approved the management fees and 3(b) Expenses set forth in the Management Agreement when it approved the Management Agreement as part of the licensing of Fund VI as an SBIC.

At all times relevant to this Claim, Zero Stage operated, and provided management services to, not only Fund VI, but also three other funds: Zero Stage Capital V, L.P.[2], Zero Stage Capital VII, L.P.[3], and Penn Venture Partners, LP[4] (collectively, the "Affiliated Funds", and, together with Fund VI, the "Zero Stage Fund Family"). All four funds shared common management and overhead, operating out of Zero Stage's offices in Cambridge, Massachusetts (now Boston). The levels of participation – both financially as well as in operating and providing management services to the funds – of Zero Stage employees varied across the Zero Stage Fund Family. In addition, various outside consulting, legal and other services were often provided to the different members of the Zero Stage Fund Family, and to Zero Stage as their investment manager, by the same professionals in their respective areas of service.

---

[1] The 3(b) Expenses listed in subparagraphs (iii) and (iv) above are specifically excluded from the delineation of "Management Expenses" in 13 CFR § 107.520(b).

[2] Zero Stage Capital V, L.P. is an existing leveraged SBIC that was a highly successful investment for SBA.

[3] Zero Stage Capital VII, L.P. is an unleveraged SBIC fund.

[4] Penn Venture Partners, LP is a New Markets Venture Capital Company, another SBA program.

## DETAIL OF COMPONENTS OF CLAIM

### I.    MANAGEMENT FEES

Accrued, Unpaid Fees

As reflected in the summary attached hereto as Exhibit 3 Zero Stage accrued Management Fees for services provided to Fund VI, pursuant to the Management Agreement, in the following amounts that remain unpaid:

| | |
|---|---|
| 1/1/2002-12/31/2002: | $2,091,589 |
| 1/1/2003-6/30/2003: | 1,206,202 |
| 6/30/2003-12/31/2003: | 1,432,202[5] |
| 1/1/2004-12/31/2004: | 2,541,216[6] |
| 1/1/2005-5/3/2005: | 670,268[7] |
| **Total Management Fee:** | **$7,941,477** |

Deferral and Waiver of a Portion of Management Fees

*Deferral of Certain Management Fees Accrued from Third Quarter 2003 Forward*

Paul Kelley, Managing Director and Chief Executive Officer of Zero Stage, wrote to Steve Knott of the SBA in a letter dated August 22, 2003 (the "August 2003 Letter"), a copy of which is attached hereto as Exhibit 9. In a gratuitous gesture of goodwill to the SBA, with whom Mr. Kelley has worked closely and on excellent terms for over a generation, the letter stated that Zero Stage would, in recognition of the poor performance of Fund VI, defer the Management Fee for Fund VI "starting with the third quarter of 2003 and going forward . . . until both our SBA obligations have been satisfied and our investors have received distributions equal to their total

---

[5] Figures for 2002 and 2003 agree with the 2002 and 2003 financial statements of Fund VI audited by PricewaterhouseCoopers and dated March 30, 2004. That "Report of Independent Auditors" is attached hereto as Exhibit 4. These figures also agree with the unaudited balance sheets of Zero Stage for 2002 and 2003. Those balance sheets and income statements are attached hereto as Exhibit 5 and Exhibit 6 respectively.

[6] The total accrued Management Fee for 2002 to 2004 - $7,271,209 - is listed as a receivable on Zero Stage's unaudited 2004 balance sheet, which is attached hereto as Exhibit 7. This figure is consistent with Fund VI's unaudited balance sheet for 2004 and the first quarter of 2005, which is attached hereto as Exhibit 8.

[7] $478,763 of this figure is reflected in Fund VI's balance sheet for the first quarter of 2005. *See* Exhibit 8. The balance is prorated to May 3, 2005.

investment in the fund." Mr. Kelley's offer was not prompted by any requirement or action by the SBA.[8]

As reflected in the table above, nearly $3.3 million in Management Fees for Fund VI had accrued and remained outstanding as of June 30, 2003.[9]  Those accrued Management Fees had not been paid as of the date of the August 2003 Letter because Fund VI did not have available liquid assets with which to pay those fees.  Accrued Management Fees would typically have been paid when additional cash was generated in Fund VI, usually from liquidation of investments in portfolio companies.

*The ImproveNet Waiver*

Zero Stage received a "Notice of Violation" letter dated December 8, 2004 (the "December 2004 Letter"), a copy of which is attached hereto as Exhibit 13, in which the SBA expressed concern about an alleged conflict of interest, in violation of 13 CFR § 107.730, with respect to ImproveNet, a Fund VI portfolio company.  According to the December 2004 Letter, "[Fund VI] lost substantially all of its investment in ImproveNet, or $2,945,010 out of an original investment of $3,001,012."  December 2004 Letter at 2.  Zero Stage responded by a letter dated December 15, 2004, a copy of which is attached hereto as Exhibit 14.

On December 17, 2004, representatives of Zero Stage, including Paul Kelley, met with Tom Morris, Tom Rigby and Elaine Hruschka of the SBA.  The subject of the meeting was the overall status of the fund, which had been moved into the SBA's Office of Liquidation effective as of October 30, 2003.  ImproveNet was among the topics discussed, and was highlighted by the SBA as its biggest concern with the operations of Fund VI.[10]

By the April 2005 Letter, the SBA, Zero Stage, and Fund VI agreed that the ImproveNet issue would be resolved by the "forfeiture" and permanent waiver of **$4,016,141.29** in Management Fees (the "ImproveNet Waiver").  The April 2005 Letter also provided that payment of certain other portions of accrued Management Fees may be deferred.

---

[8] Zero Stage had received an undated letter from the SBA in May or June 2003 informing it that Fund VI had been placed in Restricted Operations.  In that letter, the SBA informed Zero Stage that the SBA had a number of remedies available to it as a result of that placement, including reducing management fees.  The SBA, however, took no such action.

[9] Although in a letter dated January 25, 2005 to Elaine Hruschka of the SBA (the "January 2005 Letter"), the relevant pages of which are attached hereto as Exhibit 10, Zero Stage stated that it had "waived" all accrued Management Fees through December 31, 2003, the parties' later correspondence indicates that this waiver reflects a voluntary forbearance of present collection rather than a waiver of payment.  *See, e.g.,* April 19, 2005 Email from Thomas W. Rigby to Michael Haynes, a copy of which is attached hereto as Exhibit 11; April 28, 2005 Letter from Thomas G. Morris to Paul M. Kelley (the "April 2005 Letter"), a copy of which is attached hereto as Exhibit 12.

[10] Prior to this meeting, Zero Stage believed that the alleged conflict was primarily a technical violation.  Other companies that invested in ImproveNet at the same time as Fund VI, and in a subsequent financing round, included

## II.    3(a) EXPENSES

As described in the "Background of Bases for Claim" above, section 3 of the Management Agreement allocates costs and expenses between Fund VI and Zero Stage, as investment manager. During the several months leading up to May 4, 2005 (the "Receivership Date") and thereafter, Zero Stage and the SBA communicated periodically about the SBA's offer to allow Zero Stage to be reimbursed for "third-party" or "out-of-pocket" expenses incurred by Zero Stage in providing management services to Fund VI. It was (and remains) Zero Stage's understanding that, notwithstanding the deferral of certain amounts of the Management Fee, the SBA would be willing to allow Fund VI to reimburse Zero Stage for the reasonable, out-of-pocket expenses arising under section 3(a) of the Management Agreement, which otherwise would have been paid with proceeds of the Management Fee.

Zero Stage continued to incur expenses on behalf of Fund VI notwithstanding the deferral of its Management Fee from Fund VI pursuant to the August 2003 Letter. As a consequence, Zero Stage obtained a $1,300,000 line of credit from the Massachusetts Business Development Council ("MBDC") to make up the shortfall caused by the loss of Management Fee revenue. This line of credit was personally guaranteed by Paul Kelley, his son Matt Kelley, and Paul's wife, Susan Kelley. Even after Fund VI was moved into the SBA Office of Liquidation in October 2003, Zero Stage continued to aggressively manage the Fund VI portfolio. As part of that effort, Zero Stage hired new personnel, brought on seasoned outside advisors, and engaged in a new- strategy to aggressively seek out liquidity opportunities for Fund VI portfolio companies, despite what was generally considered to be a lagging market for such opportunities.

As reflected on the table attached hereto as Exhibit 15, liquidity events occurring after Zero Stage was moved into the Office of Liquidation have resulted in approximately $14,906,743 in actual or prospective (as a result of escrowing) cash flowing into Fund VI. The processes for these liquidity events were started prior to the Receivership Date, while Zero Stage continued to manage Fund VI in good faith and without current compensation, to realize a return for Fund VI's limited partners. Zero Stage continued its efforts even after the SBA had announced its decision to put the fund into receivership.

Based on its understanding that the SBA would allow reimbursement of its "third-party" expenses, Zero Stage submitted support for the reimbursement of 3(a) Expenses to the SBA on April 27, 2005, together with its signature on the Consent Order of Receivership. Zero Stage provided additional support and documentation for 3(a) Expenses to the SBA on May 4, 2005. These letters are attached hereto as Exhibit 16 and Exhibit 17, respectively.

Because Zero Stage provides operational and management services to all of the funds in the Zero Stage Fund Family, it is necessary to allocate the types of expenses covered by section 3(a) of the Management Agreement to Fund VI in proportion to the resources Fund VI consumed. Zero Stage's independent auditors conducted a review of expenses prior to their submission on April 27, 2005 and May 4, 2005. They applied the same general methodology to the expenses

---

Allstate, Alta Partners, ARCH Capital, August Capital, General Electric, Hambrecht & Quist, Dow Chemical, Armstrong Floor & Tile, Cendant, and Microsoft Corp. ImproveNet ultimately went public.

-5-

submitted for reimbursement in this Claim. 3(a) Expense allocations to Fund VI range from 0 to 60%, with the exception of "Interest Expense", which, because it relates to the line of credit from MBDC, is 100%. Throughout the period 2002-2005, allocations to Fund VI increased as a percentage of the resources consumed by Zero Stage in managing the Zero Stage Fund Family, since more resources were continually devoted to coping with Fund VI's problems. Those problems were primarily the result of the vintage of Fund VI. Having commenced investing in 1999, Fund VI became a casualty of the decelerating business climate that accompanied the bursting of the "dot com" bubble. That climate resulted in lower company valuations, fewer exit opportunities, and longer time frames (7-10 years as opposed to 3-5 years) from initial investment to exit.

As outlined in more detail on Exhibit 18, the following 3(a) Expenses were incurred and paid by Zero Stage in connection with management services provided to Fund VI during this period:

| | |
|---|---|
| 2002: | $504,257 |
| 2003: | 356,386 |
| 2004: | 275,607 |
| 2005: | 67,988 |

**Total 3(a) Expenses: $1,204,237.**[11]

### III.   3(b) EXPENSES

As noted above, resources provided to the Zero Stage Fund Family by Zero Stage often extended to the provision of outside legal and consulting services. To allocate expenses paid by Zero Stage on behalf of Fund VI, Zero Stage's independent auditors conducted a review of invoices for such services, similar to the review conducted by the auditors for 3(a) Expenses. As reflected in the explanatory notes contained in the schedules of 3(b) Expenses included in Exhibit 18, any invoice that related to a fund other than Fund VI was subtracted from the total of 3(b) Expenses otherwise subject to pro rata treatment as an expense on account of Fund VI. What remained were invoices relating either to Fund VI directly, or to Zero Stage for services provided to the Zero Stage Fund Family generally. These remaining amounts were then allocated according to the percentage of resources expended for the sake of Fund VI, as evident either from the face of the invoice itself or from interviews with Zero Stage's management that were conducted by its counsel and outside auditor.

As was the case with 3(a) Expenses, events over the course of 2002 to 2005 increasingly skewed 3(b) Expenses toward Fund VI. *See also* April 22, 2005 Memorandum from T. Tedeschi to Christopher P. Hines, a copy of which is attached hereto as Exhibit 19. The amount of the increase is greater for 3(b) Expenses than for 3(a) Expenses, since the former account for the professional services directly related to the regulatory and performance issues surrounding Fund VI.

---

[11] Note that this figure is subsumed within the total Management Fee of $7,941,477 for the period 2002-2005.

The 3(b) Expenses paid by Zero Stage on behalf of Fund VI are:

| | |
|---|---|
| 2002: | $237,288 |
| 2003: | 229,305 |
| 2004: | 354,034 |
| 2005: | 21,156 |

**Total 3(b) Expenses: $841,783.**

## IV.    POST-RECEIVERSHIP EXPENSES

The mechanics of a potential receivership were discussed at a meeting between SBA and Zero Stage representatives on March 4, 2005.  During this conference, Tom Morris requested that Zero Stage carry on with its ongoing efforts to monetize the Fund VI portfolio, and noted that any receiver appointed for Fund VI would require Zero Stage's assistance and cooperation during the receivership transition of approximately three to six months.  Mr. Morris also noted that parties involved in the receivership process would be entitled to market compensation for assisting the receivership.

Since the Receivership Date, Zero Stage personnel have expended significant time and effort assisting the Receiver in taking over Fund VI.  Attached hereto as Exhibits 20 and 21 are itemizations of time spent by Zero Stage staff and agents, together with an estimate of the total value of that time.  The total is $105,882, for services in May and June 2005, based on the monthly base compensation of the individuals involved.  Zero Stage believes that these efforts have provided a measurable benefit to the receivership in excess of the compensation requested in exchange, and that the costs of such efforts should be borne by the receivership.

**EXHIBIT H – Tab 1**

ZERO STAGE CAPITAL VI LIMITED PARTNERSHIP

AGREEMENT OF LIMITED PARTNERSHIP

Dated as of June 9, 1998

# TABLE OF CONTENTS

**ARTICLE I - GENERAL PROVISIONS** ........................................................... **1**

1.01 *Incorporated of Annexes* ......................................................................... 1

1.02 *Definitions* ............................................................................................... 1

1.03 *Name of the Partnership* ......................................................................... 4

1.04 *Business of the Partnership* .................................................................... 5

1.05 *Place of Business of the Partnership; Resident Agent for Service of Process; Registered Office in Massachusetts* ............................................ 6

1.06 *Duration of the Partnership* .................................................................... 6

1.07 *Partners' Names and Addresses* .............................................................. 7

1.08 *Title to Partnership Property* .................................................................. 7

1.09 *Certificate of Limited Partnership* .......................................................... 7

1.10 *Admission of Additional Private Limited Partners* .................................. 7

**ARTICLE II - CAPITAL CONTRIBUTIONS, NET PROFITS AND NET LOSSES** .......... **8**

2.01 *Capital Contributions* .............................................................................. 8

2.02 *Failure to Make Additional Payments* .................................................... 10

2.03 *Capital Accounts and General Allocations* ............................................. 10

2.04 *General Allocations of Net Profits and Net Losses Among Private Partners* ... 11

2.05 *Allocations of Nonrecourse Deductions and Minimum Gain* .................. 12

2.06 *Overriding Allocations of Net Profits and Net Losses* ............................ 13

2.07 *Investments Prohibited for Partner* ........................................................ 14

**ARTICLE III - DISTRIBUTIONS** .................................................................. **15**

3.01 *Distributions of Cash and Securities* ...................................................... 15

3.02 *Valuation of Noncash Distributions* ....................................................... 15

3.03 *Withholding From Certain Distributions* ................................................. 15

3.04 *Suspension of Distributions to Private Limited Partners* ....................... 16

### ARTICLE IV - MANAGEMENT ...................................................................16

4.01 *Authority of the General Partner* ....................................................16

4.02 *Reimbursement of the General Partner* ........................................17

4.03 *Services of the General Partner* .....................................................18

4.04 *Compensation and Dealings with Partnership* ...........................18

4.05 *Liability of the General Partner; Indemnification* .....................19

4.06 *Limitations on Limited Partners* ..................................................19

4.07 *Liability of Limited Partners* ........................................................19

4.08 *Tax Matters Partner* .......................................................................19

4.09 *Investment and Policy Committee* .................................................20

4.10 *Valuation of Partnership Assets* ...................................................21

4.11 *SBA Regulations* ..............................................................................21

### ARTICLE V - BOOKS, RECORDS AND BANK ACCOUNTS ................22

5.01 *Books and Records* ..........................................................................22

5.02 *Accounting Basis and Fiscal Year* ................................................22

5.03 *Reports* ...............................................................................................22

5.04 *Bank Accounts* ..................................................................................23

### ARTICLE VI - ASSIGNMENT OF INTERESTS AND SUBSTITUTION OF PRIVATE PARTNERS; WITHDRAWAL OF PRIVATE LIMITED PARTNERS ........................23

6.01 *Substitution and Assignment of a Private Limited Partner's Interest* ....23

6.02 *Transfer of Interest by the General Partner* ................................25

6.03 *Withdrawal By Private Limited Partners* .....................................25

### ARTICLE VII - DISSOLUTION AND TERMINATION ...........................27

7.01 *Events of Dissolution* .......................................................................27

7.02 *Distributions Upon Liquidation* .....................................................28

**ARTICLE VIII - MISCELLANEOUS** .................................................................... **29**

8.01 *Notices* ...................................................................................................... 29

8.02 *Successors and Assigns* ............................................................................ 29

8.03 *Power of Attorney* .................................................................................... 29

8.04 *Amendment* ............................................................................................... 29

8.05 *Creditors* ................................................................................................... 30

8.06 *No Waiver* ................................................................................................. 30

8.07 *Entire Agreement* ..................................................................................... 30

8.08 *Captions* .................................................................................................... 31

8.09 *Counterparts* ............................................................................................. 31

8.10 *Applicable Law* ......................................................................................... 31

**SIGNATURE PAGE** ................................................................................... **32**

**SCHEDULE A** ............................................................................................... **33**

# ZERO STAGE CAPITAL VI LIMITED PARTNERSHIP

# AGREEMENT OF LIMITED PARTNERSHIP

This Agreement of Limited Partnership is dated as of the 9th day of June, 1998, among Zero Stage Capital Associates VI, LLC, a Massachusetts limited liability company, as general partner (the "General Partner"), and Paul M. Kelley, Gordon B. Baty and Stanley L. Fung (the "Initial Limited Partners").

In consideration of the mutual agreements herein made, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the General Partner and the Initial Limited Partners, intending to form a Massachusetts limited partnership to be known as "Zero Stage Capital VI Limited Partnership" (the "Partnership"), pursuant to the provisions of the Massachusetts Uniform Limited Partnership Act, hereby agree as follows:

## ARTICLE I

## General Provisions

1.01    *Incorporation of Annexes.* The provisions of SBA Annex PS and SBA Annex OP attached to this Agreement are incorporated in this Agreement with the same force and effect as if fully set forth herein.

1.02    *Definitions.* For purposes of this Agreement:

"Adjusted Capital Contribution" for any Private Limited Partner, for purposes of this Agreement, shall be his Commitment increased at a simple rate of interest of ten percent (10%) per annum (365 days) from the date of his admission to the Partnership until the last date on which additional Private Limited Partners are admitted to the Partnership pursuant to Section 1.10.

"Affiliate" for purposes of Section 4.05 of this Agreement, means any person performing services on behalf of the Partnership who: (i) directly or indirectly controls, is controlled by, or is under common control with the General Partner; (ii) owns or controls 10% or more of the outstanding voting securities of the General Partner; (iii) is an officer, director, partner, manager or trustee of the General Partner; or (iv) if the General Partner is an officer, director, partner or trustee, is any company for which the General Partner acts in any such capacity. For purposes of every other Section of this Agreement, "Affiliate" means, with respect to any specified person or entity, (i) any person or entity that directly or indirectly controls, is controlled by, or is under common control with such specified person or entity; (ii) any person or entity that directly or indirectly controls 10% or more of the outstanding equity securities of the specified entity or of which the specified person or entity is directly or indirectly the owner of 10% or more of any class

-1-

of equity securities; (iii) any person or entity that is an officer of, director of, partner in, manager of, or trustee of, or serves in a similar capacity with respect to, the specified person or of which the specified person or entity is an officer, director, partner, manager or trustee, or with respect to which the specified person or entity serves in a similar capacity; or (iv) any person that is a member of the immediate family of the specified person ("immediate family" as used herein shall mean spouse, mother, father, brother, sister or lineal descendant).

"Agreement" means this Limited Partnership Agreement, including without limitation SBA Annex OP and SBA Annex PS incorporated herein pursuant to Section 1.01 hereof, as this Agreement may be amended from time to time.

"Annex OP" means SBA Annex OP incorporated into this Agreement pursuant to Section 1.01.

"Annex PS" means SBA Annex PS incorporated into this Agreement pursuant to Section 1.01.

"Capital Account" shall have the meaning set forth in Annex PS.

"Carrying Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes; provided, however, that in the circumstances described in Treasury Regulation Sections 1.704-1(b)(2)(iv)(d) and (f), the Carrying Value of an asset shall be adjusted to such asset's fair market value and shall thereafter be adjusted in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(g).

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Commitment" shall have the meaning set forth in Annex PS. The Commitment of the General Partner and each Private Limited Partner shall be as set forth on Schedule A.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Estimated Value" shall mean, in reference to a Partner's Capital Account determined as of a particular time, such Capital Account adjusted to reflect the hypothetical sale of all securities owned by the Partnership at the time of such determination, at prices equal to the most recent valuations of such securities made pursuant to Section 4.10, or, in the case of a determination in connection with the withdrawal of a Private Limited Partner pursuant to Section 6.03, valuations made as of the date of such withdrawal pursuant to Section 6.03.

"Excess Negative Balance" for a Partner means the excess, if any, of (i) the negative balance in a Partner's Capital Account after reducing such balance by the net adjustments, allocations and distributions described in Treasury Regulation Section

1.704-1(b)(2)(ii)(d)(4), (5) and (6) which, as of the end of the Partnership's taxable year are reasonably expected to be made to such Partner, over (ii) the sum of (A) the amount, if any, which the Partner is required to restore to the Partnership upon liquidation of such Partner's interest in the Partnership (or which is so treated pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c)), and (B) that portion of any indebtedness of the Partnership (other than "partner nonrecourse debt" as defined in Treasury Regulation Section 1.704-2(d)) with respect to which the Partner bears the economic risk of loss that such indebtedness would not be repaid out of the Partnership's assets if all of the Partnership's assets were sold at their respective Carrying Values as of the end of the fiscal year or other period and the proceeds from the sales, together with any amounts described in clause (A) above, were used to pay the Partnership's liabilities.

"Existing Funds" means Zero Stage Capital II Central Pennsylvania Limited Partnership, First Stage Capital Limited Partnership, and Zero Stage Capital V Limited Partnership, each of which is an existing venture capital fund in which Paul Kelley, Gordon Baty and/or Stanley Fung are currently involved.

"General Partner" means Zero Stage Capital Associates VI, LLC, a Massachusetts limited liability company, or any person or entity substituted as general partner of the Partnership pursuant to the terms of this Agreement.

"Initial Limited Partner" shall mean each of Paul Kelley, Gordon Baty and Stanley Fung. The Initial Limited Partners shall withdraw from the Partnership upon the initial admission of Private Limited Partners to the Partnership.

"IPC" means the Investment and Policy Committee of the Partnership, as more fully described in Section 4.09 of this Agreement.

"Leverage" means Leverage in the form of Participating Securities, as those terms are used in the SBIC Act.

"Limited Partner" means any Initial Limited Partner, Preferred Limited Partner or any Private Limited Partner.

"Majority in Interest of the Private Limited Partners" means Private Limited Partners owning greater than 50% of the Units owned by all Private Limited Partners.

"Maximum Tax Liability" shall have the meaning set forth in Annex PS.

"Minimum Allocation Percentage" shall mean 1.0%, for purposes hereof and, being expressly specified as such, for purposes of Annex PS and the definition of "Minimum Allocation Percentage" therein.

"MULPA" means the Massachusetts Uniform Limited Partnership Act, as amended from time to time.

-3-

"Net Profits" and "Net Losses" shall have the meaning set forth in Annex PS. For purposes of determining Net Profits and Net Losses, every item requiring separate computation under Section 702(a) of the Code shall be included.

"Paid-In Contribution" of any Partner means the amount of the Commitment of such Partner which has actually been paid to the Partnership.

"Partner" means the General Partner, each Initial Limited Partner, each Private Limited Partner and each Preferred Limited Partner.

"Partnership" means the limited partnership created and existing pursuant to this Agreement.

"Partnership Capital" means an amount equal to the sum of all of the Private Partners' Capital Account balances determined immediately prior to the allocation to the Private Partners pursuant to Sections 2.04(a)(ii) or 2.04(b)(i) of any Net Profits or Net Losses of the Partnership, increased by the aggregate amount of Net Profits to be allocated to the Private Partners pursuant to Section 2.04(a)(ii) or decreased by the aggregate amount of Net Losses to be allocated to the Private Partners pursuant to Section 2.04(c)(i).

"Preferred Limited Partner" shall have the meaning set forth in Annex PS.

"Private Limited Partner" shall have the meaning set forth in Annex PS.

"Private Limited Partner Invested Capital" means the excess of (i) the sum the amount of the Paid-In Contributions of the Private Limited Partners over (ii) the aggregate amount distributed to the Private Limited Partners pursuant to Section 3.01(c)(i).

"Private Partner" means the General Partner or any Private Limited Partner, and "Private Partners" means the General Partner and the Private Limited Partners.

"SBA" shall mean the United States Small Business Administration, and any successor thereto for purposes of administering the SBIC Act.

"SBIC" shall have the meaning set forth in Annex PS.

"SBIC Act" shall have the meaning set forth in Annex PS.

"65% in Interest of the Private Limited Partners" means Private Limited Partners owning 65% of the Units owned by all Private Limited Partners.

"Unit" shall have the meaning set forth in Section 2.01 of the Agreement.

1.03    *Name of the Partnership.* The name of the Partnership shall be Zero Stage Capital VI Limited Partnership, or such other name as the General Partner may from time to time

-4-

determine. The General Partner shall cause to be filed on behalf of the Partnership such partnership or assumed or fictitious name certificate or certificates as may from time to time be required by law.

1.04    *Business of the Partnership.*

(a)    The Partnership is organized solely for the purpose set forth in Article II of Annex PS. Without limiting the foregoing in any manner, it is expected that the Partnership will concentrate its investments in (i) new companies and entities in their earliest stages of development, and (ii) on-going later stage companies and entities which require infusions of capital. Such investments are expected to be focused on companies located primarily within the Northeastern United States.

(b)    In furtherance of the purpose of the Partnership, the Partnership shall, subject to the provisions of this Agreement, have the following powers:

(i)    to purchase or otherwise acquire, transfer, dispose of or otherwise deal in, and exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, securities and investments, without regard to whether such securities are publicly traded, readily marketable or restricted as to transfer; provided that, the Partnership does not expect that it will invest, in any one portfolio company or entity, an amount greater than 10% of the total amount of the Commitments of the Private Partners and the Preferred Limited Partners; and

(ii)    to guaranty, or otherwise become liable for, the obligations of other persons or entities; provided that, the Partnership does not expect that any such guaranty or liability with respect to any portfolio company in which the Partnership has invested, together with the aggregate amount invested by the Partnership in any such portfolio company, will exceed an amount equal to 10% of the total amount of the Commitments of the Private Partners and the Preferred Limited Partners;

(iii)    to incur indebtedness, and from time to time to issue, accept, endorse and execute promissory notes and other negotiable or non-negotiable instruments and evidences of indebtedness; to execute agreements in connection therewith; and to secure the payment of any amount thereof and of the interest thereon and other obligations in connection therewith by mortgage, pledge, hypothecation, conveyance or assignment in trust of the whole or any part of the property of the Partnership, whether at the time owned or thereafter acquired;

(iv)    to rent or acquire office space, engage personnel and do such other acts and things as may be necessary or advisable in connection with the maintenance of such office;

(v)    to engage and compensate attorneys, accountants, investment advisors, technical advisors, consultants, custodians, contractors, agents, and employees;

(vi)    to pay and incur other expenses and obligations incident to the operation of the Partnership, including those for travel, insurance and supplies;

(vii)    to establish, maintain, and close bank accounts and draw checks or other orders for the payment of money;

(viii)    to establish, maintain and close accounts with brokers;

(ix)    to pledge, hypothecate, mortgage, collaterally assign, or otherwise grant security interests in or liens on securities of a portfolio company to secure obligations of such portfolio company to others; and

(x)    to enter into, make and perform all such contracts, agreements and other undertakings, and to take any and all acts and engage in any and all activities, as in the discretion of the General Partner may be incidental to, or necessary, advisable or appropriate to, the carrying out of the foregoing powers and purposes.

This Section 1.04(b) shall not be construed so as to prohibit the Partnership, prior to the time that it becomes a licensee under the SBIC Act, from conducting any business or engaging in any activities (including, without limitation, making investments) in furtherance of the Partnership purpose set forth in Section 1.04(a) or from exercising any powers set forth in this Section 1.04(b); provided, that such business and activities shall be conducted, and such powers shall be exercised, in compliance with the SBIC Act. The Partnership shall not, however, either expressly or impliedly identify itself as a licensee under the SBIC Act unless and until it becomes such a licensee.

(c)    Notwithstanding the provisions of paragraph (b), the Partnership shall not permit its outstanding Financings and Commitments (as defined in the SBIC Act) to any small business and its Affiliates to exceed the limits permitted by the SBIC Act.

1.05    *Place of Business of the Partnership; Resident Agent for Service of Process; Registered Office in Massachusetts.* The principal place of business of the Partnership shall be located at 101 Main Street, Cambridge, Massachusetts 02142. The Partnership's resident agent for service of process in Massachusetts shall be Paul M. Kelley, 101 Main Street, Cambridge, Massachusetts 02142, and its registered office in Massachusetts for purposes of Section 5(a) of the MULPA shall be located at 101 Main Street, Cambridge, Massachusetts 02142. The General Partner may, at any time and from time to time, (a) change the location of the Partnership's principal place of business and establish such additional place or places of business of the Partnership as it may determine, (b) change the Partnership's registered office in Massachusetts and/or (c) change the Partnership's resident agent for service of process in Massachusetts, and in each case shall provide written notice of any such change to the other Partners within 30 days of any such change.

1.06    *Duration of the Partnership.* The term of the Partnership shall commence upon the filing of a Certificate of Limited Partnership of the Partnership. The General Partner shall file such Certificate on the date hereof or as soon as practicable thereafter. The term of the

Partnership shall continue until December 31, 2008 unless terminated at an earlier date or extended to a later date in accordance with Article VII hereof.

1.07   *Partners' Names and Addresses.*   Addresses of the Partners are as follows:

(a)   The name and address of the General Partner is:

> Zero Stage Capital Associates VI, LLC
> 101 Main Street
> Cambridge, Massachusetts  02142

(b)   The names and addresses of the Initial Limited Partners are set forth on Schedule A hereto. Upon admission to the Partnership of Private Limited Partners, Schedule A shall be amended to reflect the withdrawal of the Initial Limited Partners and the admission of the Private Limited Partners, including the name, address, Commitment and Units of each Private Limited Partner. Schedule A may thereafter be amended from time to time, as provided in this Agreement. In the event that Private Limited Partnership interests in the Partnership are acquired by the General Partner, it shall assume the status of a Private Limited Partner with respect to such interests, in addition to its status as the General Partner.

1.08   *Title to Partnership Property.*   All property owned by the Partnership, whether real or personal, tangible or intangible, shall be deemed to be owned by the Partnership as an entity, and no Partner, individually, shall have any ownership of such property. The Partnership may hold any of its assets in its own name or in the name of its nominee, which nominee may be one or more individuals, corporations, partnerships, trusts or other entities.

1.09   *Certificate of Limited Partnership.*   The General Partner shall deliver or mail copies of the Partnership's Certificate of Limited Partnership or any certificate of amendment thereto or cancellation thereof to the Private Limited Partners (a) in the case of the Certificate of Limited Partnership, within 10 days after the date of their admission to the Partnership, and (b) in the case of any certificate of amendment or certificate of cancellation, within 10 days after the filing thereof. In addition, all such documents will be available for inspection at the offices of the Partnership during normal business hours on reasonable prior notice to the General Partner.

1.10   *Admission of Additional Private Limited Partners.*

(a)   The General Partner may admit to the Partnership Private Limited Partners at any time and from time to time on or after the date hereof and prior to March 31, 1999; provided, that in no event shall the aggregate amount of the Commitments of the Private Limited Partners exceed $50,000,000. Upon the initial admission of Private Limited Partners, the Initial Limited Partners shall withdraw from the Partnership, and their capital contribution shall be returned to them, and thereafter they shall have no further interest in the Partnership (except to the extent they become (or own or acquire interests in) Private Partners).

(b)   The General Partner shall be permitted to admit to the Partnership, at any time, the Preferred Limited Partner.

-7-

## ARTICLE II

### Capital Contributions, Net Profits and Net Losses

2.01    *Capital Contributions.*

(a)    The General Partner and the Initial Limited Partners have contributed to the capital of the Partnership the amounts set forth opposite their respective names on Schedule A. The capital contribution of the Initial Limited Partners shall be returned to them upon their withdrawal, as contemplated by Section 1.10.

(b)    In connection with the admission to the Partnership of the Private Limited Partners, Schedule A shall be amended to reflect the amount which each Private Limited Partner has agreed to contribute to the capital of the Partnership. Such amount is referred to as each Private Limited Partner's "Commitment." Such Commitment entitles each Private Limited Partner to a limited partnership interest in the Partnership expressed as a number of Units (the "Units") in the Partnership, which number of Units shall be set forth on Schedule A hereto. For each $100,000 of a Private Limited Partner's Commitment, the Private Limited Partner is entitled to one Unit of private limited partnership interest.

(c)    With respect to each Unit subscribed for, each Private Limited Partner agrees to contribute its Commitment in installments, as follows. The first installment, in the amount of $25,000 per Unit subscribed for, shall be contributed to the Partnership upon admission of the Private Limited Partner to the Partnership. The second, third and fourth installments, each in the amount of $25,000 per Unit, shall be due and payable on the first, second and third anniversary dates, respectively, of the date of this Agreement. However, the General Partner in its judgment, based on the need of the Partnership for funds, may accelerate the date of payment of all or any portion of the second, third and fourth installments.

(d)    The General Partner shall provide written notice to each Private Limited Partner at least 30 days prior to the dates on which the second, third and fourth installments become due and payable and at least 30 days prior to the date any accelerated portion of any installment becomes due and payable.

(e)    The General Partner shall contribute to the capital of the Partnership one percent of the aggregate amount of the Commitments of all of the Private Partners to the Partnership. As of the date of this Agreement, the General Partner has contributed to the Partnership, in cash, the amount set forth on Schedule A. The balance of the General Partner's total capital contribution shall be made by delivery of cash or notes as required upon the date of each admission of Private Limited Partners to the Partnership.

(f)    The Partnership intends to qualify as an SBIC in order to enable the SBA or an affiliated entity to be a Preferred Limited Partner in the Partnership. In connection with such qualification, the General Partner, without the consent of any of the Private Limited Partners, shall be authorized to admit, at any time and from time to time, any such Preferred Limited Partner to the Partnership as a Limited Partner on such terms and conditions as the General

-8-

Partner may determine in its sole discretion. Without in any way limiting the foregoing, the interest of any Preferred Limited Partner in the Net Profits, Net Losses and distributions of cash or securities of any nature may have such priority or priorities in relationship to the interests therein of the Private Partners as the General Partner may in its sole discretion determine; provided, that the relative priorities of the General Partner and the Private Limited Partners in the Net Profits, Net Losses and distributions of cash or securities of any nature of the Partnership shall not be altered as a result of the admission of any Preferred Limited Partner, except to the extent required in order to comply with the SBIC Act.

(g)    Each person or entity who is hereafter admitted to the Partnership as a Private Limited Partner shall, by execution of this Agreement or an amendment hereto, be deemed (i) to have consented to the admission of any Preferred Limited Partner on such terms as the General Partner may determine, and to any amendment to this Agreement which may be necessary or appropriate to reflect the admission of any Preferred Limited Partner and the terms on which it invests in the Partnership, and (ii) to have acknowledged that, in connection with any admission of a Preferred Limited Partner, (A) its interest in allocations of Net Profits and Losses and distributions of cash and securities of the Partnership, and net proceeds upon liquidation of the Partnership, may be diluted or otherwise altered and (B) the Partnership will be subject to restrictions on its investments imposed by the SBA, including without limitation (x) the size of the companies in which the Partnership may invest, and (y) the size of the Partnership's investment in any particular company.

(h)    All costs and expenses in connection with the admission to the Partnership of any Preferred Limited Partner, including without limitation legal and accounting fees and expenses, shall be borne by the Partnership.

(i)    Each Private Limited Partner shall, by execution of this Agreement or an amendment hereto, constitute and appoint the General Partner and its general partners, and each of them acting singly, and any person or entity which becomes a substitute or additional General Partner of the Partnership, and each executive officer or general partner thereof, such Private Limited Partner's agent and attorney-in-fact for the purpose of (i) executing, delivering and filing such agreements, certificates and other instruments as said attorney-in-fact shall deem necessary or appropriate in order to offer and sell limited partnership interests in the Partnership and to admit subscribers therefor to the Partnership as Private Limited Partners, (ii) preparing a Schedule A to this Agreement, and such amendments to such Schedule A as may be necessary or appropriate from time to time, to reflect the admission of the Private Limited Partners to the Partnership and the agreed upon amounts of their respective Commitments and (iii) preparing such amendments to this Agreement as are required to reflect the admission of Preferred Limited Partners to the Partnership and the terms on which they shall invest in the Partnership. Such Schedule A, any amendments thereto or any amendments to this Agreement, as aforesaid, when prepared by said attorney-in-fact shall be deemed a part of this Agreement and incorporated herein by reference, as of the effective date of such Schedule A, amendment thereto or amendment to this Agreement, to the same extent as if attached hereto and incorporated herein by this reference on the date hereof. The power of attorney contained in this Section 2.01(i) is

-9-

coupled with an interest and, therefore, is irrevocable and shall survive the death, dissolution, bankruptcy, disability or incapacity of any Private Limited Partner.

(j)    No Private Limited Partner shall have the right to withdraw or to be repaid any capital contributed by him, except as otherwise specifically provided in this Agreement, and no interest shall accrue on any contributions of capital to the Partnership.

2.02    *Failure to Make Additional Payments.*

(a)    In the event any Private Limited Partner fails to pay any amount which he is required to pay to the Partnership on or before the date when such amount is due and payable, he shall be deemed to be in default hereunder (a "Defaulting Partner"). The provisions of Article II of Annex OP, relating to remedies of the Partnership upon the failure of a Private Limited Partner to fund its Commitment as provided herein, are specifically incorporated into this Section 2.02.

(b)    Each Private Limited Partner hereby constitutes and appoints the General Partner and any person or entity which becomes a substitute or additional General Partner of the Partnership, his agent and attorney-in-fact for the purpose of executing and delivering any and all documents necessary to transfer his interest in the Partnership to the purchaser thereof pursuant to this Section 2.02, which power of attorney, being coupled with an interest, is irrevocable and shall survive the death, dissolution, bankruptcy, disability or incapacity of any Partner.

(c)    Notwithstanding any of the foregoing, the obligations of the Defaulting Partner to the Partnership hereunder shall not be extinguished by the existence of the rights of the Partnership described in Article II of Annex OP, but only by, and to the extent of, the payments made in the Defaulting Partner's place by any persons or entities who purchase his interest hereunder, and the Partnership may proceed to collect any amount due from the Defaulting Partner as and when due, together with interest thereon from the date for payment stated herein at a rate (to the extent permitted by law) equal to 10% per annum, and all costs and expenses of collection incurred by the Partnership (including reasonable fees and disbursements of counsel), from the Defaulting Limited Partner.

(d)    At the option of the General Partner, as long as any Defaulting Partner remains in default, such Defaulting Partner shall not be entitled to receive any distribution of cash or property from the Partnership or participate in any vote, consent, waiver, approval or other action by the Private Limited Partners (and such Defaulting Partner's interest in the Partnership shall not be counted in determining the aggregate Commitments of all Private Limited Partners for the purpose of giving or withholding any such vote, consent, waiver, approval or other action).

2.03    *Capital Accounts and General Allocations.*

(a)    There shall be maintained for each Partner a Capital Account, which shall be maintained in accordance with Annex PS and the Code.

(b)    Prior to the admission of Private Limited Partners, Net Profits and Net Losses shall be allocated among the Partners in proportion to their capital contributions to the Partnership. Thereafter, at such times as are provided in Section 5.2 of Annex PS, Net Profits and Net Losses shall be allocated among the Partners in accordance with Section 5.3(a) of Annex PS, except as otherwise provided in Sections 5.3(b) and (c) of Annex PS. Except as otherwise provided in Sections 5.3(b) and (c) of Annex PS, the portion, if any, of Net Profits and Net Losses allocated to the Private Partners pursuant to Section 5.3(a)(iv)(B) of Annex PS shall be allocated among the Private Partners as provided in Sections 2.04, 2.05 and 2.06 of this Agreement, after all allocations of Net Profits or Net Losses pursuant to Sections 5.3(a)(i) through (iii) of Annex PS and Sections 5.3(b) and (c) of Annex PS have been made and have been reflected in the Partners' respective Capital Accounts.

(c)    Any allocations made to the General Partner and the Private Limited Partners in accordance with Sections 5.3(b) and 5.3(c) of Annex PS shall be apportioned among them as provided in this Article II. Allocations made pursuant to Sections 2.05 and 2.06 shall be deemed to be allocations required by the Code for purposes of Section 5.3(c) of Annex PS.

(d)    For income tax purposes, all items of income, gain, loss, deduction or credit shall be allocated to the Partners in the same proportion as Net Profits and Net Losses; provided, that in the event the value of any Partnership asset is adjusted, subsequent allocations of income, gain, loss and deduction with respect to such asset for income tax purposes shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its adjusted value in the same manner as under Code Section 704(c). Any elections or other decisions relating to such allocations shall be made by the General Partner in its sole discretion.

2.04    *General Allocations of Net Profits and Net Losses Among Private Partners.* Except as provided in Sections 2.05 and 2.06 below (which shall be applied first), from and after the date of admission of Private Limited Partners to the Partnership, the Net Profits and Net Losses of the Partnership for any year (or other fiscal period) allocated to the Private Partners as a group shall be allocated among the Private Partners as follows:

(a)    Net Profits of the Partnership shall be allocated as follows:

(i)    First, to any Private Partners having negative Capital Account balances, in proportion to and to the extent of such negative balances; and

(ii)    The balance, if any, to the Private Partners in such proportions and in such amounts as would result in the respective Capital Account balance of each Private Partner equaling, as nearly as possible, such Private Partner's share of the then Partnership Capital determined by calculating the amount the Private Partner would receive if an amount equal to the Partnership Capital were distributed to the Private Partners in accordance with the provisions of Section 3.01 hereof.

(b)    Net Losses of the Partnership shall be allocated as follows:

(i)    First, to each Private Partner with a positive Capital Account balance, in the amount of such positive balance; provided, however, that if the amount of Net Losses to be allocated is less than the sum of the Capital Account balances of all Private Partners having positive Capital Account balances, then the Net Losses shall be allocated to the Private Partners in such proportions and in such amounts as would result in the respective Capital Account balance of each Private Partner equaling, as nearly as possible, such Private Partner's share of the then Partnership Capital determined as set forth in Section 2.04(a)(ii) above; and

(ii)    The balance, if any, 99% to the Private Limited Partners as a group (and among the Limited Partners in proportion to the number of Units held by each of them) and 1% to the General Partner.

(c)    If the amount of Net Profits allocable to the Private Partners pursuant to Section 2.04(a)(ii) or the amount of Net Losses allocable to them pursuant to Section 2.04(b)(i) is insufficient to allow the Capital Account balance of each Private Partner to equal such Private Partner's share of the Partnership Capital, such Net Profits or Net Losses shall be allocated among the Private Partners in such a manner as to decrease the differences between the Private Partners' respective Capital Account balances and their respective shares of the Partnership Capital in proportion to such differences.

2.05    *Allocations of Nonrecourse Deductions and Minimum Gain.*  Notwithstanding the provisions of Section 2.04 above, if at any time the Partnership incurs any "nonrecourse debt" (i.e. debt that is treated as nonrecourse for purposes of Treasury Regulation Section 1.1001-2), the following provisions will apply notwithstanding anything to the contrary expressed elsewhere in this Agreement:

(i)    "Nonrecourse deductions" (as defined in Treasury Regulation Sections 1.704-2(b) and (c)) other than deductions attributable to "partner nonrecourse debt" (as defined in Treasury Regulation Section 1.704-2(b)(4)) shall not be included in the computation of Net Profits or Net Losses, and shall be allocated 99% to the Limited Partners and 1% to the General Partner;

(ii)    Nonrecourse deductions attributable to partner nonrecourse debt shall not be included in the computation of Net Profits or Net Losses, and shall be specially allocated to the Partner or Partners that bear the economic risk of loss associated with the debt;

(iii)    If in any year there is a net decrease in "partnership minimum gain" (as defined in Treasury Regulation Section 1.704-2(d)) or "partner nonrecourse debt minimum gain" (as defined in Treasury Regulation Section 1.704-2(i)(3)), Partners will be specially allocated items of income or gain for such year (and/or subsequent years to the extent necessary) in accordance with the "minimum gain chargeback" provisions of Treasury Regulation Section 1.704-2(f) and/or Treasury Regulation Section 1.704-2(i)(5), and such amounts shall not be included in the computation of Net Profits or Net Losses;

(iv)    For purposes of calculating a Partner's Excess Negative Balance, the Partner's share of minimum gain and of partner nonrecourse debt minimum gain (as determined pursuant to Treasury Regulation Sections 1.704-2(g) and 1.704-2(i)(5), respectively) shall be treated as additional amounts that the Partner is obligated to contribute to the Partnership; and

(v)    Solely for purposes of Sections 2.4(a)(ii) and 2.04(b)(i) hereof and the determination of a Partner's share of Partnership Capital as provided therein, the Capital Account balance of each Private Partner shall be increased by such Partner's share of minimum gain and of partner nonrecourse debt minimum gain (as determined pursuant to clause (iv) above).

2.06    *Overriding Allocations of Net Profits and Net Losses.*  Notwithstanding the provisions of Section 2.04 above, but subject to the provisions of Section 2.05 above, the following allocations of Net Profits and Net Losses and items thereof shall be made:

(a)    If, during any year a Partner receives any adjustment, allocation or distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), and, as a result of such adjustment, allocation or distribution, such Partner's Capital Account has an Excess Negative Balance, then items of gross income (computed with the adjustments set forth below in this Section 2.06(a)) for such year (and, if necessary, subsequent years) shall be allocated to such Partner in an amount equal to such Partner's Excess Negative Balance. For purposes of computing gross income pursuant to this Section 2.06(a):

(i)    Items of gain, loss, and deduction shall be computed based upon the Carrying Values of the Partnership's assets (in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g)) rather than upon the assets' adjusted bases for federal income tax purposes;

(ii)    Any tax-exempt income received by the Partnership shall be included as an item of gross income; and

(iii)    The amount of any adjustments to the Carrying Values of any assets of the Partnership pursuant to Code Section 743 shall not be taken into account.

(b)    In no event shall Net Losses of the Partnership be allocated to a Partner if such allocation would cause or increase an Excess Negative Balance in such Partner's Capital Account.

(c)    In no event shall the General Partner be allocated any Net Profits, Net Losses, items of Net Profits or Net Losses or items of deduction for federal income tax purposes that would result in the General Partner being allocated an amount of total federal income tax deductions that would cause the "tax shelter ratio" (as defined in Code Section 6111) of the General Partner to exceed 2:1 as of the end of any one of the first six taxable years of the Partnership ending after the date of this Agreement.

(d)    In the event that Net Profits, Net Losses or items thereof are allocated to one or more Partners pursuant to paragraphs (a), (b) or (c) above, subsequent Net Profits and Net Losses will be allocated (subject to the provisions of paragraphs (a), (b) or (c)) to the Partners in a manner designed to result in each Partner having a Capital Account balance equal to what it would have been had the original allocation of Net Profits, Net Losses or items thereof pursuant to paragraphs (a) (b) or (c) not occurred.

2.07    *Investments Prohibited for Partner.*    In the event that the Partnership makes an investment which would result in a violation by any Private Limited Partner of any law, order, decree or judgment of any court or governmental agency due to such Private Limited Partner's status as a Private Limited Partner in the Partnership, such Partner may, by notice setting forth the details of such violation, together with an opinion of counsel to the effect that participation in such investment would constitute such a violation, specifying in reasonable detail the violation (which opinion and which counsel shall be reasonably acceptable to the General Partner), delivered to the General Partner within 30 days from the date on which the Private Limited Partner has notice of the investment, refuse to be a participant therein. In such event and notwithstanding any provision in this Agreement to the contrary, but subject to any applicable provision of the SBIC Act and Annex PS:

(a)    the nonparticipating Private Limited Partner shall not share in the profits, losses or distributions derived from such investment and the interests of the other Private Limited Partners in such investment and their allocable shares of profits, losses and distributions derived therefrom shall be proportionately increased;

(b)    in lieu of participation in such investment, the nonparticipating Private Limited Partner, during the period from the date of such investment to the date of liquidation or distribution in kind of such investment, shall share in profits, losses and distributions attributable to other investments which shall be in amounts intended to compensate for its nonparticipation in the particular investment (which amounts shall be determined by the General Partner in its reasonable discretion), and the interest of all other Private Limited Partners in the profits, losses and distributions attributable to such other investments shall be correspondingly reduced; and

(c)    no part of such investment shall be distributed in kind to the nonparticipating Private Limited Partner either upon liquidation of the Partnership or during the term of the Partnership.

The General Partner shall give prompt notice to all Private Limited Partners of each investment (other than temporary investments) made by the Partnership.

-14-

# ARTICLE III

## Distributions

3.01    *Distributions of Cash and Securities.*

(a)    Subject to the SBIC Act, distributions of cash, securities, or other property shall be made at the discretion of the General Partner; provided, however, that the Partnership will endeavor to distribute to the Partners promptly after the consummation of the transaction generating the same, any net cash proceeds arising upon the disposition of any investment securities (other than temporary investments).

(b)    Except for distributions in liquidation, which shall be made in the manner provided in Section 7.02(b), all distributions shall be allocated among the Partners in accordance with Sections 6.1 and 6.2 of Annex PS. The portion, if any, of such distributions allocated to the General Partner and the Private Limited Partners pursuant to Section 6.1(ii) of Annex PS shall be allocated among them in proportion to their respective Maximum Tax Liabilities. All other distributions to the General Partner and the Private Limited Partners as a group shall be allocated among them in accordance with Section 3.01(c).

(c)    All distributions to the General Partner and the Private Limited Partners as a group made pursuant to Section 3.01(b) shall be allocated among them as follows:

(i)    First, 99% to the Private Limited Partners and 1% to the General Partner until the Private Limited Partner Invested Capital has been reduced to zero;

(ii)    The balance, if any, 80% to the Private Limited Partners and 20% to the General Partner.

(d)    Amounts distributed to the Private Limited Partners as a group pursuant to clause (i) and (ii) of Section 3.01(c) shall be allocated among them in proportion to their respective Adjusted Capital Contributions.

3.02    *Valuation of Noncash Distributions.* Noncash items shall be valued as of the date of distribution at their respective fair market values, determined in the manner provided in Section 4.10.

3.03    *Withholding From Certain Distributions.* Notwithstanding anything to the contrary herein, to the extent that the Partnership is required, or elects, pursuant to applicable law, either (i) to pay tax (including estimated tax) on a Private Limited Partner's allocable share of Partnership items of income or gain, whether or not distributed, or (ii) to withhold and pay over to the tax authorities any portion of a distribution otherwise distributable to a Private Limited Partner, the General Partner may pay over such tax or such withheld amount to the tax authorities, and such amount shall be treated as a distribution to such Private Limited Partner at the time it is paid to the tax authorities.

-15-

3.04    *Suspension of Distributions to Private Limited Partners.* No part of any distribution shall be paid to any Private Limited Partner, if at the time of any such distribution there is due and owing to the Partnership any amount required to be paid by the Private Limited Partner pursuant to Sections 2.01 and 2.02. Any such withheld distribution shall be paid to the Private Limited Partner, without interest, when all past due installments of such Private Limited Partner's Commitment have been paid in full by such Partner or, if such Partner's interest in the Partnership has been terminated as contemplated by Section 2.02, to the successor or successors to such interest.

### ARTICLE IV

### Management

4.01    *Authority of the General Partner.* Except as otherwise expressly provided in this Agreement, all decisions respecting any matter set forth herein or otherwise affecting or arising out of the conduct of the business of the Partnership shall be made by the General Partner, and the General Partner shall have the exclusive right and full authority to manage, conduct and operate the Partnership business. Specifically, but not by way of limitation, the General Partner shall be authorized:

(a)    to cause the Partnership to enter into a Management Agreement (the "Management Agreement") with Zero Stage Capital Company, Inc. (the "Management Company"), providing for the payment to the Management Company of management fees at an annual rate of 2.5% of (i) the sum of (1) the total amount of the Commitments of the Private Limited Partners, plus (2) the total amount of the eligible Commitments of the Preferred Limited Partners, plus (3) the sum of the cost of any amount recovered on any investment by the Partnership which had previously been written off, retroactive to the date of the write-off, less (ii) the sum of (1) the cost of any of the Partnership's investments (other than temporary investments) which are liquidated or distributed in kind, plus (2) the cost of any of the Partnership's investments written off by the Partnership for tax purposes, which Management Agreement shall contain such other terms and conditions as the General Partner may deem reasonable;

(b)    to use Partnership assets to acquire, hold, dispose of, and otherwise invest in and deal with securities of every kind and description;

(c)    to execute and deliver, in the name and on behalf of the Partnership, such documents and instruments as it may deem appropriate for the conduct of the Partnership's business, and to cause the obligations of the Partnership thereunder to be performed;

(d)    to borrow money and to issue evidences of indebtedness and, as security therefor, to mortgage, pledge or otherwise encumber the assets of the Partnership; provided, however, that the General Partner will endeavor to avoid causing the Partnership to generate unrelated business taxable income as a result of borrowings;

-16-

(e)    to cause to be paid on or before the due date thereof all amounts due and payable by the Partnership to any person or entity;

(f)    to acquire property, real or personal, as it may in its sole discretion deem necessary or appropriate for the conduct of the Partnership's business and to sell, exchange, or otherwise dispose of all or any part of the Partnership's property;

(g)    to employ such agents, employees, managers, accountants, attorneys, consultants and other persons necessary or appropriate to carry out the business and affairs of the Partnership and to pay fees, expenses, salaries, wages and other compensation, which shall be reasonable in amount, to such persons as it shall in its sole discretion;

(h)    to pay, extend, renew, modify, adjust, submit to arbitration, prosecute, defend or compromise, upon such terms as it may determine and upon such evidence as it may deem sufficient, any obligation, suit, liability, cause of action or claim, including taxes, either in favor of or against the Partnership;

(i)    to pay any and all reasonable fees and to make any and all reasonable expenditures which it, in its sole discretion, deems necessary or appropriate in connection with the management of the affairs of the Partnership and the carrying out of its obligations and responsibilities under this Agreement;

(j)    to compromise the obligation of a Partner to make a contribution to the capital of the Partnership or to return to the Partnership money or other property paid or distributed to such Partner in violation of this Agreement or the MULPA;

(k)    to cause the Partnership to qualify and maintain its qualification as an SBIC; and

(l)    to exercise all powers and authority granted by the MULPA to general partners, except as otherwise provided in this Agreement.

With respect to all of its obligations, powers and responsibilities under this Agreement, the General Partner is authorized to execute and deliver, for and on behalf of the Partnership, such notes and other evidences of indebtedness, contracts, agreements, assignments, deeds, leases, loan agreements, mortgages and other security instruments and agreements as it deems proper, all on such terms and conditions as it deems proper.

4.02    *Reimbursement of the General Partner.* All reasonable out-of-pocket expenses incurred by the General Partner in managing and conducting the business and affairs of the Partnership, including reasonable expenses incurred in providing or obtaining such professional, technical, administrative and other services and advice as the General Partner may deem necessary or desirable, and including without limitation all costs incurred in connection with the organization of the Partnership and the offering of limited partnership interests therein, and the qualification of the Partnership as an SBIC (and the maintenance of such qualification), shall be paid or reimbursed by the Partnership, as a Partnership expense, except as otherwise provided in the Management Agreement.

-17-

4.03   *Services of the General Partner.*

(a)     During the existence of the Partnership, the General Partner shall devote such time and effort to the Partnership business as may be necessary to promote adequately the interests of the Partnership and the mutual interests of the Partners. Until 80% of the Commitments of the Private Limited Partners have been invested in or committed to investment in venture capital investments, including amounts set aside as reserves for making follow-on investments in the Partnership's portfolio companies, Paul M. Kelley, a manager of the General Partner, shall devote substantially all of his business time to the business of the Partnership and of the Existing Funds, either in his capacity as manager of the General Partner or in his capacity as executive of the Management Company pursuant to the Management Agreement.

(b)     Nothing contained herein shall prohibit the members of the General Partner: (i) from entering into co-investments with the Partnership so long as such co-investments are on the same terms as the Partnership's investments, the managers of the General Partner unanimously consent to such co-investments and such co-investments do not restrict the size of the investment which the General Partner believes is most appropriate for the Partnership; and (ii) subject to the fiduciary obligations of the General Partner and its members, from making investments in portfolio companies of the Partnership at times and on terms different from the investments of the Partnership in such companies.

(c)     It is specifically understood and agreed that, except to the extent specifically required in Section 4.03(a): (i) the General Partner and its members shall not be required to devote full time to the Partnership business; and (ii) all of the members of the General Partner are engaged in various other projects, including without limitation the Existing Funds. Subject to the provisions of Section 4.03(a) and (b) above, the General Partner and its members may at any time and from time to time engage in and possess an interest in other business ventures of any and every type and description, independently or with others, including, without limitation, investing in securities and managing or participating in other venture capital funds, and neither the Partnership nor any Partner shall by virtue of this Agreement have any right, title or interest in or to such independent ventures and no partner involved in such independent ventures shall have any duty to make any such business venture available to the Partnership.

4.04   *Compensation and Dealings with Partnership.* Except as provided in this Section 4.04 and in Sections 4.01 and 4.02 hereof or as otherwise expressly permitted by this Agreement, no Partner shall receive any compensation for services rendered in connection with the management or operation of the Partnership or its business. Any Partner may deal with the Partnership in connection with the management and operation of the Partnership, as an independent contractor or as an agent for others, and may receive from such others or the Partnership normal profits, compensation, commissions, or other income incident to such dealings, but only if the General Partner and the IPC shall have approved, in writing and in advance, such dealings and the terms and conditions thereof, including the profits, compensation, commissions or income to be derived from such dealings. In addition, a Limited Partner may enter into transactions with the Partnership, such as co-investment with the Partnership, provided

-18-

that the General Partner shall have approved, in writing and in advance, such transaction, and provided that it does not violate the SBIC Act.

4.05    *Liability of the General Partner; Indemnification.*

(a)    The exculpation provisions contained in Section 4.1 of Annex OP are hereby specifically incorporated in this Section 4.05.

(b)    The indemnification provisions set forth in Section 4.2 of Annex OP are hereby specifically incorporated in this Section 4.05. For purposes of Section 4.2(g) of Annex OP, the determination as to whether a party has satisfied the standard of conduct set forth in Sections 4.1 and 4.2 of Annex OP shall be made by a majority in number of those representatives of the Private Limited Partners then serving on the IPC; provided, that no such determination shall be required to be made, and the party seeking indemnification shall be entitled to indemnification hereunder, if a court of competent jurisdiction, arbitrator or other regulatory or similar body determines that such party has successfully defended himself or itself on the merits.

(c)    Notwithstanding the foregoing, neither the General Partner, nor its respective Affiliates nor any person acting as a broker-dealer shall be indemnified for any losses, liabilities or expenses arising from or out of a violation of federal or state securities laws or any other intentional or criminal wrongdoing.

(d)    Any indemnity under this Section 4.05 shall be paid from, and only to the extent of, Partnership assets, and no Partner shall have any personal liability on account thereof.

4.06    *Limitations on Limited Partners.*    Except as specifically provided herein, none of the Limited Partners, as such, shall: (a) be permitted to take part in the control of the business or affairs of the Partnership; (b) have any control in the Partnership's management or operation of its property; or (c) have the authority or power in his capacity as a Limited Partner to act as agent for or on behalf of the Partnership or any other Partner, to do any act which would be binding on the Partnership or any other Partner, or to incur any expenditures on behalf of or with respect to the Partnership.

4.07    *Liability of Limited Partners.*    So long as a Limited Partner complies with the provisions of Section 4.06, the liability of each Limited Partner for the losses, debts and obligations of the Partnership shall be limited to his Commitment and his share of any undistributed net profits of the Partnership; provided, however, that to the extent provided by the MULPA and other applicable laws, a Limited Partner may in certain circumstances be liable to the Partnership to the extent of previous distributions made to him in the event that the Partnership does not have sufficient assets to discharge its liabilities.

4.08    *Tax Matters Partner.*    The General Partner shall be the "Tax Matters Partner" for the Partnership pursuant to Code Sections 6221 through 6231. The Partnership shall indemnify and reimburse the Tax Matters Partner for all expenses, including legal and accounting fees, claims, liabilities, losses and damages, incurred in connection with any administrative or judicial proceeding with respect to the Partnership or the interest of any of the Partners therein. The

-19-

payment of all such expenses shall be made before any distributions of cash or securities are made by the Partnership. Neither the General Partner, nor any Affiliate, nor any other person shall have any obligation to provide funds for such purpose. The taking of any action and the incurring of any expense by the Tax Matters Partner in connection with any such proceeding, except to the extent required by law, is a matter in the sole discretion of the Tax Matters Partner and the provisions on limitations of liability of the General Partner and indemnification set forth in Section 4.05 of this Agreement shall be fully applicable to the General Partner in its capacity as the Tax Matters Partner.

4.09    *Investment and Policy Committee.*

(a)    The General Partner shall cause to be established an Investment and Policy Committee (the "IPC"), which shall have the duties hereinafter specified. The IPC shall consist of (i) one representative of each Private Limited Partner which desires to participate thereon, (ii) each of the managers of the General Partner, and (iii) such other persons as the General Partner shall select; provided that at no time shall more than one-half of the total number of members of the IPC consist of the members of the General Partner and other persons selected by the General Partner. With the prior approval of the General Partner, members of the IPC shall be entitled to reimbursement from the Partnership for their reasonable travel and other out-of-pocket expenses in connection with the performance of their duties as members of the IPC, but shall not be entitled to any fees, remuneration or other reimbursement from the Partnership or the Partners.

(b)    No IPC member shall have any liability to the Partnership or to any Partner for any loss suffered by the Partnership which arises out of any decision made in good faith by such member. Each IPC member (including any former member) shall be indemnified by the Partnership for all costs (including reasonable attorneys' fees) reasonably incurred by such member in defending any claim brought against such member based upon an alleged breach of duties as a member of the IPC; provided, that if it is finally determined in any judicial proceeding that such member did not act in good faith with respect to the matter on which such claim is based, the Partnership shall have no indemnity obligation to such member on account of such claim and such member shall promptly reimburse the Partnership for any payment previously made by the Partnership pursuant to this Section 4.09 on account of such claim. Notwithstanding the foregoing, no IPC member shall be indemnified pursuant to this Section 4.09 unless it is determined by a disinterested third party or parties that such IPC member reasonably believed that he or she was acting in a manner that was in, or not opposed to, the Partnership's best interests, and if such a determination is not made, such IPC member shall promptly reimburse the Partnership for any payment previously made by the Partnership pursuant to this Section 4.09 on account of such claim.

(c)    The IPC shall hold an annual meeting at which the General Partner shall update the IPC as to the status of the Partnership's investments and business and operations. The General Partner shall also present to the IPC, for the IPC's review, the General Partner's estimate of the value of each venture capital investment made by the Partnership at each such annual meeting, and in connection with any other valuation made by the General Partner. The IPC shall have no authority to approve or disapprove the General Partner's estimate of the value of any

each investment, although the General Partner may consider any recommendations with respect thereto made by the IPC. Additional meetings of the IPC may be called at any time and from time to time by the General Partner. The IPC shall have such other responsibilities as may be specified in this Agreement or otherwise agreed upon by the members of the IPC and the General Partner.

4.10.   *Valuation of Partnership Assets.*

(a)   Whenever valuation of any particular asset of the Partnership is required by this Agreement (including without limitation, valuation for purposes of distribution of any asset), such value shall be determined in accordance with the Model Valuation Policy set forth in 13 CFR Part 107, Appendix III, Section III, the provisions of which are hereby adopted verbatim by the Partnership. To the extent consistent with such policy, such valuation shall be based upon all relevant factors, including without limitation the type of security, marketability, restrictions on disposition, recent purchases of the same or similar securities by other investors, pending mergers or acquisitions, current financial position and operating results, and risks and potential of the security. Valuations shall be made by the General Partner as of the end of the second fiscal quarter and the end of the fiscal year, and at such other times as may be required by this Agreement or the SBIC Act.

(b)   No value shall be assigned to the Partnership name or goodwill, or to office records, files, statistical data or other intangible assets of the Partnership not normally reflected in the Partnership's accounting records.

(c)   It is understood by the Partners that some or all of the investments of the Partnership may have no readily ascertainable market value and that, in all cases, the General Partner is given a wide range of discretion in determining such values.

(d)   The Partners agree and acknowledge that its investments shall be subject to valuation in accordance with SBA regulations and policies, and, notwithstanding anything to the contrary contained in this Section 4.10, all valuations shall be made in accordance with such regulations and policies to the extent applicable to the Partnership.

4.11   *SBA Regulations.*

(a)   The Partnership, and the General Partner in its management and operation of the Partnership, shall be subject to and comply with the SBIC Act. The exercise of the rights, powers and authority granted pursuant to this Agreement to the Partnership or the General Partner shall be subject to such restrictions as may, from time to time, be imposed by the SBIC Act, whether or not specifically so provided herein with respect to any particular right, power or authority.

(b)   The provisions of this Agreement (including this Article IV) and the Management Agreement shall not be construed (i) to permit either the Partnership, the General Partner or the Management Company to receive any fees or compensation otherwise prohibited by the SBIC Act, or (ii) subject to compliance with the SBIC Act, to prohibit the General Partner or the

-21-

Management Company and their respective Affiliates from receiving and retaining reimbursement for out-of-pocket expenses paid by them.

## ARTICLE V

### Books, Records and Bank Accounts

5.01   *Books and Records.*  The General Partner shall keep just and true books of account with respect to the operation of the Partnership, in accordance with applicable rules under the Code and applicable provisions of the SBIC Act. Such books shall be maintained at the principal place of business of the Partnership, or at such other place in Massachusetts as the General Partner shall determine, and all Partners, and their duly authorized representatives, shall at all reasonable times and on reasonable notice to the General Partner have access to such books.

5.02   *Accounting Basis and Fiscal Year.*  Such books shall be kept in accordance with generally acceptable accounting principles, in accordance with the accrual method of accounting, or in accordance with such other method of accounting as the General Partner may determine and in any event, in accordance with the provisions of the SBIC Act regarding financial accounts and reporting, and shall be closed and balanced at the end of each year of the Partnership. The fiscal year of the Partnership shall be the calendar year.

5.03   *Reports.*

(a)    An unaudited summary of the operating results of the Partnership shall be prepared by the General Partner as soon as practicable after the close of each of the first three calendar quarters of each fiscal year during which the Partnership is engaged in the business of investing in securities. Such report shall be sent to each person who was a Private Limited Partner at any time during the quarter covered by the report.

(b)    Within 90 days after the end of each fiscal year, the General Partner shall cause to be prepared and sent to each person who was a Private Limited Partner at any time during the fiscal year then ended a financial report of the Partnership, including a balance sheet, a profit and loss statement, and a cash flow or source and use of funds statement, all of which shall be certified by an independent certified public accountant selected by the General Partner. In addition, the Partnership shall provide, within 90 days after the end of each fiscal year, such information concerning the Partnership as may be needed to enable each Private Limited Partner to file his federal income tax return, any required state income tax return and any other reporting or filing requirement imposed by any governmental agency or authority.

(c)    The Partnership shall also distribute, on an annual basis after the completion of each fiscal year, a detailed statement of (i) any transactions between the Partnership and the General Partner or its Affiliates and of any fees, commissions, compensation and other benefits paid or accrued to the General Partner or its Affiliates during the fiscal year then ended, showing the amount paid or accrued to each recipient and the services performed, and (ii) any instances where the Partnership invested in a portfolio company of a venture capital fund affiliated with the General Partner.

(d)     The Partnership shall also prepare and file with the SBA all reports required to be filed by the Partnership in its capacity as a licensee under the SBIC Act.

(e)     The cost of all reporting described in this Article V shall be paid by the Partnership as a Partnership expense. Any Partner may, at any time, at his own expense, cause an audit of the Partnership books to be made, during regular business hours, by a certified public accountant of his own selection.

5.04     *Bank Accounts.*  The General Partner shall be responsible for causing one or more accounts to be maintained in a bank (or banks) which is a member of the Federal Deposit Insurance Corporation, which accounts shall be used for the payment of the expenditures incurred by the General Partner in connection with the business of the Partnership, and in which shall be deposited any and all Partnership cash receipts. All such amounts shall be and remain the property of the Partnership, and shall be received, held and disbursed by the General Partner for the purposes specified in this Agreement. There shall not be deposited in any of said accounts any funds other than funds belonging to the Partnership, and no other funds shall in any way be commingled with such funds. Subject to the SBIC Act, the General Partner may invest such funds, temporarily, as it may deem appropriate, in savings accounts, certificates of deposit, U.S. government obligations, prime grade commercial paper, money market funds, or similar low risk, high quality income securities, as the General Partner may select.

## ARTICLE VI

### Assignment of Interests and Substitution of Private Partners; Withdrawal of Private Limited Partners

6.01     *Substitution and Assignment of a Private Limited Partner's Interest.*

(a)     A Private Limited Partner may not sell, transfer, assign, pledge or otherwise dispose of (any such disposition is hereafter referred to in this Section 6.01 as a "transfer") all or any part of his interest in the Partnership (whether voluntarily, involuntarily or by operation of law) unless all of the following conditions have been satisfied:

(i)     The General Partner shall have previously consented thereto in writing, the granting or denying of which consent shall be in the General Partner's absolute discretion;

(ii)     The SBA shall have given its prior written approval, if such approval is required under the SBIC Act;

(iii)     No such transfer shall be made if, in the opinion of counsel to the Partnership, (A) it may not be effected without registration under the Securities Act of 1933, or would result in the violation of any applicable state securities laws, (B) it would result in the violation of the SBIC Act or (C) it would require the Partnership to register as an investment company or the General Partner as an investment advisor under applicable state or federal laws;

-23-

(iv)    The Partnership shall not be required to recognize any such transfer until the instruments conveying such interest, which shall be in a form satisfactory to the General Partner, have been delivered to the General Partner for recordation on the books of the Partnership;

(v)    No such transfer shall be made if, in the opinion of counsel to the Partnership, it would cause the Partnership to become taxable as a corporation or it would otherwise result in adverse income tax consequences to the Partnership or the other Partners, resulting from a tax termination of the Partnership or otherwise;

(vi)    Unless a transferee becomes a substituted Private Limited Partner in accordance with the provisions set forth below, he shall not be entitled to any of the rights granted to a Private Limited Partner hereunder, other than the right to receive all or a part of the share of the Net Profits, Net Losses and distributions to which his transferor would otherwise be entitled; and

(vii)    No transfer of less than one Unit shall be made, except that less than one Unit may be transferred as part of a transfer by a Private Limited Partner of its entire interest in the Partnership.

(b)    A transferee of the interest of a Private Limited Partner, or any portion thereof, shall become a substituted Private Limited Partner entitled to all of the rights of a Private Limited Partner if, and only if:

(i)    The transferor gives the transferee such right;

(ii)    The General Partner consents to such substitution, the granting or denying of which consent shall be in the General Partner's absolute discretion;

(iii)    The transferee pays to the Partnership all costs and expenses incurred in connection with such substitution, including specifically, without limitation, costs incurred in amending this Agreement and, if necessary, the Partnership's Certificate of Limited Partnership; and

(iv)    The transferee executes and delivers such instruments, in form and substance satisfactory to the General Partner, as the General Partner may deem necessary or desirable to effect such substitution and to confirm the agreement of the transferee to be bound by all of the terms and provisions of this Agreement.

(c)    Each Private Limited Partner acknowledges and agrees that the power of attorney granted by him pursuant to Section 8.03 below shall enable the General Partner to execute and record on behalf of such Private Limited Partner any and all instruments necessary or appropriate to reflect the admission of such assignee as an additional or substituted Private Limited Partner.

(d)    In the event that a Partner acquires an interest in the Partnership either by transfer from another Partner or by acquisition from the Partnership:

(i)    Net Profits or Net Losses of the Partnership for the year in which such acquisition occurs shall be allocated among the Partners by (A) closing the books of the Partnership as of the end of the day on which such acquisition occurs, (B) computing the Net Profits and Net Losses of the Partnership separately for the portion of the year ending as of the end of the day on which such acquisition occurs and for the remaining portion and (C) allocating the Net Profits and Net Losses as so computed for such periods among the Partners who were Partners in the Partnership during such periods; and

(ii)    Cash and other property of the Partnership distributable for the year in which such acquisition occurs shall be distributed among the Partners by (A) closing the books of the Partnership as of the end of the day on which such acquisition occurs, (B) determining the cash and property of the Partnership distributable for the portion of the year ending as of the end of the day on which such acquisition occurs and for the remaining portion and (C) distributing such cash or property as so computed for such periods among the Partners who were Partners in the Partnership during such periods.

6.02    *Transfer of Interest by the General Partner.*

(a)    The General Partner may not voluntarily sell, transfer, assign, pledge or otherwise dispose of (any such disposition is hereafter referred to in this Section 6.02 as a "transfer") all or any part of its interest in the Partnership without the prior consent of a Majority in Interest of the Private Limited Partners; provided, that without the consent of any of the Private Limited Partners, the General Partner may transfer all or a portion of its interest to an entity which is controlled by the members of or the other persons owning ownership interests in the General Partner and cause such entity to be admitted to the Partnership as a general partner, with the rights and powers of, and subject to the restrictions imposed upon, the General Partner hereunder. For purposes hereof, an entity shall be deemed to be controlled by the members of or other persons owning interests in the General Partner if the members and such other persons shall own an aggregate of 75% of the beneficial interest therein, and shall, acting without the consent of any other persons, have the power to direct the management and operations of such entity.

(b)    Without the prior approval of a Majority in Interest of the Private Limited Partners, the General Partner shall not voluntarily withdraw from the Partnership prior to the dissolution thereof.

(c)    Notwithstanding the provisions of this Section 6.02, no transfer or assignment of the General Partner's interest shall be made without the prior written consent of the SBA, and any transferee of or successor to such interest shall have only the rights of a limited partner until such time as the SBA gives its approval.

6.03    *Withdrawal By Private Limited Partners.*

(a)    The basis on which a Private Limited Partner may, or may be required by the General Partner to, terminate, in whole or in part, its obligation to fund its Commitment and withdraw, in whole or in part, from the Partnership is set forth in Sections 7.3 through 7.10 of Annex PS, which are specifically incorporated into this Section 6.03.

(b)     Each Private Limited Partner shall, upon written request therefor from the General Partner, promptly furnish to the General Partner such information as the General Partner may reasonably request from time to time in order to make, and to permit its legal counsel to make, determinations pursuant to Sections 7.3 through 7.8 of Annex PS.

(c)     If a Private Limited Partner withdraws, in whole or in part, from the Partnership as contemplated by this Section 6.03, the General Partner may, in its discretion, offer the right to subscribe for interests in the Partnership based upon the unpaid Commitment, if any, of such Private Limited Partner (or, if applicable, that portion of such unpaid Commitment equal to the portion by which such Private Limited Partner's interest in the Partnership has been reduced) in the manner described in clauses (i) through (vi) of Section 2.5 of Annex OP.

(d)     There shall be paid to any Private Limited Partner which withdraws, in whole or in part, from the Partnership as contemplated by this Section 6.03, within 90 days after the end of the most recently ended second or fourth fiscal quarter of the Partnership, without interest, an amount equal to (i) in the case of a total withdrawal, such Partner's Estimated Value Capital Account determined as of the date of its withdrawal, or (ii) in the case of a partial withdrawal, an amount necessary to reduce such Partner's interest to the extent contemplated by this Section 6.03; provided, however, that the payment to be made pursuant to this Section 6.03(d) to such Private Limited Partner shall be subject to reduction in an amount equal to the costs of selling securities or other property in order to effect such payment. The Partnership may, in the discretion of the General Partner, elect to make all or a portion of such by delivery of a promissory note from the Partnership. Such promissory note shall bear simple interest at the prime rate published from time to time in *The Wall Street Journal* (the "Prime Rate"), and (unless prepaid by the Partnership, at its sole option) shall be payable both as to principal and accrued interest only at the end of five years from the date of delivery of such promissory note or at the end of the term of the Partnership, as it may be extended pursuant to Article VII, whichever first occurs; provided, that in no event shall any payment be due (A) if such payment is prohibited by, or would result in a violation by the Partnership of, the SBIC Act, or (B) to the extent that, after giving effect to such payment, the Partnership's outstanding Leverage would exceed the amount authorized by the SBIC Act. Recourse for payment of any and all amounts due under such promissory note shall be solely to the assets of the Partnership, and such promissory note shall be without recourse to the General Partner.

(e)     Notwithstanding the provisions of Section 6.03(d), the payment provided for in Section 6.03(d) shall be made in whole or in part by delivery of a promissory note of the Partnership only if and to the extent that making such payment in whole or in part in cash would, in the good faith determination of the General Partner, materially impair the financial condition or liquidity of the Partnership or would either be prohibited by or result in a violation by the Partnership of the SBIC Act or, after giving effect to such payment, would result in the Partnership's outstanding Leverage exceeding the amount authorized by the SBIC Act. Furthermore, if such payment is made in whole or in part by delivery of a promissory note, the Partnership shall, from time to time during the term of such note, prepay all or a portion of the principal thereof if the General Partner determines reasonably and in good faith that making such prepayment would not impair the financial condition or liquidity of the Partnership and if such

prepayment is not prohibited by, and would not result in a violation by the Partnership of, the SBIC Act and, after giving effect to such prepayment, the Partnership's outstanding Leverage will not exceed the amount authorized by the SBIC Act.

(f)    Any payment under any promissory note delivered pursuant to Section 6.03(a) may be made in securities or other non-cash assets of the Partnership as long as such payment is made at the time of, and is made in the same assets as, a distribution pursuant to Section 3.01. Any such payment shall be valued as provided in Section 3.01.

(g)    Any payment contemplated by this Section 6.03 shall be subject to the provisions of Section 7.11 of Annex PS.

(h)    As of the date of payment or delivery of the promissory note pursuant to Section 6.03(d), a Private Limited Partner which is required to withdraw in whole from the Partnership shall no longer be a Private Limited Partner, and the Capital Account and Commitment of a Private Limited Partner which is required to withdraw in part shall be deemed reduced to the extent determined in accordance with Section 6.03(a).

## ARTICLE VII

### Dissolution and Termination

7.01    *Events of Dissolution.*

(a)    The Partnership shall be dissolved:

(i)    Upon the occurrence of an event of withdrawal (as provided in the MULPA) with respect to the General Partner; provided, however, that in any such event any remaining General Partner or General Partners, or, in the absence of a remaining General Partner, all of the Private Limited Partners, may elect to continue the business of the Partnership within 90 days following such date of withdrawal, and appoint a new General Partner; and

(ii)    Subject to the provisions of Article VIII of Annex PS, the Partnership shall continue until 12:00 midnight, Boston time, December 31, 2008, unless: (A) extended by the General Partner, in its sole discretion, for up to three additional one-year terms; or (B) otherwise extended or earlier terminated by agreement of the General Partner and 65% in Interest of the Private Limited Partners. The General Partner may extend the term of the Partnership without the consent of the Private Limited Partners, in connection with the admission of a Preferred Limited Partner, to the extent required by the SBA in accordance with the SBIC Act.

(b)    Dissolution of the Partnership shall be effective on the day on which the event occurs giving rise to the dissolution, but the Partnership shall not terminate until the Partnership's Certificate of Limited Partnership shall have been canceled and the assets of the Partnership shall have been distributed as provided herein. Notwithstanding the dissolution of the

Partnership, prior to the termination of the Partnership, as aforesaid, the business of the Partnership and the affairs of the Partners, as such, shall continue to be governed by this Agreement. Upon dissolution of the Partnership, the General Partner or, if none, a liquidator appointed by a majority in interest of the Private Limited Partners and approved by the SBA (if required), shall liquidate or distribute the assets of the Partnership in accordance with Section 7.02 hereof and, cause the cancellation of the Partnership's Certificate of Limited Partnership.

7.02    *Distributions Upon Liquidation.*

(a)    The Partnership shall be liquidated in accordance with this Section 7.02, MULPA and the SBIC Act. Subject to the foregoing, after payment of liabilities owing to creditors, the General Partner or liquidator shall set up such reserves as it deems reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership. Said reserves may be paid over by the General Partner or liquidator to a bank, to be held in escrow for the purpose of paying any such contingent or unforeseen liabilities or obligations and, at the expiration of such period as the General Partner or liquidator may deem advisable, such reserves shall be distributed to the Partners or their assigns in the order of priority set forth below in Section 7.02(b).

(b)    After paying such liabilities and providing for reserves as described above, the General Partner or liquidator shall cause the remaining net assets of the Partnership to be distributed to and among the Partners in accordance with Annex PS, with the portion distributable to the Private Partners distributed among the Private Partners in accordance with their positive Capital Account balances (after such balances have been adjusted to reflect the allocation of Net Profits or Net Losses pursuant to Sections 2.03, 2.04, 2.05 and 2.06 for the period ending on the date of the liquidation) in proportion to and to the extent of such positive balances. In the event that any part of such net assets consists of securities or other noncash assets, the General Partner or liquidator may (but shall not be required to) take whatever steps it deems appropriate to convert such assets into cash or into any other form which would facilitate the distribution thereof. Without limiting its rights, powers and authority herein, the General Partner or liquidator shall be permitted to sell any Partnership assets as it may determine, at such prices and on such terms as it may in its sole discretion deem appropriate. If any assets of the Partnership are to be distributed in kind, such assets shall be distributed on the basis of their fair market value at the time of distribution, as determined by the General Partner or liquidator in accordance with Section 4.10.

(c)    The provisions of this Section 7.02 shall be subject to the provisions of Section 6.2 of Annex PS.

(d)    No Private Limited Partner shall have the right to demand a return of its Paid-In Contributions.

# ARTICLE VIII

## Miscellaneous

8.01    *Notices.*  Any and all notices, elections or demands permitted or required to be made under this Agreement shall be in writing, signed by the Partner giving such notice, election or demand and shall be delivered personally, or sent by registered or certified mail, by federal express or other reputable overnight courier: (a) to the Partnership or the General Partner at their respective addresses set forth in Sections 1.04 and 1.06(a) hereof; (b) to any Private Limited Partner, at its address set forth in Schedule A to this Agreement; and (c) to any Preferred Limited Partner, c/o SBA, Investment Division; or at such other address as may be supplied by written notice given in conformity with the terms of this Section 8.01. The date of personal delivery or the date of delivery to an overnight courier, or three days after the date of mailing, as the case may be, shall be the date of such notice.

8.02    *Successors and Assigns.*  Subject to the restrictions on transfers set forth herein, this Agreement, and each and every provision hereof, shall be binding upon and shall inure to the benefit of the Partners, their respective successors, successors-in-title, heirs and assigns, and each and every successor-in-interest to any Partner, whether such successor acquires such interest by way of gift, purchase, foreclosure, or by any other method, shall hold such interest subject to all of the terms and provisions of this Agreement.

8.03    *Power of Attorney.*  Each Private Limited Partner and any additional or substituted Private Limited Partner, by the execution of this Agreement, any amendment hereto or any counterpart hereof or thereof, does hereby irrevocably constitute and appoint the General Partner, and each person serving as a manager thereof, and each substitute or additional General Partner, his true and lawful agent and attorney-in-fact, with full authority to file and record such documents and instruments as may be necessary or appropriate to carry out the provisions of this Agreement, including, but not limited to, (a) such amendments to this Agreement and to the Partnership's Certificate of Limited Partnership, each as amended from time to time, as are necessary to admit additional or substituted Private Limited Partners, any Preferred Limited Partner or a substituted General Partner to the Partnership pursuant to Sections 1.10, 2.01, 2.02, 6.01 or 6.02, (b) such amendments to this Agreement as are adopted in accordance with Section 8.04 of the Agreement and (c) such documents and instruments as are necessary to cancel the Partnership's Certificate of Limited Partnership and any amendment thereto pursuant to Section 7.01 hereof. The foregoing power of attorney, being coupled with an interest, is hereby declared to be irrevocable, and shall survive the death, dissolution, bankruptcy, disability or incapacity of any Private Limited Partner or the assignment by him of his interest in the Partnership.

8.04    *Amendment.*  In addition to any amendments otherwise authorized herein, this Agreement may be changed, modified or amended only by a writing, as follows:

(a)    amendments to admit Private Limited Partners or any Preferred Limited Partner to the Partnership, as contemplated by and in accordance with Sections 1.10, 2.01 or 2.02, may be made by an instrument in writing duly executed by the General Partner and the Private Limited Partners being admitted to the Partnership;

-29-

(b)    amendments to admit substitute Private Limited Partners in accordance with Section 6.01 may be made by an instrument in writing duly executed by the General Partner and the substitute Private Limited Partner, and amendments to admit substitute or additional General Partners in accordance with Section 6.02 may be made by an instrument in writing duly executed by the General Partner and the substitute or additional General Partner, and, to the extent their consent is required pursuant to Section 6.02, by a Majority in Interest of the Private Limited Partners;

(c)    amendments of Schedule A may be made by an instrument in writing duly executed by the General Partner, plus any other person(s) as may be required under any other section hereof by virtue of the nature of the change being made; and

(d)    all other amendments may be made by an instrument in writing duly executed by the General Partner and 65% in Interest of the Private Limited Partners; provided, however, no such other amendment shall (i) increase the liability of any Private Limited Partner, (ii) change the Commitment required of any Private Limited Partner, or (iii) change the rights and interests of any Private Limited Partner in the Net Profits, Net Losses and distributions of the Partnership, unless such amendment is duly executed by each Partner so affected by such amendment; and any amendment to the provisions of this Section 8.04(d) shall require the unanimous approval of the Partners.

To the extent required by Section 10.2 of Annex PS (which is hereby incorporated herein), any proposed amendment shall require the prior written consent of the SBA.

8.05    *Creditors.* None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of any Partner or of the Partnership other than a Partner who is such a creditor of the Partnership. Notwithstanding the foregoing, the SBA shall be a third party beneficiary of this Agreement to the extent provided in Article III of Annex OP and Section 4.7 of Annex PS, each of which is hereby incorporated by reference herein.

8.06    *No Waiver.* The failure of any Partner to insist upon strict performance of a covenant hereunder or of any obligation hereunder, irrespective of the length of time for which such failure continues, shall not constitute a waiver of such Partner's right to demand strict compliance in the future. No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation hereunder, shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation hereunder.

8.07    *Entire Agreement.* This Agreement (together with the Schedules and Annexes hereto) constitutes the full and complete agreement of the parties hereto with respect to the subject matter hereof, any and all prior correspondence, conversations, memoranda or other writings being merged herein and replaced and being without effect hereon. No promises, covenants or representations of any character or nature other than those expressly stated herein or in the Subscription Agreements between the Partnership and each Private Limited Partner in connection with the purchase and sale of interests in the Partnership, have been made to induce any party to enter into this Agreement. References in this Agreement to Articles and Sections are

-30-

intended to refer to Articles and Sections of this Agreement (other than the Annexes) unless otherwise specifically stated.

8.08    *Captions.* Titles or captions of Articles or Sections contained in this Agreement are inserted only as a matter of convenience and for reference, and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

8.09    *Counterparts.* This Agreement (and any amendment hereto) may be executed in a number of counterparts, all of which together shall for all purposes constitute one Agreement, binding on all the Partners, notwithstanding that all Partners have not signed the same counterpart.

8.10    *Applicable Law.* This Agreement and the rights and obligations of the parties hereunder shall be governed by and interpreted, construed and enforced in accordance with the laws of the Commonwealth of Massachusetts.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

-31-

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

GENERAL PARTNER:

ZERO STAGE CAPITAL ASSOCIATES VI, LLC

By: _____
Paul M. Kelley, Manager

By: _____
Gordon B. Baty, Manager

By: _____
Stanley L. Fung, Manager

INITIAL LIMITED PARTNERS:

_____
Paul M. Kelley

_____
Gordon B. Baty

_____
Stanley L. Fung

# ZERO STAGE CAPITAL VI LIMITED PARTNERSHIP

Schedule A to

Agreement of Limited Partnership

| General Partner Name and Address | | Capital Contribution |
|---|---|---|
| Zero Stage Capital Associates VI, LLP<br>101 Main Street<br>Cambridge, MA 02142 | | $10.00 |

| Initial Limited Partner Name and Address | Number of Units | Capital Contribution |
|---|---|---|
| Paul M. Kelley<br>c/o Zero Stage Capital Company, Inc.<br>101 Main Street<br>Cambridge, MA 02142 | Not applicable | $330.00 |
| Gordon B. Baty<br>c/o Zero Stage Capital Company, Inc.<br>101 Main Street<br>Cambridge, MA 02142 | Not applicable | $330.00 |
| Stanley L. Fung<br>c/o Zero Stage Capital Company, Inc.<br>101 Main Street<br>Cambridge, MA 02142 | Not applicable | $330.00 |

#706607 v1 - MURPHRDH - f57z011.DOC - 19602/1

**EXHIBIT H – Tab 2**

# MANAGEMENT AGREEMENT

MANAGEMENT AGREEMENT dated as of the 9th day of June, 1998, between Zero Stage Capital VI Limited Partnership, a Massachusetts limited partnership having an office at 101 Main Street, Cambridge, Massachusetts 02142 (the "Partnership"), and Zero Stage Capital Company, Inc., a Massachusetts corporation having an office at 101 Main Street, Cambridge, Massachusetts 02142 ("ZSC").

## INTRODUCTION

The Partnership is a Massachusetts limited partnership which is engaged in the business of investing in venture capital securities. The Partnership is governed by the terms of a Limited Partnership Agreement dated of even date herewith (as such agreement may be amended from time to time, the "Partnership Agreement"). ZSC has experience and expertise in providing management and related services to venture capital partnerships.

The Partnership wishes to retain ZSC to assist the Partnership in locating and evaluating venture capital investments, in managing the Partnership's investments, and in administering its business and operations.

Capitalized terms used herein and not otherwise defined herein shall have the respective meanings ascribed to them in the Partnership Agreement.

NOW, THEREFORE, in consideration of the foregoing, of the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Partnership and ZSC hereby agree as follows:

1.      Compliance with SBIC Act. The Partnership and ZSC each hereby agree and acknowledge that the Partnership and its operations and activities shall be subject to the SBIC Act and applicable rules and regulations adopted thereunder, and that the exercise by ZSC and the Partnership of their respective rights, powers and authority pursuant to this Agreement shall at all times be subject to such restrictions as may from time to time be imposed by the SBIC Act, regardless of whether specifically provided herein with respect to any particular right, power or authority.

2.      Services of ZSC. ZSC agrees to provide the following services to the Partnership:

(a)      ZSC will actively seek out opportunities for venture capital investments which are consistent with the Partnership's investment objectives and commitments, review and evaluate such opportunities, and present them to the Partnership along with recommendations as to which investments, if any, which should be made. ZSC will assist the Partnership in negotiating, structuring and consummating those investments which the Partnership determines to make. ZSC will review and evaluate the Partnership's investment portfolio on an ongoing basis and

make quarterly reports to the Partnership, including recommendations as to which investments, if any, should be sold or distributed.

(b)    Subject to the direction and control of the general partner of the Partnership (the "General Partner"), ZSC will manage the Partnership's business, including the management of its investments, and will conduct the day-to-day administration of the Partnership's affairs, including making distributions and providing reports and information to the Partners of the Partnership. Until 80% of the Capital Contributions of the Private Limited Partners to the Partnership are invested or committed to venture capital investments, including amounts set aside as reserves for follow-up investments, ZSC will make available to the Partnership, on a substantially full-time basis, at least one executive employee to administer the Partnership's business and provide the services contemplated by this Agreement.

(c)    ZSC will provide such other services as may be agreed upon from time to time by ZSC and the Partnership.

3.    Expenses.

(a)    Except as provided in Section 3(b) below, ZSC will bear all costs and expenses incurred in connection with the services described in Section 2 above, including without limitation (i) all salaries and expenses of ZSC employees, (ii) all office, travel, business development, equipment rental, bookkeeping equipment, and supplies as may reasonably be required by the Partnership, and (iii) all expenses associated with the development, investigation, and monitoring of investments.

(b)    ZSC shall have no responsibility for the following costs and expenses relating to the Partnership and/or its business activities, all of which shall be borne by the Partnership:

(i)    taxes or other governmental charges other than ZSC's income taxes;

(ii)    interest on money borrowed by the Partnership, if any;

(iii)    charges for specialized outside consultants, including investment bankers and other professionals;

(iv)    charges for outside lawyers and independent public accountants;

(v)    transaction costs for buying, selling, transferring, disposing of, restructuring or otherwise dealing with the Partnership's investments;

(vi)    costs and expenses incurred in connection with the organization of the Partnership and the offering and sale of limited partnership interests in the Partnership, including selling commissions, if any;

(vii)    costs and expenses incurred in connection with the Partnership's qualification as an SBIC, and the maintenance of such qualification as an SBIC;

(viii)    the cost of services provided by any Associate (as that term is defined in the SBIC Act) of the Partnership which is not part of the normal process of making and monitoring venture capital financings; and

(ix)    the cost of preparing, printing and distributing all reports to the partners of the Partnership and of conducting any meeting of partners.

4.    <u>Compensation to ZSC.</u>

(a)    The Partnership will pay to ZSC, as full compensation for the services rendered and expenses borne by ZSC pursuant to this Agreement, a management fee at an annual rate equal to 2.5% of (A) the sum of (1) the total amount of the Commitments of the Private Limited Partners (calculated, with respect to the Partnership's first fiscal year, at the end of such fiscal year), plus (2) the total amount of the eligible Commitments of the Preferred Limited Partners, plus (3) the sum of the cost of any amount recovered on any investment by the Partnership which had previously been written off, retroactive to the date of the write-off, less (B) the sum of (i) the cost of any of the Partnership's investments (other than temporary investments) which are liquidated or distributed in kind, and (ii) the cost of any of the Partnership's investments written off by the Partnership for tax purposes.

(b)    The management fee shall be computed on a quarterly basis and shall be paid for each calendar quarter in advance on the first day of such calendar quarter, except that the first installment of the management fee shall be paid on the date of this Agreement for the calendar quarter during which this Agreement is executed and shall be prorated based on the number of days remaining in such quarter. If an event occurs during a calendar quarter which changes the amount of the fee payable for such quarter, such change shall be an adjustment to the following quarterly payment.

5.    <u>ZSC's Services to Other Clients.</u>  The Partnership acknowledges and agrees that ZSC intends to perform services of the type to be performed hereunder for various clients, including, without limitation, existing and future venture capital funds. Some of these clients may have investment objectives similar to, or identical with, those of the Partnership. It is understood that ZSC may give advice to any of its other clients which may differ in its timing or nature from advice given to the Partnership. In determining the suitability of a particular investment opportunity for the Partnership itself or another fund, ZSC will consider all relevant factors, including the nature and amount of the investment, the present composition of the portfolio of the fund, and the amount of the uninvested capital of the fund. It is understood that, based on these factors, ZSC may recommend an investment to one of its clients even though it has not recommended the investment to another of its clients with assets available for investment.

6.   Participation in Investments. The parties acknowledge and agree that other funds organized or managed by ZSC or in which ZSC has an interest may make independent investments in companies in which the Partnership invests. The Partnership and ZSC will cooperate, to the extent practicable and consistent with the best interests of the Partnership, to permit such other funds which wish to co-invest with the Partnership to do so upon the same terms and conditions as are applicable to the Partnership's investment, provided such co-investment does not prevent the Partnership from satisfying its own investment objectives.

7.   Exculpation and Indemnification.

(a)   For purposes of this Agreement, the word "Affiliate" shall mean any person performing services on behalf of ZSC or the Partnership who: (i) directly or indirectly controls, is controlled by, or is under common control with ZSC or the General Partner; (ii) owns or controls 10% or more of the outstanding voting securities of ZSC or the General Partner; (iii) is an officer, director, partner or trustee of ZSC or the General Partner; or (iv) if ZSC or the General Partner is an officer, director, partner or trustee, is any company for which ZSC or the General Partner acts in any such capacity.

(b)   The exculpation provisions set forth in Section 4.1 of Annex OP are hereby specifically incorporated into this Agreement with respect to the activities, actions or omissions of ZSC and its Affiliates. The Partnership hereby agrees to indemnify and hold harmless ZSC and its Affiliates to the maximum extent permitted by the indemnification provisions set forth in Section 4.2 of Annex OP, which are hereby specifically incorporated into this Agreement.

(c)   The determination as to whether ZSC or its Affiliates have satisfied the standard of conduct contained in Sections 4.1 and 4.2 of Annex OP shall be made by a majority in number of those representatives of the Private Limited Partners then serving on the IPC; provided, that no such determination shall be required to be made, and any party seeking indemnity hereunder shall be entitled to indemnification hereunder, if a court of competent jurisdiction, arbitrator or other regulatory or similar body determines that such party has successfully defended itself on the merits.

(d)   Any indemnity under this Section 7 shall be paid from, and only to the extent of, Partnership assets, and no Partner shall have any personal liability on account thereof.

8.   Term. The term of this Agreement shall commence as of the date hereof, and shall continue until December 31, 2008, except that: (i) this Agreement shall automatically terminate upon the earlier dissolution and termination of the Partnership; (ii) this Agreement shall automatically be extended for the period of any extension of the term of the Partnership beyond December 31, 2008; and (iii) this Agreement may be terminated by the Partnership without cause upon six months prior written notice to ZSC, provided that such termination has been approved by the General Partner and 65% in interest of the Private Limited Partners of the Partnership.

-4-

9.    Miscellaneous Provisions.

(a)    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors.

(b)    This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Massachusetts.

(c)    Any and all notices permitted or required to be made under this Agreement shall be in writing, signed by the party giving such notice and shall be delivered personally, or sent by registered or certified mail, return receipt requested, or sent by Federal Express or other reputable overnight courier, to each party at its address set forth on the first page of this Agreement, or at such other address as may be supplied by written notice given in conformity with the terms of this Section 9. Three days after the date of mailing, or the date of personal delivery, or the date one business day following delivery to Federal Express or overnight courier, as the case may be, shall be the date of such notice.

(d)    This Agreement constitutes the full and complete agreement of the parties hereto with respect to the subject matter hereof and supersedes any and all prior agreements concerning the subject matter hereof.

(e)    No amendment, modification or termination of any provision of this Agreement shall be valid unless expressed in writing and signed by both parties to this Agreement.

(f)    This Agreement may not be assigned by the Partnership to any party without the prior consent of ZSC. This Agreement may not be assigned by ZSC to any party without the prior consent of the General Partner and 65% in interest of the Private Limited Partners of the Partnership; provided, that ZSC may, without the prior consent of the Partnership, assign its interest in this Agreement to any entity which is controlled by the general partners of or the other persons owning partnership interests in the General Partner. For purposes hereof, an entity shall be deemed to be controlled by the general partners of or other persons owning interests in the General Partner if the general partners and such other persons shall own an aggregate of at least 75% of the beneficial interest therein, and shall, acting without the consent of any other persons, have the power to direct the management and operations of such entity.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

-5-

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the day and year first above written.

ZERO STAGE CAPITAL VI
LIMITED PARTNERSHIP

By:    Zero Stage Capital Associates VI, LLC
       Its General Partner

By: *Paul M. Kelley*
General Manager

ZERO STAGE CAPITAL COMPANY, INC.

By: *Paul M. Kelley*
Authorized Officer

#706587 v1 - MURPHRDH - 157I011.DOC - 19602/1

-6-

**EXHIBIT H – Tab 3**

**ZERO STAGE CAPITAL VI, LP**
**Deferred Management Fees**
**FY 2002 - 2005**

## 1) Deferred Management Fees

### SUMMARY OF UNPAID FEES:

|  |  | Pre-Deferral | | Post-Deferral | | TOTAL | |
|---|---|---|---|---|---|---|---|
| Balance @ 12/31/02 | | $ | 2,091,589 | $ | - | $ | 2,091,589 | * |
| 2003 Fees earned | X | | 1,506,202 | | 1,432,202 | | 2,938,404 | see below |
| 2003 Fees paid | | | (300,000) | | - | | (300,000) | |
| Balance @ 12/31/03 | | $ | 3,297,791 | $ | 1,432,202 | $ | 4,729,993 | |
| 2004 Fees earned | | | - | | 2,541,216 | | 2,541,216 | |
| Balance @ 12/31/04 | | $ | 3,297,791 | $ | 3,973,418 | $ | 7,271,209 | |
| 2005 Fees earned | | | - | | 670,268 | | 670,268 | see below |
| Balance @ May 3, 2005 | | $ | 3,297,791 | $ | 4,643,686 | $ | 7,941,477 | |
| Less:Improvenet violation | | | - | | (4,016,141) | | (4,016,141) | |
| TOTAL UNPAID FEES | | $ | 3,297,791 | $ | 627,545 | $ | 3,925,336 | |

    *      Agrees to the 12/31/02 audited financial statements prepared by PWC.

### SUMMARY OF 2003 FEES:

| | | Pre-Deferral | | Post-Deferral | | TOTAL | |
|---|---|---|---|---|---|---|---|
| Management fee expense (2003) | - | | | | | | |
| First Quarter | | $ | 753,101 | $ | - | $ | 753,101 |
| Second Quarter | | | 753,101 | | - | | 753,101 |
| Third Quarter | | | - | | 716,101 | | 716,101 |
| Fourth Quarter | | | - | | 716,101 | | 716,101 |
| | X | $ | 1,506,202 | $ | 1,432,202 | $ | 2,938,404 | ** |

Pre-deferral = January '02 through June '03. The Company agreed to defer Management fees starting in Q3 of 2003.

** The Management fees expense agrees to PWC's audited financial statements for the year-ended 12/31/03.

### SUMMARY OF 2005 FEES:

| | Pre-Deferral | | Post-Deferral | | TOTAL | |
|---|---|---|---|---|---|---|
| Management fee expense: | | | | | | |
| First Quarter | $ | - | $ | 478,763 | $ | 478,763 | *** |
| Second Quarter (thru May 3, 2005) | | - | | 191,505 | | 191,505 | **** |
| | $ | - | $ | 670,268 | $ | 670,268 | |

    ***    Management fees as calculated by the Company's accounting staff and included in the *"First Quarter Report for 2005"*

    ****    Estimated fees determined by using the fees for First Quarter prorated through May 3, 2005.

**EXHIBIT H – Tab 4**

# Zero Stage Capital VI Limited Partnership

**(A Massachusetts Limited Partnership)**
**Financial Statements**
**December 31, 2003 and 2002**

# PRICEWATERHOUSE COOPERS ⓡ

**PricewaterhouseCoopers LLP**
125 High Street
Boston MA 02110
Telephone (617) 530 5000
Facsimile (617) 530 5001

## Report of Independent Auditors

To the Partners of
Zero Stage Capital VI Limited Partnership

In our opinion, the accompanying statements of assets, liabilities and partners' equity, and the related statements of operations, changes in partners' equity and cash flows present fairly, in all material respects, the financial position of Zero Stage Capital VI Limited Partnership (the "Partnership") at December 31, 2003 and 2002, and the results of its operations, changes in partners' equity and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the General Partner; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by the General Partner, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

*PricewaterhouseCoopers LLP*

March 30, 2004

# Zero Stage Capital VI Limited Partnership
**(A Massachusetts Limited Partnership)**
## Statements of Assets, Liabilities and Partners' Equity
### December 31, 2003 and 2002

|  | 2003 | 2002 |
|---|---|---|
| **Assets** | | |
| Investments at fair value (cost of $101,859,433 and $110,017,120 at December 31, 2003 and 2002, respectively) | $ 64,269,915 | $ 122,083,320 |
| Cash and cash equivalents | 1,032,730 | 3,198,969 |
| Investments receivable | - | 56,001 |
| Portfolio company receivable (Note 6) | 2,855 | 60,615 |
| Deferred financing costs, net | 1,828,724 | 2,194,469 |
| Interest receivable | 848,007 | 445,646 |
| Other prepaid expenses | - | 45,595 |
| Total assets | $ 67,982,231 | $ 128,084,615 |
| **Liabilities and Partners' Equity** | | |
| Accounts payable and accrued expenses | $ 45,703 | $ 47,481 |
| Management fee payable | - | 2,091,590 |
| Total liabilities | 45,703 | 2,139,071 |
| Commitments and contingencies (Note 7) | | |
| Redeemable preferred participating securities (Note 3) | 67,936,528 | 93,205,000 |
| Partners' equity | | |
| Private partners' contributed capital | 50,000,000 | 50,000,000 |
| Accumulated operating losses | (11,875,350) | (13,622,189) |
| Accumulated realized (loss) gain | (25,295,770) | (15,195,633) |
| Unrealized (depreciation) appreciation on investments (net) | (12,321,046) | 12,066,200 |
| Syndication costs | (507,834) | (507,834) |
| Total partners' equity | - | 32,740,544 |
| Total liabilities and partners' equity | $ 67,982,231 | $ 128,084,615 |

The accompanying notes are an integral part of these financial statements.

2

# Zero Stage Capital VI Limited Partnership
**(A Massachusetts Limited Partnership)**
**Statements of Operations**
**Years Ended December 31, 2003 and 2002**

|                                                              | 2003          | 2002          |
|--------------------------------------------------------------|--------------:|--------------:|
| **Income**                                                   |               |               |
| Interest                                                     | $    714,519  | $    635,329  |
| Dividend                                                     | -             | 514,109       |
| Total income                                                 | 714,519       | 1,149,438     |
| **Expenses**                                                 |               |               |
| Management fees                                              | 2,938,403     | 3,091,589     |
| Amortization of deferred financing costs                     | 365,745       | 365,745       |
| Professional and other expenses                              | 393,525       | 329,409       |
| Total expenses                                               | 3,697,673     | 3,786,743     |
| Waivers (Note 4)                                             | (4,729,993)   | -             |
| Net expenses                                                 | (1,032,320)   | 3,786,743     |
| Net investment income (loss) from operations                | 1,746,839     | (2,637,305)   |
| Realized loss on investments                                 | (10,100,137)  | (8,629,886)   |
| Change in unrealized depreciation on investments             | (49,655,718)  | (8,958,800)   |
| Net losses allocated to preferred participating securities   | 25,268,472    | -             |
| Net decrease in partners' equity resulting from operations   | $ (32,740,544) | $ (20,225,991) |

The accompanying notes are an integral part of these financial statements.

## Zero Stage Capital vI Limited Partnership
### (A Massachusetts Limited Partnership)
### Statements of Changes in Partners' Equity
### Years Ended December 31, 2003 and 2002

|  | General Partner | Limited Partners | Total |
|---|---|---|---|
| Partners' equity at December 31, 2001 | $ 529,665 | $ 52,436,870 | $ 52,966,535 |
| Net investment loss from operations | (26,373) | (2,610,932) | (2,637,305) |
| Realized loss on sale of investments | (86,299) | (8,543,587) | (8,629,886) |
| Change in unrealized appreciation on investments | (89,588) | (8,869,212) | (8,958,800) |
| Partners' equity at December 31, 2002 | 327,405 | 32,413,139 | 32,740,544 |
| Net investment income from operations | 17,469 | 1,729,370 | 1,746,839 |
| Realized loss on sale of investments | (101,001) | (9,999,136) | (10,100,137) |
| Change in unrealized appreciation on investments (net) | (243,873) | (24,143,373) | (24,387,246) |
| Partners' equity at December 31, 2003 | $        - | $        - | $        - |

The accompanying notes are an integral part of these financial statements.

4

# Zero Stage Capital VI Limited Partnership
## (A Massachusetts Limited Partnership)
### Statements of Cash Flows
### Years Ended December 31, 2003 and 2002

|  | 2003 | 2002 |
|---|---|---|
| **Cash from operating activities** | | |
| Decrease in partners' equity resulting from operations | $  (32,740,544) | $  (20,225,991) |
| Adjustments to reconcile net (decrease) increase in partners' equity to | | |
| net cash used in operating activities | | |
| Change in unrealized depreciation on investments (net) | 24,387,246 | 8,958,800 |
| Realized loss on investments | 10,100,137 | 8,629,886 |
| Conversion of accrued interest to preferred stock or notes | (304,524) | (894,084) |
| Amortization of deferred financing costs | 365,745 | 365,745 |
| Net change in operating assets and liabilities | | |
| Decrease (increase) in investment receivable | 56,001 | (56,001) |
| Increase in interest receivables | (402,361) | (140,222) |
| Decrease (increase) in other prepaid expenses | 45,595 | (22,213) |
| Increase (decrease) in prepaid management fee | (2,091,590) | 2,091,590 |
| Decrease (increase) in portfolio company receivable | 57,760 | (35,615) |
| Decrease in accounts payable and accrued expenses | (1,778) | (15,466) |
| Net cash used in operating activities | (528,313) | (1,343,571) |
| **Cash from investing activities** | | |
| Repayment of notes receivable | - | 2,475,492 |
| Purchase of investments | (2,295,038) | (3,684,104) |
| Proceeds from sale of investments | 654,232 | 1,963,389 |
| Distribution from portfolio company | 2,880 | 91,442 |
| Net cash (used in) provided by investing activities | (1,637,926) | 846,219 |
| Net decrease in cash and cash equivalents | (2,166,239) | (497,352) |
| Cash and cash equivalents at beginning of year | 3,198,969 | 3,696,321 |
| Cash and cash equivalents at end of year | $    1,032,730 | $    3,198,969 |

The accompanying notes are an integral part of these financial statements.

5

## Zero Stage Capital VI Limited Partnership
(A Massachusetts Limited Partnership)
### Notes to Financial Statements
### December 31, 2003 and 2002

1.   **Description of the Partnership**

Zero Stage Capital VI Limited Partnership (the "Partnership"), a Massachusetts Limited Partnership, was organized June 9, 1998 ("date of inception") by the Zero Stage Capital Associates VI Limited Liability Company (the "General Partner"), to operate as a licensee under Section 301(c) of the Small Business Investment Company Act of 1958, as amended (the "Act"). The primary purpose of the Partnership is to provide equity capital and long-term financing to small business concerns, as defined by the Act. The Small Business Administration ("SBA") formally approved the license on December 7, 1998.

The term of the Partnership extends to December 31, 2008, unless (i) extended by the General Partner, in its sole discretion, for up to three additional one-year terms; or (ii) otherwise extended or earlier terminated by agreement of the General Partner and 65 percent in interest of the Private Limited Partners. The General Partner may extend the term of the Partnership without the consent of the Private Limited Partners, in connection with the admission of a Preferred Limited Partner, to the extent required by the SBA in accordance with the Act or applicable regulations.

2.   **Significant Accounting Policies**

**Preparation of Financial Statements**
The Partnership's policy is to prepare its financial statements on the accrual basis of accounting.

**Cash Equivalents**
Highly liquid investments which have an original maturity of ninety days or less are considered "cash equivalents" for financial statement purposes. These investments are carried at cost plus accrued interest which approximates fair value.

**Gains and Losses on Investments and Investment Income**
Amounts reported as realized investment gains and losses are measured by the difference between the proceeds of the sale and the cost basis of the investment on a specific identification basis. Investment income due from portfolio companies is recognized on an accrual basis.

**Income Taxes**
In accordance with applicable Internal Revenue Service regulations, the income tax effects of profits and losses become those of the individual partners and are not reflected in the Partnership's statements.

**Concentrations of Market and Credit Risk**
Financial instruments which potentially subject the Partnership to concentrations of market and credit risk consist of cash, cash equivalents and investments. Concentrations of market and credit risk exist with respect to debt and equity investments in investee companies which are subject to significant risk usual to companies in various stages of start-up. Generally, there is no ready market for the Partnership's investments, as they are closely held, generally not publicly traded or, in circumstances where an investment is publicly traded, the Partnership may be subject to certain trading restrictions for a specified period of time.

The Partnership places its cash and cash equivalents in banks and institutions which it believes are creditworthy.

6

**Zero Stage Capital VI Limited Partnership**
(A Massachusetts Limited Partnership)
Notes to Financial Statements
December 31, 2003 and 2002

**Organization and Syndication Costs**
Syndication costs of $507,834 related to the Partnership have been recorded as a deduction to Partnership contributions. Syndication costs, consisting mainly of SBA fees, are deducted from Partnership contributed capital for GAAP purposes and capitalized and amortized over five years for Form 468 purposes.

**Deferred Financing and Licensing Costs**
Commitment and licensing fees paid to the SBA are capitalized and amortized over the remaining life of the Partnership using the straight-line method.

**Use of Estimates**
The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

**Investment Valuation**
Investment values are estimated by the General Partner pursuant to the valuation policy detailed in the SBA's Model Valuation Policy set forth in 13 CFR Part 107, Appendix III, Section III of the small business regulations pertaining to Small Business Investment Companies. Valuations are also in accordance with accounting principles generally accepted in the United States of America. Accordingly, investments are valued as follows: interest-bearing securities are valued at an amount not to exceed amortized cost, with unrealized depreciation recognized when value is impaired; equity securities of private companies are to be valued at cost or estimated fair value as determined by the General Partner after giving consideration to operating results, financial condition, recent transactions of the issuers, or other pertinent information. Equity securities of public companies traded in the over-the-counter market are to be valued at the average of the bid price at the close for the valuation date and the preceding two days; and listed stocks are to be valued at the average of the closing price for the valuation date and the preceding two days. Because of the inherent uncertainty of valuations, however, those estimated values may differ significantly from the values that would have been used had a ready market for the securities existed, and the differences could be material. In the opinion of the General Partner the valuation policy adopted is not materially different from GAAP.

3.    **Capital Contributions, Profits and Losses and Distributions**

As of December 31, 2003 and 2002, capital commitments from the Limited Partners totaled $49,500,000 and the capital commitments from the General Partner totaled $500,000. For the period from the date of inception to December 31, 2003 and 2002, capital contributions to the Partnership totaled $49,500,000 from the Limited Partners and $500,000 from the General Partner. At December 31, 2003 and 2002, 100% of the committed capital has been contributed.

In accordance with the Act, the Partnership may apply to the SBA for commitments to invest in Participating Securities ("Leverage") as a Preferred Limited Partner of the Partnership for up to $100,000,000. Such Participating Securities, when issued, will generally be redeemable ten years from the issue date and will be entitled to a priority return ("Prioritized Payments") equivalent to the ten-year treasury bond rate plus a premium. In addition, the SBA shares in the Partnership's profits in accordance with regulations promulgated under the Act. The Prioritized Payments are payable from available cash, but only to the extent the Partnership has earnings as defined.

## Zero Stage Capital VI Limited Partnership
(A Massachusetts Limited Partnership)
**Notes to Financial Statements**
**December 31, 2003 and 2002**

Unpaid Prioritized Payments compound at the priority return rate. All amounts due to the SBA for redemption of Participating Securities, Prioritized Payments and profit participation are senior in priority to all other partnership interests.

The Partnership has issued the following participating securities to the SBA:

| Date | Amount | Priority Rate of Return |
|------|--------|-------------------------|
| March 26, 1999 | $ 18,000,000 | 7.54% |
| July 30, 1999 | 10,000,000 | 7.54% |
| October 25, 1999 | 15,000,000 | 8.017% |
| December 10, 1999 | 7,000,000 | 8.017% |
| February 3, 2000 | 12,000,000 | 8.017% |
| March 10, 2000 | 8,800,000 | 7.449% |
| June 16, 2000 | 15,000,000 | 7.449% |
| October 13, 2000 | 4,905,000 | 6.640% |
| November 28, 2001 | 2,500,000 | 6.030% |
| | $ 93,205,000 | |

At December 31, 2003 and 2002, accumulated prioritized payments contingently due to the SBA amounted to $33,350,045 and $25,331,711, respectively. If the Partnership was liquidated at December 31, 2003 the distribution to the SBA would be approximately $67,936,528.

In accordance with the partnership agreement, net profits and cash distributions are generally allocated 99 percent to the Limited Partners and 1 percent to the General Partner until such time as the Limited Partners have received distributions at least equal to their capital contributions. After such time, the distributions will be allocated 80 percent to all Partners and 20 percent to the General Partner.

Net losses are allocated to each partner to the extent of their positive capital account balance in the same manner as gains. However, to the extent net losses are less than the positive capital account balances, losses shall be allocated in an amount that would cause such partners capital account to be equal to their share of the then Partnership Capital. To the extent the allocation of losses would result in negative capital accounts to the General Partner and the Limited Partners, such amount would be allocated to the SBA as Preferred Limited Partner to the extent of its committed capital. At December 31, 2003, $25,268,472 in losses were allocated to the Preferred Limited Partner.

**4.    Management Fees**

The management company, Zero Stage Capital Company, Inc. which is owned by certain partners of the General Partner, is paid a fee for managing and conducting the investment activities and affairs of the limited partnership. The Partnership is required to pay to the management company a fee equal to 2.5 percent per year (computed on a quarterly basis) of the total committed capital of the General Partner, Private Limited Partners and the eligible capital of the Preferred Limited Partner, net of the cost of any of the Partnership's investments which are liquidated or distributed and net of the cost of any investments written off for tax purposes by the Partnership. Any adjustment to the management fee resulting from the foregoing is made in the quarter immediately following such liquidation or distribution. In 2003, the General Partner waived $4,729,993 representing management fees for the year ended 2003 and a portion of 2002.

8

# Zero Stage Capital VI Limited Partnership
(A Massachusetts Limited Partnership)
## Notes to Financial Statements
December 31, 2003 and 2002

5. **Investments**

Investments at December 31, 2003 categorized by industry, consist of the following:

| Investments | Description of Securities | Cost | Fair Value |
|---|---|---|---|
| **Information Technology/Software** | | | |
| Bluestreak.com | 1,049,893 shares of Series B preferred stock | $  3,615,000 | $  5,082,246 |
| | 499,462 shares of Series C preferred stock | 3,375,000 | 2,417,754 |
| | Warrant to purchase 42,188 shares of Series C preferred stock, expires 9/22/05, $12.00 exercise price | - | - |
| | Warrant to purchase 17,292 shares of common stock, expires 12/21/04, $.01 exercise price | - | - |
| | | 6,990,000 | 7,500,000 * |
| eMed Technologies | 714,286 shares of Series K preferred stock | 1,000,000 | 1,514,286 |
| | 117,925 shares of Series L preferred stock | 250,001 | 250,001 |
| | Warrant to purchase 17,688 shares of common stock, expire 9/29/10, $2.82 exercise price | - | - |
| | Warrant to purchase 193,333 shares of common stock, expires 1/31/09, $0.01 exercise price | - | 407,933 |
| | | 1,250,001 | 2,172,220 |
| Axxis, Inc. | 281,281 shares of Series A preferred stock | 1,999,999 | 156,392 |
| (formerly Fuelspot, Inc.) | 90,846 shares of Series AA preferred stock | 2,000,000 | 50,510 |
| | 203,804 shares of Series B preferred stock | 3,000,000 | 113,315 |
| | 899,281 shares of Series C preferred stock | 500,000 | 500,000 |
| | 119,038 shares of common stock | 125,000 | 66,185 |
| | Warrant to purchase preferred stock based on formula, expires 6/21/05. | - | - |
| | | 7,624,999 | 886,402 |
| Gazelle Systems | 3,002,799 shares of Series A preferred stock | 3,002,800 | - |
| | 1,438,114 shares of Series B preferred stock | 3,499,997 | - |
| | 5,833,333 shares of Series C preferred stock | 2,080,000 | - |
| | Warrant to purchase 84,507 shares of Series A preferred stock, expires 10/31/04, $.47 exercise price | - | - |
| | | 8,582,797 | - |
| Jenzabar, Inc | 31,646 shares of Series A preferred stock | 100,000 | 70,000 |
| | 550,212 shares of Series B preferred stock | 2,013,777 | 1,409,643 |
| | Warrant to purchase 81,027 shares of common stock, expires 2/29/05, $2.80 exercise price | - | - |
| | | 2,113,777 | 1,479,643 |
| LiveWave, Inc. | 1,358,500 shares of Series A preferred stock | 950,000 | 950,000 |
| | 667,535 shares of Series B preferred stock | 1,829,046 | 1,829,046 |
| | 307,471 shares of Series C preferred stock | 535,000 | 535,000 |
| | 1,871,007 shares of Series D preferred stock | 1,897,693 | 1,897,693 |
| | Warrant to purchase Series B preferred stock based on formula, expires 6/13/05 | - | - |
| | Warrant to purchase 276,724 shares of common stock, expires 3/08/08, $0.01 exercise price | - | - |
| | Warrant to purchase common stock to be issued at Series C closing | - | - |
| | | 5,211,739 | 5,211,739 * |

# Zero Stage Capital VI Limited Partnership
## (A Massachusetts Limited Partnership)
## Notes to Financial Statements
## December 31, 2003 and 2002

| Investments | Description of Securities | Cost | Fair Value |
|---|---|---:|---:|
| NetKey, Inc. | 4,797,070 shares of Series A preferred stock | $ 3,000,000 | $ 2,398,535 |
| | 1,077,373 shares of Series B preferred stock | 499,999 | 538,686 |
| | Warrant to purchase 22,624 shares of Series B preferred stock, expires 1/31/08, $2.21 exercise price | - | - |
| | | 3,499,999 | 2,937,221 |
| OuterLink Corporation | 2,573,307 shares of Series B preferred stock | 3,500,000 | - |
| | 2,573,307 shares of Series B-1 preferred stock | 2,315,978 | - |
| | Warrant to purchase 1,215,278 shares of common stock, expires 8/30/04, $1.44 exercise price | - | - |
| | Warrant to purchase common stock based on formula | - | - |
| | Warrant to purchase financing round shares based on formula, expires 5/02/06 and 6/25/06 | - | - |
| | Warrant to purchase Series C shares based on formula, expires 8/24/06 | - | - |
| | | 5,815,978 | - |
| Resinate Corporation | 4,740,000 shares of Series A preferred stock | 4,740,000 | - |
| | 8,303,019 shares of Series B preferred stock | 4,500,003 | - |
| | Warrant for new securities based on formula, expires 11/30/05 | - | - |
| | Warrant to purchase common stock based on formula, expires 12/27/05 | - | - |
| | Warrant to purchase shares based on formula, expires 1/18/12 | - | - |
| | Warrant to purchase shares based on formula in relation to guarantee amount of loan to company by MBDC | - | - |
| | Subordinated convertible note, 12%, expires 9/30/03 | 250,000 | - |
| | Subordinated convertible note, 12%, expires 9/30/03 | 250,000 | - |
| | | 9,740,003 | - |
| Swift Rivers, Inc. | 2,408,660 shares of Series A preferred stock | 2,719,997 | - |
| Syncra Systems, Inc | 2,250,000 shares of Series B preferred stock | 3,000,000 | - |
| | 841,121 shares of Series C preferred stock | 3,600,000 | - |
| | Subordinated secured convertible promissory note, 12%, due 8/31/04 | 1,369,776 | 1,369,778 |
| | Warrant to purchase preferred stock based on formula, expires 5/23/05 | - | - |
| | Warrant to purchase on the Liquidation Event Date, 15,588 shares of Series F preferred stock | - | - |
| | | 7,969,776 | 1,369,778 |
| | **Total Information Technology/Software** | 61,519,066 | 21,557,003 |
| **Medical/Biotechnology** | | | |
| Amgen, Inc. | 1,348 shares of common stock | 14,490 | 71,008 |
| HEALTHvision | 827,591 shares of common stock | 1,823,244 | 1,823,244 |
| | Warrant to purchase 167,709 shares of common stock, expires 10/19/09, $3.75 exercise price | - | - |
| | | 1,823,244 | 1,823,244 |
| Spherics, Inc. | 3,250,000 shares of Series A preferred stock | 3,250,000 | 4,940,000 * |
| ViaCell, Inc. | 666,667 shares of Series G preferred stock | 2,000,000 | 5,333,336 * |
| | **Total Medical/Biotechnology** | 7,087,734 | 12,167,588 |

10

## Zero Stage Capital VI Limited Partnership
### (A Massachusetts Limited Partnership)
### Notes to Financial Statements
### December 31, 2003 and 2002

| Investments | Description of Securities | Cost | Fair Value |
|---|---|---|---|
| **Industrial/Other** | | | |
| First Service Networks | 250,000 shares of Series A preferred stock | $ 440,000 | $ 125,000 |
| | 2,774,451 shares of Series B preferred stock | 5,436,523 | 1,387,223 |
| | Warrant to purchase 255,168 shares of Series B preferred stock, expire 1/11/03 - 11/7/03, $.186152093 exercise price | - | |
| | | 5,876,523 | 1,512,223 |
| | **Total Industrial/Other** | 5,876,523 | 1,512,223 |
| **Hardware/Equipment** | | | |
| Sonexis, Inc | | | |
| | 8,000,000 shares of Series A preferred stock | 2,000,000 | 2,000,000 |
| | 4,000,000 shares of Series B preferred stock | 5,000,000 | 5,000,000 |
| | 518,135 shares of Series C preferred stock | 2,000,001 | 2,000,001 |
| | | 9,000,001 | 9,000,001 * |
| Intersense | 666,667 shares of Class A preferred stock | 1,000,000 | 400,000 |
| | 1,111,111 shares of Series B-1 preferred stock | 2,000,000 | 666,667 |
| | 274,605 shares of Series C-1 preferred stock | 763,402 | 164,763 |
| | 625,918 shares of Series D preferred stock | 375,551 | 375,551 |
| | Warrant to purchase 18,971 shares of Series C preferred stock, expires 09/08/05, $2.78 exercise price | - | - |
| | Warrant to purchase 222,222 shares of common stock, expires 10/20/04, $1.80 exercise price | - | - |
| | Warrant to purchase 53,957 shares of preferred stock, expires 3/26/07, $2.78 exercise price | - | - |
| | | 4,138,953 | 1,606,981 |
| | **Total Hardware/Equipment** | 13,138,954 | 10,606,982 |
| **Internet Related** | | | |
| FurnitureFan.com, Inc | 5,000,000 shares of Series A preferred stock | 500,000 | 250,000 |
| | 12,722,097 shares of Series B preferred stock | 5,724,943 | 2,862,472 |
| | Warrant to purchase 750,000 shares of common stock, expires 2/26/06, $0.05 exercise price | - | |
| | Warrant to purchase shares of common stock based on formula, expires 10/03/06, $0.05 exercise price | - | |
| | Convertible promissory notes, 12%, expires 12/3/04 - 3/29/04 | 2,870,000 | 1,435,000 |
| | | 9,094,943 | 4,547,472 * |
| Worldwinner.com | 5,142,213 shares of Series A preferred stock | 5,142,213 | 13,878,647 |
| | Warrant to purchase Series B preferred stock based on formula, expire 2/20/06 - 9/14/06 | - | |
| | Warrant to purchase preferred stock based on formula, expire 7/5/05 - 9/22/05 | - | |
| | | 5,142,213 | 13,878,647 * |
| | **Total Internet Related** | 14,237,156 | 18,426,119 |
| | **Total Investments** | $ 101,859,433 | $ 64,269,915 |

\* Investment represents more than 5 percent of total assets at December 31, 2003

# Zero Stage Capital VI Limited Partnership
## (A Massachusetts Limited Partnership)
## Notes to Financial Statements
## December 31, 2003 and 2002

At December 31, 2003, the fair value of the Partnership's investments as a percentage of total assets consist of the following:

Type:  Common Stock – 2.9 percent, Preferred Stock – 86.9 percent, Debt – 4.1 percent, Warrants – 0.6 percent

Industry:  Information Technology/Software – 31.7 percent, Medical/Biotechnology – 17.9 percent, Industrial/Other – 2.2 percent, Hardware/Equipment – 15.6 percent, Internet Related – 27.1 percent

All portfolio companies are located in the United States of America.

6.  **Portfolio Company Receivable**

At December 31, 2003, the Partnership had a receivable of $2,855.  This amount represents a reimbursement to be received towards the cost of a fairness opinion on Outerlink Corporation.

At December 31, 2002, the Partnership had a receivable of $60,615.  This amount is comprised of a $35,615 related to a final liquidation distribution from Mothernature.com dated December 31, 2003 and $25,000 related to the MediaSite, Inc. 2002 receivable.

7.  **Commitments**

As of August 15, 2001, the Partnership guaranteed a note of up to $1,500,000 with the Massachusetts Business Development Center for Outerlink Corporation.

As of August 15, 2001, the Partnership guaranteed a note of up to $1,400,000 with the Massachusetts Business Development Center for Furniture Fan.com Inc., an investee company.

As of June 15, 2001, the Fund guaranteed a severance payment of $80,000 to the CEO of Intersense, an investee company.

As of December 31, 2003, the Partnership is committed to invest $249,415 in one investee company.

8.  **Noncash Transactions**

During 2003 and 2002, the Partnership entered into the following noncash investing and financing activities:

On December 4, 2003, a convertible demand note from Intersense with a principal balance of $300,000 and accrued interest of $75,551 was converted into 625,918 shares of Series D preferred stock.

On March 14, 2003, secured convertible promissory notes from Live Wave, Inc. with a total principal balance of $1,668,721 and accrued interest of $228,971 was converted into 1,871,007 shares of Series D preferred stock.

12

# Zero Stage Capital VI Limited Partnership
**(A Massachusetts Limited Partnership)**
**Notes to Financial Statements**
**December 31, 2003 and 2002**

On February 27, 2002, subordinated demand notes from Worldwinners.com with a total principal balance of $3,380,308 and acquired interest of $380,308 were converted into 3,380,308 shares of Series A preferred stock.

9.      **Financial Highlights**

The Partnership is required to disclose financial highlights for the common interest in the Partnership (i.e., the limited partner interest). These financial highlights consist of limited partners' total return and expenses and net investment income (loss) ratios. For the year ended December 31, 2003, the total return, expense ratio and net investment income (loss) ratios were (100) percent, 4.30 percent, and 7.27 percent, respectively. For the year ended December 31, 2002, the total return, expense ratio and net investment income (loss) ratios were (38.19) percent, 8.48 percent, and (5.91) percent, respectively. Total return is calculated for the limited partners taken as a whole based on the profit allocation provisions of the Limited Partnership Agreement as described in Note 1.

Total return is calculated based on the change in the limited partners' total capital (excluding the effects of any capital contribution or distributions) for the current year only and, therefore, does not reflect the history-to-date return of the Partnership. The expense and net investment income (loss) ratios are calculated for the limited partners taken as a whole based on the profit allocation provisions of the Limited Partnership Agreement as described in Note 1. The net investment income (loss) ratio includes the limited partners' proportionate share of all applicable interest and dividend income less their proportionate share of all Partnership expenses as reported in the statement of operations. The ratio excludes the effects of any net realized gain (loss) on investments, which would have a positive impact on the ratio if included.

13

**EXHIBIT H – Tab 5**

Page: 1

ZSC, Inc. 1/02-12/02
Balance Sheet
December 31, 2002

## ASSETS

**Current Assets**

| | |
|---|---:|
| Regular Checking Account | 59,066.47 |
| Money Market Savings | 366.39 |
| Rec. Mgmt Fee ZSC V | (105,608.00) |
| Rec. Mgmt. Fee ZSC VI | 2,091,590.00 |
| Rec Mgmt Fee Penn Ventures | 61,060.00 |
| Rec. Penn Ventures Fund | 230,396.55 |

Total Current Assets        2,336,871.41

**Property and Equipment**

| | |
|---|---:|
| Furniture and Fixtures | 79,763.82 |
| Equipment | 319,399.60 |
| Leasehold Improvements | 7,945.65 |
| Accum. Depreciation-Furniture | (59,025.55) |
| Accum. Depreciation-Equipment | (217,408.27) |
| Accum. Depreciation-Leasehold | (2,194.51) |

Total Property and Equipment      128,480.74

**Other Assets**

| | |
|---|---:|
| Rec. ZSC VI GP 1% Contribution | 500,000.00 |
| Security Dep. Level 3 Sublease | 33,580.00 |
| Investment in Main Street Inv. | 434,055.00 |

Total Other Assets         967,635.00

Total Assets          3,432,987.15

## LIABILITIES AND CAPITAL

1/11/2006 at 5:14 PM

ZSC, Inc. 1/02-12/02
Balance Sheet
December 31, 2002

| | | |
|---|---:|---:|
| Current Liabilities | | |
| Accounts Payable | 297,695.17 | |
| Accrued Bonus | 137,500.00 | |
| Accrued 401K Discret. Contrib | 264,286.35 | |
| | | |
| Total Current Liabilities | | 699,481.52 |
| | | |
| Long-Term Liabilities | | |
| | | |
| Total Long-Term Liabilities | | 0.00 |
| | | |
| Total Liabilities | | 699,481.52 |
| | | |
| Capital | | |
| Treasury Stock | (35,250.00) | |
| Common Stock | 1,000.00 | |
| Paid-in Capital | 60,981.45 | |
| Retained Earnings | 48,381.61 | |
| Net Income | 2,658,392.57 | |
| | | |
| Total Capital | | 2,733,505.63 |
| | | |
| Total Liabilities & Capital | | 3,432,987.15 |

Page: 2

1/11/2006 at 5:14 PM

8

ZSC, Inc. 1/02-12/02
Income Statement
For the Twelve Months Ending December 31, 2002

| | Current Month | | Year to Date | |
|---|---:|---:|---:|---:|
| **Revenues** | | | | |
| Mgmt. Fee Inc.- ZSC V L.P | 607,808.00 | 7.15 | 607,808.00 | 7.15 |
| Mgmt. Fee Inc. -Penn Ventures | 0.00 | 0.00 | 0.00 | 0.00 |
| Penn Ventures Org. Cost Reimb. | 0.00 | 0.00 | 0.00 | 0.00 |
| Mgmt. Fee Income - ZSC VI | 3,091,590.00 | 36.36 | 3,091,590.00 | 36.36 |
| Management Fees Reserved ZS VI | 0.00 | 0.00 | 0.00 | 0.00 |
| Mngt fee income - ZSC VII | 0.00 | 0.00 | 0.00 | 0.00 |
| Mngt fee inc - ZSC VII CAYMAN | 0.00 | 0.00 | 0.00 | 0.00 |
| Mngt fee income - ZSC VII SBIC | 0.00 | 0.00 | 0.00 | 0.00 |
| Managment Fee Income - ZSC LLC | 5,018,662.57 | 59.02 | 5,018,662.57 | 59.02 |
| Management Fee ZSC VII LLC | 0.00 | 0.00 | 0.00 | 0.00 |
| Mngt Fee Income PA Venture Mng | 61,060.00 | 0.72 | 61,060.00 | 0.72 |
| Interest & Dividend Income | 22,992.00 | 0.27 | 22,992.00 | 0.27 |
| Transaction Fees - Portfolio | 0.00 | 0.00 | 0.00 | 0.00 |
| Board of Direct. - Exp. Reimb. | 0.00 | 0.00 | 0.00 | 0.00 |
| Investor Reports/Meeting Reimb | 0.00 | 0.00 | 0.00 | 0.00 |
| Other Income | (492,294.91) | (5.79) | (492,294.91) | (5.79) |
| Sub Rental - Income 101 Main | 156,496.94 | 1.84 | 156,496.94 | 1.84 |
| Syndication Cost Reimb- ZSC VI | 0.00 | 0.00 | 0.00 | 0.00 |
| Consulting Fees | 36,750.00 | 0.43 | 36,750.00 | 0.43 |
| Gain on sale of securities | 0.00 | 0.00 | 0.00 | 0.00 |
| Short Term Capital Gain | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Revenues | 8,503,064.60 | 100.00 | 8,503,064.60 | 100.00 |
| **Cost of Sales** | | | | |
| Total Cost of Sales | 0.00 | 0.00 | 0.00 | 0.00 |
| Gross Profit | 8,503,064.60 | 100.00 | 8,503,064.60 | 100.00 |
| **Expenses** | | | | |
| Advertising & Marketing Exp. | 85,919.16 | 1.01 | 85,919.16 | 1.01 |

1/11/2006 at 5:14 PM.

8

ZSC, Inc. 1/02-12/02
Income Statement
For the Twelve Months Ending December 31, 2002

| | | | | |
|---|---|---|---|---|
| Accounting & Tax Services | 11,909.00 | 0.14 | 11,909.00 | 0.14 |
| Marketing - Zero Stage Summit | 0.00 | 0.00 | 0.00 | 0.00 |
| Amortization Expense | 0.00 | 0.00 | 0.00 | 0.00 |
| Auto Expenses | 600.00 | 0.01 | 600.00 | 0.01 |
| Bad Debt Expense | 0.00 | 0.00 | | 0.00 |
| Bank Charges | 0.00 | 0.00 | 0.00 | 0.00 |
| Board of Directors | 0.00 | 0.00 | 0.00 | 0.00 |
| Charitable Contributions Exp | 10,100.00 | 0.12 | 10,100.00 | 0.12 |
| Consulting - NH Business Devel | 0.00 | 0.00 | 0.00 | 0.00 |
| Consulting - Computers/Network | 86,434.79 | 1.02 | 86,434.79 | 1.02 |
| Consult - B. Stevens T&E Exp. | 0.00 | 0.00 | 0.00 | 0.00 |
| Consulting MBDC | 75,000.00 | 0.88 | 75,000.00 | 0.88 |
| Consulting - Nancy McDonald | 0.00 | 0.00 | 0.00 | 0.00 |
| Consulting - Seaflower Assoc. | 0.00 | 0.00 | 0.00 | 0.00 |
| Consulting- Pillar Financial | 0.00 | 0.00 | 0.00 | 0.00 |
| Consulting- Cold Spring Adviso | 102,490.25 | 1.21 | 102,490.25 | 1.21 |
| Consulting - Bain & Co. | 56,468.16 | 0.66 | 56,468.16 | 0.66 |
| Consulting - BDCRI | 0.00 | 0.00 | 0.00 | 0.00 |
| Rutkowski & Partners | 0.00 | 0.00 | 0.00 | 0.00 |
| Consulting | 221,633.27 | 2.61 | 221,633.27 | 2.61 |
| DBAB Placement Fee | 0.00 | 0.00 | 0.00 | 0.00 |
| Fund Raising Expense - ZSC VII | 151,982.40 | 1.79 | 151,982.40 | 1.79 |
| Fund Raising Exp - New Markets | 0.00 | 0.00 | 0.00 | 0.00 |
| Depreciation Expense | 57,453.20 | 0.68 | 57,453.20 | 0.68 |
| Dues, Subscriptions, Books | 42,884.32 | 0.50 | 42,884.32 | 0.50 |
| Due Diligence Expense | 0.00 | 0.00 | 0.00 | 0.00 |
| Due Diligence RiboAssembly | 0.00 | 0.00 | 0.00 | 0.00 |
| Investor Meetings | 4,252.62 | 0.05 | 4,252.62 | 0.05 |
| Penn Venture Partner Expense | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance Exp | 3,951.00 | 0.05 | 3,951.00 | 0.05 |
| Life Insurance | 13,640.45 | 0.16 | 13,640.45 | 0.16 |
| Health Insurance | 124,022.80 | 1.46 | 124,022.80 | 1.46 |
| Dental Insurance | 2,265.00 | 0.03 | 2,265.00 | 0.03 |
| Prescription Reimbursement | 23,955.39 | 0.28 | 23,955.39 | 0.28 |
| Insurance - Disability | 33,011.46 | 0.39 | 33,011.46 | 0.39 |

1/11/2006 at 5:14 PM

Page: 2

8
ZSC, Inc. 1/02–12/02
Income Statement
For the Twelve Months Ending December 31, 2002

| | | | |
|---|---|---|---|
| Health Insurance Reimbursement | 22,954.78 | 0.27 | 22,954.78 | 0.27 |
| Dental Insurance Reimbursement | 4,466.90 | 0.05 | 4,466.90 | 0.05 |
| Long Term Care Insurance | 67,512.30 | 0.79 | 67,512.30 | 0.79 |
| Interest Expense | 0.00 | 0.00 | 0.00 | 0.00 |
| Employment Placement Fees | 0.00 | 0.00 | 0.00 | 0.00 |
| Temporary Help | 0.00 | 0.00 | 0.00 | 0.00 |
| Legal and Professional Expense | 280,185.71 | 3.30 | 280,185.71 | 3.30 |
| Maintenance Expense | 0.00 | 0.00 | 0.00 | 0.00 |
| Meals and Entertainment Exp | 30,241.97 | 0.36 | 30,241.97 | 0.36 |
| Office Supplies | 56,484.14 | 0.66 | 56,484.14 | 0.66 |
| Office Equipment - Expense | 15,854.50 | 0.19 | 15,854.50 | 0.19 |
| Office Supplies - Water | 1,948.28 | 0.02 | 1,948.28 | 0.02 |
| Software Expense | 3,148.95 | 0.04 | 3,148.95 | 0.04 |
| Other Taxes | 628.56 | 0.01 | 628.56 | 0.01 |
| Employer P/R Taxes | 127,891.61 | 1.50 | 127,891.61 | 1.50 |
| Payroll Tax Exp. - FUTA | 967.80 | 0.01 | 967.80 | 0.01 |
| Payroll Tax Exp. - SUI | 4,053.37 | 0.05 | 4,053.37 | 0.05 |
| Payroll Processing Service | 2,141.65 | 0.03 | 2,141.65 | 0.03 |
| 401 K Administration Expense | 2,749.36 | 0.03 | 2,749.36 | 0.03 |
| 401 K Discretionary Contrib. | 265,947.51 | 3.13 | 265,947.51 | 3.13 |
| Money Purchase Plan Admin Exp. | 3,638.68 | 0.04 | 3,638.68 | 0.04 |
| Money Purchase Plan Contributi | 1,300.33 | 0.02 | 1,300.33 | 0.02 |
| Postage Expense | 10,480.95 | 0.12 | 10,480.95 | 0.12 |
| Hand Courier Expense | 1,621.45 | 0.02 | 1,621.45 | 0.02 |
| Recruiting Expense | 11,400.00 | 0.13 | 11,400.00 | 0.13 |
| Seminars/Conference | 20,324.00 | 0.24 | 20,324.00 | 0.24 |
| In-House meetings | 19,643.27 | 0.23 | 19,643.27 | 0.23 |
| Miscellaneous | 23,693.38 | 0.28 | 23,693.38 | 0.28 |
| Overnight Mail Expense | 5,511.35 | 0.06 | 5,511.35 | 0.06 |
| Rent/Parking/Oper. Exp - Cambr | 641,559.32 | 7.55 | 641,559.32 | 7.55 |
| Rent - Rhode Island | 9,162.09 | 0.11 | 9,162.09 | 0.11 |
| Other RI Related Expenses | 495.00 | 0.01 | 495.00 | 0.01 |
| Rent - Maine | 0.00 | 0.00 | 0.00 | 0.00 |
| Other Maine Related Expenses | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent - New Haven | 4,500.00 | 0.05 | 4,500.00 | 0.05 |

8

## ZSC, Inc. 1/02-12/02
### Income Statement
For the Twelve Months Ending December 31, 2002

Page: 4

| | | | | |
|---|---|---|---|---|
| New Haven Related Expenses | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent - Stamford | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent - Level 3 Sublease Camb. | 0.00 | 0.00 | 0.00 | 0.00 |
| Repairs Expense | 10,572.22 | 0.12 | 10,572.22 | 0.12 |
| Maintenance Contracts | 0.00 | 0.00 | 0.00 | 0.00 |
| Office Construction | 31,465.49 | 0.37 | 31,465.49 | 0.37 |
| Salaries & Wages Expense | 2,617,535.55 | 30.78 | 2,617,535.55 | 30.78 |
| Bonus Expense | (161,472.00) | (1.90) | (161,472.00) | (1.90) |
| Bonus-Fund Closing ZSC Employ. | 0.00 | 0.00 | 0.00 | 0.00 |
| Bonus-Fund Closing-Consultant | 0.00 | 0.00 | 0.00 | 0.00 |
| Bonus - Consultants | 0.00 | 0.00 | 0.00 | 0.00 |
| Storage Space | 0.00 | 0.00 | 0.00 | 0.00 |
| Printing, Stationery & Copying | 6,151.54 | 0.07 | 6,151.54 | 0.07 |
| Telephone Expense | 23,833.65 | 0.28 | 23,833.65 | 0.28 |
| America On-Line | 976.35 | 0.01 | 976.35 | 0.01 |
| Telephone - Lease | 0.00 | 0.00 | 0.00 | 0.00 |
| Telephone- Cellular | 20,778.67 | 0.24 | 20,778.67 | 0.24 |
| Telephone - Prepaid Card | 1,539.07 | 0.02 | 1,539.07 | 0.02 |
| Internet Services | 4,579.77 | 0.05 | 4,579.77 | 0.05 |
| Automobile Expense | 37,600.00 | 0.44 | 37,600.00 | 0.44 |
| Travel - Auto Mileage | 4,120.29 | 0.05 | 4,120.29 | 0.05 |
| Travel - Airfare, Trains, Etc. | 82,201.87 | 0.97 | 82,201.87 | 0.97 |
| Travel - Hotels/Lodging/Room | 73,704.97 | 0.87 | 73,704.97 | 0.87 |
| Travel - Meals & Entertainment | 13,029.64 | 0.15 | 13,029.64 | 0.15 |
| Travel - Taxi/Bus/Train/Limo | 9,341.89 | 0.11 | 9,341.89 | 0.11 |
| Travel - Expense Report Misc. | 186.41 | 0.00 | 186.41 | 0.00 |
| Travel - Parking, Tolls | 4,398.39 | 0.05 | 4,398.39 | 0.05 |
| Travel - Phone/Fax | 3,094.89 | 0.04 | 3,094.89 | 0.04 |
| Tuition Reimbursement | 0.00 | 0.00 | 0.00 | 0.00 |
| Utilities Exp. - Electricity | 3,624.85 | 0.04 | 3,624.85 | 0.04 |
| Wages Expense | 0.00 | 0.00 | 0.00 | 0.00 |
| Other Expense | 60,021.04 | 0.71 | 60,021.04 | 0.71 |
| Penn Venture exps | 0.00 | 0.00 | 0.00 | 0.00 |
| Gain/Loss on Sale of Assets | 0.00 | 0.00 | 0.00 | 0.00 |
| Gain/Loss Main St. Investor VI | 248,907.00 | 2.93 | 248,907.00 | 2.93 |

8
ZSC, Inc. 1/02-12/02
Income Statement
For the Twelve Months Ending December 31, 2002

| | | | |
|---|---|---|---|
| Portfolio Expenses | 0.00 | 0.00 | 0.00 |
| Mass. Annual Report | 0.00 | 0.00 | 0.00 |
| Mass. Income Taxes | 0.00 | 0.00 | 0.00 |
| Federal Income Taxes | 0.00 | 0.00 | 0.00 |
| Total Expenses | 5,844,672.03 | 68.74 | 5,844,672.03 | 68.74 |
| Net Income | 2,658,392.57 | 31.26 | 2,658,392.57 | 31.26 |

1/11/2006 at 5:14 PM

**EXHIBIT H – Tab 6**

ZSC, Inc. 1/02-12/02
Balance Sheet
December 31, 2003

## ASSETS

| | | |
|---|---|---|
| **Current Assets** | | |
| Regular Checking Account | 399,908.88 | |
| Rec. Mgmt Fee ZSC V | (124,530.00) | |
| Rec. Mgmt. Fee ZSC VI | 4,729,992.00 | |
| Zero Stage VI Mgmt Fee Reserve | (4,252,592.00) | |
| Rec Mgmt. Fee VII | (715,914.66) | |
| Rec Mgmt. Fee Cayman | (486,094.99) | |
| Rec Mgmt. Fee SBIC | 25,000.01 | |
| Rec Mgmt Fee Penn. Ventures | (160,499.67) | |
| Receivable Fund Raising Exp. | 454,215.80 | |
| Rec. Penn Ventures Fund | 2,379.18 | |
| **Total Current Assets** | | (128,135.45) |
| | | |
| **Property and Equipment** | | |
| Furniture and Fixtures | 85,998.02 | |
| Equipment | 351,412.00 | |
| Leasehold Improvements | 7,945.65 | |
| Accum. Depreciation-Furniture | (59,025.55) | |
| Accum. Depreciation-Equipment | (217,408.27) | |
| Accum. Depreciation-Leasehold | (2,194.51) | |
| **Total Property and Equipment** | | 166,727.34 |
| | | |
| **Other Assets** | | |
| Rec. ZSC VI GP 1% Contribution | 500,000.00 | |
| Rec ZSC ASSOC. VII | 55,910.68 | |
| Rec. Zero Stage Capital Assoc. | 476,417.00 | |
| Inv in Penn Venture Assoc. LLC | 50,000.00 | |
| Rec ZSC SBIC VII Assoc. LP | 200,000.00 | |
| Investment in Main Street Inv. | 434,055.00 | |
| **Total Other Assets** | | 1,716,382.68 |
| | | |
| **Total Assets** | | 1,754,974.57 |

## LIABILITIES AND CAPITAL

| | | |
|---|---|---|
| **Current Liabilities** | | |
| Accounts Payable | 53,760.70 | |
| Accrued Bonus | 137,500.00 | |
| **Total Current Liabilities** | | 191,260.70 |
| | | |
| **Long-Term Liabilities** | | |
| **Total Long-Term Liabilities** | | 0.00 |
| | | |
| **Total Liabilities** | | 191,260.70 |
| | | |
| **Capital** | | |
| Treasury Stock | (35,250.00) | |
| Common Stock | 1,000.00 | |
| Paid-in Capital | 60,981.45 | |
| Retained Earnings | 2,706,774.18 | |
| Net Income | (1,169,791.76) | |
| **Total Capital** | | 1,563,713.87 |
| | | |
| **Total Liabilities & Capital** | | 1,754,974.57 |

8
ZSC, Inc. 1/02-12/02
Income Statement
For the Twelve Months Ending December 31, 2003

| | Current Month | | Year to Date | |
|---|---|---|---|---|
| **Revenues** | | | | |
| Mgmt. Fee Inc.- ZSC V L.P | 531,078.00 | 12.89 | 531,078.00 | 12.89 |
| Mgmt. Fee Inc. -Penn Ventures | 642,000.00 | 15.58 | 642,000.00 | 15.58 |
| Penn Ventures Org. Cost Reimb. | 0.00 | 0.00 | 0.00 | 0.00 |
| Mgmt. Fee Income - ZSC VI | 2,938,402.00 | 71.30 | 2,938,402.00 | 71.30 |
| Management Fees Reserved ZS VI | (4,252,592.00) | (103.19) | (4,252,592.00) | (103.19) |
| Mngt fee income - ZSC VII | 659,469.34 | 16.00 | 659,469.34 | 16.00 |
| Mngt fee inc - ZSC VII CAYMAN | 232,781.01 | 5.65 | 232,781.01 | 5.65 |
| Mngt fee income - ZSC VII SBIC | 125,000.01 | 3.03 | 125,000.01 | 3.03 |
| Management Fee Income - ZSC LLC | 2,550,740.00 | 61.89 | 2,550,740.00 | 61.89 |
| Management Fee ZSC VII LLC | 676,417.00 | 16.41 | 676,417.00 | 16.41 |
| Mngt Fee Income PA Venture Mng | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest & Dividend Income | 0.00 | 0.00 | 0.00 | 0.00 |
| Transaction Fees - Portfolio | 0.00 | 0.00 | 0.00 | 0.00 |
| Board of Direct. - Exp. Reimb. | 0.00 | 0.00 | 0.00 | 0.00 |
| Investor Reports/Meeting Reimb | 0.00 | 0.00 | 0.00 | 0.00 |
| Other Income | 0.00 | 0.00 | 0.00 | 0.00 |
| Sub Rental - Income 101 Main | 18,000.00 | 0.44 | 18,000.00 | 0.44 |
| Syndication Cost Reimb- ZSC VI | 0.00 | 0.00 | 0.00 | 0.00 |
| Consulting Fees | 0.00 | 0.00 | 0.00 | 0.00 |
| Gain on sale of securities | 0.00 | 0.00 | 0.00 | 0.00 |
| Short Term Capital Gain | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Revenues** | 4,121,295.36 | 100.00 | 4,121,295.36 | 100.00 |
| **Cost of Sales** | | | | |
| **Total Cost of Sales** | 0.00 | 0.00 | 0.00 | 0.00 |
| **Gross Profit** | 4,121,295.36 | 100.00 | 4,121,295.36 | 100.00 |
| **Expenses** | | | | |
| Advertising & Marketing Exp. | 54,742.48 | 1.33 | 54,742.48 | 1.33 |

1/11/2006 at 5:15 PM

8

ZSC, Inc. 1/02-12/02
Income Statement
For the Twelve Months Ending December 31, 2003

Page: 2

| | | | |
|---|---|---|---|
| Accounting & Tax Services | 0.00 | 0.00 | 0.00 |
| Marketing - Zero Stage Summit | 0.00 | 0.00 | 0.00 |
| Amortization Expense | 0.00 | 0.00 | 0.00 |
| Auto Expenses | 0.00 | 0.00 | 0.00 |
| Bad Debt Expense | 0.00 | 0.00 | 0.00 |
| Bank Charges | 0.00 | 0.00 | 0.00 |
| Board of Directors | 0.00 | 0.00 | 0.00 |
| Charitable Contributions Exp | 3,792.00 | 3,792.00 | 0.09 |
| Consulting - NH Business Devel | 0.00 | 0.00 | 0.00 |
| Consulting - Computers/Network | 0.00 | 0.00 | 0.00 |
| Consult - B. Stevens T&E Exp. | 0.00 | 0.00 | 0.00 |
| Consulting MBDC | 0.00 | 0.00 | 0.00 |
| Consulting - Nancy McDonald | 0.00 | 0.00 | 0.00 |
| Consulting - Seaflower Assoc. | 0.00 | 0.00 | 0.00 |
| Consulting - Pillar Financial | 0.00 | 0.00 | 0.00 |
| Consulting - Cold Spring Adviso | 0.00 | 0.00 | 0.00 |
| Consulting - Bain & Co. | 0.00 | 0.00 | 0.00 |
| Consulting - BDCRI | 0.00 | 0.00 | 0.00 |
| Rutkowski & Partners | 0.00 | 0.00 | 0.00 |
| Consulting | 373,925.45 | 373,925.45 | 9.07 |
| DBAB Placement Fee | 0.00 | 0.00 | 0.00 |
| Fund Raising Expense - ZSC VII | 0.00 | 0.00 | 0.00 |
| Fund Raising Exp - New Markets | 992.82 | 992.82 | 0.02 |
| Depreciation Expense | 0.00 | 0.00 | 0.00 |
| Dues, Subscriptions, Books | 37,912.99 | 37,912.99 | 0.92 |
| Due Diligence Expense | 0.00 | 0.00 | 0.00 |
| Due Diligence RiboAssembly | 0.00 | 0.00 | 0.00 |
| Investor Meetings | 0.00 | 0.00 | 0.00 |
| Penn Venture Partner Expense | 129,447.94 | 129,447.94 | 3.14 |
| Insurance Exp | 248,724.60 | 248,724.60 | 6.04 |
| Life Insurance | 0.00 | 0.00 | 0.00 |
| Health Insurance | 0.00 | 0.00 | 0.00 |
| Dental Insurance | 0.00 | 0.00 | 0.00 |
| Prescription Reimbursement | 0.00 | 0.00 | 0.00 |
| Insurance - Disability | 0.00 | 0.00 | 0.00 |

1/11/2006 at 5:15 PM

8
ZSC, Inc. 1/02-12/02
Income Statement
For the Twelve Months Ending December 31, 2003

| | | | |
|---|---:|---:|---:|
| Health Insurance Reimbursement | 68,420.66 | 68,420.66 | 1.66 |
| Dental Insurance Reimbursement | 0.00 | 0.00 | 0.00 |
| Long Term Care Insurance | 0.00 | 0.00 | 0.00 |
| Interest Expense | 0.00 | 0.00 | 0.00 |
| Employment Placement Fees | 0.00 | 0.00 | 0.00 |
| Temporary Help | 0.00 | 0.00 | 0.00 |
| Legal and Professional Expense | 450,675.24 | 450,675.24 | 10.94 |
| Maintenance Expense | 0.00 | 0.00 | 0.00 |
| Meals and Entertainment Exp | 0.00 | 0.00 | 0.00 |
| Office Supplies | 59,005.64 | 59,005.64 | 1.43 |
| Office Equipment - Expense | 0.00 | 0.00 | 0.00 |
| Office Supplies -Water | 0.00 | 0.00 | 0.00 |
| Software Expense | 6,591.07 | 6,591.07 | 0.16 |
| Other Taxes | 9,652.53 | 9,652.53 | 0.23 |
| Employer P/R Taxes | 0.00 | 0.00 | 0.00 |
| Payroll Tax Exp. - FUTA | 0.00 | 0.00 | 0.00 |
| Payroll Tax Exp. - SUI | 0.00 | 0.00 | 0.00 |
| Payroll Processing Service | 0.00 | 0.00 | 0.00 |
| 401 K Administration Expense | 0.00 | 0.00 | 0.00 |
| 401 K Discretionary Contrib. | 9,673.14 | 9,673.14 | 0.23 |
| Money Purchase Plan Admin Exp. | 0.00 | 0.00 | 0.00 |
| Money Purchase Plan Contributi | 0.00 | 0.00 | 0.00 |
| Postage Expense | 18,761.21 | 18,761.21 | 0.46 |
| Hand Courier Expense | 0.00 | 0.00 | 0.00 |
| Recruiting Expense | 0.00 | 0.00 | 0.00 |
| Seminars/Conference | 20,725.00 | 20,725.00 | 0.50 |
| In-House meetings | 14,334.95 | 14,334.95 | 0.35 |
| Miscellaneous | 0.00 | 0.00 | 0.00 |
| Overnight Mail Expense | 0.00 | 0.00 | 0.00 |
| Rent/Parking/Oper. Exp - Cambr. | 395,004.57 | 395,004.57 | 9.58 |
| Rent - Rhode Island | 0.00 | 0.00 | 0.00 |
| Other RI Related Expenses | 0.00 | 0.00 | 0.00 |
| Rent - Maine | 0.00 | 0.00 | 0.00 |
| Other Maine Related Expenses | 0.00 | 0.00 | 0.00 |
| Rent - New Haven | 0.00 | 0.00 | 0.00 |

8

ZSC, Inc. 1/02-12/02
Income Statement
For the Twelve Months Ending December 31, 2003

| | ZSC, Inc. 1/02-12/02 | | |
|---|---|---|---|
| New Haven Related Expenses | 0.00 | 0.00 | 0.00 |
| Rent - Stamford | 0.00 | 0.00 | 0.00 |
| Rent - Level 3 Sublease Camb. | 0.00 | 0.00 | 0.00 |
| Repairs Expense | 0.00 | 0.00 | 0.00 |
| Maintenance Contracts | 0.00 | 0.00 | 0.00 |
| Office Construction | 12,852.04 | 12,852.04 | 0.31 |
| Salaries & Wages Expense | 3,140,982.02 | 3,140,982.02 | 76.21 |
| Bonus Expense | (62,500.00) | (62,500.00) | (1.52) |
| Bonus-Fund Closing ZSC Employ. | 0.00 | 0.00 | 0.00 |
| Bonus- Fund Closing-Consultant | 0.00 | - | 0.00 |
| Bonus - Consultants | 0.00 | | 0.00 |
| Storage Space | 0.00 | 0.00 | 0.00 |
| Printing, Stationery & Copying | 0.00 | 0.00 | 0.00 |
| Telephone Expense | 38,153.33 | 38,153.33 | 0.93 |
| America On-Line | 0.00 | 0.00 | 0.00 |
| Telephone - Lease | 0.00 | 0.00 | 0.00 |
| Telephone - Cellular | 0.00 | 0.00 | 0.00 |
| Telephone - Prepaid Card | 0.00 | 0.00 | 0.00 |
| Internet Services | 5,826.54 | 5,826.54 | 0.14 |
| Automobile Expense | 52,350.36 | 52,350.36 | 1.27 |
| Travel - Auto Mileage | 0.00 | 0.00 | 0.00 |
| Travel - Airfare, Trains, Etc. | 52,829.65 | 52,829.65 | 1.28 |
| Travel - Hotels/Lodging/Room | (13,204.21) | (13,204.21) | (0.32) |
| Travel - Meals & Entertainment | 25,444.05 | 25,444.05 | 0.62 |
| Travel - Taxi/Bus/Train/Limo | 10,728.15 | 10,728.15 | 0.26 |
| Travel - Expense Report Misc. | 0.00 | 0.00 | 0.00 |
| Travel - Parking, Tolls | 0.00 | 0.00 | 0.00 |
| Travel - Phone/Fax | 0.00 | 0.00 | 0.00 |
| Tuition Reimbusement | 0.00 | 0.00 | 0.00 |
| Utilities Exp. - Electricity | 3,684.81 | 3,684.81 | 0.09 |
| Wages Expense | 0.00 | 0.00 | 0.00 |
| Other Expense | 91,018.12 | 91,018.12 | 2.21 |
| Penn Venture exps | 30,539.97 | 30,539.97 | 0.74 |
| Gain/Loss on Sale of Assets | 0.00 | 0.00 | 0.00 |
| Gain/Loss Main St. Investor VI | 0.00 | 0.00 | 0.00 |

8

ZSC, Inc. 1/02-12/02
Income Statement
For the Twelve Months Ending December 31, 2003

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| Portfolio Expenses | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Mass. Annual Report | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Mass. Income Taxes | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Federal Income Taxes | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Expenses | 5,291,087.12 | 128.38 | 5,291,087.12 | 128.38 |  |
| Net Income | (1,169,791.76) | (28.38) | (1,169,791.76) | (28.38) |  |

**EXHIBIT H – Tab 8**

## ZERO STAGE CAPITAL VI LIMITED PARTNERSHIP
### (A Massachusetts Limited Partnership)

## STATEMENTS OF ASSETS, LIABILITIES AND PARTNERS' EQUITY
### (UNAUDITED)

March 31, 2005 and December 31, 2004

### ASSETS

|  | March 31, 2005 | December 31, 2004 |
|---|---|---|
| Investments at fair value (cost $58,524,416 and $62,677,073 at March 31, 2005 and December 31, 2004, respectively) | $ 37,992,428 | $ 42,283,867 |
| Cash and cash equivalents | 1,920,884 | 1,243,697 |
| Deferred financing costs, net | 1,371,543 | 1,462,979 |
| Portfolio interest receivable, net | 547,799 | 547,799 |
| Investment sale receivable (net of reserves) | 226,163 | 226,163 |
| Other receivables | 1,212 | 1,212 |
| Total assets | $ 42,060,029 | $ 45,765,717 |

### LIABILITIES AND PARTNERS' EQUITY

|  | March 31, 2005 | December 31, 2004 |
|---|---|---|
| Accounts payable and accrued expenses | $ 60,866 | $ 96,447 |
| Accrued management fee | 7,749,972 | 7,271,209 |
| Waived management fees | (7,749,972) | (7,271,209) |
| Due to related party | 82,837 | 82,837 |
| Total liabilities | 143,703 | 179,284 |
| Preferred limited partner's capital: |  |  |
| Preferred partner's capital | 93,205,000 | 93,205,000 |
| Accumulated operating loss | (1,110,216) | (916,378) |
| Accumulated unrealized loss on investments | (20,531,988) | (20,393,206) |
| Accumulated realized loss on investments | (29,646,470) | (26,308,983) |
| Total preferred limited partner's capital | 41,916,326 | 45,586,433 |
| Partners' equity: |  |  |
| Private partners' capital | 50,000,000 | 50,000,000 |
| Accumulated operating loss | (12,314,454) | (12,314,454) |
| Accumulated realized loss on investments | (37,177,712) | (37,177,712) |
| Accumulated unrealized loss on investments |  |  |
| Syndication costs | (507,834) | (507,834) |
| Total partners' equity | - | - |
| Total liabilities and partners' equity | $ 42,060,029 | $ 45,765,717 |

**EXHIBIT H – Tab 9**



**ZERO STAGE CAPITAL**

101 Main Street, 17th Floor • Cambridge, Massachusetts 02142-1519
Tel 617-876-5355 • Fax 617-876-1248 • www.ZeroStage.com

August 22, 2003

Steve Knott
Analyst
U.S. Small Business Administration
409 Third Street, S.W.
Sixth Floor
Washington, DC 20416

Dear Steve:

Thank you for your time yesterday morning.

This letter is to confirm to you our intention to defer any management fees on Zero Stage Capital VI LP starting with the third quarter of 2003 and going forward. Our intention is to defer the fee until both our SBA obligations have been satisfied and our investors have received distributions equal to their total investment in the fund.

Sincerely yours,

Paul Kelley
Managing Director
& Chief Executive Officer

Enc.:   Forecast

Cc:     Robert A. Herlihy, CPA
        Matt Kelley
        Walter Peterson

CAMBRIDGE, MASSACHUSETTS · NEW HAVEN, CONNECTICUT · PORTLAND, MAINE · PROVIDENCE, RHODE ISLAND

*Zero Stage Capital V & VI. L.P. are Federal Licensees under the Small Business Investment Act of 1958.*

**EXHIBIT H – Tab 10**



**ZERO STAGE CAPITAL**

101 Main Street, 17th Floor · Cambridge, Massachusetts 02142-1519
Tel 617-876-5355 · Fax 617-876-1248 · www.ZeroStage.com

January 25, 2005

**BY OVERNIGHT DELIVERY**
Elaine Hruschka, Financial Analyst
Investment Division
Office of SBIC Liquidation
U.S. Small Business Administration
409 3rd Street, S.W., Suite 6350
Washington, DC 20416

Dear Ms. Hruschka:

    This letter is in response to your letter dated January 10, 2005 with respect to Zero Stage Capital VI, L.P. ("Zero Stage VI"). Thank you for your extension of time in which to respond. The text of your questions are repeated here, followed by our responses.

**1. Regarding foregone management fees, which you indicated total approximately $7 million, please provide the details supporting this figure, noting the periods covered and whether any fees were accrued from prior periods. Your supporting documents should include the accounting entries for the periods affected.**

    By letter to the SBA dated August 22, 2003, Zero Stage Capital Company, Inc. elected to waive its management fees in Zero Stage VI commencing with the third quarter of 2003. In fact Zero Stage Capital Company, Inc. waived the unpaid balance of management fees accrued for the entire calendar year ended December 31, 2002. Attached as <u>Exhibit A</u> is an internally prepared Analysis of Waived Management Fees as of 12/31/04. This shows total waived management fees through that date of $7,271,209. Of that amount, $3,297,791 represents unpaid management fees accrued as of August 22, 2003, and $3,973,418 represents management fees that would have accrued after August 22, 2003.

    Attached as <u>Exhibit B</u> are excerpts from Zero Stage VI's audited financial statements for the periods ending December 31, 2003 and 2002. The Statements of Assets, Liabilities and Partners' Equity shows management fee payable as of 12/31/02 of $2,091,590, and $0.00 management fee payable as of 12/31/03 ($4,729,993 accrued less $4,729,993 waived). The Statement of Operations shows a waiver of $4,729,993 in management fees as of 12/31/03, as explained in Note 4.

CAMBRIDGE, MASSACHUSETTS · NEW HAVEN, CONNECTICUT · PROVIDENCE, RHODE ISLAND

*Zero Stage Capital V & VI, L.P. and Zero Statge Capital SBIC VII, L.P. are Federal Licensees under the Small Business Investment Act of 1958.*

Elaine Hruschka, Financial Analyst
January 25, 2005
Page 2

2.  Disclose to the fullest extent the terms and conditions of the $1.3 million guarantee you and your son provided to Zero Stage Capital Co., Inc.  Does the guarantee apply only to the MBDC guarantee of Zero Stage VI?  Precisely what portion relates to Zero Stage Capital VI, L.P. ("Zero Stage") or to specific assets, if any?

The $1.3 million loan at issue here is a loan from MBDC to Zero Stage Capital Company, Inc.  This loan has funded part of the operating expense shortfall resulting from Zero Stage Capital Company, Inc.'s election to waive its management fees in Zero Stage VI.  This loan is entirely unrelated to the MBDC loan to FurnitureFan, which has been guaranteed by Zero Stage VI and Zero Stage Capital Company, Inc.  This loan does not relate to Zero Stage VI, or any assets of Zero Stage VI.

This loan closed on March 25, 2004, providing for a credit facility of up to $1.3 million.  The principal could be drawn down in up to 3 tranches prior to March 25, 2005 at the latest.  Outstanding principal bears interest at 2.5% over Prime.  Interest only is paid until March 25, 2005.  After that date, principal is to be paid down in 24 equal monthly installments with each installment of principal being accompanied by all accrued interest.

Zero Stage Capital Company, Inc. has drawn down $1.0 million against this line of credit and expects to draw down the remaining $300,000 in February, 2005.

This $1.3 million loan is guaranteed by myself, my son Matthew Kelley, and my wife Susan Kelley.  These guaranties are in favor of MBDC.  Each guaranty is called an "Unlimited Guaranty," and is typical of guaranties required by commercial lending institutions.  Each guaranty is absolute, unconditional and continuing, regardless of whether MBDC proceeds against Zero Stage Capital Company Inc. first, and regardless of whether Zero Stage Capital Company, Inc. has any defenses to repayment of the loan.  The guaranties also require each guarantor to pay all costs and expenses incurred by MBDC in its efforts to collect against Zero Stage Capital Company, Inc. or any guarantor.

The terms of my guaranty require me not to transfer any of my interest in a named brokerage account or any of my interest in Zero Stage Capital Company, Inc.  The terms of Matt's guaranty require him not to transfer any of his interest in Zero Stage Capital Company, Inc.  The terms of my wife's guaranty require her not to transfer any of her interest in a named brokerage account and also require her to maintain a principal balance of at least $1.3 million in that account.

3.  Discuss fully the separation terms with Bic Stevens vis a vis his unvested interest in the General Partner as it relates to Zero Stage VII, which you stated totals approximately $250,000.  Did he invest similarly in Zero Stage VI?  If so, to what extent and under what conditions?

In connection with Bic Stevens' termination from Zero Stage, we will repurchase his unvested interest in Zero Stage VII.  The actual amount to be paid to Stevens for the unvested portion of his interest in Zero Stage VII is $87,381.85, which is to be paid in 12 equal monthly installments commencing on or about April 15, 2005.  This payment is a

Elaine Hruschka, Financial Analyst
January 25, 2005
Page 3

net amount, including a deduction of $40,000.50 for Stevens' 8.0001% interest as a Class B Member of the general partner of Zero Stage VI. Zero Stage Capital Company, Inc. had advanced the $40,000.50 necessary to purchase that entire interest, and Stevens had repaid $40,000.50, representing the capital commitment for the vested portion. Zero Stage Capital Company, Inc. did not elect to repurchase the unvested portion of Stevens' interest in the Zero Stage VI general partner.

**Explain more fully, with support documentation, Mr. Stevens' transactions concerning Zero VII and its affiliates, namely, his investment in the LLC and the liabilities accounted for in the G/P. This follows your assertion he used the management company as a pass-through for personal expenses.**

As discussed at our meeting on December 17, 2004, Bic Stevens, together with Stan Fung and Brian Johnson, were put in charge of the formation of Zero Stage VII. They recommended, apparently based on the advice of fund counsel, to form a new management company, Zero Stage Capital LLC, to manage Zero Stage VII. The ownership of Zero Stage Capital LLC was intended to be allocated 1/3 to myself, 1/3 to Bic Stevens and 1/3 to Stan Fung.

Overhead for the Zero Stage family of funds is unified, meaning that all funds are run out of the same offices. Prior to the formation of Zero Stage VII, there was only one management company, Zero Stage Capital Company, Inc., which bore all the management expenses of all of the Zero Stage funds, but also received all of the management fees from those funds. Ownership of Zero Stage Capital Company, Inc. is allocated 100% to myself. The consequence of the planned formation of Zero Stage Capital LLC to manage Zero Stage VII, would have been the allocation of all Zero Stage VII management fees to Zero Stage Capital LLC, while Zero Stage Capital Company, Inc. would have continued to bear all of the operating costs. This would have had the potential effect of moving 2/3rds of the management income to Bic Stevens and Stan Fung, while they would have born none of the management expenses. Fortunately, this subterfuge was discovered by Matthew Kelley soon after he came on board as COO.

4. **What monies were paid to each of the departing employees/officers/directors/partners of Zero Stage VI and/or its Affiliates? Fully disclose the terms and conditions, the dates and the Zero Stage entity that paid the terminated individuals.**

Stanley Fung: Stanley Fung's termination agreement dated October 29, 2004 provides for him to receive a total of $74,850.33, representing the difference between Fung's paid-in capital and the vested portion of his interest in the GP's of certain Zero Stage funds.

Brian Johnson: Brian Johnson's termination agreement dated November 17, 2003 provides for him to receive (i) severance in the amount of $109,267.25, representing six months base pay, net of certain expense deductions, (ii) $167,732 for all of Johnson's interests in any and all Zero Stage funds, partnerships or other entities.

Elaine Hruschka, Financial Analyst
January 25, 2005
Page 4

Mark Thaller: Mark Thaller's termination agreement dated June 21, 2001 provides for him to receive (i) $94,086.02, representing Thaller's capital contribution, plus interest, to the general partner of Zero Stage VII.

Jamie Rice: Jamie Rice's termination agreement dated April 5, 2004 provides for him to receive (i) severance in the amount of $82,500, equal to six months base pay, (ii) $79,114.80 for all of Rice's interests in any and all Zero Stage funds, partnerships or other entities, (iii) an amount for reasonable service fees on Rice's cell phone and Blackberry for the month of his termination.

Inder Soni: Inder Soni's termination agreement dated February 11, 2003 provides for him to receive (1) severance in the amount of $46,250.02, equal to three months base pay, (ii) $50,673.58, representing the difference between Soni's paid-in capital and the vested portion of his interest in the general partner of Zero Stage VII, and (iii)continuing medical coverage and other benefits through October 31, 2002.

Bic Stevens: Bic Stevens' termination agreement dated December 23, 2004 provides for him to receive (i) severance in the amount of $20,000 per month for the six months immediately following his termination, (ii) $1,200 per month for six months, representing the interest component of a promissory note made by Stevens in favor of Silicon Valley Bank, which advanced the funds Stevens used to purchase his interest in Zero Stage VII, (iii) a total of $87,381.85 in 12 equal monthly installments commencing on or about April 15, 2005, representing reimbursement for amounts paid by Bic for all of the unvested portion of his carried interest in the general partner of Zero Stage VII, net of amounts owed for his interest in the general partner of Zero Stage VI, (iv) $4,000, representing reimbursement of funds personally advanced by Stevens on behalf of FurnitureFan, Inc., and (v) continuing medical coverage for up to six months. A copy of Stevens' termination agreement is attached as Exhibit C. All other termination agreements have already been provided to you.

I also want to use this letter to inform you that Zero Stage Capital Company, Inc. has terminated the employment of Frank Pinto and Ben Bronstein by notice given on January 12, 2004. We are currently working out the terms and conditions of their termination agreements.

5. Describe, with financial justification, the need for add-on financing; e.g., the companies, the amount to be requested, the purpose of the investment, the co-investors and specific details of the new round, the pre-and post-dollar equity positions of Zero Stage, anticipated value of dollars out for dollars in, timeline to exit, method of exit, etc. Additionally, prioritize the additional financing needs and the approximate dates for such funding.

Attached as Exhibit D is our estimate of need for additional funding for the Zero Stage VI portfolio companies during calendar year 2005. Given your desire for a prompt and orderly liquidation of investments, we are still working diligently to obtain an up-to-date assessment of all Zero Stage VI portfolio companies, and provide you with a more comprehensive analysis, including possible funding needs for 2006. As I'm sure you

Elaine Hruschka, Financial Analyst
January 25, 2005
Page 5

understand, my estimate in our December meeting of $6-10 million for future follow-on financing needs was only a semi-educated guess based on my knowledge of the portfolio, but given nonetheless in order to be fully responsive to your questions at the meeting. We are still in the process of reviewing more precisely our potential financing needs that include our 2006 projections as well, and I hope to have this complete analysis to you by February 15th.

**6. Provide details of the Syncra sale in the same manner as you did for the eMed sale showing amount to be paid out to MBDC to cover your guarantee and the residual expected to be applied to outstanding operating liabilities of the Licensee. Once this information is provided to SBA's satisfaction, it will determine whether or not to approve Licensee's financing to Syncra.**

Syncra Systems was sold on November 12, 2004 for $4.7 million. Net proceeds from the sale were $3.6 million of which Zero Stage VI is entitled to receive $441,000. Of this amount, Zero Stage VI received $117,000 in December, 2004; it will receive approximately $28,000 90 days after the closing and it will receive $296,000 18 months after the closing.

Exhibit L to our December 15, 2004 letter to you shows a shortfall of $25,000 in the operating expenses of Zero Stage VI, even with the eMed proceeds. Accordingly, we intend to apply the first $145,000 of Syncra proceeds to fund ongoing operating needs of Zero Stage VI. We anticipate using part, if not all, of the $296,000 of Syncra proceeds, when they are received in 2006, as a further lump sum payment against the MBDC liability. How much of that amount we actually use to pay off MBDC depends in part on the availability of other monies to pay Zero Stage VI operating expenses. We have attached another copy of that Exhibit L to this letter.

**7. SBA hereby approves Licensee's disposition of proceeds from the sale of eMed as outlined in your submission to SBA, dated December 17, 2004.**

Zero Stage VI will pay $500,000 to MBDC pursuant to an Amendment to Note Purchase Agreement and Promissory Note in substantially the form attached as Exhibit E. We are currently in the process of finalizing this Agreement. We will file a 1031 with respect to that payment within 30 days of the payment.

It is Zero Stage VI's intention to pay the ongoing monthly installments of principal ($4,325) plus interest under the MBDC-FurnitureFan Note, as per the terms of the Amendment attached as Exhibit E. These payments are listed under the headings "Estimated 2005 Cash Requirements" and "MBDC Payments" on Exhibit L to our December 15, 2004 letter to you.

Elaine Hruschka, Financial Analyst
January 25, 2005
Page 6

8. As to the 1031 issue, going forward please send <u>to my attention</u> a hard copy of Form 1031 for each financing and restructure being certain to request prior SBA approval, and sign and date each form.

> We will comply with this request. Please also see our response to Item 14 for information regarding our internal controls procedures.

9. Prior to obtaining SBA's approval for each of the personnel changes, provide SBA background data showing qualifications and experience in the venture capital field or other specialized expertise. Indicate who is and who is not a Control Person.

> It is my intention to make Matthew Kelley, Matthew Fong and Edwin Wang Class A members of Zero Stage Capital Associates VI, LLC, the General Partner of Zero Stage VI, and also to elect them as Directors of Zero Stage Capital Company, Inc., the management company of Zero Stage VI. All three individuals, in addition to myself, would be control persons.

> Attached as <u>Exhibits F to H</u> are brief biographies of each of these individuals, printed from the Zero Stage web site.

> We will be submitting formal requests for SBA prior approval of these management changes pursuant to SBA Regulation §107.630 as soon as the SBA Forms 415A's with the required attachments and the Fingerprint cards for these requests are completed.

10. Given Matthew Fong's proposed status as a Special General Partner, please explain the duties, responsibilities and obligations of this class of G/P. We note there is a Class B and Class C general partner. What is the distinction, and the responsibilities and obligations of each class?

> As mentioned in my response to Item 9, I intend to make Matthew Fong, as well as Matthew Kelley and Edwin Wang, Class A members of Zero Stage Capital Associates VI, LLC, the General Partner of Zero Stage VI. Only Class A members may serve as managers of Zero Stage Capital Associates VI, LLC, which is a manager-managed, LLC, so these three gentlemen would also be made managers, in addition to myself.

> The Class A members have all member voting rights.

> The Class B and Class C members do not have voting rights, except in the case of a decision to have the LLC taxed other than as a partnership or a proposed amendment to the LLC agreement. The only distinction between the Class B and Class C members is that the Class C membership interests are fully vested when issued, whereas the Class B membership interests are subject to vesting based on the continued provision of services to the LLC by the Class B members.

11. <u>You must obtain SBA approval to establish an Investment Committee.</u> Provide the names and titles of each member and discuss the responsibilities of the Committee. Please

Elaine Hruschka, Financial Analyst
January 25, 2005
Page 7

send SBA minutes of the Committee's deliberations and resolutions to date. Henceforth, provide the foregoing information within five (5) business days of the date of the Committee's meetings.

> We do not currently have an Investment Committee and do not intend to establish one at this time.

**12. Despite the fact that the funds were used to repay the MBDC guarantee, your Furniture Fan financing, dated 9/30/04, is considered a financing to a small business concern and as such required prior SBA approval. Note this requirement for any additional investment in Furniture Fan. You must also file a Form 1031.**

**SBA withholds its approval of Licensee's 6/5/03, 6/10/03 and 8/13/03 financings to Furniture Fan identified in your letter of December 17, 2004 as well as the 9/30/04 financing.**

> I want to clarify that the $45,216 "financing" dated 9/30/04 was a payment made by Zero Stage Capital Company, Inc., the Zero Stage VI management company, to MBDC on behalf of Furniture Fan for the months of June 2004 through September 2004. This was not a payment by Zero Stage VI or any other SBIC. This "financing" shows up on the books of Zero Stage VI because we treat the payment by Zero Stage Capital Company, Inc. as an obligation to be repaid by Zero Stage VI pursuant to its guaranty. Consequently, we believe that obligation must show up on the financial statements of Zero Stage VI. To date, Zero Stage VI has not gone out of pocket in the amount of $45,216. However, we will file a Form 1031 for this financing should you so request.

> I also want to point out that on December 28, 2004, while we were waiting for your approval for Zero Stage VI to commence payments of the MBDC loan pursuant to its guaranty, Zero Stage Capital Company, Inc. paid MBDC the installments due for October through December 2004. These payments were reflected on Exhibit L to our December 15, 2004 letter under the heading "October-December 2004 MBDC P&L." However, instead of paying the total of $24,586.92 for those three months, as shown on Exhibit L, Zero Stage Capital Company, Inc. paid $37,621.41. The amount shown on Exhibit L was based on the reduced principal payments of $4,350 negotiated by Bob Burrows with MBDC. However, the commencement of those reduced principal payments was contingent on MBDC's receipt of the $500,000 principal payment from the eMed proceeds. As that did not occur by the end of 2004, the October-December 2004 payments had to be made based on the then-existing payment schedule.

> Accordingly, Zero Stage VI will show the additional $37,621.41 as an additional investment and obligation on its financial statements.

> At this time, we request SBA's approval for Zero Stage VI to reimburse Zero Stage Capital Company, Inc. for (i) the $45,216 in payments made by Zero Stage Capital Company, Inc. to MBDC for the months of June 2004 through September 2004, and (ii) the $37,621.41 in payments made by Zero Stage Capital Company, Inc. to MBDC for the

Elaine Hruschka, Financial Analyst
January 25, 2005
Page 8

months of October 2004 through December 2004. Please note that due to cash flow at Zero Stage VI, we may not pay that reimbursement immediately upon receipt of your consent.

**13.** **SBA requested on several occasions that you submit a quarterly report for June 30, 2004 (2nd quarter) and September 30, 2004 (3rd quarter) that more fully describes Licensee's investments than the four-page legal sized document you provided on December 17th. A copy of the cover page is attached for your reference.**

Enclosed, please find the quarterly reports as you have requested. We will provide these to you each quarter going forward.

**14. In your efforts to comply with Section 107.506, provide a detailed schedule of internal controls that Licensee has or intends to put in place and the time line to completion.**

As part of our internal controls, we have already adopted a regulatory compliance checklist identical to the checklist provided by NASBIC in its training course. In addition, we have drafted an SBA Compliance Agreement (attached as Exhibit I) to insure compliance with virtually all of the significant SBA regulatory provisions and forms that we would intend to use in the event SBA permits Zero Stage VI to make a follow-on financing in any of its portfolio companies. We have put in place a requirement that all financing activities must be reviewed by legal counsel before any action is taken.

Paul Kelley, Matthew Kelley, Robert Barrows, and David Carmisciano, CPA, a long-term consultant to Zero Stage Capital Company, Inc. will take the NASBIC SBIC training class in either March or June of this year. In addition, we intend to have our legal counsel, McNamara Koenig & McCarthy, PC, send one of its lawyers to the NASBIC training class.

Again, we greatly appreciate your consideration and support and remain ready to provide any additional information that you may require.

Yours sincerely,

Paul M. Kelley

Encls.

cc:     John L. Koenig (w/ encls.) ✓
        R. Michael Haynes (w/ encls.)

Elaine Hruschka, Financial Analyst
January 25, 2005
Page 9

<u>List of Exhibits</u>

| | |
|---|---|
| Exhibit A | Analysis of Waived Management Fees |
| Exhibit B | Audited Financial Statement excerpts |
| Exhibit C | Bic Stevens Termination Agreement |
| Exhibit D | Add-on Financing Spreadsheet |
| Exhibit E | Amendment to FurnitureFan Promissory Note |
| Exhibit F | Biography of Matthew Kelley |
| Exhibit G | Biography of Matthew K. Fong |
| Exhibit H | Biography of Edwin Wang |
| Exhibit I | SBA Compliance Agreement |
| Exhibit L | Exhibit L from December 15, 2004 letter to SBA |

EXHIBIT A

**Zero Stage Capital VI LP**
**Analysis of Waived Management Fees**
**as of 12/31/04**

| | Activity | | Balance | Notation |
|---|---|---|---|---|
| | Payments Dr | Accrual Cr | Dr/(Cr) | |
| Balance January 1, 2002 | | | 0 | |
| Accrual January 1, 2002 | | 788,874 | 788,874 | |
| Payment January 14, 2002 | 600,000 | | 188,874 | |
| Accrual April 1, 2002 | | 775,977 | 964,851 | |
| Payment May 16, 2002 | 200,000 | | 764,851 | |
| Payment June 6, 2002 | 200,000 | | 564,851 | |
| Accrual July 1, 2002 | | 773,637 | 1,338,488 | |
| Accrual October 1, 2002 | | 763,101 | 2,091,589 | |
| Balance December 31, 2002 | 1,000,000 | 3,091,589 | 2,091,589 | Agrees to 12/31/02 Audit Report - Balance Sheet |
| Accrual January 1, 2003 | | 753,101 | 2,844,690 | |
| Payment January 3, 2003 | 300,000 | | 2,544,690 | |
| Accrual April 1, 2003 | | 753,101 | 3,297,791 | |
| Accrual July 1, 2003 | | 716,101 | 4,013,892 | |
| Accrual October 1, 2003 | | 716,101 | 4,729,993 | |
| Balance December 31, 2003 | 300,000 | 2,638,404 | 4,729,993 | Agrees to 12/31/03 Audit Report - Income Statement and Footnote 4 |
| Accrual January 1, 2004 | | 716,101 | 5,446,094 | |
| Accrual April 1, 2004 | | 655,467 | 6,101,561 | |
| Accrual July 1, 2004 | | 584,824 | 6,686,385 | |
| Accrual October 1, 2004 | | 584,824 | 7,271,209 | |
| Balance December 31, 2004 | 0 | 2,541,216 | 7,271,209 | Subject to Audit Adjustment |

**Summary of Fees Waived**

| | |
|---|---|
| Unpaid Accrual for the year ended December 31 2002 | 2,091,589 |
| Unpaid Accrual for the year ended December 31 2003 | 2,638,404 |
| Unpaid Accrual for the year ended December 31 2004 | 2,541,216 |
| | 7,271,209 |

**Journal Entries to Record Accrual and Payment of Management Fees**

| | | |
|---|---|---|
| Management Fee Expense | | xxxxxx |
| Accrued Management Fee | xxxxxx | |
| to record management fee for the quarter. | | |
| | | |
| Accrued Management Fee | | xxxxxx |
| Cash | xxxxxx | |
| to record payment of management fee. | | |

**Journal Entry to Record Waiving of Management Fees**

| | | |
|---|---|---|
| Accrued Management Fee | 4,729,993 | |
| Management Fee Expense | | 4,729,993 |
| to record waiving of unpaid management fee @ 12/31/03 | | |

EXHIBIT B

**Zero Stage Capital VI Limited Partnership**
(A Massachusetts Limited Partnership)
**Statements of Assets, Liabilities and Partners' Equity**
**December 31, 2003 and 2002**

|  | 2003 | 2002 |
|---|---|---|
| **Assets** | | |
| Investments at fair value (cost of $101,859,433 and $110,017,120 at December 31, 2003 and 2002, respectively) | $ 64,269,915 | $ 122,083,320 |
| Cash and cash equivalents | 1,032,730 | 3,198,969 |
| Investments receivable | - | 56,001 |
| Portfolio company receivable (Note 6) | 2,855 | 60,615 |
| Deferred financing costs, net | 1,828,724 | 2,194,469 |
| Interest receivable | 848,007 | 445,646 |
| Other prepaid expenses | - | 45,595 |
| Total assets | $  67,982,231 | $ 128,084,615 |
| **Liabilities and Partners' Equity** | | |
| Accounts payable and accrued expenses | $      45,703 | $      47,481 |
| Management fee payable | - | 2,091,590 |
| Total liabilities | 45,703 | 2,139,071 |
| Commitments and contingencies (Note 7) | | |
| Redeemable preferred participating securities (Note 3) | 67,936,528 | 93,205,000 |
| Partners' equity | | |
| Private partners' contributed capital | 50,000,000 | 50,000,000 |
| Accumulated operating losses | (11,875,350) | (13,622,189) |
| Accumulated realized (loss) gain | (25,295,770) | (15,195,633) |
| Unrealized (depreciation) appreciation on investments (net) | (12,321,046) | 12,066,200 |
| Syndication costs | (507,834) | (507,834) |
| Total partners' equity | - | 32,740,544 |
| Total liabilities and partners' equity | $  67,982,231 | $ 128,084,615 |

The accompanying notes are an integral part of these financial statements.

2

## Zero Stage Capital VI Limited Partnership
(A Massachusetts Limited Partnership)
### Statements of Operations
Years Ended December 31, 2003 and 2002

|  | 2003 | 2002 |
|---|---|---|
| **Income** | | |
| Interest | $ 714,519 | $ 635,329 |
| Dividend | - | 514,109 |
| Total income | 714,519 | 1,149,438 |
| **Expenses** | | |
| Management fees | 2,938,403 | 3,091,589 |
| Amortization of deferred financing costs | 365,745 | 365,745 |
| Professional and other expenses | 393,525 | 329,409 |
| Total expenses | 3,697,673 | 3,786,743 |
| Waivers (Note 4) | (4,729,993) | - |
| Net expenses | (1,032,320) | 3,786,743 |
| Net investment income (loss) from operations | 1,746,839 | (2,637,305) |
| Realized loss on investments | (10,100,137) | (8,629,886) |
| Change in unrealized depreciation on investments | (49,655,718) | (8,958,800) |
| Net losses allocated to preferred participating securities | 25,268,472 | - |
| Net decrease in partners' equity resulting from operations | $ (32,740,544) | $ (20,225,991) |

The accompanying notes are an integral part of these financial statements.

3

**Zero Stage Capital VI Limited Partnership**
(A Massachusetts Limited Partnership)
Notes to Financial Statements
December 31, 2003 and 2002

Unpaid Prioritized Payments compound at the priority return rate. All amounts due to the SBA for redemption of Participating Securities, Prioritized Payments and profit participation are senior in priority to all other partnership interests.

The Partnership has issued the following participating securities to the SBA:

| Date | Amount | Priority Rate of Return |
|------|-------:|------------------------:|
| March 26, 1999 | | |
| July 30, 1999 | $ 18,000,000 | 7.54% |
| October 25, 1999 | 10,000,000 | 7.54% |
| December 10, 1999 | 15,000,000 | 8.017% |
| February 3, 2000 | 7,000,000 | 8.017% |
| March 10, 2000 | 12,000,000 | 8.017% |
| June 16, 2000 | 8,800,000 | 7.449% |
| October 13, 2000 | 15,000,000 | 7.449% |
| November 28, 2001 | 4,905,000 | 6.640% |
| | 2,500,000 | 6.030% |
| | $ 93,205,000 | |

At December 31, 2003 and 2002, accumulated prioritized payments contingently due to the SBA amounted to $33,350,045 and $25,331,711, respectively. If the Partnership was liquidated at December 31, 2003 the distribution to the SBA would be approximately $67,936,528.

In accordance with the partnership agreement, net profits and cash distributions are generally allocated 99 percent to the Limited Partners and 1 percent to the General Partner until such time as the Limited Partners have received distributions at least equal to their capital contributions. After such time, the distributions will be allocated 80 percent to all Partners and 20 percent to the General Partner.

Net losses are allocated to each partner to the extent of their positive capital account balance in the same manner as gains. However, to the extent net losses are less than the positive capital account balances, losses shall be allocated in an amount that would cause such partners capital account to be equal to their share of the then Partnership Capital. To the extent the allocation of losses would result in negative capital accounts to the General Partner and the Limited Partners, such amount would be allocated to the SBA as Preferred Limited Partner to the extent of its committed capital. At December 31, 2003, $25,268,472 in losses were allocated to the Preferred Limited Partner.

4.   **Management Fees**

The management company, Zero Stage Capital Company, Inc. which is owned by certain partners of the General Partner, is paid a fee for managing and conducting the investment activities and affairs of the limited partnership. The Partnership is required to pay to the management company a fee equal to 2.5 percent per year (computed on a quarterly basis) of the total committed capital of the General Partner, Private Limited Partners and the eligible capital of the Preferred Limited Partner, net of the cost of any of the Partnership's investments which are liquidated or distributed and net of the cost of any investments written off for tax purposes by the Partnership. Any adjustment to the management fee resulting from the foregoing is made in the quarter immediately following such liquidation or distribution. In 2003, the General Partner waived $4,729,993 representing management fees for the year ended 2003 and a portion of 2002.

EXHIBIT C

## AGREEMENT

This AGREEMENT ("Agreement") is entered into as of December 23, 2004 by and between G. Bickley Stevens, an individual residing at                    ("Stevens"), and Zero Stage Capital Company, Inc., a Massachusetts corporation with its principal place of business at 101 Main Street, Cambridge, Massachusetts 02142 (the "Company" or "Zero Stage").

NOW THEREFORE, in consideration of the promises, mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  **Purpose of Agreement.**

    The purpose of this Agreement is to resolve all matters relating to the employment of Stevens by Zero Stage and the cessation of such employment.

2.  **Undertakings of Zero Stage.**

    Zero Stage agrees as follows:

    (a) For the months of January through June 2005 Stevens shall receive his current base pay in accordance with current payroll policies (the "Severance Period").

    (b) During the Severance Period Zero Stage shall, simultaneously with transmission of each payment referred to in the preceding sentence, transmit to Stevens an amount (the "Interest Payment") equal to the monthly interest payable on the Promissory Note (the "SVB Note"), which interest amount is currently approximately $1,200.  It is understood and agreed that Stevens shall take no action to modify or amend the terms of the SVB Note without the prior written consent of Zero Stage, and that in no event will the monthly Interest Payment exceed $1,250. Stevens may replace the SVB note with other financing of his choice, provided that he advises Zero Stage of such replacement, and in such event Zero Stage shall treat the replacement note as if it were the SVB Note.  Nothing herein shall be construed as creating any obligations on the part of Zero Stage to SVB or any other creditor of Stevens.

    (c) Commencing on or about April 15, 2004, Zero Stage shall pay Stevens the sum of $87,381.85 in twelve equal monthly installments of $7,281.83.  This total shall represent reimbursement for all of the unvested portion of the carried interest allocated to Stevens in Zero Stage Capital Company VII, LP (including any Parallel Funds, as defined in the Limited Partnership Agreement of Zero Stage Capital Company VII, LP) for which Stevens has previously paid, less any monies previously paid by Zero Stage to Zero Stage Capital VI, LP ("Fund VI") on Stevens' behalf as his capital contributions to Fund VI, all as represented on the attached Schedule 2(c). Upon completion of such payments Stevens shall receive one additional payment in

the amount of $4,000 representing monies personally advanced by him on behalf of FurnitureFan, Inc.

(d) Zero Stage agrees that it shall provide Stevens his existing medical care coverage (but not dental or other benefits) during the Severance Period or until his reemployment, whichever is sooner. Zero Stage will provide Stevens with COBRA benefits and any other benefits to which he is entitled by law.

(e) Zero Stage agrees that at no time will it disparage Stevens, and that it will respond to any and all inquires made to it, or to any of its employees individually, regarding Stevens's employment by Zero Stage, with language similar or equivalent to that set forth in Exhibit A hereto.

(f) Zero Stage agrees to cooperate with Stevens, as he may be financing or refinancing certain real property, by responding to lenders' inquiries and by other reasonable means provided that this shall not imply that Zero Stage shall undertake any financial obligations in addition to those set forth herein.

(g) Zero Stage agrees to indemnify Stevens from and against all expenses reasonably incurred or paid by him in connection with the defense or disposition of any actual or threatened claim, action, suit, or proceeding (civil, criminal, or other, including appeals) in which he may be involved as a party or otherwise by reason of his having served as a Zero Stage employee, or by reason of any action or omission or alleged action or omission by him while serving in any such capacity; except for expenses incurred or paid by him with respect to: (1) any matter as to which he did not act in the reasonable belief that his action was in the best interests of the Company, or (2) any matter as to which he shall agree or be ordered by any court of competent jurisdiction to make payment to the Company, or (3) any matter as to which he has violated any state or federal law, or any rule, regulation, policy or procedure promulgated thereunder, or (4) any matter as to which the Company shall be prohibited by law or by order of any court of competent jurisdiction from indemnifying him, or (5) direct or indirect claims of governmental agencies, including without limitation the SBA.

3.  **Undertakings of Stevens.**

Stevens agrees as follows:

(a) On the date hereof, in consideration for the payments provided for in clause 2(b), above, Stevens shall execute this Agreement and any documents referred to herein or contemplated hereby, and will diligently and in good faith perform all of the covenants and agreements set forth herein.

-2-

(b) Stevens shall execute the letter of resignation attached hereto as Exhibit B, thereby resigning as an officer, director and manager of Zero Stage and its affiliates and any and all portfolio companies of its affiliates.

(c) Stevens hereby transfers his ownership interest as a stockholder in Zero Stage Capital GP, VII, Inc., a Delaware corporation, by executing the stock power attached hereto as Exhibit C.

(d) Stevens agrees that at no time will he disparage Zero Stage or its affiliates, officers, directors, or agents, and that he will respond to any and all inquires made to him regarding his employment by Zero Stage with language similar or equivalent to that contained in Exhibit D attached hereto.

(e) Stevens agrees that for a period of one year from the date of the termination of his employment with Zero Stage, he shall not, directly or indirectly, solicit any investment from any limited partner who was an investor in any Zero Stage venture capital fund as at or December 31, 2004, exclusive of investors in the so-called "100% clean energy space."

(f) Stevens shall vacate his office on or before December 23, 2004.  Zero Stage shall maintain his e-mail and voice mail accounts during the Severance Period or until his reemployment. Stevens may maintain the use of his cell phone and Blackberry during the Severance Period or until he is sooner reemployed; provided that he reimburses Zero Stage for the usage thereof and returns the same promptly at the end of the Severance Period of his re-employment, whichever is sooner. Any other equipment or other property of Zero Stage in his possession or control, including, but not limited to, all data and information stored or preserved in any medium, shall be returned on or before December 31, 2004 unless otherwise agreed.

(g) Stevens will cooperate fully with Zero Stage in all matters relating to the portfolio companies for which Stevens was primarily or secondarily responsible, including but not limited to the possible sale of FurnitureFan, Inc. to Robert George, and in all other matters, including without limitation matters relating directly or indirectly to the interests of the United States Small Business Administration ("SBA") in any Zero Stage fund affiliate or portfolio company. He shall also cooperate in the transition of Zero Stage portfolio companies for which he currently has responsibility, including but not limited to consulting with Zero Stage and its designees from time to time at reasonable times and places.

4.    **Confidentiality.**

The parties shall treat the existence and terms of this Agreement as confidential.  The parties shall make no disclosure, unless compelled by law or requested by any governmental agency, including without limitation SBA, of the terms of this Agreement,

or of the consideration provided hereunder, or of any information whatsoever pertaining to the other party, to any person other than their respective professional advisors, to all of whom such disclosure shall be made in confidence. The parties agree that there will not be a violation of obligations hereunder if they disclose any of the aforementioned information pursuant to a subpoena or an order of a court of competent jurisdiction or for the purposes of required reporting of the transaction to administrative, regulatory, or taxing authorities.

6. **Entire Agreement; Modification and Waiver.**

This Agreement, including its Exhibits, represents the complete agreement and understanding between the parties with respect to its subject matter. There are no restrictions, agreements, understandings, promises, inducements, representations, warranties, covenants, or undertakings, whether oral or written, other than those set forth expressly and specifically herein. This Agreement may be amended or modified only by a written instrument duly executed by the parties or their respective successors that unequivocally indicates the parties' intention to modify this Agreement. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.

7. **Interpretation.**

Should any clause, sentence, provision, paragraph or part of this Agreement and its Exhibits for any reason whatsoever be declared or determined finally by any court of competent jurisdiction, or by any other competent governmental authority having jurisdiction, to be illegal or invalid or unenforceable, the validity of the remaining parts, terms, or provisions shall not be affected, impaired or invalidated thereby, and such determination of illegality, invalidity or unenforceability shall be confined in its operation to the specific clause, sentence, provision, paragraph or part of this Agreement directly involved. Such illegal or invalid part, term, or provision shall be deemed not to be a part of this Agreement and its Exhibits, and the remainder of the Agreement and Exhibits, wherever practicable, shall remain in full force and effect.

8. **Governing Law; Jurisdiction.**

This Agreement shall be governed by, construed and enforced in accordance with the laws of the Commonwealth of Massachusetts except that any conflicts of law rule requiring reference to the laws of another jurisdiction shall be disregarded.

9. **No Waiver.**

The failure by any of the parties to this Agreement to enforce it at any time, or from time to time, or a course of dealing between the parties, shall not be a waiver of such terms or conditions or of such party's right thereafter to enforce each and every term and condition

-4-

of this Agreement. No express waiver of any provision of this Agreement, or the breach thereof, shall be deemed a waiver or breach of any other provision. Any waiver, consent or authorization shall be valid only to the extent specifically set forth in writing.

10.  **Binding Effect.**

This Agreement, including its Exhibits, shall be binding upon and shall inure to the benefit of the parties hereto and, as may be applicable, all of the present and former divisions, subsidiaries, affiliates, predecessors, successors, assigns, administrators, executors, heirs, officers, directors, stockholders, trustees, partners, principals, employees, assigns, agents, insurers and attorneys, as well as other representatives of the parties and the other persons and entities listed in this provision.

11.  **No Drafting Presumption.**

All terms and provisions of this Agreement and the Exhibits have been negotiated by the parties at arm's length and to mutual agreement, with consideration by and participation of each. This Agreement and such Exhibits shall be deems as having been prepared jointly by the parties. Each party has been represented by independent counsel, or if not actually represented is (i) a sophisticated and experience business person, and (ii) has had ample opportunity to utilize and consult with counsel.

12.  **Release.**

Upon satisfaction of the mutual obligations set forth herein, the parties, on behalf of themselves and any and all of their parents, subsidiaries, affiliates, divisions, predecessors, assigns, officers, directors, employees, attorneys and agents, do hereby release and forever discharge one another, as well as their respective parents, subsidiaries, affiliates, predecessors, successors, assigns, officers, directors, employees, attorneys and agents, from any and all claims, rights, demands, obligations, agreements, contracts, representations, promises, liens, accounts, debts, liabilities, damages, expenses, costs, attorneys' fees, injunctive relief, obligations and causes of action of every kind and nature, whether in law or equity, known or unknown, suspected or unsuspected, existing or claimed to exist which that party has ever had, now has, or claims to have, against the other concerning the subject matter of this Agreement, including but not limited to Stevens's employment at Zero Stage and his participation in any and all Zero Stage funds, partnerships or entities; provided, however, that as to Stevens there shall be excepted from this release (1) any matter as to which he did not act in the reasonable belief that his action was in the best interests of the Company or its affiliates, or (2) any matter as to which he shall agree or be ordered by any court of competent jurisdiction to make payment to the Company, or (3) any matter in which he has violated any state or federal law, or any rule, regulation, policy or procedure promulgated thereunder, or (4) any matter as to which the Company shall be prohibited by law or by order of any court of competent jurisdiction from indemnifying him, or direct or indirect claims of

governmental agencies, including without limitation SBA. This paragraph is not intended to, and shall not, release the obligations of the parties hereunder.

13.    Notice.

Any notice required or permitted to be given hereunder shall be made by first class mail, postage prepaid, or by hand delivery or facsimile (with copies to follow by U.S. Mail) to:

*If to Stevens, to:*

Mr. G. Bickley Stevens

*And if to Zero Stage, to:*

Paul M. Kelley
CEO and Managing Director
Zero Stage Capital Company, Inc.
101 Main St., 17th Floor
Cambridge, Massachusetts 02142

with a copy to:

Theodore Tedeschi, Esq.
McNamara, Koenig & McCarthy, PC
65 William Street, Suite #350
Wellesley, Massachusetts 02481

14.    Counterparts.

This Agreement may be executed in multiple counterparts, each of which may contain the signatures of less than all of the parties and shall constitute an original, and all of which together shall constitute a single Agreement. Each counterpart shall be fully effective as an original when all parties have executed this Agreement.

15.    Arbitration.

Should there arise a dispute among the parties concerning this Agreement, the parties shall make a good faith effort for thirty (30) days to resolve the dispute themselves. If they are unable to so resolve the dispute in such fashion, then they shall promptly submit their dispute for arbitration pursuant to the rules of the American Arbitration Association, before a single arbitrator sitting in Boston, Massachusetts and chosen by the American Arbitration Association. The parties agree that the arbitrator's decision shall be final and binding and may be enforced in the courts of the Commonwealth of Massachusetts.

-6-

16.  **Legal Fees and Expenses.**

In the event that it shall become necessary for any party to take action to enforce the terms of this Agreement, the prevailing party shall be entitled to recover all reasonable attorneys' fees, costs, and expenses, including all out of pocket expenses that are not taxable as costs, incurred in connection with any such action, including any negotiations, mediations, arbitrations, litigation, and appeals.

Executed as an instrument under seal, as of the date first written above.

By: _____
    G. Bickley Stevens

ZERO STAGE CAPITAL COMPANY, INC.

By: _____
    Paul M. Kelley, Chief Executive Officer
    and Managing Director, and not individually

-7-

### EXHIBIT A

Bic determined to pursue socally conscious alternative energy investing.  He and Zero

Stage have an excellent relationship, and the firm will be supportive of his career plans.

**EXHIBIT B**

**RESIGNATION**

I hereby resign as an officer, director and manager of and from Zero Stage Capital Company, Inc. and any and all of its affiliates, and any and all portfolio companies of its affiliates.

G. Bickley Stevens

**EXHIBIT C**

**STOCK POWER**
**(ASSIGNMENT SEPARATE FROM CERTIFICATE)**

FOR VALUE RECEIVED AND ACKNOWLEDGED, the undersigned hereby assigns and transfers to _____

_____

One Thousand (1,000) shares of the Common Stock of Zero Stage Capital GP VII, Inc., a Delaware corporation (the "Company"), represented by Certificate No. _____ standing in the name of the undersigned on the books of the Company, which Shares represent the undersigned's entire interest in the Company.

The undersigned hereby irrevocably constitutes and appoints the Secretary of the Company attorney-in-fact to transfer those shares on the books of the Company, with full power of substitution in the premises.

Dated: December 27, 2004                    Signed _____

                                                            G. Bickley Stevens

**EXHIBIT D**

My experience at Zero Stage was positive.  We are on excellent terms.  I have high
regard for the firm and they for me.

**SCHEDULE 2(c)**

<u>SCHEDULE 2(c)</u>

## Bic Stevens Interests

| Legal Entity | Interest | Vested Percentage | Vested Interest | Capital Commitment Paid | Amount Required Vested % | Amount Due To (from) Bic | Bic's Retained Percentage Interest |
|---|---|---|---|---|---|---|---|
| Zero Stage Capital Associates VI, LLC | 8.00% | 55.55% | 4.44% | . | (A) 40,000.50 | (40,000.50) | 4.44% |
| Main Street Investors VI, LLC | 19.80% | 75.00% | 14.85% | 100.00 | 75.00 | 25.00 | 14.85% |
| Zero Stage Capital Associates VII LP | 21.93% | 66.25% | 14.53% | 521,718.23 | 401,670.00 | 120,048.23 | 8.03% (B) |
| Zero Stage Capital Associates SBIC VII LP | 28.60% | 55.00% | 15.73% | 70,229.12 | 62,920.00 | 7,309.12 | 9.23% (B) |
| Zero Stage Capital/GP VII Inc. | 33.00% | 100.00% | 33.00% | . | . | | 0.00% |
| | | | | | | $ 87,391.85 | |

(A) Bic has been allocated his original full 8.001% share of $500,000 loan made to the GP of ZSC VI as the unvested interest is not
marketable to a new or existing partner.
(B) Bic's vested percentage interest in Zero Stage Capital Associates VII LP of 14.53% and Zero Stage Capital Associates SBIC VII of 15.73%
has been reduced by 6.50 % in each case in connection with the Mass Business Loan Guaranty.

EXHIBIT D

Response to Item 5

| COMPANY | PURPOSE | CO INVESTORS | NEW ROUND DETAILS | EQUITY POSITION FULLY DILUTED | | TIMELINE TO EXIT | VALUE OF DOLLARS OUT TO VALUE OF DOLLARS IN | | | METHOD OF EXIT |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | PRE $ | POST $ | | AMOUNT REQUESTED | RETURN MULTIPLE | ACTUAL DOLLARS | |
| LiveWave, Inc. | See Note 1 | None | Senior Demand Note | 45.0% | 45.0% | 60 months | 750,000 | 1 | 750,000 | See Note 2 |
| SPHERICS, INC. | See Note 3 | CB Healthcare Fund, L.P. PROQUEST Holdings, L.P. Eastman Chemical Advent International New Series C Investors: Brown University Research Fund, Zero Stage Capital VI, LP. Zero Stage Capital (Cayman) VII, L.P. | See Note 4 | 7.7% | 10.2% | 18/24 months | 1,000,000 | 1.5 | 1,500,000 | Sale to Public Company or IPO |
| | | | | | | | 1,750,000 | | 2,250,000 | |

Note 1: The loan proceeds will be used to pay down short-term trade debt and improve balance sheet strength. This will have a materially positive impact on the Company's ability to fulfil several near-term contracts, such as security for the Presidential inauguration, that are of marquee value and highly consequential to enterprise value. The result can be significant in respect of several specific Letters of Intent from viable public and private bidders to acquire the Company.

Note 2: LiveWave has retained Jeffries & Co. to find potential buyers for the company. LiveWave has received four letters of interest. In addition, three additional prospective buyers have expressed interest in the Company. Two of these are multinational companies with substantial resources, and are well known and respected in their respective fields of expertise. Nondisclosure agreements have been signed by these prospective buyers, and it is expected that their due diligence process will commence shortly. Livewave's projected 3rd quarter revenues are anticipated to be $1,300,000 mainly 67% of that for the three preceding quarters. Projected full year revenues are anticipated to be approximately $4,000,000. LiveWave has a backlog (signed contracts) of $12,000,000. $4,000,000. Anticipated contracts - categorized as highly likely to be signed in the near term - range from a low of $9,000,000 to a high of $93,000,000.

Note 3: The purpose of these funds are to allow Spherics to conduct clinical testing trails.

Note 4: The First tranche (85%) of a Series C Pfd financing round occurred 01/03/05. Zero Stage VI did not participate, as a result of which its fully diluted ownership %age has dropped to 7.87%. However, the current Series C Pfd investors are seeking additional investors. Therefore, a "deferred first tranche" is scheduled to occur on January 31, 2005. If Zero Stage VI's proposed investment is approved ($350,000 @ deferred first tranche, $350,000 @ second tranche), then its ownership %age would increase to 10.20% provided no other new investors participate. Licensee's ownership prior to the Series C Pfd round was 17.53%. New investors participated in the Series C Pfd round which results in a drop in ownership % for all investors who have participated in previous financings. The new Series C Pfd aka investors have invested $5,817,500. The second tranche is scheduled to take place upon the occurrence of specific milestone events or by vote of 67% of the Series C Pfd Stock shareholders. If either of the foregoing events does not occur by December 31, 2005 then the second tranche will not take place.

EXHIBIT E

## AMENDMENT TO NOTE PURCHASE AGREEMENT
## AND PROMISSORY NOTE

This AGREEMENT, made as of 24th day of January, 2005, by and between FurnitureFan, Inc., a Delaware corporation (the "Company"), Zero Stage Capital VI Limited Partnership ("Zero Stage VI"), and Massachusetts Business Development Corporation (the "Purchaser").

WHEREAS, the Company and the Purchaser are parties to a certain Note Purchase Agreement, dated as of October 3, 2001, as amended on April 3, 2002 and on December 31, 2003, (the "Purchase Agreement"), pursuant to which the Company issued to the Purchaser the Company's Note (as amended on April 3, 2002 and on December 31, 2003), due April 1, 2014, in the original principal amount of $1,400,000 (the "Note"); and

WHEREAS, Zero Stage VI is a guarantor of the Company's obligations under the Note; and

WHEREAS, the Note has an outstanding principal amount of $976,543.12 as of January 1, 2005; and

WHEREAS, the Company has requested the Purchaser, and the Purchaser has agreed, subject to the terms and conditions contained herein, to amend the Purchase Agreement and the Note so as to modify the required principal repayment under the Note as set forth herein;

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto do hereby agree with each other as follows:

1.    Section 1.05(a) of the Purchase Agreement is hereby amended in its entirety (with the amendments underlined) to read as follows:

"(a) Required Redemptions. Beginning on and with May 1, 2002, and on the first day of each calendar month thereafter through and including September 1, 2003, the Company will redeem, without premium, $25,925.93 in principal amount of the Notes, or such lesser amount as may be then outstanding, together with all accrued and unpaid interest then due on the amount so redeemed. Beginning on and with May 1, 2004, and on the first day of each calendar month thereafter through and including December 1, 2004, the Company will redeem, without premium, $8,641.98 in principal amount of the Notes, or such lesser amount as may be then outstanding, together with all accrued and unpaid interest then due on the amount so redeemed. Beginning on and with January 1, 2005, and on the first day of each calendar month thereafter through and including April 1, 2014, the Company will redeem, without premium, $4,325.00 in principal amount of the Notes, or such lesser amount as may be then outstanding, together with all accrued and unpaid interest then due on the amount so redeemed. On the stated or accelerated maturity of the Notes, the Company will pay the principal amount of the Notes then outstanding together with all accrued and unpaid interest then due

1

thereon. No optional redemption of less than all of the Notes shall affect the obligation of the Company to make the redemptions required by this subsection. The Company shall establish and maintain an automatic payment system, with a bank or trust company acceptable to the Purchasers, whereby said bank or trust company will automatically pay to each Purchaser on the first day of each calendar month the required redemption of principal and payment of interest, due on such date. The Company shall at all times maintain sufficient funds in said account to permit such payments on a timely basis."

2.      If so requested by the Purchaser, the Company will, as soon as possible, and in any event within ten (10) business days from the date of such request, issue to the Purchaser, against tendering by the Purchaser of the Note held by it, a replacement Note evidencing the foregoing amendment, as well as the two prior amendments to the extent not previously documented.

3.      Promptly after the execution of this Agreement by all parties, Zero Stage VI will make a prepayment of $500,000 to Purchaser, which is to be applied against the outstanding principal balance of the Note. The monies used to fund this prepayment originated from the liquidation of a Zero Stage VI portfolio company. Zero Stage VI covenants, to the extent allowed by the U.S. Small Business Administration, to use monies received by it from the liquidation of other Zero State VI portfolio companies to make similar principal prepayments against the then outstanding principal balance of the Note.

4.      The Purchase Agreement and the Note are hereby amended wherever necessary to reflect the changes described in this Agreement.

5.      The Company understands and agrees that (i) in modifying the Purchase Agreement and the Note, Purchaser is relying upon the Company's representations, warranties and agreements, as set forth in the Purchase Agreement and the Note, (ii) except as expressly modified pursuant to this Agreement (including the effects of Section 4 hereof), the Purchase Agreement and the Note remain unchanged and in full force and effect, (iii) it is the intention of Purchaser to retain as liable parties all makers and endorsers of the Purchase Agreement and the Note, unless a party is expressly released by Purchaser in writing, (iv) no maker, endorser or guarantor will be released by virtue of this Agreement.

6.      This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and either of the parties hereby may execute this Agreement by signing any such counterpart.

7.      This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts and shall have the effect of a sealed instrument.

<div align="center">

BALANCE OF PAGE INTENTIONALLY LEFT BLANK
SIGNATURES ON FOLLOWING PAGE

</div>

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

FURNITUREFAN, INC.

By: _____
    Severin Ritchie, Chief Executive Officer

MASSACHUSETTS BUSINESS DEVELOPMENT CORPORATION

By: _____
    Kenneth J. Smith, President

ZERO STAGE CAPITAL VI LIMITED PARTNERSHIP

By: Zero Stage Capital Associates VI, LLC

By: _____
    Paul Kelley, Managing Director

3

Zero Stage

EXHIBIT F  Page 1 of 1

ABOUT ZSC    THE TEAM    INVESTMENT PHILOSOPHY    PORTFOLIO    ENTREPRENEURIAL RESOU



ZERO STAGE CAPITAL

Investor Ce

Investment Professionals

**Matt Kelley, Managing Director and Chief Operating Officer**

*"Entrepreneurs succeed by being tenacious. They may have great ideas and a lot of talent, but they succeed because they're persistent. Hard-driving entrepreneurs with a deep sense of integrity make great business partners."*

**Matt Kelley**
Managing Director
Chief Operating
Officer

Matt rejoined Zero Stage Capital in 2001, having previously spent two years as an analyst and three years as an associate with the firm starting in 1991. He focuses on investments across technology sectors and growth stages.

Prior to joining Zero Stage Capital as a principal, he was involved in the initial planning and development of Navigator Technology Ventures. Previously, he was the founder and managing director of MB Capital, a private equity fund capitalized with $20 million raised from regional banks including BankBoston, Citizens, Eastern Bank, Fleet, State Street, and U.S. Trust in 1996. While at MB Capital he invested in 14 companies that spanned a wide range of stages and industry sectors. His investments at MB Capital have generated a 21% net IRR to date. Matt has extensive private equity fund organization experience and was involved in the formation and fund raising of MB Capital, Penn Venture Partners I, Zero Stage Capital V, and Zero Stage Capital VI. As an associate at Zero Stage Capital he focused on life science and IT/communication investments.

Earlier in his career, Matt was a member of the Emerging Business Group Practice at Coopers & Lybrand (now PricewaterhouseCoopers), where he assisted in the growth of venture capital backed technology companies by providing management consulting, assurance and strategic planning.

He earned his AB from Dartmouth College and his MS and MBA degrees from Northeastern University.
Back



home | about zsc | the team | investment philosophy | portfolio | entrepreneurial resources | submit business plan | cc
Copyright © 2001 Zero Stage Capital. All rights reserved

Zero Stage

**EXHIBIT G**   Page 1 of 1

contact us    site map    opt-in for news

Submit Business Pl

ABOUT ZSC     THE TEAM     INVESTMENT PHILOSOPHY     PORTFOLIO     ENTREPRENEURIAL RESOU

# ZERO STAGE CAPITAL

Investor Ce



## Investment Professionals

### Matt Fong, Special General Partner

Matt Fong, as special general partner, brings a unique blend of entrepreneurial, financial, political, and legal expertise with global platforms and networks to the Zero Stage Capital investment portfolio.

As founder and president of Strategic Advisory Group (SAG), Matt develops corporate strategies and advises such organizations as Lennar, one of the largest homebuilders in the United States, and YCS, a privately held company with multi-million dollar real estate and corporate interests worldwide.

A member of the board of advisors to RAND Center for Asia Pacific Policy, Matt provides advice on defense, economic, and social policies between the U.S. and Asia. He also serves on the Toffler Advisory Board and works with the world's leading futurists, Alvin and Heidi Toffler.

Matt is an independent director for Trust Company of the West, a complex of mutual funds, and Vialta, a home entertainment products company. He serves as a regent for Pepperdine University and sits on its investment committee.

Previously, Matt provided strong fiscal stewardship in California's fiscal affairs as vice chairman of the State Board of Equalization (California's tax agency) and state treasurer (the state's chief financial officer). He also served as a trustee of CalPers and CalStrs Pension Funds, with over $200 billion in investment assets.

President Bush appointed Matt to serve as chairman of the Pension Benefit Guaranty Corporation (PBGC) Advisory Committee, which provides fiscal oversight and corporate governance to a $36 billion investment portfolio protecting America's workforce enrolled in defined benefit pension plans.

Matt earned his B.S. degree from the United States Air Force Academy, an MBA from Pepperdine University, and a JD from Southwestern University. He is licensed to practice law in California and Washington D.C. Matt holds a FAA Certified Flight Instructor License (CFI-I), a Commercial Pilot License (SEL) and Glider rating.
Back



home | about zsc | the team | investment philosophy | portfolio | entrepreneurial resources | submit business plan | co
Copyright © 2001 Zero Stage Capital. All rights reserved

Zero Stage



contact us   site map   opt in for news          Submit Business Pl

ABOUT ZSC    THE TEAM    INVESTMENT PHILOSOPHY    PORTFOLIO    ENTREPRENEURIAL RESOU



# ZERO STAGE CAPITAL

Investor Ce

## Investment Professionals

### Edwin J. Wang, Managing Director

*"Innovation is more than discovering something that never was. It's about realizing the potential in what already exists and unlocking the value that it represents. We invest in uncertainty at a discount and realize return on clarity at a premium."*

Edwin Wang is an investment professional with 20 years of experience in private equity, technology principal investing, and cross border investment banking. He joined Zero Stage Capital in 2004.

At Cross Pacific Technology Partners, he has led successful late-stage private equity technology investment financings in Convergent Networks, Inc.; Multiplex, Inc.; UTStarcom, Inc. (UTSI:NASDAQ); Yipes Enterprise Services, Inc.; and Zhone Technologies, Inc. (ZHNE:NASDAQ).

Previously, he was president & CEO at SCM Investment Management Corporation and its predecessors ("SCM"), an investment manager and advisor to U.S. and Asian institutions. SCM, which manages public equity technology investments with its affiliates, was investment manager for a Tier 1 Japanese property/casualty insurer. The fund's equity investments focused on technology, including communications, networking and storage sectors, with attention to special situations, including relative value, growth-at-a-reasonable-price, and event-driven risk.

Edwin has been a director and manager for non-Japanese Asia cross-border and private equity investments at Credit Suisse First Boston. While there, he originated, structured, arranged, and placed the first institutional greater China cross-border private equity direct investment fund, the $150 million Asia Corporate Partners Fund, on behalf of China Development Corporation, one of the leading indigenous private equity investment firms in Asia.

He was also vice president for private placements at Drexel Burnham Lambert and an associate in the Capital Markets Group at Lehman Brothers. He began his career in the investment business at Fidelity Management & Research Company and subsequently managed municipal bond funds for the Bank of New England Asset Management Division, where he delivered top decile performance.

Edwin earned his B.A. degree in Economics from Columbia University and was a visiting fellow in finance at the MIT Sloan School of Management under the sponsorship of the late Nobel laureate, Dr. Franco Modigliani. He is licensed with the NASD for Series 3, Series 7, Series 24, Series 52 and Series 63.
Back

home | about zsc | the team | investment philosophy | portfolio | entrepreneurial resources | submit business plan | co

Copyright © 2001 Zero Stage Capital. All rights reserved

EXHIBIT I

## SBA COMPLIANCE AGREEMENT

This SBA Compliance Agreement ("Agreement") is entered into as of [Month] ___, 2005, by and between [Name of portfolio Company], a [Name of State] corporation ("Company") and Zero Stage Capital VI, L.P., a Massachusetts Limited Partnership ("Zero Stage").

## PRELIMINARY STATEMENTS

A. Zero Stage receives funding from the U.S. Small Business Administration ("SBA") for investments in qualified entities under the Small Business Investment Act of 1958, as amended ("SBIC Act").

B. Zero Stage desires to purchase Series __ Preferred Stock ("Series __ Stock") of Company pursuant to the Series ___ Preferred Stock Purchase Agreement by and among Company and Zero Stage ("Stock Purchase Agreement"). Any term not herein defined, shall have the meaning subscribed to it in the Stock Purchase Agreement.

A. Company will raise significant capital by the sale of Series ___ Stock. As a condition of the purchase of the Series ___ Stock, Zero Stage and Company have agreed to enter into this Agreement.

In consideration of the purchase of the Series ___ Stock and other mutual warranties, covenants and agreements contained herein and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows:

1. Company's Representations, Warranties and Covenants. Company hereby represents, warrants and covenants to Zero Stage as of the date hereof and as of the Closing Date of the Stock Purchase Agreement as follows:

a. Small Business Concern. The Company, together with its "affiliates" (as that term is defined in Title 13 of the United States Code of Federal Regulations) is a "Small Business" within the meaning of the SBIC Act, and the regulations promulgated thereunder (including part 107 and 121 of Title 13 of the United States Code of Federal Regulations). The Company's primary business activity does not involve, directly or indirectly, providing funds to others, the purchase or discounting of debt obligations, factoring or long-term leasing of equipment with no provision for maintenance or repair, and the Company is not classified under Major Group 65 (Real Estate) or Industry No. 1531 (Operative Builders) of the SIC Manual. The Company acknowledges that it has been advised that Zero Stage is a Small Business Investment Company and licensee under the SBIC Act.

b. Small Business Documentation. The Company will complete, execute and deliver to Zero Stage, within thirty (30) days from the date hereof, SBA Forms 480, 652, and 1031 (Parts A and B) together with a business plan showing the Company's financial projections (including balance sheets and income and cash flows statements) for the period described therein and has represented to Zero Stage the Company's intended use of proceeds from the sale of Purchased Shares to Zero Stage (the "Use of Proceeds Statement"). The Company represents and warrants to Zero Stage that the information regarding the Company and its affiliates set forth in the SBA Form 480, Form 652, and Form 1031 and the Use of Proceeds Statement delivered at the Closing is accurate and complete.

c. Use of Proceeds.

(i) The Company shall provide Zero Stage with all necessary information

1

for Zero Stage to timely report to the SBA the use of proceeds from the sale of Series ___ Preferred Stock to Zero Stage on SBA Form 1031. In addition, the Company shall promptly provide to Zero Stage or the SBA, as the case may be, all such information specified in Section 107.610 of Title 13 of the United States Code of Federal Regulations. The Company shall provide Zero Stage and/or the SBA, upon written request from Zero Stage or the SBA, as the case may be, reasonable access to the Company's books and records to confirm the use of proceeds reported by the Company to the SBA on SBA Form 1031. The Company will use the proceeds from the Stock Purchase Agreement for only those purposes specified in such SBA Form 1031 and the Company shall not violate any SBA regulations which may be applicable to it. Notwithstanding the above, Zero Stage shall use its reasonable best efforts to cause the SBA to execute and deliver a confidentiality agreement in a form acceptable to the Company and the SBA prior to access to the Company's information by the SBA as provided in this subsection.

       (ii)   The proceeds from the sale of the Series ___ Preferred Stock to Zero Stage will be used by the Company to fund working capital, for general corporate purposes and for growth, modernization and/or expansion. No portion of such proceeds (i) will be used to purchase stock in a company licensed under the SBIC Act; (ii) will be used to acquire realty or to discharge an obligation relating to the prior acquisition of realty; (iii) will be used outside of the United States (except to acquire abroad material and equipment or property rights for use or sale in the United States); or (iv) will be used for any purpose contrary to the public interest (including but not limited to activities which are in violation of law) or inconsistent with free competitive enterprise, in each case, within the meaning of Section 107.720 of Title 13 of the United States Code of Federal Regulations.

    d.    Information Covenant. Promptly after the end of each calendar year subsequent to the Closing Date (but in any event prior to February 28 of each year) and at such other times as may be reasonably requested by Zero Stage, the Company shall deliver to Zero Stage a written assessment of the economic impact of Zero Stage's investment in the Company, specifying the full-time equivalent jobs created or retained in connection with the investment, the impact of the investment on the businesses of the Company in terms of: expanded revenue and taxes, other economic benefits resulting from the investment (including, but not limited to, technology development or commercialization, minority business development, urban or rural business development and expansion of exports) and such other information as may be required regarding the Company in connection with the filing of Zero Stage's SBA Form 468. In addition to any other rights granted hereunder, the Company shall grant Zero Stage and the SBA access to the Company's books and records for the purpose of verifying the use of such proceeds to the extent required in Section 107.620 of Title 13 of the United States Code of Federal Regulations. The Company also will furnish or cause to be furnished to Zero Stage such other information regarding the business, affairs and condition of the Company as Zero Stage may from time to time reasonably request. Notwithstanding the above, Zero Stage shall use its reasonable best efforts to cause the SBA to execute and deliver a confidentiality agreement in a form acceptable to the Company and the SBA prior to access to the Company's information by the SBA as provided in this subsection.

    e.    Activities and Proceeds.

       (i)   Neither the Company nor any of its affiliates (as that term is defined in Section 121.103 of Title 13 of the United States Code of Federal Regulation) will engage in any activities or use directly or indirectly the proceeds from the sale of the Purchased Shares to Zero Stage for any purpose for which a small business investment company is prohibited from providing funds by the SBIC Act as set forth in Section 107.720 of Title 13 of the United States Code of Federal Regulation.

       (ii)   Without obtaining the prior written approval of Zero Stage, the Company will not change within one (1) year after the Closing Date, the Company's business activity from enterprise software development and sales (as set forth on the Company's tax return) to a business activity

to which a licensee under the SBIC Act is prohibited from providing funds by the SBIC Act.

    f.  Compliance. If the Company's business activity changes to a business activity which a licensee under the SBIC Act is prohibited from providing funds by the SBIC Act or the proceeds are used for ineligible business activities, the Company will use all commercially reasonable efforts and cooperate in good faith to assist Zero Stage to sell its investment in the Company in a commercially reasonable manner. However, in no way shall this be considered Zero Stage's sole remedy if the Company's business activity changes to a business activity to which a licensee under the SBIC Act is prohibited from providing funds by the SBIC Act.

  2.  Indemnification. Any breach of Paragraph 1 above shall be an indemnification event for the purposes of Article ____ of the Stock Purchase Agreement and shall require the same indemnifications provided in Article ____ of the Stock Purchase Agreement.

  3.  Redemption of Series ____ Stock. In the event of the redemption of shares of Series ____ Stock of the Company held by Zero Stage, the Series ___ Redemption Price shall be equal to the greater of (i) Zero Stage's initial investment plus any accumulated but unpaid preferred dividends, to the extent of legally retained earnings; (ii) the earnings of the Company for the prior twelve-month period before interest, taxes, depreciation and amortization, but excluding extraordinary losses, multiplied by ten and divided by the number of shares of the Company's common stock outstanding (including securities convertible into common stock without the payment of additional consideration) and then multiplied by the number of shares of Company's stock held by Zero Stage, on an "as if converted to common basis," or (iii) "Fair Market Value," as described below. For these purposes, Fair Market Value will be value of Company, as determined by a "Big Five" accounting firm jointly selected by Zero Stage and Company, multiplied by Zero Stage's ownership percentage in Company. If Zero Stage and Company are unable to agree on an independent appraiser, then each party will choose an appraiser, and those appraisers will jointly select another Big Five accounting firm to perform the appraisal.

  4.  General.

    (a)  Severability. The provisions of this Agreement are severable, so that the validity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other term or provision of this Agreement, which shall remain in full and effect.

    (b)  Specific Performance. In addition to any and all other remedies that may be available at law in the event of any breach of this Agreement, Zero Stage shall be entitled to specific performance of the agreements and obligations of the Company hereunder and to such other injunctive or other equitable relief as may be granted by a court of competent jurisdiction.

    (c)  Governing Law. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of Massachusetts without application of the conflicts of law principles thereof.

    (d)  Notices. All notices, requests, demands and other communications hereunder must be in writing and shall be delivered in person, mailed by prepaid certified or registered mail, return receipt requested, or sent by facsimile transmission, to such other address as shall have been furnished in writing to the Company (in the case of the Zero Stage) or to Zero Stage (in the case of the Company) in accordance with the provisions of this Section 4(d). All such notices, requests, demands and other communications will (i) if delivered in person to the address as provided in this Section, be deemed given upon delivery, (ii) if delivered by mail in the manner described above to the address as provided in this

3

Section, be deemed given upon receipt and (iii) if delivered by facsimile transmission to the facsimile number as provided in this Section, be deemed given upon confirmed receipt. Notices have been mailed by first class mail to:

If to Company:

[Name]
[Street Address]
[City, State, zip code]
Attn:
Phone: _____, President
Fax:

If to Zero Stage:

Zero Stage Capital Associates VI, LLC
101 Main Street, 17th Floor
Cambridge, Massachusetts
Attn:   Paul M. Kelley, Managing Member
Phone: (617) 876-5355
Fax:   (617) 876-1248

(e)     Complete Agreement; Amendment.  This Agreement constitutes the full and complete agreement of the parties hereto with respect to the subject matter hereof.  No amendment, modification or termination of any provision of this Agreement shall be valid unless in writing and signed by the Company and Zero Stage.

(f)     Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall constitute one Agreement binding on all the parties hereto.

Company:

[Name of Company
a [State] corporation

By: _____
[Name], President

Zero Stage:

Zero Stage Capital VI, L.P.
a Massachusetts limited partnership
By: Zero Stage Capital Associates, LLC
Its: General Partner

By: _____
Paul M. Kelley
Managing Member

4

EXHIBIT L

### Exhibit L
## ZSC VI Cash Requirements

| | | |
|---|---:|---:|
| ZSC VI Cash at 9/30 | | $ 422,504.00 |
| Initial tranche from e-Med sale | 749,492.38 | |
| Initial Paydown to MBDC | (505,495.03) | |
| Remaining Proceeds Available | | 243,997.35 |
| Estimated Cash Available | | $ 666,501.35 |
| | | |
| | | **$$$** |
| October-December 2004 MBDC P&I | | 24,586.92 |
| Actual October, November Legal | | 25,974.35 |
| Actual Insurance-October, November | | 7,386.18 |
| Actual Consulting-October, November | | 25,731.01 |
| Actual Printing & Mailing | | 4,522.15 |
| | | |
| Actual Expenses | | 88,200.61 |
| 12/04 Legal | | 15,000.00 |
| 12/04 Consulting | | 9,000.00 |
| 12/04 Insurance+10/03-9/04 Insurance | | 71,243.09 |
| Third Quarter Report-Printing & Mailing | | 4,522.15 |
| Q4, 2004 Cash Requirements | | 187,965.85 |
| | | |
| Estimated 2005 Cash Requirements | | |
| MBDC Payments | | 76,171.25 |
| 2004 PWC Audit | | 35,000.00 |
| 2004 PWC Tax Returns | | 15,000.00 |
| 2004 SBA Audit | | 15,000.00 |
| 2005 Legal | | 190,800.00 |
| 2005 Consulting | | 108,000.00 |
| 2005 Insurance | | 44,317.08 |
| 2005 Printing & Mailing | | 19,173.92 |
| 2005 Cash Requirements | | 503,462.25 |
| | | |
| Total 2004 and 2005 Cash Requirements | | $ 691,428.10 |
| Cash Shortfall | | $ 24,926.75 |
| | | |
| Remaining Principal Balance Due MBDC@12/31/05 | | $ 436,359.53 |

**EXHIBIT H – Tab 12**

U. S. SMALL BUSINESS ADMINISTRATION
409 3RD STREET, S.W., SUITE 6350
WASHINGTON, D.C. 20416
TELEPHONE: (202) 205-6500,    FACSIMILE: (202) 205-6957

INVESTMENT
DIVISION

OFFICE OF
LIQUIDATION

Writer's telephone (202) 205-7366

**Via Facsimile and First Class Mail**

April 28, 2005

Mr. Paul M. Kelley
Zero Stage Capital VI, L.P.
101 Main Street, 17th Floor
Cambridge, Massachusetts 02142-1519

Re:    Zero Stage Capital VI, L.P.
       Resolution of Regulatory Issues for Certain Transactions.

Dear Mr. Kelley:

Upon execution of this letter and of the consent papers for receivership by Zero Stage Capital VI, L.P. ("Zero VI"), the U.S. Small Business Administration ("SBA") will consider the regulatory issues concerning the following transactions by Zero VI to be resolved with respect to Title 13 of the Code of Federal Regulations, Part 107:

1.  Post-approval will be granted for the financings by Zero VI to Furniture Fan on or about the following dates with respect to 13 C.F.R. Section 107.1820(f)(1):

       June 10, 2003        $215,000
       August 13, 2003      $ 80,000

2.  The Investment in ImproveNet in the amount of $3,011,010 in violation of 13 C.F.R. Section 107.730 is considered resolved through the forfeiture by Zero Stage Capital Company, Inc. of $4,016,141.29 in management fees that otherwise would have been due from Zero VI as of April 15, 2005. This amount is waived permanently, and in its entirety. Management fees accrued in excess of this amount may be deferred until such time as SBA is paid in full Licensee's Participating Securities and all accrued Prioritized Payments.

3.  Post-approval is granted for changes in the management team of Zero VI as disclosed to SBA.

The above resolutions of regulatory issues are each conditioned upon the accuracy of the representations, statements and documents submitted to SBA by Zero VI and are strictly limited to the matters identified.

Please do not hesitate to contact me at (202) 205-7366 or Thomas W. Rigby, Esq. at (202) 619-1610 with any questions.

Very truly yours,

Thomas G. Morris, Director
Office of SBIC Liquidation

SEEN, ACKNOWLEDGED & AGREED:

Zero Stage Capital Associates VI, LLC
General Partner of Zero Stage Capital VI, L.P.

Dated: 5/4/05

AND BY:

Zero Stage Capital Company, Inc.
By: Paul M. Kelly
Its: Chairman & CEO

Dated: 5/4/05

2

**EXHIBIT H – Tab 13**

U. S. SMALL BUSINESS ADMINISTRATION
409 3RD STREET, S.W., SUITE 6350
WASHINGTON, D.C. 20416
TELEPHONE: (202) 205-6300    FACSIMILE: (202) 205-6871

INVESTMENT
DIVISION
-----------
OFFICE OF
LIQUIDATION

Writer's telephone (202) 205-3645

Via Facsimile and Certified Mail (P837 581 008)

December 8, 2004

Mr. Paul M. Kelley, Managing Director
Mr. Robert A. Barrows, Chief Financial Officer
Zero Stage Capital VI, L.P.
101 Main Street, 17th Floor
Cambridge, Massachusetts 20142

Re:    Notice of Violation

Dear Sirs:

By letter dated December 19, 2003 (enclosed), SBA notified you that Zero Stage Capital VI, L.P. ("Zero Stage VI") was transferred to liquidation status for violations of substantive provisions of Title 13, Part 107 of the Code of Federal Regulations (the "Regulations"), including without limitation violation of 13 C.F.R. § 107.730 for conflict of interest financings of ImproveNet. The Office of Liquidation provided you 15 days from the date of that letter to cure the cited violations. You failed to do so within the established time frame. You are in violation of the Regulations and in default of the terms of your Leverage. SBA reserves all rights and remedies under the Regulations and under the Small Business Investment Act of 1958, as amended (the "Act"). 13 C.F.R. § 107.1910.

In addition, SBA has determined that Zero Stage VI has violated the Regulations as identified below and SBA hereby advises you that you have 15 days from the date of this letter to cure:

1.    13 C.F.R. § 107.1820(c)(3). Zero Stage VI made additional investments in a Portfolio Company, FurnitureFan, on or about June 10, 2003 and August 13, 2003 that failed to comply with the restrictions under § 1830(f)(1) imposed by SBA by letter dated June 4, 2003 and received by Zero Stage VI on or about that date. This violation constitutes a Contingent Removal Condition.

2.    13 C.F.R. 107.1820(c)(2), Zero Stage VI has been in repeated non-compliance with substantive provisions of the Regulations as identified in this and prior correspondence from SBA. This repeated non-compliance constitutes a Contingent Removal Condition.

3.    13 C.F.R. § 107.503, failure to adhere to Valuation Guidelines with respect to Furniture Fan.

4.    13 C.F.R. 107.506, failure to safeguard Licensee's assets/ internal controls after notification by SBA Examiner of this failure.

5.    13 C.F.R. § 107.1830, based on representations in Zero Stage VI's September 30, 2004 Form 468, your level of capital impairment of 183.72% is well in excess of that permitted by the Regulations.

DEC 08 '04  04:35PM SBA                                                    P.2/6

Mr. Paul Kelley
Mr. Robert Barrows
Page Two
December 8, 2004

6. Further, 13 C.F.R. § 107.510(b), failure to seek prior SBA approval for material changes in management in the Licensee, its investment advisor and/or general partner. Be advised that SBA is also considering whether these changes may also constitute a willful change in control in violation of 13 C.F.R. § 107.410 and § 1820(b)(4).

7. 13 C.F.R. § 107.640, failure to file Portfolio Financing Reports. Zero Stage VI failed to file SBA Form 1031s for five separate financings made to Furniture Fan after June 4, 2003, totaling $245,216. You did not seek prior written SBA approval for the 9/30/04 financing, in contravention of 13 C.F.R. § 1820(f)(1).

| | |
|---|---|
| 9/15/03 | $85,000 |
| 10/9/03 | 55,000 |
| 11/3/03 | 35,000 |
| 12/5/03 | 25,000 |
| 9/30/04 | 45,216 |

Additionally, SBA's records show that Zero Stage VI still has not filed Form 1031 despite the fact that SBA provided the location on SBA's web site to download this form. Failure to do so again will constitute a another repeated violation of § 107.640.

Further, we do not observe on file your request for approval of two financings to Furniture Fan reported on your Form 468 and for which you filed 1031s – $215,000 on 6/10/03 and $80,000 on 8/13/03, in violation of 13 C.F.R. § 107.1820(f)(1), as identified above.

Moreover, Licensee was delinquent between two and seventy days beyond the 30-day time limit set forth in 13 C.F.R. § 107.640 in submitting several 1031s for Furniture Fan and Syncra Systems, in violation of 13 C.F.R. § 107.640, wherein Zero Stage VI must submit a Portfolio Financing Report on SBA Form 1031 within 30 days of the closing date of the financing.

Additionally, Zero Stage VI failed to file 1031s for financings to Syncra Systems totaling $297,492 made in 2004, which are reflected on Zero Stage VI's Form 468, as of September 30, 2004, as $47,078 (9/8/04) and $249,415 (9/30/04), constituting additional repeated violations under 13 C.F.R. § 107.640.

Finally and most importantly, it bears emphasis that we are extremely concerned about your Associate dealings with relation to ImproveNet in violation of 13 C.F.R. § 107.730. Despite your denial of self-dealing to the prejudice of the small concern, the Licensee, its shareholders or partner of the SBA, Licensee lost substantially all of its investment in ImproveNet, or $2,945,010 out of an original investment of $3,001,012. In addition, this investment violated 13 C.F.R. § 107.730(d), which prohibited that investment without SBA's prior written approval, regardless of prejudice.

The foregoing is made without prejudice to any other rights of SBA, and SBA specifically reserves the right to seek and impose further remedies upon Zero Stage VI as warranted. 13 C.F.R. § 107.1910

2

DEC 08 '04   04:35PM SBA                                          P.3/6

Mr. Paul Kelley
Mr. Robert Barrows
Page Three
December 8, 2004

Please contact me at the above listed number at your earliest convenience to set up a meeting prior to
December 17th to discuss these serious regulatory violations.

Sincerely,

Elaine Hruschka
Financial Analyst

cc:     Thomas G. Morris, Director, Office of SBIC Liquidation
        Gail G. Green, Chief, Account Resolution Branch
        Thomas W. Rigby, Chief Counsel for SBIC Liquidation
        John L. Koenig, Esq.

3

**EXHIBIT H – Tab 14 (Part 1)**



**ZERO STAGE CAPITAL**

101 Main Street, 17th Floor · Cambridge, Massachusetts 02142-1519
Tel 617-876-5355 · Fax 617-876-1248 · www.ZeroStage.com

December 15, 2004

**BY OVERNIGHT DELIVERY**
Elaine Hruschka, Financial Analyst
Investment Division (ID)
Office of SBIC Liquidation
U.S. Small Business Administration
409 3rd Street, S.W., Suite 6350
Washington, DC 20416

Dear Ms. Hruschka:

This letter is in response to your two letters dated December 8, 2004 with respect to Zero Stage Capital VI, L.P. ("Zero Stage" or ZSC VP"), and the Report of Examination dated August 3, 2004, which was received by us December 8, 2004. In anticipation of our meeting on December 17, 2004, we have attempted to respond to each issue raised in those documents. Our responses refer in numerous cases to attached exhibits. A list of all Exhibits is included at the end of this letter. We thank you for the opportunity to meet with you and to discuss these issues. We hope that we will be able to clear the air with respect to Zero Stage's past dealings with the SBA and reach an agreement with respect to our future relations.

### 12/8/04 Notice of Violation Letter

1.    13 C.F.R. 107.1820(c)(3). Zero Stage VI made additional investments in a Portfolio Company, Furniture Fan, on or about June 10, 2003 and August 13, 2003 that failed to comply with the restrictions under 1830(f)(1) imposed by SBA by letter dated June 4, 2003 and received by Zero Stage VI on or about that date. This violation constitutes a Contingent Removal Condition.

Response: We acknowledge that Zero Stage should have received approval prior to the June and August 2003 financings as a result of the SBA letter dated June 4, 2003. Unfortunately, there was a misunderstanding on Zero Stage's part resulting from the SBA's approval of an additional $200,000 of financing to Furniture Fan in a letter that was sent on September 12, 2003 (see attached Exhibit A). That letter approved the financing of $85,000 made on 9/15/03, the financing of $60,000 made on 9/29/03 and the financing of $55,000 made on 10/9/03. Since that letter made no mention of the fact that prior financings had not been approved, Zero Stage management failed to

Elaine Hruschka, Financial Analyst
December 15, 2004
Page 2

realize that there was any issue as to the status of previous financings, and incorrectly
assumed that there was no issue.  This problem was further exacerbated by the fact
that the CFO role was in transition in August and September of 2003, arising from the
termination of Brian Johnson and the hiring of Rob Herlihy as interim CFO.  I also
note that Mr. Johnson's termination was directly related the unacceptable regulatory
compliance lapses discussed here and throughout this response.

2.    **13 C.F.R. 107.1820(c)(2).  Zero Stage VI has been in repeated non-compliance
with substantive provisions of the Regulations as identified in this and prior
correspondence from SBA.  This repeated non-compliance constitutes a
Contingent Removal Condition.**

Response:  We will discuss this issue in detail at our meeting.  However, we have
taken significant actions to address these core problems in complying with SBA
regulations:

- We have voluntarily waived management fees for Zero Stage Capital VI.  This
  has resulted in savings to the fund of approximately $6.7 million.  Since
  March, 2004, I, along with my son Mathew, have personally guaranteed $1.3
  million that Zero Stage Capital borrowed to make certain that the value of the
  assets of the Fund would be maximized.

- We have put together a team to correct problems of the past and see to it that
  they do not re-occur, recognizing that the new additions to the Zero Stage
  team are subject to SBA approval.

- Our new team is working hard on portfolio companies to find and extract
  maximum value.

- We have replaced our former Partner/CFO, Brian Johnson, with a non-Partner
  CFO. A significant part of the problems we have experienced in complying
  with SBA regulations and discussed throughout this response are directly due
  to the skill and character deficits of our former CFO. I have found that for a
  CFO to be effective it is better to remove that person from investment and
  partnership considerations that might cloud his judgment

- We are also in the process of terminating another partner, Bic Stevens, who,
  along with Brian Johnson, was largely responsible for the portfolio company
  financings and regulatory violations discussed in our response.

- We have established the position of Chief Operating Officer at Zero Stage to
  oversee a variety of responsibilities including those related to corporate
  governance.

Elaine Hruschka, Financial Analyst
December 15, 2004
Page 3

- We have retained the Boston-based accounting firm of Feeley & Driscoll, PC, specifically to facilitate the transition of responsibilities to our new CFO and to review and enhance internal controls.

- We have hired a new employee with 20 years of experience in corporate financial matters to assist the CFO.

- Finally, we are fortunate to have added, subject to SBA approval, Matthew Fong to join Zero Stage Capital as a Special General Partner. Matt will help Zero Stage in many ways, and especially in the area of corporate governance.

- Zero Stage Capital has addressed all governance concerns on a going forward basis by removal of the major offenders;

3.    **13 C.F.R. 107.503, failure to adhere to Valuation Guidelines with respect to Furniture Fan.**

Response: We acknowledge and understand the concerns raised by the SBA concerning previous valuations. While ultimately incorrect, our valuations were reviewed by PriceWaterhouseCoopers, the ZSC VI auditor. Our most recent valuation of Furniture Fan (as of 6/30/04) reflects the valuation that was recommended by SBA during its most recent examination that concluded in May 2004.

4.    **13 C.F.R. 107.506, failure to safeguard Licensee's assets/internal controls after notification by SBA Examiner of this failure.**

Response: We understand the seriousness of this issue and recognize that we have not made as much progress as expected. The SBA counsel we had originally retained, as mentioned in our letter to Steve Knott dated January 17, 2003, was not responsive to our needs, and lacking initiative from him, we dropped the ball ourselves. However, we are now taking corrective action. To improve compliance and internal controls several management changes have occurred. We have created the position of Chief Operating Officer, a position responsible for the day-to-day operations of the investment advisor. We hired a new full time CFO earlier this year. We have and will be making changes to our investment advisor staff. We have retained experienced SBA counsel, Michael Haynes, to advise us on ongoing SBA compliance. We again stress that most all of the regulatory violations mentioned, including inadequate internal controls, occurred under the watch of our ex-CFO/Partner, Brian Johnson. Those unacceptable violations were also mostly related to portfolio companies being handled by two partners, one of whom has been terminated, and the other, Bic Stevens, who is also being terminated at this time.

Elaine Hruschka, Financial Analyst
December 15, 2004
Page 4

We plan on making staff more knowledgeable of SBA regulations and operations. Frank Pinto, an investment advisor, has attended the SBIC training program offered by the SBA. Robert Barrows, CFO and Matt Kelley, COO will be attending SBA training sessions in the coming year, as will all members of the Zero Stage management team who have not already attended the class. A compliance checklist will be created to ensure financings are in compliance with SBA regulations and the appropriate filings occur on a timely basis.

We have established an Investment Committee that will monitor the performance of portfolio companies on a monthly basis, paying particular attention to those companies designated as watch list companies. We have hired independent outside consultants to sit on the Executive Committee who will also be helpful to us in engineering liquidity events.

We expect these changes to result in actions that will enable us to better manage the assets of the licensee and ensure regulatory compliance.

5.    **13 C.F.R. 107.1830, based on representations in Zero Stage VI's September 30, 2004 Form 468, your level of capital impairment of 183.72% is well in excess of that permitted by the Regulations.**

Response: We are moving aggressively to cure this capital impairment, through a quick and orderly liquidation of portfolio assets, with the help of a new team with experience in extracting the highest value from these kinds of situations. An example that illustrates dynamic changes taking place in the portfolio may be instructive.

OuterLink was founded in 1991 as Newcomb Communications, Inc. with a mission to provide a complete end-to-end solution for secure, real-time, continent-wide tracking and messaging for high-value mobile assets. The company's initial product development and marketing efforts focused on the general aviation industry, with particular emphasis on the needs of owners of large helicopter fleets operating in geographically remote areas.

In 2000, the company secured significant venture funding from Zero Stage Capital and ChevronTexaco Technology Ventures, and changed its name to OuterLink Corporation. It then and accelerated its product development, sales and marketing efforts. By September 2002, despite a $3 million revenue run rate, OuterLink was out of cash, after $26 million of total cumulative venture investment, nearly 13 years of development, and a string of big spender CEOs. ZSC VI was instrumental in the installation of a new turnaround CEO, Van Chu, who had had a successful track record with ZSC VI in an earlier portfolio company. In January 2003, a private equity M&A advisory firm, Cross Pacific Technology Partners, founded and managed by Ed

Elaine Hruschka, Financial Analyst
December 15, 2004
Page 5

Wang, was retained as investment banker to originate and execute viable strategic liquidity alternatives. In January 2004, Digital Angel Corporation (AMEX:DOC), an advanced technology company also involved in rapid and accurate identification, location tracking and condition monitoring of high-value mobile assets, acquired OuterLink for $16 MM in preferred stock that since has been converted into common stock.

ZSC VI's original investment in OuterLink was $5.8 MM. Based on Friday, December 13, 2004 closing price for Digital Angel Corporation, that investment is now worth $2.4 MM. From a near total write down, this has become a positive outcome that speaks to the virtue of mining value actively from portfolio companies that are in trouble or even have been left for dead.

We are inspired by this example and several other pending exits being engineered on an expeditious basis that restore the rationality, discipline and core values and culture of the firm. Currently, the record will show that the firm, following a painful but necessary restructuring, personnel terminations and realignment and strategic repositioning, is getting back on track and well on the road to returning to the promise of a brighter future, consistent with its historical roots of strong corporate governance.

6.     Further, 13 C.F.R. 107.510(b), failure to seek prior SBA approval for material changes in management in the Licensee, its investment advisor and/or general partner. Be advised that SBA is also considering whether these changes may also constitute a willful change in control in violation of 13 C.F.R. 107.410 and 1820(b)(4).

Response: Please see attached <u>Exhibit B</u>.

7(a)   13 C.F.R. 107.640 failure to file Portfolio Financing Reports. Zero Stage VI failed to file SBA Form 1031s for five separate financings made to Furniture Fan after June 4, 2003 totaling $245,216. You did not seek prior written SBA approval for the 9/30/04 financing, in contravention of 13 C.F.R. 1820(f)(1).

Response: We acknowledge that the Form 1031 for the 9/15/03 financing was not filed within the 30-day period. However, ZSC VI did file the Forms 1031 for the financings that occurred on 10/9/03, 11/3/03 and 12/5/03. We have been able to verify this fact via the SBA software. We have not been able to produce a hard copy of the confirmation from the SBA that those filings were received. Unfortunately, there was a problem with respect to transmission of confirmations from the SBA that continues today. We communicated with Ms. Antoinette Shingler at the SBA about trying to correct this problem. We also discussed this issue with James Judge during his audit and he suggested we send a follow up letter to Ms. Shingler with a copy to himself and Mr. John Wilmeth of the SBA. With that letter (attached as <u>Exhibit C</u>),

Elaine Hruschka, Financial Analyst
December 15, 2004
Page 6

we filed hard copies of the four Forms 1031 for the financings from 9/15/03 through 12/5/03.

With respect to the $45,216 financing dated 9/30/04, ZSC VI did not actually provide financing to Furniture Fan for that amount. That amount represents principal and interest payments that Zero Stage Capital Company, Inc.("Zero Stage Capital") paid to MBDC on behalf of Furniture Fan for the months of June 2004 through September 2004. Since ZSC VI was the original guarantor on this loan, we recorded the liability of ZSC VI to Zero Stage Capital with a corresponding increase to ZSC VI's investment in Furniture Fan. We anticipated filing a Form 1031 when ZSC VI repaid the obligation to ZSC.

7(b)   **Additionally, SBA records show that Zero Stage VI still has not filed Form 1031a despite the fact that SBA provided the location on SBA's web site to download this form. Failure to do so again will constitute another repeated violation of 107.640.**

Response: In connection with the SBA's review of the 6/30/04 Form 468 for ZSC VI, SBA requested, in a letter dated August 18, 2004, that we file Form 1031A. The Form 1031A was submitted in a letter dated September 15, 2004, a copy of which is attached as <u>Exhibit D</u>.

7(c)   **Further, we do not observe on file your request for approval of two financings to Furniture Fan reported on your Form 468 and for which you filed 1031s- $215,000 on 6/10/03 and $80,000 on 8/13/03, in violation of 13 C.F.R. 107.1820(f)(1) as identified above.**

Response: We hereby respectively request post-approval for the 6/5/03 financing of $35,000, the 6/10/03 financing of $215,000 and the 8/13/03 financing or $80,000. These amounts were used by FurnitureFan to maintain basic operations and reduce liabilities. At the time these financings occurred, we felt that these investments were necessary to protect our investment and were necessary to provide FurnitureFan the time necessary to locate prospective acquirers.

7(d)   **Moreover, Licensee was delinquent between two and seventy days beyond the 30-day time limit set forth in 13 C.F.R. 107.640 in submitting several 1031's for Furniture Fan and Syncra Systems, in violation of 13 C.F.R. 107.640 wherein Zero Stage VI must submit a Portfolio Financing Report on SBA Form 1031 within 30 days of the closing date of the financing.**

Response: The lack of filing a 1031 within 30 days of financing is unacceptable. Under no circumstances in the future will the Licensee fail to file a Form 1031 within 30 days of future financings.

Elaine Hruschka, Financial Analyst
December 15, 2004
Page 7

7(e)    Additionally, Zero Stage VI failed to file 1031's for financings to Syncra Systems totaling $297,492 made in 2004, which are reflected on Zero Stage VI's Form 468, as of September 30, 2004, as $47,078 (9/8/04) and $249,415 (9/30/04) constituting additional repeated violations under 13 C.F.R. 107.640.

Response: The Licensee has filed the Forms 1031 for the above financings. The financing for $47,078 was filed on September 28, 2004 (see copy of e-mail transmission attached as Exhibit E). The $249,415 financing appearing on Form 468 represents the conversion during 9/04 of convertible note financings that occurred earlier in 2004: specifically a convertible note financing in the amount of $93,531 which occurred on 1/5/04; a convertible note financing in the amount of $77,942 which occurred on 2/9/04; and a convertible note financing in the amount of $77,942 which occurred on 4/9/04. Three separate Forms 1031 were filed for these financings. Copies of the Forms 1031 for all of the 2004 financings to Syncra are attached as Exhibit F.

As mentioned above, we did not receive Form 1031 confirmations from the SBA. As noted previously, we have had communications with Ms. Antoinette Shingler about this problem. We also raised this issue with Mr. James Judge during his field examination. Please see Exhibit C.

We continue to experience problems receiving Form 1031 e-mail confirmations. We have not received confirmations for a majority of the 2004 financings for this Licensee and an affiliated SBIC.

7(f)    Finally and most importantly, it bears emphasis that we are extremely concerned about your Associate dealings with relation to ImproveNet in violation of 13 C.F.R. 107.730. Despite your denial of self-dealing to the prejudice of the small concern, the Licensee, its shareholders or partner of the SBA, Licensee lost substantially all of its investment in ImproveNet, or $2,945,010 out of an original investment of $3,001,012. In addition, this investment violated 13 C.F.R. 107.730(d), which prohibited that investment without SBA's written approval, regardless of prejudice.

Response: We acknowledge the seriousness of these violations, and assure you that we are using all possible diligence to put Zero Stage Capital into a position from which these violations would never occur again. We regret that nothing can be done at this time to cure the violation. This issue was the subject of a number of communications between us in the past. However, we must reiterate that the violation was not intentional. We sincerely believe that given the circumstances at the time, with other high-quality investors who invested substantially more in total than did ZSC VI, that the SBA would likely have given its consent to this financing. Finally,

Elaine Hruschka, Financial Analyst
December 15, 2004
Page 8

the later significant round of financing of ImproveNet, and its subsequent IPO led by two reputable underwriters, would seem to further support the decision to invest.

## 12/8/04 Management Change Letter

1.  **You are hereby directed to provide SBA the names of all persons in a decision-making capacity, including the title and responsibility of those listed below, in (1) Zero Stage VI;(2) each entity considered an Associate of Zero Stage VI;(3) its investment advisor; and/or (4) its general partner. You are further directed to provide employment and/or separation agreements (and the reason for their departure) and amended organizational documents reflecting any changes made to the management structure of Zero Stage VI for the period beginning calendar year 2000 through the present.**

    Response: Please see <u>Exhibit B</u>. With respect to organizational documents, an Assignment by Gordon Baty to Baty LLC of his Membership Interest in Zero Stage Capital Associates VI, LLC, the general partner of Zero Stage Capital VI Limited Partnership, together with the acceptance by the assignee, is attached as <u>Exhibit G</u>.

2.  **Provide the SBA with a quarterly update, as of September 30, 2004, which to date has not been received by SBA, although it has previously been requested.**

    Response: We have been diligently gathering the necessary information to provide the SBA with the portfolio update ever since your request. It has been included as <u>Exhibit H</u>. The main reason for the delay is the problem of obtaining the necessary information from the portfolio companies, which are under no legal obligation to provide us with the requested information. We anticipate that going forward, we will be able to get this information to you within 60-75 days after each quarter-end.

3.  **Provide the SBA with a breakdown of the $160,965 in legal fees as reported in the SBA Form 468 for the period ending September 30, 2004, listing the lawyers you engaged, their firms, the specific assets for which you sought counsel, the issues and the outcomes.**

    Response: Please see <u>Exhibit I</u>.

4.  **Provide the SBA with any asset sales by Zero Stage VI since it was placed into liquidation status (October 30, 2003) and the term and conditions and use of proceeds from any such sales.**

    Response: There have been two asset sales since ZSC VI was placed into liquidation status. eMed Technologies was sold for $48.0 million on October 8, 2004. Net proceeds from the sale were $43.4 million, of which ZSC VI is entitled to receive

Elaine Hruschka, Financial Analyst
December 15, 2004
Page 9

$1.019 million.  Of this amount, $269,000 was placed in an escrow account and will be released in approximately nine months, assuming escrow terms are satisfied.  We anticipate using a majority of the proceeds to satisfy ZSC VI's guaranty obligation to Massachusetts Business Development Corporation ("MBDC") in connection with Furniture Fan.

Syncra Systems was sold on November 12, 2004 for $4.7 million.  Net proceeds from the sale were $3.6 million of which ZSC VI is entitled to receive $441,000.  Of this amount, $117,000 will be received in 12/04, approximately $28,000 will be received 90 days after the closing and $296,000 will be received 18 months after the closing.  A majority of these proceeds will be used to fund debt service payments as a result of ZSC VI's guarantee of Furniture Fan's loan from MBDC.

5.    **SBA provided its approval for two 2004 financings to Syncra Systems in the amounts of $249,415 and $48,000.  It was anticipated that a third party, Retek, would acquire all the assets of Syncra for $8,000,000.  Your financings were $77 in excess of the amount approved.  Taking note of the fact that you converted $171,473 of debt financing to equity during 2004, please explain why you immediately depreciated your cash equity infusion of $249,415 by half, and by the same token increased by $1 the $48,077 tranche made only 22 days earlier. Both fundings were evidenced by the purchase of the company's series AA preferred stock.  Has the company been sold and/or the acquisition been completed?**

Response:  We notified SBA via e-mail prior to funding (see Exhibit J) that the actual amount of the financing for Syncra was $48,077 rather than the $48,000 approved by SBA.  Despite the small amount of this additional financing, we clearly should have obtained SBA's prior approval for this $77 overage since it was in excess of the amount approved by SBA, and we apologize for this oversight.

The cash equity infusion of $249,415 was depreciated by half.  In valuing the portfolio as of June 30, 2004, it was decided that all equity financings as of 6/30 would be valued at $0 and all debt financings would be valued at 50% of cost.  This was the value that the SBA suggested during its audit examination in May 2004.  We did not actually increase the valuation of the 9/04 financing by $1.  The additional $1 on the 9/30 From 468 was presented due to a rounding issue when trying to reconcile the portfolio security amounts on page 2P of the Form 468 with Summary of Loans and Investments on page 13P.

Syncra Systems was sold in November 2004.  See details in response to item 4, immediately above.  We will reflect in our fourth quarter financials the difference between the sale proceeds realized and our valuation.

Elaine Hruschka, Financial Analyst
December 15, 2004
Page 10

6.    A clarification of the discrepancy between financings to Furniture Fan reported
      on Zero Stage VI's Form 468 for the period ended September 30, 2004 and
      SBA's report of Forms 1031 submitted by Zero Stage VI. The 1031s submitted
      by Zero Stage VI indicate Zero Stage make the two financings below, neither of
      which is listed on your Form 468 as of 9/30/04:

                2/4/03              $150,000
                6/14/03             $215,000

      Response: The above financings are listed on the Form 468 for the period ended
      9/30/04. While the $150,000 debt financing was funded on 2/4/03, the related note is
      dated 1/31/03. As a consequence, the Form 468 reflects an investment date of
      1/31/03. Similarly, the $215,000 debt financing was funded on 6/11/03, while the
      related note is dated 6/10/03. Both Form 468 and Form 1031 reflect a date of
      6/10/03. The hard copy of the Forms 1031 filed is attached as Exhibit K.

7.    You advised SBA that a portion of the initial tranche from the eMed sale would
      be used to fund working capital of the SBIC. Please provide a detailed written
      listing of how the funds will be employed in the Licensee.

      Response: Please see Exhibit L for Licensee's cash requirements analysis.

                    8/3/04 Report of Examination

                    Status of Prior Finding

1.    Did not follow its SBA approved portfolio valuation guidelines in valuing its
      investments in Sonexis, Inc. (Sonexis); FurnitureFan, Inc. (FurnitureFan);
      LiveWave, Inc. (LiveWave); devine, Inc. and Powercell, Inc.

      Response: Please note that findings 1 through 4 are addressed throughout the
      responses to the two SBA letters dated December 8, 2004 and the SBA Report of
      Examination dated August 3, 2004

2.    Did not maintain adequate internal controls to ensure compliance with the laws
      and regulations governing the SBIC program.

          Please see response to item 1.

Elaine Hruschka, Financial Analyst
December 15, 2004
Page 11

3.  Restricted prepayment of debt investments without the prior written approval of SBA in its financings to Resinate Corporation (Resinate); LiveWave and Syncra Systems, Inc.

    Please see response to item 1.

4.  Did not file the required Portfolio Financing Reports, SBA Form 1031, within the required thirty days following the closing date.

    Please see response to item 1.

5.  An additional finding that also remains unresolved involves the sharing of management fees paid by portfolio concerns and the licensee's SBA approved Investment advisor to another associate of the licensee (Bain and Company, Inc.). This fee sharing arrangement was entered into without the required approval of SBA and for which the licensee lacked supporting documentation. This finding has been discussed with the licensee and remains unresolved as of May 28, 2004, the exit interview date.

    Response: We acknowledge the seriousness of this violation, and regret that nothing can be done at this time to cure the violation. However, we must reiterate that the violation was not intentional and seemed completely appropriate to us as a business matter at the time.

### Findings

1.  Unapproved investments made under Restricted Operations Section 107.1820(e), (e)(7) and (f)(1). While under Restricted Operations, the licensee made three investments in a portfolio concern without obtaining the required prior written approval of SBA.

    Response: Zero Stage should have requested prior approval for these three follow-on financings, which occurred during the period that Brain Johnson was responsible for these matters. We apologize for this lapse in regulatory compliance and hereby request SBA's post-approval for these transactions. Matt Kelley to provide support to SBA for post approval of three Furniture Fan financings: $35,000 dated 6/5/03; $215,000 dated June 10, 2003 and $80,000 dated 8/13/03.

2.  Overline limitation exceeded - Section 107.740(a). The licensee exceeded its permissible overline limitation in its financing of a small concern by $131,980.

    Response: We agree that the Licensee has exceeded the overline limitation in this instance. This, again, is primarily as a result of inappropriate reliance on the departed

Elaine Hruschka, Financial Analyst
December 15, 2004
Page 12

members of Zero Stage's management team who clearly acted inappropriately and not in the best interests of the licensee. At the time, the additional financing that caused the overline was deemed to be the only way to protect the prior investments, as appears to have been understood by the SBA when it approved an additional $60,000 financing in November 2003 (please see Exhibit A). We hereby request SBA's post-approval for this overline financing.

3.    **Portfolio valuation guidelines not followed - Section 107.503(a). The licensee did not follow its SBA approved valuation policy as well as SBA valuation guidelines in valuing several of its portfolio investments in its Annual Financial Report, SBA Form 468, as of December 31, 2003.**

Response: In most of these cases, portfolio investment values were based on information made available to us by members of our management who were responsible for primary contact with those portfolio companies, as indicated below. Without the benefit of hindsight, those valuations appeared to conform to our valuation policy and the SBA valuation guidelines, as confirmed by our independent CPAs. We believe portfolio valuations as of June 30, 2004 are now consistent with values recommended by the SBA during their field examination in May 2004.

Furniture Fan (B. Stevens) - as of 6/30/04 equity valued at $0, notes at 50% of cost.

Resinate (S. Fung) - valued at $0 as of 12/31/03. Write-off occurred in Q1, 2004 when decline in asset value became permanent - company ceased operations.

Swift Rivers (B. Stevens) - valued at $0 at 12/31/03. Write-off occurred in Q2, 2004 when decline in asset value became permanent - company ceased operations.

Gazelle Systems (B. Stevens) - valued at $0 at 12/31/03. Write-off occurred in Q2, 2004 when decline in asset value became permanent - company ceased operations.

Sonexis (B. Stevens) - valued at $0 as of 6/30/04, SBA recommended value of $2/3^{rds}$ of cost.

Syncra (B. Stevens) - reduced valuation to $809,056 - equity valued at $0 and notes valued at 50% of cost. Write-down in Q4 based upon sales proceeds received.

Amgen - we continued to value the shares at a discount of 15% from market value because we were informed by the escrow agent that most, if not all, escrow expenses had been paid.

4.    **Unapproved prepayment restrictions - Section 107.830(d)(2). The licensee made four separate convertible debt financings to a portfolio concern, that were**

Elaine Hruschka, Financial Analyst
December 15, 2004
Page 13

covered by a side letter agreement that contained prepayment restrictions not approved by SBA. A similar matter was reported in the Other Matters section of the prior examination report.

Response: Zero Stage erred in each of these financings by entering into a side letter agreement that was inconsistent with the SBA regulations, and this should not have happened. As we were not the lead investor in this financing, we did not request the restriction. However, once it was requested, we should have, but did not, recognize our obligations under the SBA regulations. We hereby give SBA our assurances that this regulatory oversight will not occur again. With respect to Syncra, the prepayment restriction is no longer an issue as the Company was sold in November 2004.

5.    **Portfolio Financing Reports not filed timely – Section 107.640. The Licensee did not file one Portfolio Financing Report, SBA Form 1031, within 30 days of the closing. The licensee also did not have the required SBA receipt forms for three other Portfolio Financing Reports so that the examiner could not ascertain if they had actually been filed. The prior examination report also cited the licensee for not filing such reports timely.**

Response: As previously discussed, the Licensee will make every effort to ensure that all Forms 1031 are filed with SBA in a timely manner. With respect to receipt from SBA of the Form 1031 filings, please see prior responses and Exhibit C for action taken by the Licensee to attempt to resolve this problem.

6.    **Inadequate internal controls – Section 107.506. The licensee continues to demonstrate a lack of internal controls for ensuring that its financings and other transactions were in compliance with the laws and regulations governing the SBIC program. This lack of internal controls was also reported in the prior examination report as of December 31, 2002.**

Response: Please see our response above to item 4 in Notice of Violation letter dated December 8, 2004.

### Other Matters

1.    **Unreported management and ownership changes – Section 107.680(a)(1). The Licensee did not notify SBA about the resignation of a manager at its general partner; the shifting of member's ownership interest in the general partner into a private trust; the sale of the resigning chief financial officer's entire partnership interests in all Zero Stage entities to an associate off the licensee; the appointment of an associate as a managing director; and the resignation of a key associate; as required by the regulations.**

Elaine Hruschka, Financial Analyst
December 15, 2004
Page 14

Response: Clearly these changes should have been reported to SBA for post-approval as required under Section 107.680(a)(1). Please see Exhibits B and G for a complete description of Zero Stages current management team. We also herby request that SBA accept this correspondence as notification of the changes required to be reported under Section 107.680(a)(1) and seek SBA's approval for these changes.

Again, thank you for the opportunity to respond to each of the issues raised in your letters and the most recent Report of Examination. We look forward to the opportunity to meet with you on the 17th and to discuss these matters with you in more detail.

Yours sincerely,

Paul M. Kelley

Paul M. Kelley

### List of Exhibits

| | |
|---|---|
| Exhibit A | SBA letter dated September 12, 2003 |
| Exhibit B | Management Changes and related agreements |
| Exhibit C | ZSC letter to SBA regarding Forms 1031 confirmations |
| Exhibit D | ZSC letter dated September 15, 2004 with Form 1031a |
| Exhibit E | September 28, 2004 ZSC email indicating submission of Form 1031 for Syncra financing dated 9/8/04 |
| Exhibit F | Forms 1031 for 2004 Syncra financings |
| Exhibit G | Assignment of Membership Interest in Zero Stage Capital Associates VI, LLC |
| Exhibit H | September 30, 2004 quarterly portfolio update |
| Exhibit I | Breakdown of legal fees for year-to-date 9/30/04 |
| Exhibit J | ZSC email regarding $48,077 Syncra financing |
| Exhibit K | Forms 1031 for 2003 Furniture Fan financings |
| Exhibit L | Licensee cash requirements analysis |

Ex. A.

VIA FACSIMILE AND MAIL

License No. 01/71-0372

Mr. Paul Kelley
Mr. Bic Stevens
Zero Stage Capital VI, LP
101 Main Street, 17th Floor
Cambridge, Massachusetts 02142-1519

Dear Mr. Kelly and Mr. Stevens:

The Office of SBIC Operations ("Operations") has reviewed Zero Stage Capital VI's ("ZSC") request to make a follow-on investment in FurnitureFan. On June 4, 2003, Operations placed ZSC in Restricted Operations for noncompliance pursuant to §107.1820(e) of SBA Regulations. Under the Restricted Operations conditions, ZSC must receive SBA's prior written approval before making any follow-on investment.

ZSC requests permission to invest an additional $200,000 in FurnitureFan. ZSC has invested $8.75 million in the company to date with a current value of $4.38 million. The additional capital will fund operations as the company continues negotiating a sale to Furniture Today, a subsidiary of Reed Elsevier. You indicate that ZSC will fund the additional investment in tranches, based on "demonstrable progress" with Reed. You anticipated that the $200,000 will last the company until October 15, at which time you expect to have a written offer from Reed.

The General Partner certifies that this investment is the best use of the Licensee's remaining $1.4 million in liquidity. The GP also certifies that Syncra Software is the only other company in the portfolio that will require capital from the Licensee.

Based upon the General Partner's certifications, Operations approves ZSC's request to invest up to an additional $200,000 in FurnitureFan. Operations expects this additional capital to fund the company until a deal with Reed Elsevier is consummated. Operations is not inclined to approve another funding request for this investment.

Please contact Steve Knott at 202-205-7731 with any questions in this matter.

Sincerely,


Walter Peterson
Chief Area I
Office of SBIC Operations

*Exhibit B*
Management & Management Changes

| Name | Title in ZSCC, Inc. | Responsibilities | Comments/Other Roles: |
|---|---|---|---|
| **Current Management** | | | |
| Paul Kelley | Managing Director and CEO | Overall responsibility for the strategic direction and investment philosophy and management of Zero Stage Capital. Also identifies investment opportunities primarily in the life science sector. | Paul is a general partner in the GP of ZSC V, a manager in the GP of ZSC VI, a limited partner in the GP of the three Zero Stage VII funds, a stockholder in the Corporate GP of the GP of two ZSC VII funds and a manager in the GP of the general partner of ZSC SBIC VII LP. |
| Matthew Kelley | Managing Director and COO | Responsible for the day to day operations of Zero Stage Capital. | Employment agreement previously provided. |
| Gordon Baty | Venture Advisor | Works on an as-needed basis with specific portfolio companies in ZSC V-VII have investments. | Gordon is also a manager in the GP of ZSC VI and a GP in the General Partner of ZSC V. Operating agreement previously provided. |
| Frank Pinto | Managing Director | Identify investment opportunities in the IT/communications and life science sectors. Frank also serves on the board or is an observer and monitors the performance of certain portfolio companies in ZSC V-VII. | Frank is also a Managing Member of Penn Ventures Partners, L.P., a New Markets Venture Capital Company. Employment agreement previously provided. |
| Ben Bronstein | Managing Director | Identify investment opportunities in the life science sector.  Ben also serves on the board or is an observer and monitors the performance of certain portfolio companies in ZSC V-VII. He advises companies on organizational, research and development and business development issues. | Employment agreement previously provided. |
| G. Bickley Stevens | Managing Director | Identify investment opportunities in the IT/communications and energy related technology sectors. Bic also serves on the board or is an observer and monitors the performance of certain portfolio companies in ZSC V-VII. | Bic is a member in the GP of ZSC VI, limited partner in the GP of two ZSC VII funds, a stockholder in the Corp. GP of two ZSC VII funds.  The terms of the termination, to be effective 12/31/04, are currently being negotiated |
| Nader Yaghoubi | Senior Analyst | Evaluates investment opportunities in the life science sector and reviewing emerging technologies in areas including genomics, drug discovery, nanotechnology, medical devices and tissue engineering. | No employment agreement. |

| Name | Title | Description | | Notes |
|------|-------|-------------|---|-------|
| Robert Barrows | Chief Financial Officer | Oversee accounting staff and coordinate all investment reporting, audit and tax compliance matters. | | Employment agreement attached (1/21/04). |
| Allen Mottur | Venture Advisor Consultant | Works with portfolio companies to enhance performance, strengthen competitive advantage and market positioning and improve operational and organization effectiveness. | | Consulting Agreement |
| **Terminated Management** | | | | |
| Stanley Fung | | | N/A | Terminated 10/29/04 for performance issues - agreement attached |
| Brian Johnson | | | N/A | Terminated on 11/17/03 for performance issues - agreement attached |
| Mark Thaller | | | N/A | Departed-Termination Letter dated June 21, 2001 attached. |
| Jamie Rice | | | N/A | Departed-Termination Letter dated April 5, 2004 attached. |
| Inder Soni | N/A | | N/A | Departed-Termination Letter dated February 11, 2003 attached |
| **Proposed New Management** | | | | |
| Matthew Fong | Special General Partner (Proposed) | Corporate governance and finance expertise | | |
| Edwin Wang | Venture Partner (Proposed) | M&A expertise - help position portfolio companies for liquidity events | | |
| Van Chu | Venture Partner (Proposed) | Currently a venture advisor evaluating portfolio companies for turn-around and possible M&A transactions | | |

# EMPLOYMENT AGREEMENT

This **Employment Agreement** ("Agreement") is made and entered into January 21, 2004 by and between Zero Stage Capital Company, Inc. a Massachusetts business corporation with its principal place of business at 101 Main Street, Cambridge, Massachusetts 02142 ("Zero Stage" or "Employer"), and Robert A. Barrows ("Barrows"), an individual residing at the address appearing below.

**WHEREAS**, Zero Stage desires to employ Barrows upon the terms and conditions provided in this Agreement and Barrows desires to accept employment by Zero Stage upon the terms and conditions hereinafter provided.

**NOW THEREFORE**, in consideration of the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     **Employment; Duties.**

Zero Stage hereby agrees to employ Barrows and Barrows hereby accepts such employment for the period stated herein and upon the terms and conditions herein provided. During the Employment Period, as defined in Section 3 below, Barrows shall have the title of "Chief Financial Officer" of the Employer, reporting directly to the Chief Executive Officer and Chief Operating Officer of the Employer. The primary responsibility of such position shall include but not necessarily be limited to (i) all accounting functions associated with such position including functions directly related to Zero Stage, individually, and as it is or may be a general partner or manager of any affiliated venture capital fund, (ii) assisting in reporting, as applicable to limited partners of affiliated venture capital funds, and governmental or regulatory authorities, (iii) duties reasonably assigned to him by Zero Stage and necessary and desirable to be performed by him in light of his skills and background, including with respect to such funds and their respective portfolio companies, and (iv) in connection with the foregoing, to work with general counsel to Zero Stage in furtherance of the business and corporate goals of Zero Stage, and its proper operation and legal compliance. Barrows shall also work to foster good relations between

Zero Stage and such funds, and among such funds, Zero Stage, investors in such funds and the portfolio companies of such funds. Barrows shall devote his full business time and his best energies, skills, and attention to the performance of his duties and responsibilities hereunder, and shall perform such services faithfully, diligently, and completely to the best of his ability. It shall not be a violation of this Agreement for Barrows to serve as a director of any company which does not compete with Employer or one of Employer's portfolio companies, or to serve as a director, trustee, officer or consultant to a charitable or non-profit entity; provided, however, that he first obtains the permission of the Employer to do so, which permission shall not be unreasonably withheld or delayed.

2.    **Compensation.**

(a)    During the Employment Period, the Employer shall pay Barrows a base salary calculated at an annual rate of $165,000. The base salary shall be paid in accordance with Employer's payroll policies in effect from time to time. The base salary will be reviewed as promptly as possible after the end of each calendar year during the term of this Agreement, at which time the base salary may be adjusted. It is understood that except as provided herein the Employer shall be under no obligation to grant a base salary increase.

(b)    In addition to the base salary payable to Barrows, he shall be eligible to receive an annual performance bonus in such amount, if any, as the Employer shall deem appropriate, taking into consideration Employer's evaluation of Barrows's performance, and the availability of profits payable to the Employer from venture capital funds. Such determination will be based in part upon the achievement of certain specified goals, which shall be determined in consultation with Barrows. It shall be the goal of the parties that such bonus shall be in the range of at least thirty percent (30%) of the base salary in effect from time to time; *provided, however,* that it is understood and agreed that the payment of any bonus is within the discretion of the Employer. Further, upon request of Barrows, Zero Stage shall consider selling to Barrows two percent (2%) of the equity of the general partner of any venture capital fund subsequent to Zero Stage's seventh fund.

2

3.    **Employment Period.**

Barrows's Employment Period pursuant to this Agreement shall continue indefinitely unless terminated upon ninety (90) days written notice by either party, or as provided in accordance with Paragraph 6.

4.    **Fringe Benefits.**

(a)    Barrows shall be entitled to such health, dental, accident, disability benefits and paid sick and personal leave as the Employer may currently or hereafter provide to its executive employees, it being understood that such benefits as currently exist are set forth on Schedule 1 hereto.

(b)    Barrows shall be entitled to a term life insurance policy payable upon his death in an amount equal to two times his then current base salary, payable to whomever he shall designate; provided, however, that if such insurance cannot be obtained without "rating" for medical conditions of Employee, Employer may obtain less coverage for the premiums it would pay if Employee were unrated.

(c)    Barrows shall be entitled to four weeks of paid vacation during 2004 and each consecutive twelve-month period.  Unused vacation shall not be carried over unless agreed.

(d)    Barrows shall be entitled to participate in any executive level retirement, deferred income or other plans that the Employer may adopt for its other executive level personnel from time to time.

(e) Barrows shall be entitled to (i) an automobile allowance of $600 per month and free parking, and (ii) a cell phone, a PDA, and reimbursement of reasonable expenses relating to each.

5.    **Expenses.**

The Employer shall pay all reasonable business expenses incurred by Barrows in the performance of his employment.  Such expenses shall be documented as the Employer may reasonably request, and shall be reviewed and approved by an employee other than Barrows.

6.    **Termination.**

3

In addition to termination by notice as provided in accordance with Paragraph 3, this Agreement shall terminate:

(a)    In the event that Barrows dies, in which case the Employment Period shall terminate as of the date of his death and Employer will pay to his legal representatives any unpaid amounts earned by Barrows through such date.

(b)    In the event that (i) Barrows, by any reason of physical or mental disability, shall be unable to perform the services required of him hereunder for more than one hundred and fifty (150) days in the aggregate during any consecutive twelve-month period, and (ii) the Employer shall in good faith determine that Barrows, by reason of such physical or mental disability, shall be unable to perform the services required of him hereunder, the Employment Period shall terminate fifteen (15) days from the date upon which the Employer gives written notice to Barrows of its intention to terminate the Employment Period because of the disability. Under no circumstances will termination due to disability enable Barrows to become eligible for any compensation or benefits from the Employer beyond the termination date other than any long term disability coverage plan provided by the Employer. Barrows shall be entitled to and shall receive all benefits and rights to which he is entitled by applicable law.

(c)    In the event that Barrows voluntarily terminates his employment hereunder, the Employer may elect that his Employment Period terminate prior to the expiration of the ninety-day period provided in subparagraph 3, in which case Barrows shall neither receive pay for the balance of such ninety (90) day period nor any further compensation or benefits following the actual date of termination (other than benefits that have become vested under any of the plans described herein or to which Barrows is entitled by law).

(d)    In the event Barrows is discharged for Cause, the Employment Period shall terminate on the date of discharge for Cause as determined by Employer. As used herein, "Cause" shall mean:

(i)    Consistent and material neglect of duty or other material breach of this Agreement following reasonable written notice and opportunity to correct any such neglect of duty or material breach;

4

(ii)    Commission of any act of fraud or involvement in any conflict of interest or self-dealing, conviction of a felony or any offenses involving moral turpitude, or any criminal offense of any magnitude involving the Employer or any fund or other entity affiliated with Employer; or

(iii)    Breach of Paragraphs 7 or 8 hereof.

(e)    In the event Employer terminates Barrows's employment without cause Barrows shall be paid his base salary during the period beginning on the date notice is provided as required by Paragraph 3 and ending six months thereafter, or until like employment is obtained by him (whichever is sooner).

7.    **Confidentiality and Nondisclosure.**

(a)    Barrows is aware and acknowledges that he will have access to valuable technical and non-technical trade secrets and confidential information belonging and/or relating to Zero Stage, the aforementioned funds and their respective portfolio companies, affiliates, successors, subsidiaries, assigns or divisions, including but not limited to (1) inventions and discoveries not yet patented or published; (2) technical specifications for and drawings of proprietary products and processes; (3) engineering, research, development, and design projects and research and development data; (4) business information such as product costs, vendor and customer lists, lists of approved components and sources, price lists, production schedules, computer programs, business plans and sales and profit or loss information not yet announced or disclosed to the public; and (5) other information not generally available to the public or to competitors of the Employer, its affiliated funds or any portfolio company of such funds, which, if divulged would either materially damage the Employer or aid or benefit a competitor (all of which is denominated "Confidential Information"), all of which constitutes a valuable part of the assets of the Employer.

(b)    Accordingly, Barrows will not, at any time during or after the course of his employment, directly or indirectly disclose to any third party or use for himself or any third party any Confidential Information, whether or not it was first obtained, acquired, developed, devised or otherwise created in whole or part by the efforts of Barrows, without first obtaining

5

the Employer's written consent. The obligations of Barrows under this subparagraph shall not apply to Confidential Information that (i) is or becomes (through no improper action or inaction by Barrows) generally available to the public, or (ii) was in Barrows's possession or known by Barrows without restriction prior to receipt from the disclosing party, or (iii) was rightfully disclosed to Barrows by a third party without restriction, or (iv) was independently developed without use of any Confidential Information of the disclosing party by Barrows who has had no access to such information, or (v) is disclosed by Barrows on a need to know basis in the course of performing his duties hereunder. Barrows may make disclosures required by law or court order provided Barrows notifies Employer of any such order and reasonably cooperates at Employer's expense in any steps Employer takes to limit disclosure and to obtain confidential treatment or a protective order and has allowed Zero Stage to participate in the proceeding. The provisions of this paragraph shall survive the termination of this Agreement.

(c)     All Confidential Information, including but not limited to records, files, memoranda, reports, drawings, plans, sketches, equipment, prototypes and software which Barrows uses, prepares, or comes into contact with during his employment, shall remain the sole property of Zero Stage and the aforementioned funds, as applicable, and shall be returned to the appropriate party by Barrows promptly upon termination of his employment.

8.    **Assignment of Rights.**

The provisions of this Paragraph shall survive the termination of this Agreement.

(a)     All inventions and discoveries, whether patentable or unpatentable, conceived or made by Barrows during the period of time in which he provides services to or on behalf of the Employer (whether during or after normal working hours) and which relate in any way to the business of the Employer, its affiliates, successors, subsidiaries, assigns or divisions, shall belong to and be the sole property of the Employer. Barrows shall disclose to the Employer in writing any inventions or discoveries covered by this Agreement and, without further remuneration, shall do any of the following acts at the request and expense of the Employer: (1) execute any assignments to the Employer or its nominee of the entire right, title, and interest in and to any such inventions or discoveries; (2) execute any other proper instruments or documents

necessary or desirable in applying for or obtaining patents (including divisions, continuations, renewals or reissues thereof) on such inventions or discoveries in the United States and foreign countries, including renewal or reissuance papers when appropriate; and (3) cooperate in the prosecution or defense of any claims, lawsuits, or other proceedings involving such inventions or discoveries; provided however that Employer shall remunerate Barrows at his then current rates for any such cooperation rendered after the termination of the Employment Period.

(b) As applicable, any works of authorship such as writings, computer programs, formulas, designs, and the like which are authored or created by Barrows during the period of time in which he provides services to or on behalf of the Employer (whether during or after normal working hours) and which are directly related to the business of the Employer, its respective affiliates, successors, subsidiaries, assigns or divisions, shall belong to and be the sole property of the Employer whether copyrightable or not. Without further remuneration Barrows shall do any of the following acts at the request and expense of the Employer: (1) execute any assignments of the entire right, title and interest in and to any such works of authorship; (2) execute any other proper instruments or documents necessary or desirable in applying for and obtaining registration of copyrights on such works of authorship in the United States and foreign countries, including renewal or reissuance papers when appropriate; and (3) cooperate in the prosecution or defense of any claims, lawsuits, or other proceedings involving such works of authorship; provided however that Employer shall remunerate Barrows at his then current rates for any such cooperation rendered after the termination of the Employment Period.

9. **Non-Solicitation.**

Except as provided below, during the term of this Agreement and for a period of one year after Barrows has ceased to be employed by the Employer for any reason, Barrows shall not, without the prior written consent of a duly authorized officer of Zero Stage, (1) solicit the employment of, entice away, or in any other manner persuade or attempt to persuade to leave the employment of Zero Stage, any fund affiliated with Zero Stage or any portfolio company of the aforementioned funds, any person employed by them, or (2) solicit a venture capital investment

7

from any investor in any venture capital fund or funds affiliated with Employer. The provisions of this Paragraph shall survive the termination of this Agreement.

10.  **Remedies.**

Barrows acknowledges that the restrictions contained in Paragraphs 7 through 9, in view of the nature of the business in which the Employer is engaged, are reasonable and necessary to protect the legitimate interest of the Employer and the funds with which the Employer is affiliated from time to time. **Barrows understands that the remedies at law for his violation of any of the covenants or provisions of Paragraphs 7 through 9 will be inadequate, that such violations may cause irreparable injury within a short period of time, and that the Employer shall be entitled to preliminary injunctive relief and other injunctive relief against such violation without resort to arbitration.** Such injunctive relief shall be in addition to, and in no way in limitation of, any and all other remedies that the Employer shall have in law and equity for the enforcement of those covenants and provisions. If the scope of any restriction contained in Paragraphs 7 through 9 is too broad to permit enforcement of such restriction to its full extent, then such restriction shall be enforced to the maximum extent permitted by law, and Barrows hereby consents and agrees that such scope may be judicially modified accordingly in any proceeding brought to enforce such restriction. The terms of this Agreement, including but not limited to the "remedies" set forth in this paragraph are specifically understood and agreed to be for the benefit of Zero Stage, the aforementioned funds, and any funds with which Zero Stage may hereafter be affiliated, and any of their respective affiliates, and as such may be enforced by either Zero Stage or any of the aforementioned funds or portfolio companies alone and not necessarily together, as may be appropriate in light of Barrows's affiliation with any such fund or portfolio company.

11.  **Indemnification.**

Zero Stage shall at all times indemnify and hold Barrows harmless from any loss, damage, expense (including but not limited to the reasonable fees and expenses of legal counsel) or liability resulting from any claim, action or demand arising out of or related to the

performance of his duties hereunder to the full extent from time to time permitted under Massachusetts law.

12.    **Waiver**.

The failure of any party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver thereof or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement. Any waiver must be in writing and no waiver of any breach of any provision of this Agreement shall constitute a waiver of any other breach of such provision or any other provision hereof.

13.    **Notices**.

Any notice or other communication under this Agreement shall be in writing and shall be deemed duly given if and when delivered personally or three business days after it is mailed by certified mail, return receipt requested, postage prepaid, as follows:

If to Employer:

Zero Stage Capital Company, Inc.
101 Main Street, 17th Floor
Cambridge, MA 02142
Attention: Paul M. Kelley, Senior Managing Director
            and Chief Executive Officer

with a copy to:

Theodore Tedeschi, Esq.
Israel Silberman PC
20 William Street, Suite 150
Wellesley, MA 02481

If to Barrows, at the address appearing below.

14.    **Assignment**.

Neither party may transfer or assign any of the duties, rights, benefits or obligations of this Agreement except as specifically provided herein.

9

15. **Severability**.

Invalidity or unenforceability of any term or provision of this Agreement shall not affect the validity or enforceability of the remaining terms or provisions hereof which shall remain in full force and effect.

16. **Entire Agreement**.

This Agreement constitutes the entire agreement between the parties on the date hereof with respect to Barrows's employment, supersedes all prior agreements and understandings and cannot be amended or terminated orally. No modification hereof shall be valid unless in writing and signed by the parties.

17. **Governing Law**.

This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts without application of the conflict of law rules of the laws of such Commonwealth.

18. **Arbitration of Disputes**.

Except as provided in Paragraph 10, any dispute, controversy or claim, whether statutory or common law, arising out of or relating to Barrows's employment, termination of employment or this Agreement, or the alleged breach thereof, which cannot be resolved by the parties after thirty days' written notice of such dispute shall be settled by binding arbitration in Boston or Cambridge, Massachusetts, in accordance with the rules then prevailing of the American Arbitration Association. A single arbitrator shall determine such arbitration and judgment upon the award rendered by the arbitrator may be entered in any court of competent jurisdiction.

19. **Counterparts**.

This Agreement may be executed in one or more counterparts, each of which shall be considered an original but taken together shall constitute the same instrument.

20. **Captions**.

10

All Paragraphs, titles or captions contained in this Agreement are for convenience only and shall not be deemed a party of this Agreement and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provisions hereof.

21.    **Drafting.**

This Agreement has been drafted jointly by the parties, and each party acknowledges that he has had the opportunity to have this Agreement reviewed by competent legal counsel of its or his choosing, as applicable.

22.    **Non-Disparagement.**

During the term of this Agreement, and after its termination for any reason, neither party shall directly or indirectly disparage the other in any fashion or forum.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

Zero Stage Capital Company, Inc.

By: _Paul M. Kelley_
     Paul M. Kelley, Senior Managing
     Director and Chief Executive Officer,
     and not individually

_Robert A. Barrows_
     Robert A. Barrows
     5 Anthony Lane
     Danvers, Ma. 01923

11

## SETTLEMENT AGREEMENT

This AGREEMENT ("Agreement") is entered into on October 29, 2004, by and between Stan Fung, an individual residing at 11 Monteiro Way, North Andover, Massachusetts 02142 ("Fung"), and Zero Stage Capital Company, Inc., a Massachusetts corporation, and Zero Stage Capital GP VII, Inc., a Delaware corporation, both with their principal place of business at 101 Main Street, Cambridge, Massachusetts 02142 (together referred to herein as "Zero Stage"), acting for themselves and as duly authorized, on behalf of their affiliates as the context may require.

WHEREAS, the parties wish to resolve all matters relating to (1) the employment of Fung by Zero Stage Capital Company, Inc. and the termination of such employment on March 29, 2004 ("Termination Date"), and (2) Fung's relationships with any affiliate of Zero Stage without the necessity of litigation or administrative proceedings.

NOW THEREFORE, in consideration of the promises, mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Undertakings of Zero Stage.**
   Zero Stage hereby agrees as follows:

   (a) <u>Waiver of Noncompetition Covenant</u>. Zero Stage, on behalf of itself and all interested parties, forever waives its rights with respect to Section 11.6(b)(2)(A) of the Limited Partnership Agreement of Zero Stage Capital Associates VII, L.P. dated as of September 29, 2000 ("ZSC VII") and that of Zero Stage Capital Associates SBIC VII, L.P. dated as of March, 2001 ("ZSC SBIC VII") (collectively, the "Partnership Agreements") regarding the noncompetition obligation by Fung to Zero Stage or any affiliated entity.

   (b) <u>Confirmation of Capital Account and Percentage Interests</u>. Zero Stage confirms the percentage interests of Fung in each partnership or limited liability company, his original capital account as amended to reflect additional capital contributions, if any, and his capital account adjusted to the date of this Agreement, all as provided in Schedule 1(b) attached to this Agreement and incorporated herein by reference.

   (c) <u>Consent to Assignment of Interests</u>. To the extent there is no material adverse consequence to Zero Stage, Zero Stage hereby agrees to consent, and to use its best efforts to obtain the consent of any other party which may be required, to the transfer of Fung's ownership interests in Zero Stage Capital Associates Limited Partnership, Zero Stage Capital Associates VI, LLC, Main Street Investors VI, LLC, ZSC VII, and ZSC SBIC VII, to an irrevocable trust or trusts for the benefit of Fung's children upon the written request of Fung.

MCT/1391153

## CONFIDENTIAL

(d)    Reimbursement of Unvested Capital Contributions.  Upon execution and delivery of this Agreement, Zero Stage shall pay to Fung the sum of $74,850.33 in three equal consecutive monthly installments of $24,950.11 beginning on the date of execution of this Agreement by the parties.  This amount shall represent reimbursement of the difference between Fung's capital account in ZSC VII and the vested portion of Fung's capital account balance, as adjusted, net of amounts advanced on behalf of Fung by Zero Stage , each as more specifically detailed and accounted on Schedule I(b) attached hereto and incorporated herein by reference.

(e)    Health Benefits.  Zero Stage agrees that it shall provide Fung with COBRA benefits and any other benefits to which he is entitled by law.

(f)    Documents to be Provided.  Zero Stage will provide Fung with Schedule K-1s for the various limited liability companies and partnerships for in which Fung has an interest at the same time as they are provided to other persons having interests in such entities.  In addition, Zero Stage will provide Fung with quarterly reports as provided to other parties in interest for those Funds for which Zero Stage Capital Associates Limited Partnership, Zero Stage Capital Associates VI, LLC, ZSC VII and ZSC SBIC VII act as general partners as they are mailed to investors in these Funds.  At such time as any distribution is paid or any notice of distribution is given with respect to any of the entities in which Fung has a retained percentage interest, Zero Stage will provide Fung with this information (and payment if the circumstances require) at such time as such distribution or notice is paid or given, as the case may be, to any other person having a retained percentage interest in the same entities.

(g)    Nondisparagement.  Zero Stage agrees that at no time will it disparage Fung, and that it will respond to any and all inquires made to it, or to any of its employees individually, regarding Fung's employment by Zero Stage, with language similar or equivalent to that set forth in Exhibit A hereto.  Any media inquiry will be directed to Paul Kelley ("Kelley") only, who will provide the same response as provided in Exhibit A.  In addition, Kelley shall provide Fung's contact information to the inquiring media representative upon request.

(h)    No Further Requirement of Fung.  Zero Stage acknowledges and warrants to Fung that no additional action, monetary contribution, work or duty is required of Fung other than as expressly provided in this Agreement in connection with any limited partnership or limited liability company in which he may have an interest or may have had an officerial function.

MCT/139115.3                                    -2-

**CONFIDENTIAL**

(i)    Power and Authority of Zero Stage.  Zero Stage warrants and represents to Fung that it has the power and authority necessary to enter into this Agreement and to commit, to the extent required for purposes of this Agreement, its affiliates to the obligations and undertakings which may be applicable to such affiliates in connection with this Agreement and that no further action is required to obtain the consent, or authority to be bound, of any such affiliates.

2.    **Undertakings of Fung.**
Fung hereby agrees as follows:

(a)    Resignation; Retired Partner Status.  Fung acknowledges that he has resigned, or with execution of this Agreement resigns, as an officer, director and manager of Zero Stage and its affiliates and portfolio companies of Zero Stage's affiliates, and that, as of the Termination Date, he shall be deemed a Retired Partner of ZSC VII and of ZSC SBIC VII as defined in Section 11.4.3 of the Partnership Agreements. Fung also hereby transfers his ownership interests as a member of Zero Stage Capital LLC (the "LLC") to the LLC and, by executing the stock power attached hereto, as a stockholder of Zero Stage Capital GP, VII, Inc., a Delaware corporation, by executing the stock power attached hereto.

(b)    Nonsolicitation of Zero Stage Investors.  Fung agrees that for a period of one (1) year from the Termination Date, he shall not without the prior written consent of Zero Stage, solicit funding from, or voluntarily initiate contact with, any limited partner of ZSC VII, ZSC SBIC VII, Zero Stage Capital (Cayman) VII, as of March 29, 2004, or any officer, director, employee or agent of any of the forgoing entities. Zero Stage agrees that Mr. Karl White, a trustee serving with him on the Board of the University of Massachusetts at Amherst, is an exception to this prohibition on "voluntarily initiate contact."

(c)    Nonsolicitation of Zero Stage Portfolio Companies.  Fung agrees that for a period of one (1) year from the Termination Date, he shall not, without the prior written consent of Zero Stage, solicit, or voluntarily initiate contact with any company (each a "Portfolio Company") in which there is an investment by those Funds managed and invested in by ZSC VII, ZSC SBIC VII, Zero Stage Capital (Cayman) VII or Zero Stage Capital Associates VI, LLC as of March 29, 2004, or any officer, director, employee or agent of any such Portfolio Company, for any purpose except for obtaining references only (after prior written notice to Zero Stage) related to Fung's employment or to his fund development activities.

(d)    Nondisparagement.  Fung agrees that at no time will he disparage Zero Stage, or its affiliates, officers, directors, or agents, and that he will respond to any and all

MCT/139115.3                                    -3-

**CONFIDENTIAL**

inquires made to him regarding his employment by Zero Stage with language similar or equivalent to that contained in Exhibit B attached hereto.

3.    **Confidentiality.**

The parties shall treat the existence and terms of this Agreement and the contents of the negotiations and discussions resulting in this Agreement, and the matters resolved by this Agreement as confidential. The parties shall make no disclosure, unless compelled by law, of the terms of this Agreement, or of the consideration provided hereunder, or of any information whatsoever pertaining to the other party except as expressly provided herein, to any person other than their respective professional advisors, to all of whom such disclosure shall be made in confidence. The parties agree that there will not be a violation of obligations hereunder if they disclose any of the aforementioned information pursuant to a subpoena or an order of a court of competent jurisdiction or for the purposes of required reporting of the transaction to administrative, regulatory, or taxing authorities. Any party making disclosure pursuant to the preceding sentence shall promptly notify the other in detail of the facts and circumstances thereof prior to the actual disclosure, unless otherwise ordered by a court of competent jurisdiction.

4.    **No Admission.**

Neither this Agreement, its Exhibits and Schedules, nor any consideration provided for hereunder, are, or shall be construed to be, an admission of any fault, wrongdoing or liability whatsoever as to any matter herein by any party or any of their agents, attorneys, representatives, or employees, but is in full settlement of disputed issues, and all such liability is expressly denied.

5.    **Entire Agreement; Modification and Waiver.**

This Agreement, including its Exhibits and Schedules, represents the complete agreement and understanding between the parties with respect to its subject matter. There are no restrictions, agreements, understandings, promises, inducements, representations, warranties, covenants, or undertakings, whether oral or written, other than those set forth expressly and specifically herein. This Agreement may be amended or modified only by a written instrument duly executed by the parties or their respective successors that unequivocally indicates the parties' intention to modify this Agreement. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.

6.    **Representation.**

This Agreement, including its Exhibits and Schedules , is the product of negotiations by parties advised and represented by legal counsel and therefore shall not be construed or interpreted against either of the parties, and each party executes this Agreement voluntarily.

MCT/139115.3                               -4-

**CONFIDENTIAL**

7. **Interpretation.**

Should any clause, sentence, provision, paragraph or part of this Agreement and its Exhibits and Schedules for any reason whatsoever be declared or determined finally by any court of competent jurisdiction, or by any other competent governmental authority having jurisdiction, to be illegal or invalid or unenforceable, the validity of the remaining parts, terms, or provisions shall not be affected, impaired or invalidated thereby, and such determination of illegality, invalidity or unenforceability shall be confined in its operation to the specific clause, sentence, provision, paragraph or part of this Agreement directly involved. Such illegal or invalid part, term, or provision shall be deemed not to be a part of this Agreement and its Exhibits and Schedules, and the remainder of the Agreement and Exhibits and Schedules, wherever practicable, shall remain in full force and effect.

8. **Governing Law; Jurisdiction.**

This Agreement shall be governed by, construed and enforced in accordance with the laws of the Commonwealth of Massachusetts except that any conflicts of law rule requiring reference to the laws of another jurisdiction shall be disregarded.

9. **No Waiver.**

The failure by any of the parties to this Agreement to enforce it at any time, or from time to time, or a course of dealing between the parties, shall not be a waiver of such terms or conditions or of such party's right thereafter to enforce each and every term and condition of this Agreement. No express waiver of any provision of this Agreement, or the breach thereof, shall be deemed a waiver or breach of any other provision. Any waiver, consent or authorization shall be valid only to the extent specifically set forth in writing.

10. **Binding Effect.**

This Agreement, including its Exhibits and Schedules, shall be binding upon and shall inure to the benefit of the parties hereto and, as may be applicable, all of the present and former divisions, subsidiaries, affiliates, predecessors, successors, assigns, administrators, executors, heirs, officers, directors, stockholders, trustees, partners, principals, employees, assigns, agents, insurers and attorneys, as well as other representatives of the parties and the other persons and entities listed in this provision.

11. **No Drafting Presumption.**

All terms and provisions of this Agreement and the Releases and Waivers, and the drafting of this Agreement and the Releases and Waivers, have been negotiated by the parties at arm's length and to mutual agreement, with consideration by and participation of each. This Agreement has been prepared jointly by the parties. Each party has been represented by independent counsel, or if not represented, has had ample opportunity to utilize and consult with counsel.

MCT/139115.3

**CONFIDENTIAL**

12. <u>Release.</u>

Upon satisfaction of the mutual obligations set forth herein, the parties, on behalf of themselves and any and all of their parents, subsidiaries, affiliates, divisions, predecessors, assigns, officers, directors, employees, attorneys and agents, do hereby release and forever discharge one another, as well as their respective parents, subsidiaries, affiliates, predecessors, successors, assigns, officers, directors, employees, attorneys and agents, from any and all claims, rights, demands, obligations, agreements, contracts, representations, promises, liens, accounts, debts, liabilities, damages, expenses, costs, attorneys' fees, injunctive relief, obligations and causes of action of every kind and nature, whether in law or equity, known or unknown, suspected or unsuspected, existing or claimed to exist which that party has ever had, now has, or claims to have, against the other concerning the subject matter of this Agreement, including but not limited to Fung's employment at Zero Stage and his participation in and direction of any and all Zero Stage funds, partnerships or entities; <u>provided, however,</u> that as to Fung there shall be excepted from this release (1) any matter in which it has been determined that he has knowingly or willfully violated any state or federal law, or any rule, regulation, policy or procedure promulgated thereunder, or (2) fraud. For purposes of this Section 12, "fraud" shall mean the intentional misrepresentation or concealment of a material fact by Fung in connection with his employment by Zero Stage. Zero Stage agrees to indemnify Fung from and against all expenses reasonably incurred or paid by him in connection with the defense or disposition of any actual or threatened claim, action, suit, or proceeding (civil, criminal, or other, including appeals) in which he may be involved as a party or otherwise by reason of his having served as a Zero Stage employee, or by reason of any action or omission or alleged action or omission by him while serving in any such capacity; except for expenses incurred or paid by him with respect to (1) and (2) of the preceding sentence. This paragraph is not intended to, and shall not, release the obligations of the parties expressly provided by this Agreement. An indemnified party in this Section 12 shall have no right of setoff or diminishment of economic interest of an indemnifying party in the event indemnification is required pursuant to this Section 12.

13. <u>Notice.</u>

Any notice required or permitted to be given hereunder shall be made by certified mail, postage prepaid, or by hand delivery or facsimile (with copies to follow by certified mail, postage prepaid) to:

*If to Fung, to:*

Mr. Stanley L. Fung
11 Monteiro Way
North Andover, MA 02142

with a copy to:

MCT/1391153

-6-

**CONFIDENTIAL**

Robert D. Williams, Esq.
Masterman, Culbert & Tully LLP
One Lewis Wharf
Boston, MA 02110

*And if to Zero Stage, to;*

Paul M. Kelley
CEO and Managing Director
Zero Stage Capital Company, Inc.
101 Main St., 17th Floor
Cambridge, Massachusetts 02142

with a copy to:

John J. McCarthy, Esq.
McNamara Koenig & McCarthy, PC
65 William Street, Suite 250
Wellesley, Massachusetts 02481

14.    **Counterparts.**
This Agreement may be executed in multiple counterparts, each of which may contain the signatures of less than all of the parties and shall constitute an original, and all of which together shall constitute a single Agreement. Each counterpart shall be fully effective as an original when all parties have executed this Agreement.

15.    **Arbitration.**
Should there arise a dispute among the parties concerning this Agreement, the parties shall make a good faith effort for thirty (30) days to resolve the dispute themselves. If they are unable to so resolve the dispute in such fashion, then they shall promptly submit their dispute for arbitration pursuant to the rules of the American Arbitration Association, before a single arbitrator sitting in Boston, Massachusetts and chosen by the American Arbitration Association. The parties agree that the arbitrator's decision shall be final and binding and may be enforced in the courts of the Commonwealth of Massachusetts.

16.    **Legal Fees and Expenses.**
In the event that it shall become necessary for any party to take action to enforce the terms of this Agreement, the prevailing party shall be entitled to recover all reasonable attorneys' fees, costs, and expenses, including all out of pocket expenses that are not taxable as costs, incurred in connection with any such action, including any negotiations, mediations, arbitrations, litigation, and appeals.

<u>**CONFIDENTIAL**</u>

Executed as an instrument under seal, as of the date first written above.

_____
Stanley L. Fung


ZERO STAGE CAPITAL COMPANY, INC.

By: _____
    Paul M. Kelly, Chief Executive Officer
    and Managing Director, hereunto duly
    authorized, and not individually


ZERO STAGE CAPITAL COMPANY GP VII, INC.

By: _____
    Paul M. Kelly, President, Chief Executive Officer
    and Chief Operating Officer, hereunto duly
    authorized, and not individually

MCT/139115.3                    -8-

<u>CONFIDENTIAL</u>

Executed as an instrument under seal, as of the date first written above.

_____
Stanley L. Fung

ZERO STAGE CAPITAL COMPANY, INC.

By: _____
      Paul M. Kelly, Chief Executive Officer
      and Managing Director, hereunto duly
      authorized, and not individually

ZERO STAGE CAPITAL COMPANY GP VII, INC.

By: _____
      Paul M. Kelly, President, Chief Executive Officer
      and Chief Operating Officer, hereunto duly
      authorized, and not individually

MCT/139115.3                                    -8-

**EXHIBIT H – Tab 14 (Part 2)**

## AGREEMENT

This AGREEMENT ("Agreement") is entered into as of November 17, 2003 by and between Brian M. Johnson, an individual residing at 9 Edmund Brigham Way, Westboro, Massachusetts 01581 ( "Johnson"), and Zero Stage Capital Company, Inc., a Massachusetts corporation with its principal place of business at 101 Main Street, Cambridge, Massachusetts 02142 (the "Company" or "Zero Stage").

NOW THEREFORE, in consideration of the promises, mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    **Purpose of Agreement.**
      The purpose of this Agreement is to resolve all matters relating to the employment of Johnson by Zero Stage and the cessation of such employment.

2.    **Undertakings of Zero Stage.**
      Zero Stage agrees as follows:

      (a)    On November 17, 2003 (the "Closing Date"), Zero Stage shall deliver to Johnson good funds in the amount of $109,267.25. This sum represents one-half of Johnson's most recent yearly base salary ($250,000), excluding bonuses and other perquisites, net of credit card expenses of $15,732.75 that the parties have agreed may be deducted therefrom.

      (b)    Commencing on November 30, 2003 and continuing on the final day of each of the next five subsequent months, Zero Stage shall pay Johnson the sum of $167,732 in six equal monthly installments (without interest) of $27,955.34, representing all of Johnson's interests in any and all Zero Stage funds, partnerships, or other entities.

      (c)    Zero Stage agrees that Johnson may retain, and Zero Stage hereby transfers to Johnson, the following equipment purchased by Zero Stage for use by Johnson during his employment:

             (1) DELL COMPUTER, Monitor and peripherals (Serial No. 1VHX721) and IBM ThinkPad Laptop, Serial No. 78WGVA7
             (2) BLACKBERRY, Serial No. 031/17/15996

      (d)    Zero Stage agrees that at no time will it disparage Johnson, and that it will respond to any and all inquires made to it, or to any of its employees individually, regarding Johnson's employment by Zero Stage, with language similar or equivalent to that set forth in Exhibit A hereto. Zero Stage agrees further that any violation of this subparagraph shall cause Johnson irreparable harm, entitling Johnson to immediate injunctive relief, in addition to any damages claims he may have.

(e)    Within seventy-two (72) hours from the date of execution of this Agreement, Zero Stage will ship at its own cost, or otherwise make available to Johnson, certain personal property of Johnson, including a "stand-up desk" and photographs.

(f)    Zero Stage agrees to indemnify Johnson from and against any judgment or settlement, and all expenses, including attorney's fees, reasonably incurred or paid by him in connection with the defense or disposition of any actual or threatened claim, action, suit, or proceeding (civil, criminal, or other, including appeals) in which he may be involved as a party or otherwise by reason of his having served as a Zero Stage employee, or by reason of any action or omission or alleged action or omission by him while serving in any such capacity, except for expenses incurred or paid by him with respect to: (1) any matter as to which he shall agree or be ordered by any court of competent jurisdiction to make payment to the Company; or (2) any matter as to which it has been determined by a final adjudication in a court of law that he has knowingly or willfully violated any state or federal law, or any rule, regulation, policy or procedure promulgated thereunder, except that, notwithstanding anything contained in this paragraph to the contrary, Zero Stage shall indemnify Johnson (i) for any matters as to which it has been determined by a final adjudication in a court of law that he was directed to undertake by Zero Stage whether or not it is determined that he knowingly or willfully violated any state or federal law, any rule, regulation, policy or procedure promulgated thereunder, and (ii) to the same extent as other partners and officers of Zero Stage, or (3) any matter as to which the Company shall be prohibited by law or by order of any court of competent jurisdiction from indemnifying him.

3.    **Undertakings of Johnson.**
Johnson agrees as follows:

(a)    On the Closing Date, in consideration for the payments provided for in clause 2(b), above, at such time as all payments provided for in clause 2(b) have been received by Johnson, Johnson shall convey to Zero Stage all of his interests in any Zero Stage fund, partnership, or other entity, in accordance with the Assignment in the form of Exhibit B attached hereto. Such Assignment shall be subject to the Escrow Agreement to be executed simultaneously herewith, in the form attached hereto as Exhibit C. Johnson shall retain all of his interests in any Zero Stage fund, partnership or other entity, even though held in escrow, until all of the payments set forth in clause 2(b) above have been made. The foregoing notwithstanding, Johnson shall not exercise any rights as a stockholder, member, partner or limited partner in any entity affiliated with Zero Stage, provided, however, that if Zero Stage fails or neglects to make any payment required by Clause 2(b) above, which failure continues for 5 business days after written notice from Johnson to Zero Stage, Johnson shall be entitled to exercise any and all rights as a stockholder, member, partner or limited partner in any entity affiliated with Zero Stage.

-2-

(b)    Within seventy-two (72) hours from the date of execution of this agreement, Johnson shall return all property belonging to Zero Stage that is then in his possession or control, including, but not limited to, all data and information stored or preserved in any medium, and he shall certify, under oath, that he has deleted from his computer all information relating or pertaining to Zero Stage or any affiliate or employee of Zero Stage.

(c)    Johnson agrees that at no time will he disparage Zero Stage, or its affiliates, officers, directors, or agents, and that he will respond to any and all inquires made to him regarding his employment by Zero Stage with language similar or equivalent to that contained in Exhibit D attached hereto. Johnson agrees further that any violation of this subparagraph shall cause Zero Stage irreparable harm, entitling Zero Stage to immediate injunctive relief, in addition to any damages claims it may have.

(d)    Non-Solicitation. Johnson agrees that for a period of three years from the date of this Agreement, he shall not, directly or indirectly, solicit any investment from any limited partner who was an investor in any Zero Stage venture capital fund at or before the date of his termination.

4.    **Confidentiality.**
The parties shall treat the existence and terms of this Agreement as confidential. The parties shall make no disclosure, unless compelled by law, of the terms of this Agreement, or of the consideration provided hereunder, or of any information whatsoever pertaining to the other party, to any person other than their respective professional advisors, to all of whom such disclosure shall be made in confidence. The parties agree that there will not be a violation of obligations hereunder if they disclose any of the aforementioned information pursuant to a subpoena or an order of a court of competent jurisdiction or for the purposes of required reporting of the transaction to administrative, regulatory, or taxing authorities. Any party making disclosure pursuant to the preceding sentence shall promptly notify the other in detail of the facts and circumstances thereof prior to the actual disclosure, unless otherwise ordered by a court of competent jurisdiction.

5.    **No Admission.**
Neither this Agreement, its Exhibits, nor any consideration provided for hereunder, are, or shall be construed to be, an admission of any fault, wrongdoing or liability whatsoever as to any matter herein by any party or any of their agents, attorneys, representatives, or employees, but is in full settlement of disputed issues, and all such liability is expressly denied.

6.    **Entire Agreement; Modification and Waiver.**
This Agreement, including its Exhibits, represents the complete agreement and understanding between the parties with respect to its subject matter. There are no

restrictions, agreements, understandings, promises, inducements, representations, warranties, covenants, or undertakings, whether oral or written, other than those set forth expressly and specifically herein. This Agreement may be amended or modified only by a written instrument duly executed by the parties or their respective successors that unequivocally indicates the parties' intention to modify this Agreement. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.

7.    **Representation.**
This Agreement, including its Exhibits, is the product of negotiations by parties advised and represented by legal counsel and therefore shall not be construed or interpreted against any of the parties, and each party executes this Agreement voluntarily.

8.    **Interpretation.**
Should any clause, sentence, provision, paragraph or part of this Agreement and its Exhibits for any reason whatsoever be declared or determined finally by any court of competent jurisdiction, or by any other competent governmental authority having jurisdiction, to be illegal or invalid or unenforceable, the validity of the remaining parts, terms, or provisions shall not be affected, impaired or invalidated thereby, and such determination of illegality, invalidity or unenforceability shall be confined in its operation to the specific clause, sentence, provision, paragraph or part of this Agreement directly involved. Such illegal or invalid part, term, or provision shall be deemed not to be a part of this Agreement and its Exhibits, and the remainder of the Agreement and Exhibits, wherever practicable, shall remain in full force and effect.

9.    **Governing Law; Jurisdiction.**
This Agreement shall be governed by, construed and enforced in accordance with the laws of Massachusetts except that any conflicts of law rule requiring reference to the laws of another jurisdiction shall be disregarded.

10.    **No Waiver.**
The failure by any of the parties to this Agreement to enforce it at any time, or from time to time, or a course of dealing between the parties, shall not be a waiver of such terms or conditions or of such party's right thereafter to enforce each and every term and condition of this Agreement. No express waiver of any provision of this Agreement, or the breach thereof, shall be deemed a waiver or breach of any other provision. Any waiver, consent or authorization shall be valid only to the extent specifically set forth in writing.

11.    **Binding Effect.**
This Agreement, including its Exhibits, shall be binding upon and shall inure to the benefit of the parties hereto and, as may be applicable, all of the present and former divisions, subsidiaries, affiliates, predecessors, successors, assigns, administrators, executors, heirs, officers, directors, stockholders, trustees, partners, principals, employees, assigns, agents, insurers and attorneys, as well as other representatives of the parties and the other persons and entities listed in this provision.

12.    **No Drafting Presumption.**

All terms and provisions of this Agreement and the Releases and Waivers, and the drafting of this Agreement and the Releases and Waivers, have been negotiated by the parties at arm's length and to mutual agreement, with consideration by and participation of each, and no party shall be deemed the scrivener of this Agreement.

13.    **Release.**

Upon satisfaction of the mutual obligations set forth herein, the parties, on behalf of themselves and any and all of their parents, subsidiaries, affiliates, divisions, predecessors, assigns, officers, directors, employees, attorneys and agents, do hereby release and forever discharge one another, as well as their respective parents, subsidiaries, affiliates, predecessors, successors, assigns, officers, directors, employees, attorneys and agents, from any and all claims, rights, demands, obligations, agreements, contracts, representations, promises, liens, accounts, debts, liabilities, damages, expenses, costs, attorneys' fees, injunctive relief, obligations and causes of action of every kind and nature, whether in law or equity, known or unknown, suspected or unsuspected, existing or claimed to exist which that party has ever had, now has, or claims to have, against the other concerning the subject matter of this Agreement including but not limited to Johnson's employment at Zero Stage and his participation in any and all Zero Stage funds, partnerships or entities; provided, however, that if Zero Stage subsequently discovers that Johnson has misappropriated funds, it shall not be deemed to have released any such claims against Johnson for such misappropriation of which it is not now aware provided that Zero Stage shall be deemed to release and waive any such claim for alleged misappropriation that it does not assert within 6 months from the date of this Agreement.

14.    **Notice.**

Any notice required or permitted to be given hereunder shall be made by first class mail, postage prepaid, or by hand delivery or facsimile (with copies to follow by U.S. Mail) to:

*If to Johnson, to:*

Brian M. Johnson
9 Edmund Brigham Way
Westboro, Massachusetts 01581

with a copy to:

Neil V. McKittrick, Esq.
Goulston & Storrs
400 Atlantic Avenue
Boston, Massachusetts 02110


*And if to Zero Stage, to:*

Paul M. Kelley
CEO and Managing Director
Zero Stage Capital Company, Inc.
101 Main St., 17th Floor
Cambridge, Massachusetts 02142

with a copy to:

Theodore Tedeschi, Esq.
Israel Silberman, P.C.
20 William Street, Suite #150
Wellesley, Massachusetts  02481

15.  **Counterparts.**
This Agreement may be executed in multiple counterparts, each of which may contain the signatures of less than all of the parties and shall constitute an original, and all of which together shall constitute a single Agreement. Each counterpart shall be fully effective as an original when all parties have executed this Agreement.

16.  **Arbitration.**
Should there arise a dispute among the parties concerning this Agreement, the parties shall make a good faith effort for thirty (30) days to resolve the dispute themselves.  If they are unable to so resolve the dispute in such fashion, then they shall promptly submit their dispute for arbitration pursuant to the rules of the American Arbitration Association, before a single arbitrator sitting in Boston, Massachusetts and chosen by the American Arbitration Association.  The parties agree that the arbitrator's decision shall be final and binding and may be enforced in the courts of the Commonwealth of Massachusetts.

17.  **Legal Fees and Expenses.**
In the event that it shall become necessary for any party to take action to enforce the terms of this Agreement, the prevailing party shall be entitled to recover all reasonable attorneys' fees, costs, and expenses, including all out of pocket expenses that are not taxable as costs, incurred in connection with any such action, including any negotiations, mediations, arbitrations, litigation, and appeals.

Executed as an instrument under seal, as of the date first written above.

By: _____
Brian M. Johnson


ZERO STAGE CAPITAL COMPANY, INC.

By: _____          MY COMMISSION EXPIRES OCTOBER 8, 2010
Paul M. Kelley, Chief Executive Officer
and Managing Director, and not individually

-7-

**Exhibit A**

**Agreement – Brian M. Johnson and Zero Stage Capital Co. Inc.**

Zero Stage agrees that it will inform its employees and affiliates whenever formal or informal inquiries are made to them about Johnson they will always be answered in a positive manner.  Further, they will state the following or equivalent:

- Johnson was a partner and CFO of Zero Stage.  Johnson and Zero Stage came to an agreed upon, amicable parting of ways whereby Johnson wanted to pursue investing with and working with start-up/early stage companies in an operating role.

- Johnson did an excellent job, and he worked well with members of the firm, its investors, portfolio companies and its networks of affiliates/service providers.

EXHIBIT D

"It was time for me to make a move.  I wanted to pursue investing with and working with startup/early stage companies in an operating role.  It was an amicable parting.  Zero Stage is a first rate firm with excellent people.  I enjoyed working there and learned from the time I spent there."

**EXHIBIT B**

**ASSIGNMENT**

    This Assignment is delivered pursuant to, and is subject to, a certain Escrow Agreement of even date, and an Agreement of even date between the undersigned and Zero Stage Capital Company, Inc. The undersigned agrees to execute and deliver such further instruments of assignment and conveyance as may reasonably be requested hereafter by Zero Stage Capital Company, Inc., all at the expense of Zero Stage Capital Company, Inc.

    In exchange for the payment by Zero Stage of $167,732 to be paid in six consecutive equal monthly installments of $27,955.34 commencing on November 30, 2003 and other good and valuable consideration, the undersigned hereby sells, transfers and assigns to Zero Stage Capital Company, Inc., or its nominee or nominees, all of the right, title and interest of the undersigned in and to any and all general partnerships, limited liability companies, limited partnerships, or any other entities affiliated with Zero Stage Capital Company, Inc. The undersigned represents and warrants that he has good and marketable title to the foregoing, and has not pledged or otherwise created any security interest therein.

    Executed as an instrument under seal as of November 17, 2003.

                                                            _Brian M. Johnson_
Brian M. Johnson

MY COMMISSION EXPIRES OCTOBER 8, 2010

-1-

EXHIBIT C

ESCROW AGREEMENT

Escrow Agreement made this 17th day of November 2003 by and between Brian M. Johnson ("Depositor" or "Johnson"), Zero Stage Capital Company, Inc. ("Company" or "Zero Stage"), and Israel Silberman PC ("Escrow Agent").

WITNESSETH:

WHEREAS, Depositor and Zero Stage have entered into an Agreement dated November 17, 2003 ("Agreement"), and attached hereto, whereby, inter alia, Depositor shall convey to Zero Stage all of his interests in various Zero Stage entities in exchange for certain payments; and

WHEREAS, the parties wish to effectuate an escrow arrangement whereby assets transferred by Depositor will be held by the Escrow Agent until such time as said interests become transferable to Zero Stage, pursuant to said Agreement, and subject to the terms set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  **Appointment and Assignment.** Depositor and Zero Stage appoint the Escrow Agent to serve as such pursuant hereto, and the Escrow Agent accepts such appointment. Depositor has caused, or will promptly after the execution herewith cause, the Assignment, as defined in the Agreement, to be delivered to the Escrow Agent to be held and disposed of strictly in accordance with this Escrow Agreement.

2.  **Performances by Escrow Agent.** The Escrow Agent agrees to deliver the Assignment at the time that Zero Stage becomes entitled thereto. Zero Stage shall become so entitled as of the date that the Escrow Agent (i) receives a joint written notice from Zero Stage and Johnson that Johnson has been compensated in full for the Assignment, in accordance with the terms of the Agreement, and (ii) such joint written notice instructs Escrow Agent to release the Assignment from this escrow and deliver it to Zero Stage.

3.  **Completion of Obligations.** Upon payment in full to Johnson pursuant to the Agreement and delivery of the Assignment to Zero Stage, this Escrow Agreement shall terminate and the Escrow Agent shall be discharged from all further obligation or responsibility hereunder.

4.  **Terms and Conditions of Escrow.** Acceptance by the Escrow Agent of its duties under this Escrow Agreement is an accommodation to the parties, and is subject to the

following terms and conditions, which all parties to this Escrow Agreement hereby agree shall govern and control the rights, duties and immunities of the Escrow Agent.

A.  The duties and responsibilities of the Escrow Agent shall be limited to those expressly set forth herein, and except as specifically provided for herein including without limitation by notice pursuant to Section 7 hereof, the Escrow Agent shall not be subject to, nor obligated to recognize, any other agreement between, or direction or instructions of, any or all of the parties hereof.

B.  The Escrow Agent shall disregard any and all notices or instructions given by any of the parties hereto or by any other person, firm or corporation, except only such notices or instructions as are herein provided for and orders or process of any court entered or issues with or without jurisdiction. If any of the property subject hereto is at any time attached, garnished or levied under any court order, or in the case payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case an order, judgment or decree shall be made or entered by any court or arbitrator affecting such property, or any part thereof, then and in any such events, the Escrow Agent is authorized in its sole but reasonable discretion to rely upon and comply with any such order, writ, judgment or decree, which it believes to be binding upon it, and if the Escrow Agent complies with any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any other person, firm or corporation by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

C.  The Escrow Agent may rely and shall be fully protected in acting upon any paper or other document which may be submitted to it in connection with its duties hereunder and which is believed by it to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution or validity hereof.

D.  The Escrow Agent shall not be required to institute or defend any administrative, arbitral, judicial or other action or legal process involving any matter referred to herein which in any manner affects it or its duties or liabilities hereunder unless and until it has received full indemnity in an amount, and of such character, as it shall in its sole discretion require, against any and all claims, liabilities, judgments, attorneys' fees and other costs and expenses of any and every kind in relation thereto.

E.  Depositor and Company shall jointly and severally indemnify and save the Escrow Agent, its shareholders, associates, counsel and employees harmless of and from and against any claims, liabilities, judgments, attorneys' fees and other costs and expenses of any and every kind and nature that may be incurred by any of them by reason of the performance of the Escrow Agent hereunder.

F.  The Escrow Agent shall not be responsible for any act or failure to act except in the case of his own bad faith or willful misconduct. In the event that the Escrow

Agent is uncertain as to its proper action hereunder it shall refrain from taking any action until satisfied in its sole but commercially reasonable discretion.

5. **Waiver of Conflict of Interest**. Depositor and Company understand and agree that the Escrow Agent is counsel for the Company, and may perform services for the Company in the future. Depositor and Company consent to such present and future representation, and agree that the services of the Escrow Agent hereunder shall not expressly or implicitly restrict or inhibit the Escrow Agent from any such representation, either generally or in connection with any action, dispute, controversy, arbitration, suit or negotiation arising hereunder or in respect of the Assignment, except that, in the event of a dispute concerning payment by Zero Stage for the Assignment, as required by, and pursuant to the terms of, the aforementioned Agreement, the Escrow Agent shall refrain from representing any party under this Escrow Agreement. In all other circumstances, the Depositor and the Company hereby waive any and all claims that may be asserted by reason of any such present or future relationship, after having had an opportunity to consider such relationships and to make inquiry of the Escrow Agent in any regard.

6. **Notices**. Any notice required or permitted to be given hereunder shall be made by first class mail, postage prepaid, or by hand delivery or facsimile (with copies to follow by U.S. Mail) to:

*If to Johnson, to:*

Brian M. Johnson
9 Edmund Brigham Way
Westboro, Massachusetts 01581

with a copy to:

Neil V. McKittrick, Esq.
Goulston & Storrs
400 Atlantic Avenue
Boston, Massachusetts 02110

*If to Zero Stage:*

Paul M. Kelley
CEO and Managing Director
Zero Stage Capital Company, Inc.
101 Main St., 17th Floor
Cambridge, Massachusetts 02142

With a copy to:

Theodore Tedeschi, Esq.
Israel Silberman, P.C.
20 William Street, Suite # 150
Wellesley, Massachusetts 02481

If to Escrow Agent, to:

Israel Silberman, P.C.
20 William Street, Suite # 150
Wellesley, Massachusetts 02481
Attn: Theodore Tedeschi, Esq.

7.    **Additional Right of Escrow Agent**. Notwithstanding anything to the contrary contained herein, in the event that a controversy arises between one or more of the parties hereto or between any of the parties hereto and any other person not a party hereto, as to whether or not or to whom the Escrow Agent shall deliver any portion of the Assignment, or as to any other matter arising out of or relating hereto, the Escrow Agent shall determine the same and shall not make any delivery of the Assignment or any portion thereof, but shall retain the same rights of the parties to the dispute that shall have been finally determined by agreement of the parties or by final order of a court of competent jurisdiction or finding of an arbitrator; provided however, that the time for appeal from any such final order or finding has expired without an appeal having been taken. The Escrow Agent shall deliver the Assignment or any portion thereof within ten (10) business days after the Escrow Agent has received written notice from the parties of any such agreement or final order or finding (accompanied by a sworn affidavit of the parties that the time for appeal has expired without an appeal having been taken). The Escrow Agent shall be entitled to assume that no such controversy has arisen unless it has received a written notice signed by the parties that such a controversy has arisen which refers specifically to this Escrow Agreement and identifies by name and address the adverse claimants to the controversy.

8.    **Resignation**. The Escrow Agent may resign at any time without designation of cause and without liability, and shall in such event hold the Assignment or any remaining portion thereof and deliver same only upon the joint written instructions of the Depositor and the Company.

9.    **Applicable Law**. This Escrow Agreement and its validity, construction and performance shall be governed by the substantive laws of the Commonwealth of Massachusetts without regard to conflict of law principles.

10.   **Miscellaneous**. Captions and recitals herein are for convenience and do not constitute a part hereof. This Escrow Agreement shall not be amended, nor shall any right hereunder be waived, except in a writing signed by all parties. No waiver in one instance shall constitute a waiver in any other. This Escrow Agreement shall be binding upon the successors and assigns of the parties. In the event of any conflict between the Agreement and this instrument, the Agreement shall control.

Executed as an instrument under seal, as of the first date written above.

By:    *Brian M Johson*
       Brian M. Johnson

MY COMMISSION EXPIRES OCTOBER 8, 2010
MY COMMISSION EXPIRES OCTOBER 8, 2010

ZERO STAGE CAPITAL COMPANY, INC.

By:    _____

     Paul M. Kelley, duly authorized, and not individually

ISRAEL SILBERMAN PC

By:    _____



101 Main Street, 17th Floor • Cambridge, Massachusetts 02142-1519
Tel 617-876-5355 ◦ Fax 617-876-1248 ◦ www.ZeroStage.com

June 21, 2001

Mr. Mark C. Thaller
297 Meadowbrook Road
Weston, MA  02493

Re:  Termination of Interest in Zero Stage Entities

Dear Mark:

The purpose of this letter is to set forth the agreement between us with respect to certain matters based upon conversations among the two of us and Brian Johnson.  (For purposes of this letter, all references to "Zero Stage Capital" in this letter include Zero Stage Capital Company, Inc., Zero Stage Capital, LLC, and all entities affiliated with them, including but not limited to Zero Stage Capital Associates, L.P., Zero Stage Capital Associates VI, LLC, Zero Stage Capital Associates VII, L.P. and the Zero Stage Capital funds V-VII.)

1.  You agree to surrender all of your rights and interests (whether capital or profits interests) in, or claims to ownership of, Zero Stage Capital Associates VI, LLC and Zero Stage Capital Associates VII, L.P.

2.  Zero Stage Capital agrees to release and indemnify you and hold you harmless from all current, future and/or implied liabilities (including future attorneys' fees as they become due) and/or duties you may have, if any, associated with Zero Stage Capital VI, L.P. ("ZSC VI"), Zero Stage Capital VII, L.P. ("ZSC VII"), Zero Stage Capital Associates VI, LLC and Zero Stage Capital Associates VII, L.P., and the companies in which ZSC VI & ZSC VII have made investments.

3.  Within five business days after this letter agreement and the release in the form of Exhibit A have been executed by Thaller, Zero Stage Capital Associates VII, L.P. will return to you the amount of your capital contribution to it ($94,086.02), together with interest earned equal to whatever amount of interest it earned from its bank on your capital contribution from the date you paid the capital in until the date of repayment to you.  Zero Stage Capital will bear all the costs of the necessary legal/tax work and/or any taxes that are owed as a result of the provisions of this paragraph.

Mr. Mark C. Thaller
June 21, 2001
Page 2

4. Zero Stage Capital will work with you in attempting to find a way to minimize the cost of the Section 83(b) election filed with the IRS in January 2000 with respect to the interest in Zero Stage Capital Associates VI, LLC. Zero Stage Capital will bear all the costs of the necessary legal/tax work and/or any taxes that are owed as a result of the Section 83 (b) filing made, including the one made in or about January 2001.

5. It is a condition of this agreement that we both sign the mutual release of claims against the other relating to above matters attached as <u>Exhibit A</u>.

Very truly yours,

ZERO STAGE CAPITAL COMPANY, INC., on behalf of itself and the other affiliated companies listed in the first paragraph of this letter

By: _Paul M. Kelley_____
    Paul M. Kelley, President

Agreed to and accepted:

_Mark Thaller_____
Mark Thaller

Date _6 - 21 - 01_____

## MUTUAL RELEASE OF CLAIMS

For good and valuable consideration, receipt and sufficiency of which are hereby acknowledged:

1.    Mark Thaller of Weston, MA ("Thaller") does hereby release, remise, and forever discharge Zero Stage Capital Company, Inc., Zero Stage Capital, LLC, and all entities affiliated with either of them, including but not limited to Zero Stage Capital Associates, L.P., Zero Stage Capital Associates VI, LLC, Zero Stage Capital Associates VII, L.P. , the Zero Stage Capital funds V-VII, and the officers, directors, managers, members, partners, employees and agents thereof (collectively the "Zero Stage Parties"), and their respective successors, assigns, heirs and agents (collectively, for this paragraph, the "Released Parties") from all debts, demands, actions, causes of action, suits, accounts, covenants, contracts, agreements, damages, and all claims and liabilities of every nature which Thaller or his assigns or heirs now have or ever had against any of the Released Parties, whether jointly, severally, or individually, known or unknown, absolute or contingent, determined or speculative, both in LAW and in EQUITY, related to or based upon any interest in any of the Zero Stage Parties, except for the express obligations set forth in the letter agreement between the parties dated June 21, 2001.

2.     Zero Stage Capital Company, Inc., a Massachusetts corporation, on behalf of itself and as agent for each of the other Zero Stage Parties and Released Parties, does hereby release, remise, and forever discharge Thaller, and his assigns, heirs and agents (collectively, for this paragraph, the "Released Thaller Parties") from all debts, demands, actions, causes of action, suits, accounts, covenants, contracts, agreements, damages, and all claims and liabilities of every nature which any of the Zero Stage Parties, or their successors, assigns, heirs and agents, now have or ever had against the Released Thaller Parties, whether jointly, severally, or individually, known or unknown, absolute or contingent, determined or speculative, both in LAW and in EQUITY, related to or based upon any interest in any of the Zero Stage Parties, except for the express obligations set forth in the letter agreement dated June 21, 2001.

Executed under seal this 25ᵗʰ day of June, 2001.

_____
Mark C. Thaller

Executed under seal this 21ˢᵗ day of June, 2001.

ZERO STAGE CAPITAL COMPANY, INC.,
on behalf of itself and the other affiliated
companies listed in the first paragraph of this
letter

By: _____
Paul M. Kelley, President

Commonwealth of Massachusetts)
                                ) ss.
County of _Middlesex_           )

    On this _21_ day of _June_, 2001, before me personally appeared Mark C. Thaller, known to me to be the person described in and who executed the foregoing instrument and acknowledged that he executed the same as his free act and deed.

_Sara Seberman_
Notary Public

My Commission Expires:

SARA SEBERMANIAN, Notary Public
My Commission Expires Nov. 5, 2004

Commonwealth of Massachusetts)
                                ) ss.
County of _Middlesex_           )

    On this _21_ day of _June_, 2001, before me personally appeared Paul M. Kelley, known to me to be the person described in and who executed the foregoing instrument, who, being duly sworn, did say that he is the President of Zero Stage Capital Company, Inc., and acknowledged that he executed the same as his free act and deed.

_Sara Seberman_
Notary Public

My Commission Expires:

#1025568 v\1 – schneipc – tzc0011.doc0 – 20094/3

-2-

## AGREEMENT

This AGREEMENT ("Agreement") is entered into on _April 5th_, 2004, effective as of March 29, 2004, by and between Jamie Rice, an individual residing at 391 Commonwealth Avenue, #2, Boston, Massachusetts 02115 ("Rice"), and Zero Stage Capital Company, Inc., a Massachusetts corporation with its principal place of business at 101 Main Street, Cambridge, Massachusetts 02142 (the "Company" or "Zero Stage").

NOW THEREFORE, in consideration of the promises, mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Purpose of Agreement.**
   The purpose of this Agreement is to resolve all matters relating to the employment of Rice by Zero Stage and the cessation of such employment.

2. **Undertakings of Zero Stage.**
   Zero Stage agrees as follows:

   (a)    For three months (the "First Pay Period"), following the date hereof (the "Closing Date"), Rice shall receive his current base pay in accordance with current payroll policies. Thereafter, Rice shall receive compensation equal to three additional months of base pay, payable over the six months (the "Second Pay Period) following the First Pay Period; provided, however, that if, during the Second Pay Period Zero Stage Capital VIII shall close on its first round of financing, then the payment schedule during the Second Pay Period shall be modified and accelerated to that which prevailed during the First Pay Period.

   (b)    Commencing on or about April 15, 2004, Zero Stage shall commence paying Rice the sum of $79,114.80 in nine equal monthly installments (without interest) of $8,7790.53. This total shall represent compensation for all of Rice's interests in any and all Zero Stage funds, partnerships, or other entities.

   (c)    Zero stage agrees that Rice may retain his cell phone. Any other equipment in his possession shall be returned in accordance with paragraph 3(e).

   (d)    Zero Stage agrees that it shall pay reasonable service fees for Rice's cell phone and Blackberry for the month of April, but that Rice shall be responsible for any and all charges incurred thereafter.

   (e)    Zero Stage agrees that it shall allow Rice access to his office e-mail until April 16, 2004.

   (f)    Zero Stage agrees that it shall provide Rice with COBRA benefits and any other benefits to which he is entitled by law.

(g)    Zero Stage agrees that at no time will it disparage Rice, and that it will respond to any and all inquires made to it, or to any of its employees individually, regarding Rice's employment by Zero Stage, with language similar or equivalent to that set forth in Exhibit A hereto.

(h)    Zero Stage agrees to indemnify Rice from and against all expenses reasonably incurred or paid by him in connection with the defense or disposition of any actual or threatened claim, action, suit, or proceeding (civil, criminal, or other, including appeals) in which he may be involved as a party or otherwise by reason of his having served as a Zero Stage employee, or by reason of any action or omission or alleged action or omission by him while serving in any such capacity; except for expenses incurred or paid by him with respect to: (1) any matter as to which it has been determined that he did not act in the reasonable belief that his action was in the best interests of the Company, or (2) any matter as to which he shall agree or be ordered by any court of competent jurisdiction to make payment to the Company, or (3) any matter as to which it has been determined that he has knowingly or willfully violated any state or federal law, or any rule, regulation, policy or procedure promulgated thereunder, or (4) any matter as to which the Company shall be prohibited by law or by order of any court of competent jurisdiction from indemnifying him.

3.    **Undertakings of Rice.**
Rice agrees as follows:

(a)    On the Closing Date, in consideration for the payments provided for in clause (b), above, Rice shall convey to Zero Stage all of his interests in any Zero Stage fund, partnership, or other entity, in accordance with the Assignment in the form of Exhibit B attached hereto.  Such Assignment shall be subject to the Escrow Agreement to be executed simultaneously herewith, in the form attached hereto as Exhibit C.

(b)    On the Closing Date, Rice shall execute a letter of resignation in the form attached hereto as Exhibit D, resigning as a Director and/or Officer of any and all Zero Stage portfolio companies.

(c)    Except as otherwise provided in this Agreement, within seventy-two (72) hours from the Closing Date, Rice shall return to Zero Stage any equipment or other property of Zero Stage that is then in his possession or control, including, but not limited to, all data and information stored or preserved in any medium.

(d)    Rice agrees that at no time will he disparage Zero Stage, or its affiliates, officers, directors, or agents, and that he will respond to any and all inquires made to him regarding his employment by Zero Stage with language similar or equivalent to that contained in Exhibit E attached hereto.

-2-

(e)    Rice agrees that for a period of two years from the date of the termination of his employment with Zero Stage, he shall not, directly or indirectly, solicit any investment from any limited partner who was an investor in any Zero Stage venture capital fund at or before March 29, 2004.

4.    **Confidentiality.**
The parties shall treat the existence and terms of this Agreement as confidential. The parties shall make no disclosure, unless compelled by law, of the terms of this Agreement, or of the consideration provided hereunder, or of any information whatsoever pertaining to the other party, to any person other than their respective professional advisors, to all of whom such disclosure shall be made in confidence. The parties agree that there will not be a violation of obligations hereunder if they disclose any of the aforementioned information pursuant to a subpoena or an order of a court of competent jurisdiction or for the purposes of required reporting of the transaction to administrative, regulatory, or taxing authorities. Any party making disclosure pursuant to the preceding sentence shall promptly notify the other in detail of the facts and circumstances thereof prior to the actual disclosure, unless otherwise ordered by a court of competent jurisdiction.

5.    **No Admission.**
Neither this Agreement, its Exhibits, nor any consideration provided for hereunder, are, or shall be construed to be, an admission of any fault, wrongdoing or liability whatsoever as to any matter herein by any party or any of their agents, attorneys, representatives, or employees, but is in full settlement of disputed issues, and all such liability is expressly denied.

6.    **Entire Agreement; Modification and Waiver.**
This Agreement, including its Exhibits, represents the complete agreement and understanding between the parties with respect to its subject matter. There are no restrictions, agreements, understandings, promises, inducements, representations, warranties, covenants, or undertakings, whether oral or written, other than those set forth expressly and specifically herein. This Agreement may be amended or modified only by a written instrument duly executed by the parties or their respective successors that unequivocally indicates the parties' intention to modify this Agreement. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.

7.    **Representation.**
This Agreement, including its Exhibits, is the product of negotiations by parties advised and represented by legal counsel and therefore shall not be construed or interpreted against any of the parties, and each party executes this Agreement voluntarily.

8.    **Interpretation.**
Should any clause, sentence, provision, paragraph or part of this Agreement and its Exhibits for any reason whatsoever be declared or determined finally by any court of competent jurisdiction, or by any other competent governmental authority having jurisdiction, to be illegal or invalid or unenforceable, the validity of the remaining parts, terms, or provisions shall not be affected, impaired or invalidated thereby, and such determination of illegality, invalidity or unenforceability shall be confined in its operation to the specific clause, sentence, provision, paragraph or part of this Agreement directly involved. Such illegal or invalid part, term, or provision shall be deemed not to be a part of this Agreement and its Exhibits, and the remainder of the Agreement and Exhibits, wherever practicable, shall remain in full force and effect.

9.    **Governing Law; Jurisdiction.**
This Agreement shall be governed by, construed and enforced in accordance with the laws of the Commonwealth of Massachusetts except that any conflicts of law rule requiring reference to the laws of another jurisdiction shall be disregarded.

10.    **No Waiver.**
The failure by any of the parties to this Agreement to enforce it at any time, or from time to time, or a course of dealing between the parties, shall not be a waiver of such terms or conditions or of such party's right thereafter to enforce each and every term and condition of this Agreement. No express waiver of any provision of this Agreement, or the breach thereof, shall be deemed a waiver or breach of any other provision. Any waiver, consent or authorization shall be valid only to the extent specifically set forth in writing.

11.    **Binding Effect.**
This Agreement, including its Exhibits, shall be binding upon and shall inure to the benefit of the parties hereto and, as may be applicable, all of the present and former divisions, subsidiaries, affiliates, predecessors, successors, assigns, administrators, executors, heirs, officers, directors, stockholders, trustees, partners, principals, employees, assigns, agents, insurers and attorneys, as well as other representatives of the parties and the other persons and entities listed in this provision.

12.    **No Drafting Presumption.**
All terms and provisions of this Agreement and the Releases and Waivers, and the drafting of this Agreement and the Releases and Waivers, have been negotiated by the parties at arm's length and to mutual agreement, with consideration by and participation of each. This Agreement has been prepared jointly by the parties. Each party has been represented by independent counsel, or if not represented, has had ample opportunity to utilize and consult with counsel.

13.    **Release.**
Upon satisfaction of the mutual obligations set forth herein, the parties, on behalf of themselves and any and all of their parents, subsidiaries, affiliates, divisions,

-4-

predecessors, assigns, officers, directors, employees, attorneys and agents, do hereby release and forever discharge one another, as well as their respective parents, subsidiaries, affiliates, predecessors, successors, assigns, officers, directors, employees, attorneys and agents, from any and all claims, rights, demands, obligations, agreements, contracts, representations, promises, liens, accounts, debts, liabilities, damages, expenses, costs, attorneys' fees, injunctive relief, obligations and causes of action of every kind and nature, whether in law or equity, known or unknown, suspected or unsuspected, existing or claimed to exist which that party has ever had, now has, or claims to have, against the other concerning the subject matter of this Agreement, including but not limited to Rice's employment at Zero Stage and his participation in any and all Zero Stage funds, partnerships or entities; provided, however, that as to Rice there shall be excepted from this release (1) any matter as to which it has been determined that he did not act in the reasonable belief that his action was in the best interests of the Company or its affiliates, or (2) any matter as to which he shall agree or be ordered by any court of competent jurisdiction to make payment to the Company, or (3) any matter in which it has been determined that he has knowingly or willfully violated any state or federal law, or any rule, regulation, policy or procedure promulgated thereunder, or (4) any matter as to which the Company shall be prohibited by law or by order of any court of competent jurisdiction from indemnifying him. This paragraph is not intended to, and shall not, release the obligations of the parties hereunder.

14. **Notice.**
Any notice required or permitted to be given hereunder shall be made by first class mail, postage prepaid, or by hand delivery or facsimile (with copies to follow by U.S. Mail) to:

*If to Rice, to:*

Mr. Jamie Rice
391 Commonwealth Avenue, #2
Boston, Massachusetts 02115

*And if to Zero Stage, to:*

Paul M. Kelley
CEO and Managing Director
Zero Stage Capital Company, Inc.
101 Main St., 17th Floor
Cambridge, Massachusetts 02142

with a copy to:

Theodore Tedeschi, Esq.
Israel Silberman, P.C.
20 William Street, Suite #150
Wellesley, Massachusetts 02481

15. **Counterparts.**

This Agreement may be executed in multiple counterparts, each of which may contain the signatures of less than all of the parties and shall constitute an original, and all of which together shall constitute a single Agreement. Each counterpart shall be fully effective as an original when all parties have executed this Agreement.

16. **Arbitration.**

Should there arise a dispute among the parties concerning this Agreement, the parties shall make a good faith effort for thirty (30) days to resolve the dispute themselves. If they are unable to so resolve the dispute in such fashion, then they shall promptly submit their dispute for arbitration pursuant to the rules of the American Arbitration Association, before a single arbitrator sitting in Boston, Massachusetts and chosen by the American Arbitration Association. The parties agree that the arbitrator's decision shall be final and binding and may be enforced in the courts of the Commonwealth of Massachusetts.

17. **Legal Fees and Expenses.**

In the event that it shall become necessary for any party to take action to enforce the terms of this Agreement, the prevailing party shall be entitled to recover all reasonable attorneys' fees, costs, and expenses, including all out of pocket expenses that are not taxable as costs, incurred in connection with any such action, including any negotiations, mediations, arbitrations, litigation, and appeals.

Executed as an instrument under seal, as of the date first written above.

By: _____
Jamie Rice

ZERO STAGE CAPITAL COMPANY, INC.

By: _____
Paul M. Kelley, Chief Executive Officer
and Managing Director, and not individually

-6-

## EXHIBIT A

Jamie was interested in taking his career in a different direction.  He and Zero Stage have an excellent relationship, and the firm will be supportive of his career plans.  We have high regard for Jamie, and he for us.

**ASSIGNMENT**

This Assignment is delivered pursuant to, and is subject to, a certain Escrow Agreement entered into this date.

For good and valuable consideration, the undersigned hereby sells, transfers and assigns to Zero Stage Capital Company, Inc., or its nominee or nominees, all of the right, title and interest of the undersigned in and to any and all general partnerships, limited liability companies, limited partnerships, or any other entities affiliated with Zero Stage Capital Company, Inc.. The undersigned represents and warrants that he has good and marketable title to the foregoing, and has not pledged or otherwise created any security interest therein.

The undersigned agrees to execute and deliver such further instruments of assignment and conveyance as may reasonably be requested hereafter by Zero Stage Capital Company Inc., all at the expense of Zero Stage Capital Company, Inc.

Executed as an instrument under seal as of April 5th, 2004.

Jamie Rice

**EXHIBIT H – Tab 14 (Part 3)**

**EXHIBIT C**

## ESCROW AGREEMENT

Escrow Agreement made this _5th_ day of April, 2004 by and between Jamie Rice ("Depositor" or "Rice"), Zero Stage Capital Company, Inc. ("Company" or "Zero Stage"), and Theodore Tedeschi ("Escrow Agent").

### W I T N E S S E T H :

WHEREAS, Depositor and Zero Stage have entered into an Agreement of even date herewith ("Agreement"), and attached hereto, whereby, inter alia, Depositor shall convey to Zero Stage all of his interests in various Zero Stage entities in exchange for certain payments; and

WHEREAS, the parties wish to effectuate an escrow arrangement whereby assets transferred by Depositor will be held by the Escrow Agent until such time as said interests become transferable to Zero Stage, pursuant to said Agreement, and subject to the terms set forth herein;

NOW THEREFORE, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.   **Appointment and Assignment.**  Depositor and Zero Stage appoint the Escrow Agent to serve as such pursuant hereto, and the Escrow Agent accepts such appointment. Depositor has caused, or will promptly after the execution herewith cause, the Assignment, as defined in the Agreement, to be transferred to the Escrow Agent to be held and disposed of in accordance with this Escrow Agreement.

2.   **Performances by Escrow Agent.**  The Escrow Agent agrees to deliver the Assignment at the time that Zero Stage becomes entitled thereto.  Zero Stage shall become so entitled as of the date that the Escrow Agent (i) receives notice from Zero Stage that Rice has been compensated in full for the Assignment, in accordance with the terms of the Agreement, and (ii) receives evidence that a copy of such notice has been given to Rice, and without subsequent notice by Rice within ten (10) days thereafter, of his objection to the distribution of the Assignment by the Escrow Agent to Zero Stage.

3.   **Completion of Obligations.**  Upon transfer of the Assignment to Zero Stage, this Escrow Agreement shall terminate and the Escrow Agent shall be discharged from all further obligation or responsibility hereunder.

4.   **Terms and Conditions of Escrow.**  Acceptance by the Escrow Agent of its duties under this Escrow Agreement is an accommodation to the parties, and is subject to the following terms and conditions, which all parties to this Escrow Agreement hereby agree shall govern and control the rights, duties and immunities of the Escrow Agent:

A.    The duties and responsibilities of the Escrow Agent shall be limited to those expressly set forth herein, and the Escrow Agent shall not be subject to, nor obligated to recognize, any other agreement between, or direction or instructions of, any or all of the parties hereof.

B.    The Escrow Agent is authorized, in its sole discretion, to disregard any and all notices or instructions given by any of the parties hereto or by any other person, firm or corporation, except only such notices or instructions as are herein provided for and orders or process of any court entered or issued with or without jurisdiction. If any of the property subject hereto is at any time attached, garnished or levied under any court order, or in the case payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case an order, judgment or decree shall be made or entered by any court or arbitrator affecting such property, or any part thereof, then and in any of such events, the Escrow Agent is authorized in its sole discretion to rely upon and comply with any such order, writ, judgment or decree, which it believes to be binding upon it, and if the Escrow Agent complies with any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any other person, firm or corporation by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

C.    The Escrow Agent may rely and shall be fully protected in acting upon any paper or other document which may be submitted to it in connection with its duties hereunder and which is believed by him to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution or validity hereof.

D.    The Escrow Agent may consult with legal counsel selected by it, and the opinion of such counsel shall be full and complete authorization and protection to the Escrow Agent in respect of any action taken or omitted by the Escrow Agent hereunder in accordance with the opinion of such counsel.

E.    The Escrow Agent shall not be required to institute or defend any administrative, arbitral, judicial or other action or legal process involving any matter referred to herein which in any manner affects it or its duties or liabilities hereunder unless and until it has received full indemnity in an amount, and of such character, as it shall in its sole discretion require, against any and all claims, liabilities, judgments, attorneys' fees and other costs and expenses of any and every kind in relation thereto.

F.    Depositor and Company shall jointly and severally indemnify and save the Escrow Agent, its shareholders, associates, counsel, and employees harmless of and from and against any claims, liabilities, judgments, attorneys' fees and other costs and expenses of any and every kind and nature that may be incurred by any of them by reason of the performance of the Escrow Agent hereunder.

2

G.    The Escrow Agent shall not be responsible for any act or failure to act on its part except in the case of his own bad faith or willful negligence, and in the event that the Escrow Agent is uncertain as to its proper action hereunder it may refrain from taking any action until satisfied in its own sole discretion.

H.    Without limitation, the Escrow Agent shall have no responsibility whatsoever with respect to the recitals contained in this Escrow Agreement or in any other document or documents exchanged among any of the parties hereto.

5.    <u>Waiver of Conflict of Interest</u>.  Depositor and Company understand and agree that the Escrow Agent is counsel for the Company, and may perform services for the Company in the future.   Depositor and Company consent to such present and future representation, and agree that the services of the Escrow Agent hereunder shall not expressly or implicitly restrict or inhibit the Escrow Agent from any such representation, either generally or in connection with any action, dispute, controversy, arbitration, suit or negotiation arising hereunder or in respect of the Assignment.  In the event of a dispute concerning payment by Zero Stage for the Assignment, as required by, and pursuant to the terms of, the aforementioned Agreement, the Escrow Agent, without limitation, may take any one or more of the following actions:  resign as Escrow Agent, or refrain from representing any party under this Escrow Agreement in connection with such dispute. The Depositor and the Company hereby waive any and all claims that may be asserted by reason of any such present or future relationship, after having had an opportunity to consider such relationships and to make inquiry of the Escrow Agent in any regard.

6.    <u>Notices</u>.  Any notice required or permitted to be given hereunder shall be made by first class mail, postage prepaid, or by hand delivery or facsimile (with copies to follow by U.S. Mail) to:

*If to Rice, to:*

Mr. Jamie Rice
391 Commonwealth Avenue, #2
Boston, Massachusetts 02115

*If to Zero Stage, to:*

Paul M. Kelley
CEO and Managing Director
Zero Stage Capital Company, Inc.
101 Main St., 17th Floor
Cambridge, Massachusetts 02142

with a copy to:

Theodore Tedeschi, Esq.
20 William Street, Suite #150
Wellesley, Massachusetts 02481

3

*If to Escrow Agent, to:*

Theodore Tedeschi, Esq.
20 William Street, Suite #150
Wellesley, Massachusetts 02481

7.    <u>Additional Rights of Escrow Agent</u>.   Notwithstanding anything to the contrary contained herein, in the event that a controversy arises between one or more of the parties hereto or between any of the parties hereto and any other person not a party hereto, as to whether or not or to whom the Escrow Agent shall deliver any portion of the Assignment, or as to any other matter arising out of or relating hereto, the Escrow Agent shall not be required to determine the same and need not make any delivery of the Assignment or any portion thereof, but may retain same until the rights of the parties to the dispute shall have been finally determined by agreement or by final order of a court of competent jurisdiction or finding of an arbitrator; provided however, that the time for appeal from any such final order or finding has expired without an appeal having been taken. The Escrow Agent shall deliver the Assignment or any portion thereof within ten (10) business days after the Escrow Agent has received written notice of any such agreement or final order or finding (accompanied by an affidavit that the time for appeal has expired without an appeal having been taken). The Escrow Agent shall be entitled to assume that no such controversy has arisen unless it has received a written notice that such a controversy has arisen which refers specifically to this Escrow Agreement and identifies by name and address the adverse claimants to the controversy.

8.    <u>Resignation</u>.   The Escrow Agent may resign at any time without designation of cause and without liability, and shall be entitled in such event to hold the Assignment or any remaining portion thereof and deliver same only upon the joint written instructions of the Depositor and the Company.

9.    <u>Applicable Law</u>.  This Escrow Agreement and its validity, construction and performance shall be governed by the substantive laws of the Commonwealth of Massachusetts without regard to conflict of law principles.

10.   <u>Miscellaneous</u>.  Captions and recitals herein are for convenience and do not constitute a part hereof. This Escrow Agreement shall not be amended, nor shall any right hereunder be waived, except in a writing signed by all parties. No waiver in one instance shall constitute a waiver in any other. This Escrow Agreement shall be binding upon the successors and assigns of the parties. In the event of any conflict between the Agreement and this instrument, the terms hereof shall control.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

4

Executed as an instrument under seal, as of the date first written above.

By: _____
Jamie Rice


ZERO STAGE CAPITAL COMPANY, INC.

By: _____
Paul M. Kelley, duly authorized, and not individually


_____
Theodore Tedeschi

5

EXHIBIT D

## RESIGNATION

I hereby resign as an officer and director of Resinate, Inc., and from any other positions I may now hold at any portfolio company affiliated with any venture capital limited partnership affiliate of Zero Stage Capital Company, Inc.

_____

Jamie Rice

### EXHIBIT E

My experience at Zero Stage was positive.  We are on excellent terms.  I have high regard for the firm and they for me.



101 Main Street, 17th Floor • Cambridge, Massachusetts 02142-1519
Tel 617-876-5355 • Fax 617-876-1248 • www.ZeroStage.com

February 11, 2003

Mr. Inder Soni
9A Canal Street
Westport, CT 06880

Re:   Separation Agreement and General Release

Dear Inder:

    This letter proposes the following Separation Agreement and General Release ("Agreement") between you, on the one hand, and Zero Stage Capital Company, Inc. ("Zero Stage"), Zero Stage Capital GP VII, Inc. (the "GP") and Zero Stage Capital Associates VII, L.P. (the "Partnership", and, collectively with Zero Stage and the GP, the "Company"), on the other hand.  Capitalized terms used in this Agreement without definition shall have the meanings ascribed to them in the Limited Partnership Agreement of the Partnership dated as of September 29, 2000 (the "Partnership Agreement").

I.    Background.

    A.    You have been employed by the Company as Vice President and then Principal since May 15, 1999. You and the Company have agreed to terminate your employment relationship on an amicable basis.

    B.    On July 15, 2002, your employment with the Company terminated.

II.    Terms of Agreement

In order to effect the termination of your employment and to provide you with certain benefits that you would not otherwise be entitled to, you and the Company agree as follows:

1.    This Agreement shall not be in any way construed as an admission by the Company that it has acted wrongfully with respect to you or any other person, or that you have any rights whatsoever against the Company.

2.    Even if you do not sign this Agreement, the Company will pay you the compensation that you have earned through the date of your termination and will honor any contractual or other obligations to you. The company will pay you $3,962.88 in expenses that have been incurred and submitted as per standard company procedure. Even if you do not sign this Agreement, you will be offered benefits to which you are entitled under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). Even if you do not sign this agreement, subject to the terms, conditions and exclusions of the Company's insurance policy and those insurance policies of our portfolio companies, you will be covered under the Company's Director and Officer insurance policy for your Board membership of HotSocket, Netkey and First Service Networks.

3.    In exchange for the promises contained in this Agreement and release of claims as set forth below, and provided that you do not revoke this Agreement as set forth in Paragraph 12(c).

a.    The Company will pay you a severance allowance in the amount of $46,250.02 (three months of your current base pay.) As of August 31, 2002 the Company had paid you $19,270.83 towards the total severance amount of $46,250.02. From September 1, 2002 forward you will be paid in bi-monthly payments of $3854.17 totaling $26,979.19, with the last payment ending on November 30, 2002.

b.    The Company will pay for your medical coverage (i.e., COBRA benefits) and any other benefits to which you may be entitled through October 31, 2002.

c.    You may keep the Company laptop and printer currently used by you. You may continue to use the Company's cell phone plan until September 5, 2002, at which time it will be transferred to your name. You will return all other Company property in your possession or control to the Company.

2

d.   It is hereby confirmed that for so long as you remain a Retired Partner, except as specifically provided in Section 11.5 of the Partnership Agreement with respect to Retired Partners, you will be entitled to all of the benefits and have all the rights of a "Partner", under the Partnership Agreement with respect to your Percentage Interest, as in effect as of the date hereof.

e.   It is hereby further confirmed that for the purposes of the Partnership Agreement, you shall be deemed at all times after the date hereof to be a "Covered Person", as such term is defined in Section 12.1.1(b) thereof and an "Indemnitee", as defined under Section 12.2.1 with respect to any of your acts or omissions occurring during the period of your employment with the Company and your ownership of a Percentage Interest.

4.   In consideration of the promises contained in this Agreement, you agree:

a.   On behalf of yourself and anyone claiming through you, including but not limited to your spouse, heirs, legal representatives, and assigns to expressly, irrevocably and unconditionally release, acquit and forever discharge the Company and/or its affiliated venture capital funds, the portfolio companies of such funds, subsidiaries, divisions, predecessors, successors and assigns of any of the foregoing, as well as their respective past and present officers, directors, employees, shareholders, trustees, joint venturers, partners, and limited partners (hereinafter "Zero Stage Releasees" collectively), in their individual and/or corporate capacities, from any and all claims, liabilities, promises, actions, damages and the like, known or unknown, which you ever had against any of the Zero Stage Releasees arising out of or relating to your employment with the Company and/or the termination of your employment with the Company. Said claims include, but are not limited to: (1) employment discrimination (including claims of sex discrimination and/or sexual harassment) and retaliation under Title VII (42 U.S.C.A. 2000e etc.) and under 42 U.S.C.A. section 1981 and section 1983, age discrimination under the Age Discrimination in Employment Act (29 U.S.C.A. sections 621-634) as amended; (2) disputed wages; (3) wrongful discharge and/or breach of any alleged employment contract; and (4) claims based on any tort, such as invasion of privacy, defamation, fraud and infliction of emotional distress; provided, however that nothing in this

3

paragraph 4 (a) shall affect or be deemed to affect the rights under the Partnership Agreement of you or your permitted successors and assigns against any of the Zero Stage Releasees that is a party thereto.

b.  That you shall not bring any legal action against any of the Zero Stage Releasees for any claim waived and released under this Agreement and that you represent and warrant that no such claim has been filed to date. You further agree that should you bring any type of administrative or legal action arising out of claims waived under this Agreement, you will bear all legal fees and costs, including those of the Zero Stage Releasees.

5.  In consideration of the promises contained in this Agreement, the Company agrees:

a.  On behalf of itself and anyone claiming through it, including but not limited to its affiliated venture capital funds, the portfolio companies of such funds, subsidiaries, divisions, predecessors, successors and assigns of any of the foregoing, as well as their respective past and present officers, directors, employees, shareholders, trustees, joint ventures, partners, limited partners, and anyone claiming through them (hereinafter the "Zero Stage Releasors") to expressly, irrevocably and unconditionally release, acquit and forever discharge you, your spouse, heirs, legal representatives and assigns (the "Soni Releasees"), in their individual and/or corporate capacities, from any and all claims, liabilities, promises, actions, damages and the like, known or unknown, which the Zero Stage Releasors ever had against any of the Soni Releasees arising out of or relating to your employment with the Company provided, however that nothing in this paragraph 5 (a) shall affect or be deemed to affect the rights under the Partnership Agreement of any of the Zero Stage Releasors that is a party to the Partnership Agreement or their respective permitted successors and assigns against any of the Soni Releasees.

b.  That the Zero Stage Releasors shall not bring any legal action against the Soni Releasees for any claim waived and released under this Agreement and that the Zero Stage Releasors represent and warrant that no such claim has been filed to date. The Zero Stage Releasors further agree that should they bring any type of administrative or legal action arising out of claims waived under this Agreement, the

4

Company will bear all legal fees and costs, including those of the Soni Releasees.

6.  You agree not to disparage the Zero Stage Releasees in any fashion or forum, and they likewise agree not to disparage you.

7.  You agree that you will not, directly or indirectly, disclose the fact of and terms of this Agreement, including the severance benefits, to anyone other than your attorney, except to the extent such disclosure may be required for accounting or tax reporting purposes or as otherwise required by law.

8.  This Agreement shall be binding on the parties and upon their respective heirs, administrators, representatives, executors, officers, directors, employees, successors and assigns and shall inure to their benefit and to that of their respective heirs, administrators, representatives, executors, officers, directors, employees, successors and assigns.

9.  You acknowledge that you have had access to valuable technical and non-technical trade secrets and confidential information belonging to and/or relating to the Company, its affiliated venture capital funds and their portfolio companies which if divulged would either materially damage such entities or aid or benefit a competitor of same ("Confidential Information"), all of which are valuable assets which the Company seeks to protect on its behalf and on behalf of such funds and such portfolio companies. Accordingly, you will not at any time for any reason directly or indirectly disclose to any third party or use for yourself or any third party any Confidential Information without first obtaining the written consent of the Company. This restriction shall not apply to information that becomes generally available to the public through no fault or action by you. All Confidential Information, including but not limited to records, files, software and the like shall remain the sole property of the Company, such funds, and portfolio companies, as applicable. On or before October 15, 2002, you will return all tangible forms of Confidential Information, as well as any other Company property, besides the Company laptop and printer referred to in Paragraph 3(c), in your possession or control. You further represent and warrant that you have not retained and will not retain any copies, electronic or otherwise, of any of the foregoing.

10.  You will cooperate fully with the Company, consistent with the requirements of your current employment, at the Company's sole expense, in its defense of or other participation in any administrative, judicial or other proceeding.

5

11.   In the event that you breach any of your obligations under Paragraphs 6, 9, or 10, any outstanding obligations of the Company hereunder shall immediately terminate, and any payments previously made to you pursuant to Paragraph 3 shall be returned to the Company.

12.   You also acknowledge that you have been informed pursuant to the federal Older Workers Benefit Protection Act of 1990 that:

a.   You have the right to consult with an attorney before signing this Agreement.

b.   You do not waive rights or claims under the federal Age Discrimination in Employment Act that may arise after the date this waiver is executed.

c.   You have seven (7) days after signing this Agreement to revoke the Agreement, and the Agreement will not be effective until that revocation period has expired.

13.   The provisions of this Agreement are severable. If any provision is held to be invalid or unenforceable, it shall not affect the validity or enforceability of any other provision.

14.   This Agreement sets forth the entire agreement between you and the Company and supersedes any and all prior oral or written agreements or understandings between you and the Company concerning the subject matter of this Agreement. This Agreement does not supersede the terms and conditions of the Partnership Agreement, except to the extent, if any, that the Partnership Agreement is expressly modified by this Agreement. This Agreement may not be altered, amended or modified, except by a further written document signed by you and the Company.

15.   If any dispute should arise between the parties with respect to this Agreement or the breach thereof, it shall be resolved by binding arbitration conducted pursuant to the Commercial Arbitration Rules of the American Arbitration Association, in Boston or Cambridge Massachusetts, by a single arbitrator selected in accordance with the Commercial Arbitration Rules of the American Arbitration Association.  The decision of the arbitrator shall be final and no appeal may be taken from it.  The arbitrator may award reasonable attorneys fees to the party determined by the arbitrator to have prevailed in that proceeding.  This Paragraph 15 notwithstanding, any breach of Paragraph 9 shall not be subject to this arbitration provision, it being acknowledged that the Company or any affiliated venture capital fund or portfolio company of such fund may suffer irreparable harm from such breach and may therefore seek equitable relief in a court of proper jurisdiction in the event of such breach.

6

16.    You represent that you fully understand your right to review all aspects of this Agreement with an attorney of your choice, that you have had the opportunity to consult with an attorney of your choice, that you have carefully read and fully understand all the provisions of this Agreement and that you are freely, knowingly and voluntarily entering into this Separation Agreement and General Release.

17.    This Agreement shall be deemed to have been drafted jointly by the parties, and shall be governed by the laws of the Commonwealth of Massachusetts.

If you are willing to enter into this Agreement, please signify your acceptance in the space indicated below, and return it to me. As I noted earlier, this Agreement will not become effective until seven (7) days after the date you sign this Agreement.

Very truly yours,

Zero Stage Capital Company, Inc.

By: _Paul M. Kelley_____
      Paul M. Kelley Senior Managing
      Director and Chief
      Executive Officer

ZERO STAGE CAPITAL GP, VII, INC.

By: _Paul M. Kelley_____

ZERO STAGE CAPITAL VII, L.P.

By: _Paul M. Kelley_____

Accepted and agreed to on this 19 day of February, 2003

_Inder Soni_____
Inder Soni

Witness: _Nicholas Kristthamo_____

Date: _2-19-03_____

7



ZERO
STAGE
CAPITAL

101 Main Street, 17th Floor • Cambridge, Massachusetts 02142-1519
Tel 617-876-5355 • Fax 617-876-1248 • www.ZeroStage.com

July 15, 2002

Mr. Inder Soni
9A Canal Street
Westport, CT 06880

Re: <u>Termination of Relationship with Zero Stage Capital</u>

Dear Inder:

After a careful review of the needs of Zero Stage Capital in today's economic environment, we have concluded that it is best to terminate your employment at Zero Stage Capital. Accordingly, this letter (i) serves as notice of the termination of your employment by Zero Stage Capital, Inc. effective as of July 31, 2002, and (ii) constitutes notice to you of your Mandatory Retirement, effective as of the date of delivery of this letter, as a Class A Limited Partner of Zero Stage Capital Associates VII, L.P. pursuant to Section 11.4.3(a) of its Limited Partnership Agreement. As a result of your termination, the vested 32.5% portion of your 7.38% interest in Zero Stage Capital Associates VII, L.P. (or 2.3985% of all of the interests in that partnership) will automatically be converted into a Retired Partner's interest in accordance with section 11.4.3 of the Limited Partnership Agreement.

Inder, I regret that it has been necessary to take this step. However, I think that it is best for you and best for Zero Stage Capital, and that it can be accomplished in a smooth and professional manner. I would like to work with you over the next two weeks to work out the terms of a smooth separation, including continuing obligations with respect to confidential information, transition of responsibility for portfolio companies (including your resignation as a Zero Stage designee director or observer where appropriate) and similar matters. In addition, you are entitled to continuation coverage under certain benefit plans in accordance with the requirements of COBRA, and we will be sending you a separate letter addressing those issues within the next few days.

Very truly yours,

ZERO STAGE CAPITAL COMPANY, INC.

By: _Paul M. Kelley_____
    Paul M. Kelley, President

ZERO STAGE CAPITAL GP VII, INC.

By: _Paul M. Kelley_____
    Paul M. Kelley

CAMBRIDGE, MASSACHUSETTS • NEW HAVEN, CONNECTICUT • PORTLAND, MAINE • PROVIDENCE, RHODE ISLAND

*Zero Stage Capital V & VI, L.P. are Federal Licensees under the Small Business Investment Act of 1958*

...ation of  Partnership  9/29/00

## ZERO STAGE CAPITAL ASSOCIATES VII L.P.
### Economic Exhibit of Inder Soni

| Total Subscription * | Percentage Interest ** |
|---|---|
| $233,546.89 | 7.38% |

### Vesting Schedule

| Period During Which Retirement Date Occurs: | Percentage of Percentage Interest Retained: |
|---|---|
| Any time after the date hereof | 10.00% |
| On or before the first anniversary of such Partner's admission date | 21.25% |
| After the first such anniversary through and including the second such anniversary | 32.50% |
| After the second such anniversary through and including the third such anniversary | 43.75% |
| After the third such anniversary through and including the fourth such anniversary | 55.00% |
| After the fourth such anniversary through and including the fifth such anniversary | 66.25% |
| After the fifth such anniversary through and including the sixth such anniversary | 73.00% |
| After the sixth such anniversary through and including the seventh such anniversary | 79.75% |
| After the seventh such anniversary through and including the eighth such anniversary | 86.50% |
| After the eighth such anniversary through and including the ninth such anniversary | 93.25% |
| After the ninth such anniversary through and including the tenth such anniversary | 100.00% |
| **To Be Completed** | |
| After such 10th anniversary or if such Partner continues to be a Class A Partner as of date of Partnership's final liquidating distribution | 100.00% |

32.5% x 7.38% = 2.3

The table set forth above shall not be altered without the prior written consent of the Partner whose name is set forth above.

\* 1  Equal to 3.14% of 2%, not exceeding $6,000,000, of total Fund Subscriptions.

\*\*  Percentage Interest of all Class A Limited Partners are subject to pro rata reduction in an aggregate amount equal to the Percentage Interest of Bain & Company, Inc.

NUZUM\9808\1.1038179_7





101 Main Street, 17th Floor • Cambridge, Massachusetts 02142-1519
Tel 617-876-5355 • Fax 617-876-1248 • www.ZeroStage.com

June 1, 2004

Ms. Antoinette B. Shingler
Program Analyst
U. S. Small Business Administration
Office of Investment Division
409 Third Street, S.W.- Suite 6300
Washington, DC  20416

Dear Ms. Shingler:

Enclosed you will find the following four Portfolio Financing Reports on Form 1031 in connection with Zero Stage Capital VI Limited Partnership financing of FurnitureFan, Inc.:

· Financing dated September 15, 2003 in the amount of $ 85,000
· Financing dated October 9, 2003 in the amount of $ 55,000
· Financing dated November 4, 2003 in the amount of $ 35,000
· Financing dated December 1, 2003 in the amount of $ 25,000

With the exception of the Form 1031 for September 15, 2003, the above 1031's were previously filed.  However, we never received confirmation from the SBA that they were received.  We apologize for not filing the  September 15, 2003 form.  I would appreciate if you could send confirmations of these filings for our records to my e-mail address below.

I also wanted to make you aware that we have not been receiving confirmations from the SBA on most of the 1031 filings we have done in 2004.  I would appreciate if you would update your records to send confirmations to my attention at bbarrows@zerostage.com .

Please let me know if you have any questions or require additional information.  Thank you very much for your assistance.

Sincerely,

Robert A. Barrows
Chief Financial Officer

Cc: Mr. James T. Judge, Jr. (w/o enclosures)
    Mr. John Wilmeth (w/o enclosures)

CAMBRIDGE, MASSACHUSETTS · NEW HAVEN, CONNECTICUT · PROVIDENCE, RHODE ISLAND
Zero Stage Capital V & VI, L.P. and Zero Stage Capital SBIC VII, L.P. are Federal Licenses under the Small Business Investment Act of 1958.

@002

# U.S. Small Business Administration

## Portfolio Financing Report

OMB No. 3245–0078

Expiration Date 04/30/01

Name of Licensee Zero Stage Capital VI, L.P.          License Number 01/71-0372

## Part A – Small Business Concern Data

1. Name of Small Concern: FurnitureFan, Inc.          2. Employer Identification Number: 02-0513032

3. Street Address 142 North Road          4. City Sudbury          5. State MA   6. ZIP Code 01776

7. County Middlesex          8. Date Business Established  11/9/1999          9. SIC Code 8724

10. Form of Business (enter appropriate number, 1–4)          1
    1) Corporation  2) Partnership  3) Proprietor  4) Limited Liability Company

11. Percentage of Small Concern (if any) Owned by:

    Blacks _____ % Hispanics _____ % Native Americans _____ %

    Asian Pacific Americans _____ % Subcontinent Asian Americans _____ %

12. Percentage of Small Concern Owned by Women (if any) _____ %

## Part B – Small Business Concern Prefinancing Information

13. Fiscal Year End Immediately Prior to Date of Financing (Month/Day/Year)   12/31/2002

14. Gross Revenue for Prior Fiscal Year $ 730,614   15. After–Tax Profit or (Loss) for Prior Fiscal Year $ (2,258,297)

16. Income Taxes for Prior Fiscal Year: Federal $ 0   State $ 456   Local $ 0

17. Employee Payroll Tax Withholdings for Prior Fiscal Year: Federal $ 184,535   State and Local $ 54,063

18. Total Assets $ 485,935   19. Net Worth (Deficit) $ (485,935)   20. Retained Earnings (Deficit) $ 0

21. Borrowings from Other Sources: Short–term $ _____   Long-term $ 1,175,000   Total $ 1,175,000

22. Number of Employees  14

## Part C – Financing Information

23. Date of Financing  9/15/03   24. Date of Disbursement  9/15/03

25. Purpose of Financing (enter appropriate number(s); 1–10)   1   2   3
    1) Working Capital or Inventory Purchase          6) New Building or Plant Construction
    2) Marketing Activities                          7) Land Acquisition or Dwelling Construction on Existing Land
    3) Research and Development                       8) Plant Modernization or Leasehold Improvement
    4) Acquisition of All or Part of an Existing Business   9) Acquisition of Machinery and Equipment
    5) Consolidation of Obligations or Non–SBIC Debt Refunding   10) Other (specify)

26. Is this the First Financing of this Small Concern by the Licensee?   ☐ Yes   ☑ No

27. Financing Instruments and Applicable Amounts (for participations, include Licensee's portion only):

| Instrument | Amount | Initial Interest Rate(s) | % Ownership |
|---|---|---|---|
| Loan Only | $ | % | |
| Debt with Equity Features | $ 85,000 | 12 % | |
| Equity Only | $ | | % |
| Total Financing | $ | | |

## Part D – Licensee Verification

I hereby certify that the information contained above is complete and correct to the best of my knowledge and belief.

Name Lois Desaulniers

Title  Controller

Signature  Lois Desaulniers          Date 9-15-03

SBA Form 1031 (3-95) Previous Editions Obsolete

This form was electronically produced by Elite Federal Forms, Inc.

# U.S. Small Business Administration
## Portfolio Financing Report

OMB No. 3245-0078

Expiration Date 04/30/01

Name of Licensee Zero Stage Capital VI, L.P.        License Number 01/71-0372

## Part A -- Small Business Concern Data

1. Name of Small Concern  FurnitureFan, Inc.        2. Employer Identification Number  02-0513032
3. Street Address  142 North Road        4. City  Sudbury    5. State  MA    6. ZIP Code  01776
7. County  Middlesex        8. Date Business Established  11/9/1999    9. SIC Code  8724
10. Form of Business (enter appropriate number; 1-4)    1

   1) Corporation 2) Partnership 3) Proprietor 4) Limited Liability Company        5/4/9

11. Percentage of Small Concern (if any) Owned by:

   Blacks ____ % Hispanics ____ % Native Americans ____ %

   Asian Pacific Americans ____ % Subcontinent Asian Americans ____ %

12. Percentage of Small Concern Owned by Women (if any) ____ %

## Part B -- Small Business Concern Prefinancing Information

13. Fiscal Year End Immediately Prior to Date of Financing (Month/Day/Year)  12/31/2002
14. Gross Revenue for Prior Fiscal Year $  720,614    15. After--Tax Profit or (Loss) for Prior Fiscal Year $  (2,258,897)
16. Income Taxes for Prior Fiscal Year: Federal $  0    State $  456    Local $  0
17. Employee Payroll Tax Withholdings for Prior Fiscal Year: Federal $  184,535    State and Local $  54,063

   Total Assets $  485,935  19. Net Worth (Deficit) $  (485,935)    20. Retained Earnings (Deficit) $  0
21. Borrowings from Other Sources: Short--term $  ____    Long--term $  1,175,000    Total $  1,175,000
22. Number of Employees  14

## Part C -- Financing Information

23. Date of Financing  10/9/03  24. Date of Disbursement  10/10/03
25. Purpose of Financing (enter appropriate number(s); 1-10)  1    2    3

   1) Working Capital or Inventory Purchase        6) New Building or Plant Construction
   2) Marketing Activities        7) Land Acquisition or Dwelling Construction on Existing Land
   3) Research and Development        8) Plant Modernization or Leasehold Improvement
   4) Acquisition of All or Part of an Existing Business        9) Acquisition of Machinery and Equipment
   5) Consolidation of Obligations or Non--SBIC Debt Refunding    10) Other (specify) ____

26. Is this the First Financing of this Small Concern by the Licensee?    ☐ Yes  ☑ No
27. Financing Instruments and Applicable Amounts (for participations, include Licensee's portion only):

| Instrument | Amount | Initial Interest Rate(s) | % Ownership |
|---|---|---|---|
| Loan Only | $ | % | |
| Debt with Equity Features | $ 55,000 | 12 % | |
| Equity Only | $ | | % |
| Total Financing | $ | | |

## Part D -- Licensee Verification

I hereby certify that the information contained above is complete and correct to the best of my knowledge and belief.

Lois Desaulniers

Title  Controller

Signature  Lois Desaulniers        Date  10/9/03

SBA Form 1031 (3-95) Previous Editions Obsolete

This form was electronically produced by Elite Federal Forms, Inc.

# U.S. Small Business Administration
## Portfolio Financing Report

OMB No. 3245-0078
Expiration Date 04/30/01

Name of Licensee Zero Stage Capital VI, L.P.     License Number 01/71-0372

**Part A -- Small Business Concern Data**

1. Name of Small Concern  Furniture.Fan, Inc.     2. Employer Identification Number  02-0513032
3. Street Address 142 North Road     4. City Sudbury     5. State MA  6. ZIP Code 01776
7. County  Middlesex     8. Date Business Established  11/9/1999  9. SIC Code 8742
10. Form of Business (enter appropriate number; 1–4)    1
   1) Corporation  2) Partnership  3) Proprietor  4) Limited Liability Company          51491
11. Percentage of Small Concern (if any) Owned by:

   Blacks _____ % Hispanics _____ % Native Americans _____ %

   Asian Pacific Americans _____ % Subcontinent Asian Americans _____ %

12. Percentage of Small Concern Owned by Women (if any) _____ %

**Part B -- Small Business Concern Prefinancing Information**

13. Fiscal Year End Immediately Prior to Date of Financing (Month/Day/Year)  12/31/2002
14. Gross Revenue for Prior Fiscal Year $  720,514     15. After–Tax Profit or (Loss) for Prior Fiscal Year $  (2,258,897)
16. Income Taxes for Prior Fiscal Year: Federal $  0     State $ 456     Local $ 0
17. Employee Payroll Tax Withholdings for Prior Fiscal Year: Federal $  184,535     State and Local $  54,063
18. Total Assets $  485,935  19. Net Worth (Deficit) $  (485,935)  20. Retained Earnings (Deficit) $  0
21. Borrowings from Other Sources:  Short–term $ _____  Long–term $ 1,175,000  Total $ 1,175,000
22. Number of Employees  14

**Part C -- Financing Information**

23. Date of Financing 11-4-03  24. Date of Disbursement  11-4-03
25. Purpose of Financing (enter appropriate number(s); 1–10)  1   2   3

   1) Working Capital or Inventory Purchase
   2) Marketing Activities
   3) Research and Development
   4) Acquisition of All or Part of an Existing Business
   5) Consolidation of Obligations or Non–SBIC Debt Refunding

   6) New Building or Plant Construction
   7) Land Acquisition or Dwelling Construction on Existing Land
   8) Plant Modernization or Leasehold Improvement
   9) Acquisition of Machinery and Equipment
   10) Other (specify)

26. Is this the First Financing of this Small Concern by the Licensee? ☐ Yes  ☑ No
27. Financing Instruments and Applicable Amounts (for participations, include Licensee's portion only):

| Instrument | Amount | Initial Interest Rate(s) | % Ownership |
|---|---|---|---|
| Loan Only | $ | % | |
| Debt with Equity Features | $ 35,000 | 12 % | |
| Equity Only | $ | | % |
| Total Financing | $ | | |

**Part D -- Licensee Verification**

I hereby certify that the information contained above is complete and correct to the best of my knowledge and belief.

   Lois Desaulniers

Title  Controller

Signature  Lois Desaulniers     Date 11-3-03

SBA Form 1031 (3-95) Previous Editions Obsolete

This form was electronically produced by Elke Federal Farms, Inc

# U.S. Small Business Administration
## Portfolio Financing Report

OMB No. 3245–0078
Expiration Date 04/30/01

Name of Licensee Zero Stage Capital VI, L.P.

License Number 01/71-0372

## Part A -- Small Business Concern Data

1. Name of Small Concern   FurnitureFan, Inc.

2. Employer Identification Number   02-0513033

3. Street Address  142 North Road

4. City  Sudbury

5. State  MA

6. ZIP Code  01776

7. County  Middlesex

8. Date Business Established   11/9/1999

9. SIC Code  5712

5,141

10. Form of Business (enter appropriate number; 1–4)   1
   1) Corporation  2) Partnership  3) Proprietor  4) Limited Liability Company

11. Percentage of Small Concern (if any) Owned by:

Blacks _____ %  Hispanics _____ %  Native Americans _____ %

Asian Pacific Americans _____ %  Subcontinent Asian Americans _____ %

12. Percentage of Small Concern Owned by Women (if any) _____ %

## Part B -- Small Business Concern Prefinancing Information

13. Fiscal Year End Immediately Prior to Date of Financing (Month/Day/Year)   12/31/2002

14. Gross Revenue for Prior Fiscal Year $  720,614    15. After-Tax Profit or (Loss) for Prior Fiscal Year $  (2,258,897)

16. Income Taxes for Prior Fiscal Year: Federal $  0    State $  456    Local $ 0

17. Employee Payroll Tax Withholdings for Prior Fiscal Year: Federal $  184,535    State and Local $  54,063

18. Total Assets $  485,935   19. Net Worth (Deficit) $  (485,935)   20. Retained Earnings (Deficit) $  0

21. Borrowings from Other Sources: Short–term $ _____   Long–term $  1,637,621   Total $  1,637,621

22. Number of Employees   6

## Part C -- Financing Information

23. Date of Financing  12-1-03   24. Date of Disbursement  12-05-03

25. Purpose of Financing (enter appropriate number(s); 1–10)  1    2    3
   1) Working Capital or Inventory Purchase
   2) Marketing Activities
   3) Research and Development
   4) Acquisition of All or Part of an Existing Business
   5) Consolidation of Obligations or Non–SBIC Debt Refunding
   6) New Building or Plant Construction
   7) Land Acquisition or Dwelling Construction on Existing Land
   8) Plant Modernization or Leasehold Improvement
   9) Acquisition of Machinery and Equipment
   10) Other (specify) _____

26. Is this the First Financing of this Small Concern by the Licensee?   ☐ Yes   ☑ No

27. Financing Instruments and Applicable Amounts (for participations, include Licensee's portion only):

| Instrument | Amount | Initial Interest Rate(s) | % Ownership |
|---|---|---|---|
| Loan Only | $ | % | |
| Debt with Equity Features | $ 22,000 | 12 % | |
| Equity Only | $ | | % |
| Total Financing | $ | | |

## Part D -- Licensee Verification

I hereby certify that the information contained above is complete and correct to the best of my knowledge and belief.

Lois Dasaulniers

Title  Controller

Signature _____   Date  11-26-03

SBA Form 1031 (3-95) Previous Editions Obsolete
This form was electronically produced by Elke Federal Forms, Inc.





101 Main Street, 17th Floor • Cambridge, Massachusetts 02142-1519
Tel 617-876-5355 • Fax 617-876-1248 • www.ZeroStage.com

September 15, 2004

Ms. Elaine Hruschka
Financial Analyst
Office of SBIC Liquidation
U.S. Small Business Administration
409 Third Street, S.W.  Suite 6350
Washington, DC  20416

**RE: FORM 1031A**
**Zero Stage Capital VI, L.P. (Licensee number 01/71-0372)**

Dear Elaine:

Please find enclosed SBA Form 1031A listing all filings of SBA Form 1031 by the above licensee for the period beginning 1/1/2004 and ending 6/30/2004.

If you have any questions or need additional information, please feel free to call me.

Sincerely,

Robert A. Barrows
Chief Financial Officer

Enclosure

CAMBRIDGE, MASSACHUSETTS • NEW HAVEN, CONNECTICUT • PROVIDENCE, RHODE ISLAND
*Zero Stage Capital V & VI, L.P. and Zero Statge Capital SBIC VII, L.P. are Federal Licensees under the Small Business Investment Act of 1958.*

SBA Form 1031A

# U.S. Small Business Administration
## Portfolio Financing Report Certification

I hereby certify that the following is a list of all filings of SBA Form 1031 (Portfolio Financing Report) by
ZERO STAGE CAPITAL VI, L.P. (Licensee) during the period beginning 1/1/2004 and ending 6/30/2004.

| Small Business Name | Date of Financing | Loan Only | Debt with Equity | Equity Only |
|---|---|---|---|---|
| | | | Amount of Financing | |
| Syncra Systems, Inc. | 01/05/2004 | $0 | $93,531 | $0 |
| Syncra Systems, Inc. | 02/09/2004 | $0 | $77,942 | $0 |
| Syncra Systems, Inc. | 04/09/2004 | $0 | $77,942 | $0 |

I further certify that the information contained in such filings is complete and correct to the best of my knowledge and belief.

Name of Authorized Official (Print) _Paul M. Kelley_

Title _Manager of Zero Stage Capital Associates VI, LLC, its General Partner_

Signature _Paul M. Kelley_ Date _9/14/04_



Page 1 of 1

**Bob Barrows**

| | |
|---|---|
| **From:** | Erica Morris |
| **Sent:** | Tuesday, September 28, 2004 10:07 AM |
| **To:** | 'sbic@sba.gov' |
| **Cc:** | Bob Barrows |

**Subject:** AMENDED DATE: Zero Stage Capital VI, L.P. Lic: 01/71-0372; Form 1031- Syncra Systems

Please note that the attached file replaces this previous submission. The date of actual financing is 9/8/2004; not 9/20/2004.
Thank you,
Erica Morris
Zero Stage Capital
617-876-5355 x110

> -----Original Message-----
> **From:** Erica Morris
> **Sent:** Tuesday, September 28, 2004 9:48 AM
> **To:** sbic@sba.gov'
> **Cc:** Bob Barrows
> **Subject:** Zero Stage Capital VI, L.P. Lic: 01/71-0372; Form 1031- Syncra Systems
>
> Please find the attached form 1031 related to the 9/20/04 Portfolio Financing of Syncra Systems, Inc.
>
> Thank you,
> Erica Morris
> Zero Stage Capital
> 617-876-5355 x110

9/28/2004



| SBA Form 1031 | U.S. Small Business Administratio | OMB No. 3245-078 |
|---|---|---|

# U.S. Small Business Administratio
## Portfolio Financing Report

OMB No. 3245-078
Expiration Date 7/31/2004

**Name of Licensee** ZERO STAGE CAPITAL VI, L.P.                    **License Number** 01/71-0372

## Part A - Small Business Concern Data

1.  Name of Small Concern  Syncra Systems, Inc.                    2. Employer Identification Numbe  04-3408197
3.  Street Address  271 Waverly Oaks Road, Suite 201
4.  City  Waltham            5. State  MA        6. Zip Code  02452            7. County  Middlesex
8.  Small Business FAX  (781) 693-1189            9. Contact Person for FAX  Jon Choate
10. Date Business Established  02/11/1998            11. Form of Business  Corporation
12. NAICS Cod  514191            Industry
13. Percentage of Small Concern (if any) Owned by:  Blacks  0 %        Hispanics  0 %        Native Americans  0 %
                                                Asian Pacific Americans  0 %    Subcontinent Asian Americans  0%
14. Percentage of Small Concern Owned by Women (if any)  0 %    14a. Percentage Owned by Veterans (if any)  0 %

## Part B - Prefinancing Information

Prefinancing Status  Previously Submitted
15. Fiscal Year End Immediately Prior to Date of Financing (Month/Day/Year)
16. Gross Revenue for Prior Fiscal Year                17. After-Tax Profit (Loss) for Prior Fiscal Year
18. Income Taxes for Prior Fiscal Year:  Federal            State            Local
19. Employee Payroll Tax Withholdings for Prior Fiscal Year:  Federal            State and Local
20. Total Assets        21. Net Worth (Deficit)            22. Retained Earnings (Deficit)
23. Number of Employees

## Part C - Financing Information

24. Date of Financing  09/08/2004        25. Date of Disbursement  09/08/2004
26. Purpose of Financing (enter appropriate number(s); 1-10):  1)  1    2)  9    3)  0

  1. Working Capital or Inventory Purchase                6. Acquisition of Machinery and Equipment
  2. Plant Modernization or Leasehold Improvement        7. Land Acquisition or Dwelling Construction on Existing Land
  3. Acquisition of All or Part of an Existing Business    8. Marketing Activities
  4. Consolidation of Obligations or Non-SBIC Debt Refunding    9. Research and Development
  5. New Building or Plant Construction                10. Other

27. Is this the First Financing of this Small Business by the Licensee    No
28. Financing instruments and Applicable Amounts (for participations, include Licensee's portion only):

| Instrument | Amount | Initial Interest Rate(s) | % Actual Ownershi |
|---|---|---|---|
| Loan Only | 0 | 0.00 % | |
| Debt with Equity Features | 0 | 0.00 % | |
| Equity Only | 48,078 | | 18.04 % |
| Total Financing | $48,078 | | |

29. Comments  The Port. Co. originally dated the financing a/o date Amended Cert. of Inc. was actually filed.

## Part D - Transmission Verification

Transmission Date  09/28/2004

°you have leverage or a leverage commitment, file Form 1031A (Portfolio Financing Report Certification) semiannually with your semi-annual valuation report and your year-end Form 468 (Annual Financial Report). If you do not have leverage or a leverage commitment, file Form 1031A annually with your Form 468.

SBA Form 1031 (6/98) Previous Editions Obsolete

SBA Form 1031

# U.S. Small Business Administratio

## Portfolio Financing Report

OMB No. 3245-0078
Expiration Date 7/31/2004

Name of Licensee  ZERO STAGE CAPITAL VI, L.P.

License Number  01/71-0372

## Part A - Small Business Concern Data

1.  Name of Small Concern  Syncra Systems, Inc.

2.  Employer Identification Numbe  04-3408197

3.  Street Address  716 Main Street

4.  City  Waltham

5.  State  MA

6.  Zip Code  02451

7.  County  Middlesex

8.  Small Business FAX  (781) 693-1189

9.  Contact Person for FAX  Jon Choate

10. Date Business Established  02/11/1998

11. Form of Business  Corporation

12. NAICS Cod  514191        Industry

13. Percentage of Small Concern (if any) Owned by:  Blacks  0 %  Hispanics  0 %  Native Americans  0 %  Asian Pacific Americans  0 %  Subcontinent Asian Americans  2%

14. Percentage of Small Concern Owned by Women (if any)  3 %  14a. Percentage Owned by Veterans (if any)  0 %

## Part B - Prefinancing Information

Prefinancing Status  Previously Submitted

15. Fiscal Year End Immediately Prior to Date of Financing (Month/Day/Year)

16. Gross Revenue for Prior Fiscal Year            17. After-Tax Profit  (Loss) for Prior Fiscal Year

18. Income Taxes for Prior Fiscal Year:  Federal                State                Local

19. Employee Payroll Tax Withholdings for Prior Fiscal Year:  Federal                State and Local

20. Total Assets          21. Net Worth (Deficit)            22. Retained Earnings (Deficit)

23. Number of Employees

## Part C - Financing Information

24. Date of Financing  04/09/2004        25. Date of Disbursement  04/09/2004

26. Purpose of Financing (enter appropriate number(s); 1-10):  1)  1    2)  9    3)  0

   1. Working Capital or Inventory Purchase       6. Acquisition of Machinery and Equipment
   2. Plant Modernization or Leasehold Improvement   7. Land Acquisition or Dwelling Construction on Existing Land
   3. Acquisition of All or Part of an Existing Business   8. Marketing Activities
   4. Consolidation of Obligations or Non-SBIC Debt Refunding   9. Research and Development
   5. New Building or Plant Construction         10. Other

27. Is this the First Financing of this Small Business by the Licensee    No

28. Financing instruments and Applicable Amounts (for participations, include Licensee's portion only):

| Instrument | Amount | Initial Interest Rate(s) | % Actual Ownershi |
|---|---|---|---|
| Loan Only | 0 | 0.00 % | |
| Debt with Equity Features | 77,942 | 12.00 % | |
| Equity Only | 0 | | 0.00 % |
| **Total Financing** | **$77,942** | | |

29. Comments

## Part D - Transmission Verification

Transmission Date    04/09/2004

 you have leverage or a leverage commitment, file Form 1031A (Portfolio Financing Report Certification) semiannually with your semi-annual valuation report and your year-end Form 468 (Annual Financial Report).  If you do not have leverage or a leverage commitment, file Form 1031A annually with your Form 468.

SBA Form 1031 (6/98) Previous Editions Obsolete

# U.S. Small Business Administration
## Portfolio Financing Report

OMB No. 3245-0078

Expiration    Date:07/31/2004

Name of Licensee  Zero Stage Capital VI, L.P.

License Number  01/71-0372

## Part A - Small Business Concern Data

1. Name of Small Business  Syncra Systems, Inc     2. Employer Identification Number  04-3408197
3. Street Address  716 Main Street     4. City  Waltham     5. State  MA
6. ZIP Code  02451     7. County  Middlesex     8. Small Business FAX  781-693-1189
9. Contact Person for FAX  Joseph Impellizen     10. Date Business Established  02 / 11 / 1998
11. Form of Business (select one)  1     1) Corporation 2) Partnership 3) Proprietor 4) Limited Liability Company
12. SIC Code  7372     or Industry (if SIC Code is not known)
13. Percentage of Small Concern (if any) Owned by: Blacks  0  % Hispanics  0  % Native Americans  0  %
    Asian Pacific Americans  .2  % Subcontinent Asian Americans  2.2  %
14. Percentage of Small Concern Owned by Women (if any)  3  %

51491

## Part B - Prefinancing Information

Prefinancing Info Status (select one)  2     1) New Information 2) Previously Submitted 3) Acquired Business 4) New Business
15. Fiscal Year End Immediately Prior to Date of Financing (Month/Day/Year)  12 / 31 / 2003
16. Gross Revenue for Prior Fiscal Year $  3564752  17. After-Tax Profit or (Loss) for Prior Fiscal Year $  (6482511
18. Income Taxes for Prior Fiscal Year: Federal $  N/A     State $  N/A     Local $  N/A
19. Employee Payroll Tax Withholdings for Prior Fiscal Year: Federal $  681151     State and Local $  190587
20. Total Assets $  2374134     21. Net Worth (Deficit) $  (9080515
22. Retained Earnings (Deficit) $  (73784420     23. Number of Employees  37.5

## Part C - Financing Information

24. Date of Financing  02 / 09 / 2004     25. Date of Disbursement  02 / 09 / 2004
26. Purpose of Financing (enter appropriate number(s); 1-10)  1  9
    1) Working Capital or Inventory Purchase     6) Acquisition of Machinery and Equipment
    2) Plant Modernization or Leasehold Improvement     7) Land Acquisition or Dwelling Construction
    3) Acquisition of All or Part of an Existing Business     8) Marketing Activities
    4) Consolidation of Obligations or Non-SBIC Debt Refunding     9) Research and Development
    5) New Building or Plant Construction     10) Other (specify)
27. Is this the First Financing of this Small Business by the Licensee?  ☐ Yes  ☑ No
28. Financing Instruments and Applicable Amounts (for participations, include Licensee's portion only):

| Instrument | Amount | Initial Interest Rate(s) | % Ownership |
|---|---|---|---|
| Loan Only | $ | 12 % | |
| Debt with Equity Features | $ 77942 | 12 % | |
| Equity Only | $ | | % |
| Total Financing | $ 77942 | | |

29.  Comments

## Part D - Licensee Verification

Transmission Date  03 / 05 / 2004

PLEASE NOTE: The estimated burden for the completion of this form is 12 minutes per response. You will not be required to respond to this information collection if a valid OMB approval number is not displayed.  If you have questions or comments concerning this estimate or other aspects of this information collection, please contact the U.S. Small Business Administration, Chief, Administrative Information Branch, Washington, D.C. 20416 and/or Office of Management and Budget, Clearance Officer, Paperwork Reduction Project (3245-0078), Washington, D.C. 20503. PLEASE DO NOT SEND FORMS TO OMB.

SBA Form 1031 (3-00) Previous Editions Obsolete

This form was electronically produced by Elite Federal Forms, Inc.

## U.S. Small Business Administration
### Portfolio Financing Report

OMB No. 3245–0078

Expiration Date:07/31/2004

| Name of Licensee Zero Stage Capital VI, L.P. | License Number 01/71-0372 |
|---|---|

### Part A - Small Business Concern Data

1. Name of Small Business Syncra Systems, Inc.          2. Employer Identification Number 04-3408197
3. Street Address 716 Main Street          4. City Waltham          5. State MA
6. ZIP Code 02451          7. County Middlesex          8. Small Business FAX 781-693-1189
9. Contact Person for FAX Joseph Impellizeri          10. Date Business Established 02 / 11 / 1998          5/4/9/
11. Form of Business (select one) 1     1) Corporation 2) Partnership 3) Proprietor 4) Limited Liability Company
12. SIC Code 7372     or Industry (if SIC Code is not known)
13. Percentage of Small Concern (if any) Owned by: Blacks 0 % Hispanics 0 % Native Americans 0 %
          Asian Pacific Americans .2 % Subcontinent Asian Americans 2.4 %
14. Percentage of Small Concern Owned by Women (if any) 3.5 %

### Part B - Prefinancing Information

Prefinancing Info Status (select one) 2     1) New Information 2) Previously Submitted 3) Acquired Business 4) New Business
15. Fiscal Year End Immediately Prior to Date of Financing (Month/Day/Year) 12 / 31 / 02
16. Gross Revenue for Prior Fiscal Year $ 4082224   17. After-Tax Profit or (Loss) for Prior Fiscal Year $ (7665802)
18. Income Taxes for Prior Fiscal Year: Federal $ N/A     State $ N/A     Local $ N/A
19. Employee Payroll Tax Withholdings for Prior Fiscal Year: Federal $ 1004728   State and Local $ 250481
20. Total Assets $ 4242894   21. Net Worth (Deficit) $ (3716907)
22. Retained Earnings (Deficit) $ (63662400)   23. Number of Employees 42

### Part C - Financing Information

24. Date of Financing 01 / 05 / 2004          25. Date of Disbursement 01 / 05 / 2004
26. Purpose of Financing (enter appropriate number(s); 1-10)     1     9
     1) Working Capital or Inventory Purchase          6) Acquisition of Machinery and Equipment
     2) Plant Modernization or Leasehold Improvement          7) Land Acquisition or Dwelling Construction
     3) Acquisition of All or Part of an Existing Business          8) Marketing Activities
     4) Consolidation of Obligations or Non-SBIC Debt Refunding          9) Research and Development
     5) New Building or Plant Construction          10) Other (specify)
27. Is this the First Financing of this Small Business by the Licensee?     [ ] Yes [✓] No
28. Financing Instruments and Applicable Amounts (for participations, include Licensee's portion only):

| Instrument | Amount | Initial Interest Rate(s) | % Ownership |
|---|---|---|---|
| Loan Only | $ | 12 % | |
| Debt with Equity Features | $ 93,531 | 12 % | |
| Equity Only | $ | | % |
| Total Financing | $ 93,531 | | |

29. Comments

### Part D - Licensee Verification

Transmission Date 01 / 05 / 2004

PLEASE NOTE: The estimated burden for the completion of this form is 12 minutes per response. You will not be required to respond to this information collection if a valid OMB approval number is not displayed. If you have questions or comments concerning this estimate or other aspects of this information collection, please contact the U.S. Small Business Administration, Chief, Administrative Information Branch, Washington, D.C. 20416 and/or Office of Management and Budget, Clearance Officer, Paperwork Reduction Project (3245-0078), Washington, D.C. 20503. PLEASE DO NOT SEND FORMS TO OMB.

SBA Form 1031 (3-00) Previous Editions Obsolete
This form was electronically produced by Elite Federal Forms, Inc.

ZERO STAGE CAPITAL ASSOCIATES VI, LLC

ASSIGNMENT OF MEMBERSHIP INTEREST

The undersigned, Gordon B. Baty (the "Assignor"), does hereby assign, convey and transfer onto Baty LLC, a Delaware limited liability company (the "Assignee"), all of Assignor's right, title and interest as a limited liability company member in Zero Stage Capital Associates VI, LLC ("Company"), such interest, after taking into account the August 30, 1999 letter agreement between Assignor and the Company, constituting a 7.4182% fully vested Class A membership interest in said Company (the "Equity Interest"), to have and hold such Equity Interest for itself, its successors and assigns; Assignor hereby grants Assignee the right to become a substituted member in the Company; and Assignor hereby covenants with the Assignee that Assignor is the lawful owner of said Equity Interest, free of all liens and encumbrances, and Assignor has good right to convey the same as aforesaid, and that the Assignor will defend the same against any lawful claims or demands of any other persons. However, nothing in the foregoing shall be interpreted to be an assignment of Assignor's position as a Manager of the Company or shall constitute the Assignee as a substituted member of the Company until and unless all of the Managers shall have consented to such substitution in accordance with the Company's governing instruments.

IN WITNESS WHEREOF, the undersigned Assignor has hereunto set his hand as of the 1st day of February, 2000.

ASSIGNOR:

_____
Gordon B. Baty

_____
Tax ID, Baty LLC

In the Presence of

_____

NOTICE: The signature(s) to this assignment must correspond with the name as indicated in the relevant ownership agreement in every particular, without alteration or enlargement.

<u>AGREEMENT OF ASSIGNEE</u>

Pursuant to the Operating Agreement of Zero Stage Capital Associates VI, LLC (the "Company"), the undersigned Baty LLC, a Delaware limited liability company, as the assignee of all of Gordon B. Baty's right, title and interest in a Class A membership interest in the Company described in the foregoing Assignment of Membership Interest, hereby:

(i)     agrees to pay to the Company all costs and expenses incurred in connection with such substitution, including specifically, without limitation, costs incurred in amending the Operating Agreement and, if necessary, the Company's Certificate of Organization;

(ii)     agrees to execute and deliver such instruments, in form and substance satisfactory to the Principal Manager, as the Principal Manager may deem necessary or desirable to effect such substitution; and

(iii)     confirms its agreement to be bound by all of the terms and provisions of the Operating Agreement, dated as of October 1, 1999, as it may be amended from time to time.

IN WITNESS WHEREOF, the undersigned Assignee has hereunto set his hand as of the 1st day of October, 2000.

ASSIGNEE:

_____
Gordon B. Baty, Managing Member

In the Presence of

_____

NOTICE:  The signature(s) to this assignment must correspond with the name as indicated in the relevant ownership agreement in every particular, without alteration or enlargement.

# Exhibit H
## Zero Stage Capital VI, L.P.
## Selected Portfolio Company Summary for the SBA - 3rd quarter 2004

| Company | Company Update | Positive Devel / Challenges | Exit Strategy | Cash On Hand 5/02/2004 | Gross Monthly Cash Burn | Net Monthly Cash Burn | Cash Flow Positive | Months remaining w existing w no additional financing | Time of C Break | Cash Paid |
|---|---|---|---|---|---|---|---|---|---|---|
| xis, Inc. (formerly eMed, Inc.) [1] | - A publicly traded company | - The company achieved profitability in Q3 amidst several capital constraints to accelerate a 3rd quarter customer base. - The company drew an additional sales resource from an industry competitor. Axis continues to win new accounts. - Cash flow has been a recent concern, but the company has managed to invest in financial obligation on a timely basis, while growing their accounts receivable turn. - The company launched Price Risk, a new product offering which has attracted several new customers including Cary Oil and Shipley Energy. - The company has been upgrading its operating technology to a Microsoft.net architecture. This has been a requirement and benefit for numerous accounts. | - The company recently presented to the Chicago Mercantile Exchange, regarding the creation of a futures contract to be offered and settled based on Axis eXtend price data. - Axis continues to be recognized as an industry leader in providing unbiased and accurate pricing. - Axis continues to receive unsolicited offers to purchase the business. Discussions with McGraw Hill are ongoing and are in discussions with other players in the petroleum and pricing business. - The management has submitted an information request to begin formalized due diligence of the company. | $28K | | Cash Flow Positive | Cash Flow Positive | Cash Flow Positive | | |
| | | | | | | | | | | |
| | Third quarter revenue results put the company on target to achieve the Board's objectives for 2004, while sustaining over $2 million in cash. No additional cash will be needed going forward. Management's plan assumes building a base from current trends. - implemented a customer outreach program to all five platforms as well as building a strategic service business that will set the company forward to new levels of success to be highly competitive but slightly growing marketplace. She has put into place a new business model plan for the remainder of '04 which is being executed effectively and has established an '05 plan which anticipates a successful exit by the end of the second quarter of 2005. | The Company's Board of Directors has given its new CEO, Annette Tonti - former founder of Bluestride - the responsibility for stabilizing the company after the departure of former CEO (former CEO). Further, Ms. Tonti has been given the responsibility for | $3.3M | $927K | | | | | | |
| | | | | | | | | | | |
| ital Angel Corporation (X) | A publicly traded company | - Reduced annual payroll by $450,000 without sacrificing quality of service. - Refocused business strategy, reflecting the strategic shift from marketing and sales efforts and initiated a performance based culture. - Relationship building with media networks focusing on multi-based interactive marketing platforms. | Since the change in company direction and management which was initiated in July of this year, there have been several significant accomplishments in the areas of stabilization and rebout. | $110K | | | | | | |

ZERO
STAGE
CAPITAL

# Zero Stage Capital VI, L.P.
## Selected Portfolio Company Summary for the SBA - 3rd quarter 2004

| Company | Company Update | Positive News/ Challenges | Exit Strategy | Cash On Hand 9/30/2004 | Gross Monthly Cash Burn | Net Monthly Cash Burn | Months remaining assuming no additional financing | Trip of Bus |
|---|---|---|---|---|---|---|---|---|
| First Service Networks | - FSN completed the first nine months of 2004 with revenue of $15.2 million, up 44% over the same period in 2003. Through September budget, but only 9% behind the June budget. Through September 2004, EBITDA was negative $4.1 million, 16% below the 2004 budget, but 83% above the same period for 2003. FSN has continued to maintain its budgeted cash use under reduced revenue. <br>- FSN continues to require additional funding. The company received $800K during the 3rd quarter. $1M has been funded through the middle of October 2004 and additional funding will be required through the middle of 2005. Assuming the required funding would likely come from the draw down of $3M, the required funding would be approximately $2.5M ($3.5M less the $1.0M funded to date). | - Dan Taylor joined FSN in late August 2004 as VP of Sales and Marketing. FSN continues to grow its customer base by building on FSN's large account activities which enables such as Fannie Mae, USPS and CompUSA. As of the end of 3rd quarter 2004, FSN has 14.0K equivalent full sites, a 28% increase over year-end 2003, but 2.4% sites behind the budget of 17.2K sites. <br>- The technology platform is virtually complete. A final major release for managing Preventative Maintenance was ready in late June and is expected to be fully operational through several contractors. Over 70% of the sites are now being serviced through the new system, which should dramatically improve the efficiency of dispatching and invoicing these services. <br>- The company appears close to resolving its dispute with Benson, the former owner of the company. | The company is in advanced stages of negotiations to acquire a similar company which is much larger and is profitable. | $668K | $2.3M | $491K | 1.03 | 3rd |
| eMed Technologies | - eMed Technologies was acquired on October 6, 2004 by Cedara Software Corporation (NASDAQ: CDSW) in a $48 million all-cash transaction. | Proceeds to Zero Stage VI are $1.9M, with $250K placed in escrow | | | | | | |
| syntheticFan | - Furniture Fan recognized revenue of $100,000 and a net loss of $46,000 since the quarter it was worked its way through a summer slump. <br>- The company has begun to market its new website to major manufacturers with a positive response. | - Management believes that it can achieve positive EBIT in the fourth quarter and it can continue to grow the business thereafter. | The initial goal is to reach profitability. Once profitability is achieved, the next goal is to increase revenue which will make the company attractive to larger advertising companies | Potential resale in 2005. | $5.1M | $2.3M | $27.4K | 13.0 | 2nd/ 3rd |
| HealthVision | - The company released Mobile HealthVision during the quarter which enables physicians to have access to patient information while making hospital rounds. <br>- Quarterly revenue is on track with budgeted expectation. | - HealthVision is well positioned to participate in government-based e-health initiatives coming from Washington, D.C. <br>- Continued improvements in operating margin are bringing the company closer to quarterly profitability, which is expected by the end of 2004. <br>- The company has begun to examine a number of strategic options. | | | $376K | $406K | None | End quart |

**Zero Stage Capital VI, L.P.**

**Selected Portfolio Company Summary for the SEA - 3rd quarter 2004**

| Company | Positive Update | Positive News/ Challenges | Exit Strategy | Cash On Hand 9/30/2004 | Gross Monthly Cash Burn | Net Monthly Cash Burn | Cash Flow Positive | Months remaining assuming no additional financing |
|---|---|---|---|---|---|---|---|---|
| Intersense | | | | $2.8M | $335K | | Cash Flow Positive | — |
| Jenzabar | | | | $20.6M | $4.3M | | Cash Flow Positive | 1.4 |
| LiveWave | | | | $92K | $58K | $66K | | 1F |

Zero Stage Capital VI, L.P.
Selected Portfolio Company Summary for the SBA - 3rd quarter 2004

| Company | Company Update | Positive News/ Challenges | Exit Strategy | Cash "On Hand" 9/30/2004 | Gross Monthly Cash Burn | Net Monthly Cash Burn | Months remaining assuming no additional financing | Time of Bre... |
|---|---|---|---|---|---|---|---|---|
| Nekey | · Nekey voted the third quarter $3.0 million and a revenue backlog of $3.0 million in contract bookings of $3.0 million and a revenue backlog of $535,000. The company is on track to take advantage of retail market · As of September 30, 2004, cash was $3.17 million. $1.3 million increase in the 2004 plan. · Revenue for the nine months December of 2005. These million and total expenses were $1.7 lower than the 2004 plan. The lower expenses are due in part to the lag in investment in product development. · Current customers include BMS, Target, JC Penney, PETCO and SAKS. | · Nekey has recently entered an agreement to a more robust scenario enhancing its position in the market. · Nekey has successfully targeted the retail market and expects that its pipeline will continue to grow with more of the Retail 600 for the remainder of 2004. Continued success depends on the ability to develop and convert ongoing pilot programs and to keep lower costs for retailers and an enhanced shopping experience for the customers. | Merger/acquisition with a complementary company (allow for technology or market resources) in order to expand its operational pace. | $3.4M | $551K | $320K | 16.6 | 4th |
| Soreus | · Soreus completed its Zero Stage did not participate in the refinancing and retains common shares comprising approximately 1.2% of the company. | · Soreus has approximately $191,000 in cash. At the end of the third quarter, the company had a net loss of $150,000. · Soreus is projecting approximately $50,000-$100,000 in hardware sales in the fourth quarter and is beginning to ramp up its service sales. | Soreus has restated their financial situation and will have an opportunity to be acquired by a larger firm once it proves out its new model and achieve profitability. | $191K | $551K | $470K | 0.4 | 2* |
| Sofeics | · Generally promising "proof of principle" data on Spheranzion CR delivery. Company in process of closing a $35MM Series C equity financing at $15MM pre-money (down round from the $24MM post-money Series B). | · Continuing to negotiate two additional collaborations in the area of oral delivery. Company is continuing to develop and validate its technology platform collaborations and initial human studies. | Trade Sale or IPO: The Company is continuing to develop and validate its technology platform collaborations and initial human studies. | $2.1M | $331K | $341K | 6.3 | 2* |
| Syncra Systems | · Syncra has been sold to Flextix, a major public company which provides software for retailers and manufacturers for $4.7 million in cash. · Zero Stage invested $40,000 as part of a bridge financing round to provide the company with sufficient cash to effect this transaction. · Zero Stage will receive approximately $44,000 over the next eighteen months as its pro-rata portion of the transaction. | | | | | | | |

ZERO STAGE CAPITAL

# Zero Stage Capital VI, LP.
## Selected Portfolio Company Summary for the SBA - 3rd quarter 2004

| Company | Company Update | Positive/Newel Challenges | Exit Strategy | Cash On Hand 9/30/2004 | Gross Monthly Cash Burn | Net Monthly Cash Burn | Months remaining assuming no additional financing |
|---|---|---|---|---|---|---|---|
| VaiCell | • Vitacell had a significant court ruling in its favor over its dispute with Pharmamann. <br> • The company has moved into new consolidated space at 245 First Street in Cambridge. <br> • Vitacell is continuing to develop its protein banking product line. <br> • Vitacell is seeking improvement in its capital market and will be looking in order to preserve cash and has more than $32 million remaining. | • The company is growing and is on track to achieve record revenue in 2004. | IPO | $32.3M | $448K | $1.0M | 21.7 |
| Worldwinner.com | • Worldwinner completed its third quarter ahead of plan, with cash entry fees of $10.1 million transaction revenue or $2.3 million and EBITDA of ($224,000). <br> • October transaction revenue was a record $559,000, 19% ahead of budget and up 49% from the prior year. <br> • Worldwinner acquired eEdge and is in the process of assimilating its site. | • The company expects to be positive for the rest of the year, as it continues for WorldWinner, an opportunity to refine its product and business model. <br> • WorldWinner has solidified its position and now plans to concentrate on smaller competitors within the skilled gaming space. To this end, WW has recently acquired eEdge, one of the leading skilled-based bridge sites. | IPO or merger. There presently exists an opportunity ... | $16.4M | $886K | $715K | 30.8 |

Note:
1) Axxio: The decrease in Company Exit Valuation is due to timing of the sale of the company; figures reflected contemplate a sale by the end of the second quarter of 2005.
2) Headnotour: Amount ZSC VI Receives = ZSC VI's share of proceeds reflects its position behind a $43M preference.
3) Spherics: The significant change in "Amount ZSC VI Receive" is in large part a result of the dilutive financing being contemplated ($235MM at $15 nominal pre-money valuation).

Exhibit I

**Zero Stage Capital VI Limited Partnership**
**Legal Expense through September 30, 2004.**

| Firm | Amount | Description | Issues | Outcome |
|---|---|---|---|---|
| Brown, Rudnick Berlack Israels LLP | $8,959.92 | Media Site | Sale to Sonic Foundry | completed |
| Israel Silberman PC | $6,408.43 | Reshate | Shut down of company and transfer of IP to ZSC entity | completed |
| Israel Silberman PC | $284.68 | Legal letters-2003 audit | 2003 Audit letters | completed |
| Nixon Peabody | $2,892.33 | Syncra | financing | completed |
| Israel Silberman PC | $11,835.27 | Reshate | Shut down of company and attempted sale of IP | shut down completed; no value in IP |
| Israel Silberman PC | $394.95 | Axxis | Management carve-out issues | Completed agreement |
| Israel Silberman PC | $142.02 | Services for 11/03-Powercell | | |
| Nixon Peabody | $1,395.00 | Furniture Fan | Bridge Loan | completed |
| Nixon Peabody | $2,103.00 | Syncra | Review financing documents | completed |
| Nixon Peabody | $182.94 | ViaCell | | |
| Nixon Peabody | $1,451.14 | Gazelle | Management changes | completed |
| Nixon Peabody | $1,810.83 | First Service Networks | | |
| Day, Berry & Howard LLP | $3,800.00 | ZSC VI Regulatory Matters | Regulatory matters | pending |
| Pepper Hamilton LLP | $228.97 | Reshate | | |
| Gary Cruickshank | $7,970.70 | Axxis | Management carve-out issues; reorganization of company | Completed |
| Israel Silberman/McNamara, Koenig & McCarthy | $40,058.63 | Reshate | Shut down of company and transfer of IP to ZSC entity | completed |
| Israel Silberman/McNamara, Koenig & McCarthy | $346.50 | Bluestreak | Advice on conflicts in old management | Management replaced |
| Griesinger, Tighe & Maffei, LLP | $2,520.98 | Reshate | Discuss possible litigation against management | completed |
| Nixon Peabody | $1,183.50 | Apex | Settlement with banker | CEO removed |
| Nixon Peabody | $4,095.00 | Jenzabaar | | |
| Nixon Peabody | $510.25 | FlaCell | | |
| Nixon Peabody | $620.49 | First Service Networks | | |
| Nixon Peabody | $165.00 | Furniture Fan | | |
| Nixon Peabody | $436.42 | Legal letters-2003 audit | 2003 Audit letters | completed |
| Kirkpatrick & Lockhart | $5,206.25 | Attention to SBA Matters | | |
| Nixon Peabody | $265.88 | Gazelle | Management changes | completed |
| Nixon Peabody | $269.38 | Legal letters-2003 audit | | |
| Francis Conte | $2,500.00 | Apex | IP right issue | completed |
| McNamara, Koenig and McCarthy | $3,249.26 | Livewave | Debt financing; management incentive agreement | completed |
| McNamara, Koenig and McCarthy | $378.00 | Furniture Fan | | |
| McNamara, Koenig and McCarthy | $13,489.29 | Digital Angel | Sale of Shares, board representation | In process |
| McNamara, Koenig and McCarthy | $400.07 | Sonexis | Work on dissolution | pending |
| McNamara, Koenig and McCarthy | $148.97 | Gazelle | Sale of company | completed |
| McNamara, Koenig and McCarthy | $661.50 | Syncra | Settlement of litigation from former CEO | completed |
| Outerlink Corporation | $27,119.11 | | | completed |
| Brown, Rudnick, Freed & Gesmer | $592.00 | Apex Medical | Sale of company | |
| Seyfarth Shaw | $4,647.76 | Reshate | | |
| Nixon Peabody | $4,032.90 | Konarka and Syncra | Note financing | completed |
| | $160,965.32 | | | |

Ex J.

## Bob Barrows

| | |
|---|---|
| From: | Bob Barrows |
| Sent: | Wednesday, September 08, 2004 12:36 PM |
| To: | 'elaine.hruschka@sba.gov' |
| Cc: | Bic Stevens |
| Subject: | Syncra Add-On Investment |

Elaine,

Wanted to let you know that the actual amount of the investment is
$ 48,077.74 and we plan to have ZSC VI fund today.

Thank you for your assistance.

Bob Barrows
Chief Financial Officer
Zero Stage Capital
101 Main Street
Cambridge, Ma. 02142
Tel: (617) 876-5355 X 105
Fax:(617) 876-1248
bbarrows@zerostage.com


-----Original Message-----
From: Hruschka, Elaine [mailto:elaine.hruschka@sba.gov]
Sent: Friday, July 30, 2004 2:12 PM
To: Bic Stevens
Cc: Hruschka, Elaine
Subject: RE: I put it in the body of the email

The Syncra add-on in the amount of $48,000 has been approved by SBA.

Elaine Hruschka
Financial Analyst
Office of SBIC Liquidation
Tel. (202) 205-3645
Fax (202) 205-6957

-----Original Message-----
From: Bic Stevens [mailto:BStevens@zerostage.com]
Sent: Friday, July 30, 2004 10:10 AM
To: elaine.hruschka@sba.gov
Subject: FW: I put it in the body of the email


Here it is in text form

Bic Stevens
Managing Director
Zero Stage Capital
101 Main Street
Cambridge, MA 02142
617-876-5355 X108

-----Original Message-----
From: Jeffrey Stamen [mailto:JStamen@syncra.com]
Sent: Friday, July 30, 2004 10:07 AM
To: Bic Stevens
Subject: I put it in the body of the email

1

REQUEST FOR APPROVAL FOR ADD ON INVESTMENT

SBIC NAME:  Zero Stage Capital VI, L.P.

SBC NAME:  Syncra Systems, Inc.

HOW MUCH MONEY IS BEING REQUESTED:  $48,000

DATE REQUIRED:  7/31/04 ?

WILL SBA NEED TO ADVANCE THE MONEY TO THE SBIC FOR THE FUNDING?: YES ?

IF THE SBA NEEDS TO ADVANCE THE MONEY, WILL THE MONEY BE
PRE (10/1/91) OR POST BLIF?: N/A

IS OVERLINE APPROVAL NEEDED?: ??

WHAT WILL THE MONEY BE USED FOR?: (Summarize here- attach justification memo to this
request) TO INVEST ZERO'S PRO-RATA SHARE OF $300,000 IN ADDITIONAL BRIDGE FINANCING WHICH
IS NEEDED TO PROVIDE SYNCRA SYSTEMS, INC. WITH SUFFICIENT WORKING CAPITAL TO CONTINUE
OPERATING WHILE AN ANTICIPATED SALE OF THE COMPANY IS CONSUMMATED.

WHAT HAPPENS IF THE REQUEST IS GRANTED/DENIED?: (Summarize here- detail in attached Memo)
IF GRANTED, IT IS FELT THAT ZERO STAGE WILL BE ABLE TO MAKE MOOT THE ISSUE RAISED BY PRISM
VENTURES OF PREFERENTIAL TREATMENT BEING GRANTED TO ZERO STAGE DURING THE SCHEDULED
RECAPITALIZATION OF SYNCRA SYSTEMS DESPITE ZERO'S NON-PARTICIPATION TO DATE IN THE
ADDITIONAL BRIDGE FINANCING PROVIDED TO SYNCRA.

IF ZERO STAGE PARTICIPATES IN THE ADDITIONAL BRIDGE FINANCING, THE POTENTIAL RETURN ON THE
REQUESTED $48,000 IS CONSERVATIVELY ESTIMATED AT OVER 62% IN A MATTER OF ONLY A 2-3
MONTHS, COMPUTED AS FOLLOWS:

|  | Conservative | Minimum |
|---|---|---|
| Needed | | |
| Estimated sale prices of Syncra Systems (see note 1) | | |
| $5,000,000 | $3,210,000 | |
| Estimated deductions from the proceeds (see note 2) | | |
| ($480,000) | ($426,300) | |
| Estimated net sale proceeds | $4,520,000 | |
| $2,783,700 | | |
| Investors portion of proceeds (see note 3) | 75% | |
| $3,390,000 | $2,087,775 | |
| Zero Stage Capital's portion of investor proceeds, without requested | | |
| $48,000 (see note 4) | $532,230 | $327,781 |
| Zero Stage Capital's portion of investor proceeds, with requested | | |
| $48,000 (see note 4) | $610,200 | $375,800 |
| Incremental proceeds generated by $48,000 investment | $77,970 | |
| $48,019 | | |
| Estimated return on $48,000 investment | 62.44% | |
| 0.04% | | |

Note 1    Figure based on a prior offer of $3-4MM plus equity. With the
equity piece now having been
         stripped out, it is felt that $5MM is the most conservative
offer that is likely to be received. This $5MM figure
         represents just under 1.5 times trailing 12 months revenue (as
of 3/31/04) and nearly a 75% discount off of

2

Syncra's total cost to develop the the software technology being sold.

"Minimum" scenario is imputed price needed for the $48,000 incremental investment to be recouped in full.

Note 2    Deductions include: investment bankers' commission and settlement of all remaining liabilities of the company,
including severance and transition payments to employees not retained post-sale (assumes the sale is
structured as an asset sale).

Note 3    25% of proceeds carved out for employees.

Note 4    Zero's stake would be 15.7%, if the requested $48,000 is not available to invest.
Zero's stake would be `18%, if the requested $48,000 is invested.

IF DENIED, THERE IS A CHANCE THAT LEGAL ISSUES RAISED BY PRISM VENTURES MIGHT DELAY THE SALE OF THE COMPANY LONG ENOUGH FOR THE COMPANY TO FAIL IN THE INTERIM AND, THUS, PUT ZERO STAGE'S CURRENT POSITION IN THE RECAPITALIZED COMPANY AT RISK.

LOAN #:

3

**Ex. K**

## U.S. Small Business Administration

### Portfolio Financing Report

OMB No. 3245–0078

Expiration Date 04/30/01

Name of Licensee Zero Stage Capital VI, L.P. | License Number 01/71-0372

### Part A -- Small Business Concern Data

1. Name of Small Concern  FurnitureFan, Inc. | 2. Employer Identification Number  02-0513032
3. Street Address 142 North Road | 4. City Sudbury | 5. State MA | 6. ZIP Code 01776
7. County  Middlesex | 8. Date Business Established  11/9/1999 | 9. SIC Code 8724

NAICS 6 digit

51491

10. Form of Business (enter appropriate number; 1–4)  1
   1) Corporation 2) Partnership 3) Proprietor 4) Limited Liability Company
11. Percentage of Small Concern (if any) Owned by:

   Blacks _____ % Hispanics _____ % Native Americans _____ %

   Asian Pacific Americans _____ % Subcontinent Asian Americans _____ %
12. Percentage of Small Concern Owned by Women (if any) _____ %

### Part B -- Small Business Concern Prefinancing Information

13. Fiscal Year End Immediately Prior to Date of Financing (Month/Day/Year)  12/31/2002
14. Gross Revenue for Prior Fiscal Year $  720,614 | 15. After–Tax Profit or (Loss) for Prior Fiscal Year $  (2,258,897)
16. Income Taxes for Prior Fiscal Year: Federal $  0 | State $  456 | Local $ 0
17. Employee Payroll Tax Withholdings for Prior Fiscal Year: Federal $  184,535 | State and Local $  54,063
18. Total Assets $  485,935 | 19. Net Worth (Deficit) $  (485,935) | 20. Retained Earnings (Deficit) $  0
   Borrowings from Other Sources: Short–term $ _____ Long–term $ 1,175,000 | Total $ 1,175,000
22. Number of Employees  14

### Part C -- Financing Information

23. Date of Financing  6/10/03  24. Date of Disbursement  6/10/03
25. Purpose of Financing (enter appropriate number(s); 1–10)  1 | 2 | 3

   1) Working Capital or Inventory Purchase
   2) Marketing Activities
   3) Research and Development
   4) Acquisition of All or Part of an Existing Business
   5) Consolidation of Obligations or Non–SBIC Debt Refunding
   6) New Building or Plant Construction
   7) Land Acquisition or Dwelling Construction on Existing Land
   8) Plant Modernization or Leasehold Improvement
   9) Acquisition of Machinery and Equipment
   10) Other (specify) _____

26. Is this the First Financing of this Small Concern by the Licensee? ☐ Yes ☑ No
27. Financing Instruments and Applicable Amounts (for participations, include Licensee's portion only):

| Instrument | Amount | Initial Interest Rate(s) | % Ownership |
|---|---|---|---|
| Loan Only | $ | % | |
| Debt with Equity Features | $ 215,000 | 12 % | |
| Equity Only | $ | | % |
| Total Financing | $ | | |

### Part D -- Licensee Verification

I hereby certify that the information contained above is complete and correct to the best of my knowledge and belief.

Name  Lois Desaulniers

CONTROLLER

Signature  _Lois Desaulniers_  Date  6/9/03

SBA Form 1031 (3-95) Previous Editions Obsolete
This form was electronically produced by Elite Federal Forms, Inc.

01/29/2003 14:34 FAX 9783712533          FURNITUREFAN                    ☑ 012

# U.S. Small Business Administration
## Portfolio Financing Report

OMB No. 3245–0078
Expiration Date 04/30/01

**Name of Licensee** Zero Stage Capital VI, L.P.          **License Number** 01/71-0372

## Part A – Small Business Concern Data

1. Name of Small Concern  FurnitureFan, Inc.          2. Employer Identification Number  02-0513032
3. Street Address  142 North Road          4. City  Sudbury          5. State  MA    6. ZIP Code  01776
7. County  Middlesex          8. Date Business Established  11/9/1999          9. SIC Code  8742
10. Form of Business (enter appropriate number; 1–4)  1
   1) Corporation  2) Partnership  3) Proprietor  4) Limited Liability Company
11. Percentage of Small Concern (if any) Owned by:
   Blacks _____ % Hispanics _____ % Native Americans _____ %
   Asian Pacific Americans _____ % Subcontinent Asian Americans _____ %
12. Percentage of Small Concern Owned by Women (if any) _____ %

## Part B – Small Business Concern Prefinancing Information

13. Fiscal Year End Immediately Prior to Date of Financing (Month/Day/Year)  12/31/2002
14. Gross Revenue for Prior Fiscal Year $  720,614    15. After–Tax Profit or (Loss) for Prior Fiscal Year $  (2,258,897)
16. Income Taxes for Prior Fiscal Year:  Federal $  0    State $  456    Local $ 0
17. Employee Payroll Tax Withholdings for Prior Fiscal Year: Federal $  184,535    State and Local $  54,063
18. Total Assets $  485,935   19. Net Worth (Deficit) $  (485,935)   20. Retained Earnings (Deficit) $  0
21. Borrowings from Other Sources: Short–term $ _____  Long–term $ 1,250,000   Total $ 1,250,000
22. Number of Employees  13

## Part C – Financing Information  2/4/03                         2/4/03

23. Date of Financing  1/31/03    24. Date of Disbursement  1/31/03
25. Purpose of Financing (enter appropriate number(s); 1–10)  1    2    3
   1) Working Capital or Inventory Purchase          6) New Building or Plant Construction
   2) Marketing Activities          7) Land Acquisition or Dwelling Construction on Existing Land
   3) Research and Development          8) Plant Modernization or Leasehold Improvement
   4) Acquisition of All or Part of an Existing Business          9) Acquisition of Machinery and Equipment
   5) Consolidation of Obligations or Non–SBIC Debt Refunding          10) Other (specify)

26. Is this the First Financing of this Small Concern by the Licensee?  ☐ Yes  ☑ No
27. Financing Instruments and Applicable Amounts (for participations, include Licensee's portion only):

| Instrument | Amount | Initial Interest Rate(s) | % Ownership |
|---|---|---|---|
| Loan Only | $ | % | |
| Debt with Equity Features | $ 150,000 | 12 % | |
| Equity Only | $ | | % |
| Total Financing | $ 150,000 | | |

## Part D -- Licensee Verification

I hereby certify that the information contained above is complete and correct to the best of my knowledge and belief.
Name  Lois Desaulniers
Title  Controller
Signature  *Lois Desaulniers*          Date

SBA Form 1031 (3-95) Previous Editions Obsolete
This form was electronically produced by Elite Federal Forms, Inc.

*Exhibit L*
# ZSC VI Cash Requirements

| | | |
|---|---:|---:|
| ZSC VI Cash at 9/30 | | $ 422,504.00 |
| Initial tranche from e-Med sale | 749,492.38 | |
| Initial Paydown to MBDC | (505,495.03) | |
| Remaining Proceeds Available | | 243,997.35 |
| **Estimated Cash Available** | | **$ 666,501.35** |
| | | |
| | | **$$$** |
| October-December 2004 MBDC P&I | | 24,586.92 |
| Actual October, November Legal | | 25,974.35 |
| Actual Insurance-October, November | | 7,386.18 |
| Actual Consulting-October, November | | 25,731.01 |
| Actual Printing & Mailing | | 4,522.15 |
| | | |
| Actual Expenses | | 88,200.61 |
| 12/04 Legal | | 15,000.00 |
| 12/04 Consulting | | 9,000.00 |
| 12/04 Insurance+10/03-9/04 Insurance | | 71,243.09 |
| Third Quarter Report-Printing & Mailing | | 4,522.15 |
| Q4, 2004 Cash Requirements | | 187,965.85 |
| | | |
| Estimated 2005 Cash Requirements | | |
| MBDC Payments | | 76,171.25 |
| 2004 PWC Audit | | 35,000.00 |
| 2004 PWC Tax Returns | | 15,000.00 |
| 2004 SBA Audit | | 15,000.00 |
| 2005 Legal | | 190,800.00 |
| 2005 Consulting | | 108,000.00 |
| 2005 Insurance | | 44,317.08 |
| 2005 Printing & Mailing | | 19,173.92 |
| 2005 Cash Requirements | | 503,462.25 |
| | | |
| **Total 2004 and 2005 Cash Requirements** | | **$ 691,428.10** |
| **Cash Shortfall** | | **$ 24,926.75** |
| | | |
| **Remaining Principal Balance Due MBDC@12/31/05** | | **$ 436,359.53** |

# EXHIBIT H – Tab 15

## ZERO STAGE CAPITAL FUND VI

**Proceeds From Fund VI Companies After the Fund Was Placed into the SBA Office of Liquidation and, Later, SBA Receivership[1]**

| Company | Date of Sale | Actual/Potential Sale Proceeds |
|---|---|---|
| Digital Angel (Outerlink) | January 27, 2005 | $1,315,169.64[2] |
| | July 2005 | $307,272.00[3] |
| Livewave | October 28, 2005 | $8,130,965.57[4] |
| ViaCell | July 2005 | $5,153,335.91[5] |
| | Total: | $14,906,743.12 |

**Note:** There are additional assets in the Fund. These include roughly 1,000 shares of Amgen (all of which should be released from escrow by the end of 2006[6]) from its acquisition of Kinetix in 2000, and equity interests in Bluestreak, HealthVision, Netkey, Powercell, Spherics, and Worldwinner. These six companies are operating concerns and may, if sold, return additional capital to the SBA.

---

[1] The Fund was notified that it had been moved into the Office of Liquidation by way of letter dated December 19, 2003 (*See* J. Koenig memo of 1.11.06). At a meeting with Tom Morris on March 4, 2005, Zero Stage was notified that the Fund would be placed into receivership, which it was, with Zero Stage's consent, on May 4, 2005 (*See* J. Koenig memo of 1.11.06).

[2] Sale of 297,560 shares of Digital Angel at $4.65/share (*See* Fund VI Rollforward).

[3] Pursuant to the acquisition agreement (January 22, 2004), 74,400 shares were held in escrow until July of 2005 (Info. from Adam Miles of Jefferies). Fund VII sold its shares at that time for roughly $4.13/share (Info. from Betsy Story). The number above assumes that the SBA sold all of Fund VI's shares at that price. The per share price as of 1.10.06 is roughly $3.12. If the SBA is still holding these shares, the value is slightly more than $232,000. The stock's low price following the escrow release was $2.31 in November. It should be noted that Zero Stage offered the SBA to have ZSC's broker sell its Fund VII shares with the SBA's Digital Angel and ViaCell shares, but the SBA declined.

[4] $1,595,013.07 will be held in escrow until October, 2007 pursuant to the acquisition agreement (October 28, 2005) (Info. from Peter Mottur, LiveWave exit spreadsheet). The total number was further reduced by roughly $60,000 (Fund VI's proportional share of the money paid to the SBA to cover its expenses as escrow agent) (Info. from Peter Mottur, LiveWave exit spreadsheet).

[5] ViaCell went public on 1.21.05 (*See* Fund VI Rollforward). There was a 6-month lock-up during which Zero Stage's shares could not be sold (**Ed, please confirm**). Funds V and VII sold all of their shares following the lock-up for roughly $7.73/share (Info. from Betsy Story). The number above assumes that the SBA sold all of Fund VI's shares at that price. The per share price as of 1.10.06 is roughly $5.96. If the SBA is still holding these shares, the value is slightly more than $3,973,000. The stock's low price since July was $4.66 in October.

[6] *See* Fund VI Rollforward.

**EXHIBIT H – Tab 16**

# McNAMARA KOENIG & McCARTHY, PC

## ATTORNEYS AT LAW

Telephone (781) 431-1700
www.mkmlegal.com

65 WILLIAM STREET
WELLESLEY, MASSACHUSETTS 02481

Facsimile (781) 237-8120

April 27, 2005

Thomas G. Morris, Director
Investment Division
Office of SBIC Liquidation
U.S. Small Business Administration
409 3rd Street, S.W., Suite 6300
Washington, DC 20416

Dear Mr. Morris:

Enclosed, please find the Agreed Motion Under 15 U.S.C. §687c and the Consent Order of Receivership signed by Paul Kelley.

Also enclosed, please find for your consideration the management expense analysis prepared by Zero Stage Capital Company, Inc. for the period commencing January 1, 2002 and ending April 26, 2005. Even though Zero Stage, by its letter dated August 22, 2003, volunteered to defer management fees starting with the third quarter of 2003 and going forward, in actuality, Zero Stage has deferred all management fees accrued since January 1, 2002 that were unpaid on August 22, 2003.

The analysis shows the total expenses incurred by Zero Stage during that period, the determination of which of those expenses are related to fund activities, and the allocation to Fund VI of those fund-related expenses. The analysis includes two sheets detailing the expenses, one sheet for the calendar years 2002 through 2004 and the second sheet for 2005 to date, and two additional sheets detailing the salaries and wages during those same two periods. The expense sheet for 2005 includes a grand total by expense category.

As you will see, the percent of Zero Stage expenses allocated to Fund VI increases generally over the period. These allocations were prepared by Zero Stage, with the input of all management, outside counsel, and review by Zero Stage's independent auditors, Feeley & Driscoll, P.C., whose report is also enclosed

The issues with Fund VI were increasingly resource and time consuming over the period 2002-2005. Zero Stage deployed all human resources from across the company to deal with Fund VI. In addition, numerous external and internal resources had to be brought to bear to clarify, quantify, and remedy the problems with the Fund VI portfolio. During this entire period very minimal time and effort was expended on the other, non-problematic, affiliated funds, namely, Fund V, Fund VII and its affiliates, and Penn Venture Partners. Thus, at most times during the period, well in excess of half, and at times close to all, of the firm's energies and

McNamara Koenig & McCarthy, PC

<div style="text-align: right">

Thomas G. Morris, Director
April 27, 2005
Page 2

</div>

resources were devoted to Fund VI. Certainly, third party expenses, such as consultants and attorneys, were very much skewed toward Fund VI.

To calculate third-party expenses eligible for reimbursement, Zero Stage has divided its expenses into 4 categories:

Category A:    expenses paid to third parties other than Zero Stage employees.

Category B:    indirect employment expenses, to the extent not included in Salaries & Wages.

Category C:    salaries and wages to Zero Stage employees. This Category has been further subdivided into 5 categories:

1: employees who are also equity owners in Zero Stage or any Zero Stage fund.
2: employees who are not equity owners but who exercise management authority
3: back office and administrative employees
4: employees who work only on Penn Venture Partners matters
5: one administrative employee, 30% of whose salary is paid by Penn Venture Partners - the balance has been allocated to Fund VI as set forth on the analysis.

Category D:    non-employment related expenses related to Penn Venture Partners.

It is our belief that the expenses listed in Categories A, B, C3, and C5 should be reimbursable, and it is our request that you approve reimbursement of those expenses at this time.

If you have any questions about this analysis, please call me.

Yours sincerely,

John L. Koenig

Encls.

cc:  Paul G. Kelley
     R. Michael Haynes, Esq.



## FEELEY & DRISCOLL, P.C.
### Certified Public Accountants Business Consultants

To the Management of Zero Stage Fund VI
Cambridge, Massachusetts

We have performed the procedures enumerated below, which were agreed to by the Management of Zero Stage Fund VI, solely to assist you with respect to the allocation reimbursement schedule, referred to as "the Schedule". The Management of Zero Stage Fund VI is responsible for the preparation and validation of figures and allocations included in the Schedule. The sufficiency of the procedures is solely the responsibility of the Management of Fund VI. Consequently, we make no representation regarding the sufficiency of the procedures described below either for the purpose for which this report has been requested or for any other purpose.

Our procedures and findings are as follows:

    a.    We recalculated the amounts included in the Schedule for the years of 2002, 2003 and 2004 and noted that amounts were reported consistently for the periods in question.

    b.    We inquired with members of Management regarding the methodology used to determine the expense allocations. Based on our conversations, we feel that Management used consistent methods in determining the allocation of the reimbursable expenses included in the Schedule.

    c.    We analyzed the allocations of the reimbursable expenses as shown in the Schedule. We feel that the allocations supporting the amount of requested reimbursable expenses have been determined in a reasonable and equitable manner.

We were not engaged to, and did not conduct an audit, the objective of which would be the expression of an opinion on the reimbursable expense schedule of Zero Stage Fund VI. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.

This report is intended solely for the information and use of the Small Business Administration and Management of Zero Stage Fund VI, and is not intended to be and should not be used by anyone other than those specified parties.

April 26, 2005

*Feeley & Driscoll, P.C.*

200 Portland Street, Boston, Massachusetts 02114-1709 • (617) 742-7788
153 Broad Street, P.O. Box 5158, Nashua, New Hampshire 03061-5158 • (603) 883-0444
Telefax (617) 742-0410
www.fdcpa.com

ZERO STAGE CAPITAL COMPANY INC.
BLE TO FUND ACTIVITY AND SUBSEQUENTLY APPORTIONED
TO ZSC VI LP
OR THE YEARS ENDED 2002, 2003 AND 2004

| 2003 EXPENSES TO BE ALLOCATED AND APPORTIONED | | | | | 2004 EXPENSES TO BE ALLOCATED AND APPORTIONED | | | | |
|---|---|---|---|---|---|---|---|---|---|
| TOTAL MGMT CO EXPENSES TO BE ALLOCATED | EXPENSES ALLOCABLE TO FUND ACTIVITIES Y/N | ALLOCABLE EXPENSES TO BE APPORTIONED AMONG FUNDS | % OF EXPENSES TO BE APPORTIONED TO ZSC VI LP | EXPENSES APPORTIONED TO ZSC VI LP | TOTAL MGMT CO EXPENSES TO BE ALLOCATED | EXPENSES ALLOCABLE TO FUND ACTIVITIES Y/N | ALLOCABLE EXPENSES TO BE APPORTIONED AMONG FUNDS | % OF EXPENSES TO BE APPORTIONED TO ZSC VI LP | EXPENSES APPORTIONED TO ZSC VI LP |
| 54,742.48 | N | 0.00 | 0.00% | 0.00 | 52,259.42 | N | 0.00 | 0.00% | 0.00 |
| 52,350.36 | Y | 52,350.36 | 25.00% | 13,087.59 | 33,944.57 | Y | 33,944.57 | 35.00% | 11,880.60 |
| 373,925.45 | Y | 373,925.45 | 60.00% | 224,355.27 | 162,255.77 | Y | 162,255.77 | 75.00% | 162,255.77 |
| 0.00 | N | 0.00 | 80.00% | 0.00 | 0.00 | Y | 0.00 | 80.00% | 0.00 |
| 37,912.99 | Y | 37,912.99 | 30.00% | 11,373.90 | 12,025.47 | Y | 12,025.47 | 20.00% | 12,025.47 |
| 992.81 | N | 0.00 | 0.00% | 0.00 | 3,474.21 | Y | 3,474.21 | 50.00% | 1,737.11 |
| 14,334.95 | Y | 14,334.95 | 60.00% | 8,600.97 | 7,841.92 | Y | 7,841.92 | 50.00% | 3,920.96 |
| 54,563.54 | Y | 54,563.54 | 30.00% | 16,369.06 | 12,662.23 | Y | 12,662.23 | 25.00% | 3,165.56 |
| 0.00 | N/A | 0.00 | 30.00% | 0.00 | 39,368.06 | Y | 39,368.06 | 100.00% | 39,368.06 |
| 5,826.54 | Y | 5,826.54 | 30.00% | 1,747.96 | 7,596.67 | Y | 7,596.67 | 20.00% | 1,519.33 |
| 0.00 | Y | 0.00 | 60.00% | 0.00 | 0.00 | Y | 0.00 | 30.00% | 0.00 |
| 450,675.24 | Y | 450,675.24 | 60.00% | 270,405.14 | 308,510.72 | Y | 308,510.72 | 75.00% | 231,383.04 |
| 0.00 | | 0.00 | 30.00% | 0.00 | 0.00 | Y | 995.00 | 20.00% | 199.00 |
| 12,852.04 | Y | 12,852.04 | 30.00% | 3,835.61 | 0.00 | Y | 0.00 | 30.00% | 0.00 |
| 0.00 | | 0.00 | 30.00% | 0.00 | 34,196.50 | Y | 34,196.50 | 30.00% | 10,218.95 |
| 59,005.64 | Y | 59,005.64 | 30.00% | 17,701.69 | 22,116.58 | Y | 22,116.58 | 30.00% | 6,634.97 |
| 91,018.12 | Y | 91,018.12 | 30.00% | 27,305.44 | 1,658.97 | Y | 1,658.97 | 20.00% | 331.79 |
| 9,652.53 | Y | 9,652.53 | 20.00% | 1,930.51 | 9,575.82 | Y | 9,575.82 | 30.00% | 2,872.75 |
| 18,761.21 | Y | 18,761.21 | 30.00% | 5,628.36 | 0.00 | Y | 0.00 | 60.00% | 0.00 |
| 0.00 | Y | 0.00 | 30.00% | 0.00 | 273,156.07 | Y | 273,156.07 | 60.00% | 163,893.64 |
| 395,004.57 | Y | 395,004.57 | 50.00% | 197,502.29 | 0.00 | Y | 0.00 | 25.00% | 0.00 |
| 0.00 | Y | 0.00 | 50.00% | 0.00 | 10,575.00 | Y | 10,575.00 | 35.00% | 3,701.25 |
| 20,725.00 | Y | 20,725.00 | 35.00% | 7,253.75 | 5,662.50 | Y | 5,662.50 | 35.00% | 1,698.15 |
| 6,591.07 | Y | 6,591.07 | 30.00% | 1,977.32 | 41,801.32 | Y | 41,801.32 | 35.00% | 14,630.53 |
| 38,153.33 | Y | 38,153.33 | 35.00% | 13,353.67 | 30,506.88 | Y | 30,506.88 | 60.00% | 18,304.13 |
| 75,797.64 | Y | 75,797.64 | 60.00% | 45,478.58 | 4,321.43 | Y | 4,321.43 | 25.00% | 1,080.36 |
| 3,684.81 | Y | 3,684.81 | 25.00% | 921.20 | | | | | |
| 1,776,570.33 | | 1,720,835.03 | | 868,848.31 | 1,074,595.31 | | 1,018,771.68 | | 680,124.01 |
| 0.00 | | 0.00 | 55.00% | 0.00 | 0.00 | Y | 0.00 | 60.00% | 0.00 |
| 0.00 | Y | 0.00 | 55.00% | 0.00 | 0.00 | Y | 0.00 | 60.00% | 0.00 |
| 262,581.72 | Y | 262,581.72 | 55.00% | 144,419.95 | 282,431.64 | Y | 282,431.64 | 60.00% | 169,458.98 |
| 262,581.72 | | 262,581.72 | | 144,419.95 | 282,431.64 | | 282,431.64 | | 169,458.98 |
| 2,352,312.34 | Y | 2,352,312.34 | 55.00% | 1,293,771.79 | 1,673,342.07 | Y | 1,673,342.07 | 60.00% | 1,004,005.24 |
| 132,206.40 | Y | 132,206.40 | 55.00% | 72,713.52 | 300,460.20 | Y | 300,460.20 | 60.00% | 180,276.12 |
| 398,951.13 | Y | 398,951.13 | 55.00% | 219,423.12 | 253,871.24 | Y | 253,871.24 | 60.00% | 152,322.74 |
| 184,481.64 | Y | 184,481.64 | 55.00% | 101,464.90 | 322,835.28 | Y | 322,835.28 | 60.00% | 193,701.17 |
| 0.00 | | 0.00 | 55.00% | 0.00 | 9,205.63 | Y | 9,205.63 | 60.00% | 5,523.38 |
| 3,067,951.51 | | 3,067,951.51 | | 1,687,373.33 | 2,559,714.42 | | 2,559,714.42 | | 1,535,828.65 |
| 30,539.97 | N | 0.00 | 0.00% | 0.00 | 113,748.01 | N | 0.00 | 0.00% | 0.00 |
| 129,447.94 | N | 0.00 | 0.00% | 0.00 | 2,304.90 | N | 0.00 | 0.00% | 0.00 |
| 0.00 | N | 0.00 | 0.00% | 0.00 | 10,155.00 | N | 0.00 | 0.00% | 0.00 |
| 159,987.91 | | 0.00 | | 0.00 | 126,207.91 | | 0.00 | | 0.00 |
| 5,267,091.47 | | 5,051,368.26 | | 2,700,641.59 | 4,042,859.28 | | 3,860,917.74 | | 2,394,412.55 |

ZERO STAGE CAPITAL COMPANY, INC.
EXPENSES ALLOCABLE TO FUND ACTIVITY AND SUBSEQUENTLY APPORTIONED
TO ZSC VI LP
FOR 2005 THROUGH APRIL 26, 2005

2005 EXPENSES THRU 04/26/05 ALLOCATED AND APPORTIONED

| EXPENSES | TOTAL MGMT CO EXPENSES TO BE ALLOCATED | EXPENSES ALLOCABLE TO FUND ACTIVITIES Y/N | ALLOCABLE EXPENSES TO BE APPORTIONED AMONG FUNDS | % OF EXPENSES TO BE APPORTIONED TO ZSC VI LP | EXPENSES APPORTIONED TO ZSC VI LP | GRAND TOTAL |
|---|---|---|---|---|---|---|
| **CATEGORY A** | | | | | | |
| Advertising & Marketing Exp. | 16,133.00 | N | 0.00 | 0.00% | 0.00 | 0.00 |
| Automobile Expense | 4,882.45 | Y | 4,882.45 | 35.00% | 1,708.86 | 36,227.05 |
| Consulting | 8,077.50 | Y | 8,077.50 | 75.00% | 6,058.13 | 602,831.08 |
| Consulting- MBDC | 0.00 | Y | 0.00 | 80.00% | 0.00 | 60,000.00 |
| Dues, Subscriptions, Books | 640.62 | Y | 640.62 | 20.00% | 128.12 | 36,392.79 |
| Fund Raising Exp - ZSC VII & New Markets | 0.00 | N | 0.00 | 0.00% | 0.00 | 0.00 |
| In-House meetings | 1,198.37 | Y | 1,198.37 | 50.00% | 599.19 | 20,978.42 |
| Insurance Exp | 0.00 | Y | 0.00 | 25.00% | 0.00 | 20,719.92 |
| Interest Expense | 25,833.33 | Y | 25,833.33 | 100.00% | 25,833.33 | 65,201.39 |
| Internet Services | 1,994.37 | Y | 1,994.37 | 20.00% | 398.87 | 5,040.10 |
| Investor Meetings | 0.00 | Y | 0.00 | 30.00% | 0.00 | 1,275.79 |
| Legal and Professional Expense | 17,541.50 | Y | 17,541.50 | 75.00% | 13,156.13 | 646,386.93 |
| Miscellaneous | 0.00 | Y | 0.00 | 20.00% | 0.00 | 7,307.01 |
| Office Construction | 0.00 | Y | 0.00 | 30.00% | 0.00 | 13,295.26 |
| Office Equipment Expense | 0.00 | Y | 0.00 | 65.00% | 0.00 | 4,756.35 |
| Office Supplies | 6,472.93 | Y | 6,472.93 | 30.00% | 1,941.88 | 49,277.71 |
| Other Expense | 5,440.86 | Y | 5,440.86 | 30.00% | 1,632.26 | 53,578.98 |
| Other Taxes | 0.00 | Y | 0.00 | 20.00% | 0.00 | 2,388.01 |
| Postage & Delivery | 2,211.88 | Y | 2,211.88 | 30.00% | 663.56 | 14,448.80 |
| Recruiting Expense | 0.00 | Y | 0.00 | 30.00% | 0.00 | -3,420.00 |
| Rent/Parking/Oper. Expenses | 111,652.02 | Y | 111,652.02 | 30.00% | 33,495.61 | 689,943.92 |
| Repairs Expense | 0.00 | Y | 0.00 | 25.00% | 0.00 | 2,643.86 |
| Seminars/Conference | 200.00 | Y | 200.00 | 35.00% | 70.00 | 18,138.40 |
| Software Expense | 0.00 | Y | 0.00 | 30.00% | 0.00 | 4,620.76 |
| Telephone Expense | 5,844.09 | Y | 5,844.09 | 35.00% | 2,045.43 | 47,607.55 |
| Travel - Airfare, Trains, Etc. | 2,030.75 | Y | 2,030.75 | 60.00% | 1,218.45 | 162,752.61 |
| Utilities Exp. - Electricity | 775.55 | Y | 775.55 | 25.00% | 193.89 | 3,101.66 |
| | 210,929.22 | | 194,796.22 | | 89,143.70 | 2,572,353.52 |
| | | | | | | |
| **CATEGORY B** | | | | | | |
| Employee Benefit Programs | 0.00 | Y | 0.00 | 60.00% | 0.00 | 0.00 |
| Employer Payroll Tax Expense | 56,094.52 | Y | 56,094.52 | 60.00% | 33,656.71 | 84,813.36 |
| Health & Welfare Expenses | 53,314.63 | Y | 53,314.63 | 60.00% | 31,988.78 | 462,599.34 |
| | 109,409.15 | | 109,409.15 | | 65,645.49 | 547,412.70 |
| | | | | | | |
| **CATEGORY C** | | | | | | |
| Salaries & Wages | 1   471,250.06 | Y | 471,250.06 | 60.00% | 282,750.04 | 3,921,668.88 |
| Salaries & Wages | 2   92,058.31 | Y | 92,058.31 | 60.00% | 55,234.99 | 370,724.59 |
| Salaries & Wages | 3   37,453.39 | Y | 37,453.39 | 60.00% | 22,472.03 | 519,023.68 |
| Salaries & Wages | 4   105,000.00 | Y | 105,000.00 | 60.00% | 63,000.00 | 380,666.07 |
| Salaries & Wages | 5   27,500.00 | Y | 27,500.00 | 60.00% | 16,500.00 | 22,023.38 |
| | 733,261.76 | | 733,261.76 | | 439,957.06 | 5,213,506.59 |
| | | | | | | |
| **CATEGORY D** | | | | | | |
| Penn Venture Expense | 28,154.27 | N | 0.00 | 0.00% | 0.00 | 0.00 |
| Penn Venture Partner Expense | 0.00 | N | 0.00 | 0.00% | 0.00 | 0.00 |
| Penn Ventures O/A expenses | 32,989.78 | N | 0.00 | 0.00% | 0.00 | 0.00 |
| | 61,144.05 | | 0.00 | | 0.00 | 0.00 |
| | | | | | | |
| | 1,114,744.18 | | 1,037,467.13 | | 594,746.24 | 8,333,272.81 |

ASSUMPTIONS AND STATEMENTS
1. Salaries and Wages are taken directly from the Payroll Journals
2. Legal expenses are apportioned at a higher percentage in 2004 and 2005 due to the requests of the SBA in those periods
3. Employee Benefit Programs have been combined with Salaries and Wages - 401(K) Salary Reduction Arrangement funded by employees.
4. Percentages for all other items of expense have been arrived at by consensus of the management team as to what is apprprinte
5. Charitable Contributions were not taken into account.
6. No effect was given to depreciation
7. The management fees received in cash have been applied to the respective expenses by a factor arrived at by dividing the total salaries of the category 1 & 4 employees by the expenses of the Management Company
This factor is then multiplied by the management fee received in cash. The product is then deducted from the total cash management fee received. The remainder is then applied to all other expenses of the Management Company.

| | |
|---|---|
| Total for 2002-2005 - Category A | 2,572,353.52 |
| Total for 2002-2005 - Category B | 547,412.70 |
| Total for 2002-2005 - Categories C1, C2, C4 | 4,672,459.53 |
| Total for 2002-2005 - Categories C3 and C5 | 541,047.06 |
| Total for 2002-2005 - Category D | 0.00 |
| Total for 2002-2005 - All Categories | 8,333,272.81 |

ZERO STAGE CAPITAL COMPANY, INC.
CLASSIFICATION OF EMPLOYEES SALARIES
2002, 2003 AND 2004

| E-Y | 2002 SALARIES AND WAGES | | | 2003 SALARIES AND WAGES | | | 2004 SALARIES AND WAGES | | |
|---|---|---|---|---|---|---|---|---|---|
| | GROSS WAGES | EMPLOYMENT TAXES | TOTAL | GROSS WAGES | EMPLOYMENT TAXES | TOTAL | GROSS WAGES | EMPLOYMENT TAXES | TOTAL |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 168,198.00 | 0.00 | 168,198.00 |
| | 44,953.37 | 3,438.95 | 48,392.32 | 46,499.92 | 3,557.25 | 50,057.17 | 43,949.92 | 7,888.73 | 51,886.65 |
| | 83,333.48 | 6,375.08 | 89,708.56 | 50,000.16 | 3,825.12 | 53,825.28 | 50,000.16 | 3,825.12 | 53,825.28 |
| | 0.00 | 0.00 | 0.00 | 250,000.08 | 9,018.96 | 259,019.04 | 300,000.08 | 9,793.76 | 309,799.84 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 54,360.00 | 4,158.56 | 58,518.56 | 62,000.00 | 4,743.08 | 66,743.08 | 57,000.00 | 4,360.56 | 61,360.56 |
| | 562,500.00 | 13,419.99 | 575,919.99 | 376,850.00 | 10,858.27 | 387,708.27 | 67,708.35 | 5,179.66 | 72,888.01 |
| | 500,000.16 | 12,513.76 | 512,513.76 | 281,250.05 | 9,472.10 | 290,722.15 | 0.00 | 0.00 | 0.00 |
| | 71,754.91 | 5,489.11 | 77,244.02 | 31,057.97 | 2,375.87 | 33,433.84 | 0.00 | 0.00 | 0.00 |
| | 43,750.02 | 3,346.86 | 47,096.88 | 175,000.08 | 7,931.52 | 182,931.60 | 175,000.08 | 7,987.32 | 182,987.40 |
| | 1,125,000.00 | 21,576.42 | 1,146,576.42 | 450,000.00 | 11,919.12 | 461,919.12 | 450,000.00 | 11,974.92 | 461,974.92 |
| | 0.00 | 0.00 | 0.00 | 25,000.02 | 1,912.50 | 26,912.52 | 100,000.08 | 6,899.88 | 106,899.96 |
| | 57,070.56 | 4,365.90 | 61,436.46 | 53,866.78 | 4,120.95 | 57,987.73 | 22,614.48 | 1,730.00 | 24,344.48 |
| | 57,000.00 | 4,360.56 | 61,360.56 | 21,594.85 | 1,652.01 | 23,246.86 | 0.00 | 0.00 | 0.00 |
| | 0.00 | 0.00 | 0.00 | 150,000.00 | 7,569.12 | 157,569.12 | 69,866.61 | 5,344.81 | 75,211.42 |
| | 56,250.00 | 4,303.18 | 60,553.18 | 200,000.82 | 8,293.02 | 208,293.84 | 150,000.00 | 7,624.92 | 157,624.92 |
| | 66,685.65 | 5,100.00 | 71,785.65 | 165,000.00 | 7,786.66 | 172,786.66 | 199,999.92 | 8,349.72 | 208,349.64 |
| | 247,500.00 | 8,852.61 | 256,352.61 | 28,993.55 | 2,218.00 | 31,211.56 | 123,750.00 | 7,244.16 | 130,994.16 |
| | 26,875.61 | 2,055.97 | 28,931.58 | 0.00 | 0.00 | 0.00 | 11,910.31 | 911.15 | 12,821.46 |
| | 235,104.10 | 8,672.83 | 243,776.93 | 325,000.00 | 10,106.40 | 335,106.40 | 0.00 | 0.00 | 0.00 |
| | 487,500.12 | 12,332.45 | 499,832.57 | 0.00 | 0.00 | 0.00 | 243,541.67 | 8,981.15 | 252,522.82 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8,551.45 | 654.19 | 9,205.63 |
| A | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 54,186.60 | 4,153.80 | 58,310.40 |
| | 0.00 | 0.00 | 0.00 | 79,200.50 | 6,058.84 | 85,259.34 | 26,237.50 | 2,007.17 | 28,244.67 |
| | 156,249.90 | 7,529.40 | 163,779.30 | 124,999.92 | 7,206.48 | 132,206.40 | 124,999.92 | 7,262.28 | 132,262.20 |
| | 3,875,898.88 | 127,891.61 | 4,003,760.49 | 2,943,700.49 | 124,251.02 | 3,067,951.51 | 2,447,545.13 | 112,169.30 | 2,559,714.42 |

| 2002 GROSS | TAXES | TOTAL | 2003 GROSS | TAXES | TOTAL | 2004 GROSS | TAXES | TOTAL |
|---|---|---|---|---|---|---|---|---|
| 3,351,354.53 | 92,190.00 | 3,443,544.53 | 2,273,100.37 | 79,211.97 | 2,352,312.34 | 1,610,020.26 | 63,341.81 | 1,673,342.07 |
| 156,249.90 | 7,529.40 | 163,779.30 | 124,999.92 | 7,206.48 | 132,206.40 | 293,197.92 | 7,262.28 | 300,460.20 |
| 312,014.45 | 23,869.05 | 335,883.50 | 370,600.18 | 28,350.95 | 398,951.13 | 231,628.82 | 22,242.42 | 253,871.24 |
| 56,250.00 | 4,303.16 | 60,553.16 | 176,000.02 | 9,481.62 | 184,481.64 | 304,106.68 | 18,688.60 | 322,835.28 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8,551.45 | 654.19 | 9,205.63 |
| 3,875,898.88 | 127,891.61 | 4,003,760.49 | 2,943,700.49 | 124,251.02 | 3,067,951.51 | 2,447,545.13 | 112,169.30 | 2,559,714.42 |

| 2002 GROSS | TAXES | TOTAL | 2003 GROSS | TAXES | TOTAL | 2004 GROSS | TAXES | TOTAL |
|---|---|---|---|---|---|---|---|---|
| 86.47% | 72.08% | 86.01% | 77.22% | 63.75% | 76.67% | 65.79% | 56.47% | 65.37% |
| 4.03% | 5.89% | 4.09% | 4.25% | 6.60% | 4.31% | 11.98% | 6.47% | 11.74% |
| 8.05% | 18.65% | 8.39% | 12.59% | 22.82% | 13.00% | 9.46% | 19.83% | 9.97% |
| 1.45% | 3.38% | 1.51% | 5.94% | 7.63% | 6.01% | 12.43% | 16.64% | 12.61% |
| 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.35% | 0.58% | 0.36% |
| 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |

A 70% OF TIME DEVOTED TO THE ZERO SATAGE FUNDS

ZERO STAGE CAPITAL COMPANY, INC.
CLASSIFICATION OF EMPLOYEES' SALARIES
2005

| NAME | Y/N | BASIS OF DETERMINATION | CATE-GORY | 2005 SALARIES AND WAGES | | |
|---|---|---|---|---|---|---|
| | | | | GROSS WAGES | EMPLOYMENT TAXES | TOTAL |
| BARROWS | N | MANAGEMENT - NO DECISION MAKING AUTHORITY REGARDING PORTFOLIO CO.'S | 2 | 55,600.00 | 4,253.40 | 59,853.40 |
| BARTZ | N | BACK OFFICE NO DECISION MAKING AUTHORITY REGARDING PORTFOLIO CO.'S | 3 | 14,666.64 | 1,122.00 | 15,788.64 |
| BITY | Y | PORTFOLIO CONTACT - BOARD MEMBER SEAT | 1 | 16,666.72 | 1,275.00 | 17,941.72 |
| BRONSTEIN | Y | PORTFOLIO CONTACT - BOARD MEMBER SEAT | 1 | 83,333.36 | 6,375.00 | 89,708.36 |
| CARMISCIANO | N | MANAGEMENT - NO DECISION MAKING AUTHORITY REGARDING PORTFOLIO CO.'S | 2 | 31,249.98 | 2,390.62 | 33,640.60 |
| CAULFIELD | Y | BACK OFFICE NO DECISION MAKING AUTHORITY REGARDING PORTFOLIO CO.'S | 3 | 19,000.00 | 1,453.50 | 20,453.50 |
| FUNG | Y | PORTFOLIO CONTACT - BOARD MEMBER SEAT | 1 | 0.00 | 0.00 | 0.00 |
| JOHNSON | Y | PORTFOLIO CONTACT - BOARD MEMBER SEAT | 1 | 0.00 | 0.00 | 0.00 |
| KAM | N | BACK OFFICE NO DECISION MAKING AUTHORITY REGARDING PORTFOLIO CO.'S | 3 | 0.00 | 0.00 | 0.00 |
| KELLEY, M | Y | PORTFOLIO CONTACT - BOARD MEMBER SEAT | 1 | 74,583.34 | 5,705.63 | 80,288.97 |
| KELLEY, P | Y | PORTFOLIO CONTACT - BOARD MEMBER SEAT | 1 | 150,000.00 | 11,475.00 | 161,475.00 |
| KLINE | N | PENN VENTURES - NO ZERO STAGE FUND ACTIVITY | 4 | 33,333.36 | 2,550.00 | 35,883.36 |
| LETCH-D'ALESSIO | N | BACK OFFICE NO DECISION MAKING AUTHORITY REGARDING PORTFOLIO CO.'S | 3 | 3,786.75 | 289.69 | 4,076.44 |
| MONROE | N | BACK OFFICE NO DECISION MAKING AUTHORITY REGARDING PORTFOLIO CO.'S | 3 | 0.00 | 0.00 | 0.00 |
| MORRIS | N | PENN VENTURES - NO ZERO STAGE FUND ACTIVITY | 4 | 50,000.00 | 3,825.00 | 53,825.00 |
| PECK | N | PORTFOLIO CONTACT - BOARD MEMBER SEAT | 1 | 66,666.64 | 5,100.00 | 71,766.64 |
| PINTO | Y | PORTFOLIO CONTACT - BOARD MEMBER SEAT | 1 | 0.00 | 0.00 | 0.00 |
| RICE | Y | WORKED WITH PORTFOLIO CO.'S | 5 | 0.00 | 0.00 | 0.00 |
| RODRIGUEZ | N | BACK OFFICE NO DECISION MAKING AUTHORITY REGARDING PORTFOLIO CO.'S | 3 | 0.00 | 0.00 | 0.00 |
| SONI | N | WORKED WITH PORTFOLIO CO.'S | 5 | 0.00 | 0.00 | 0.00 |
| STEVENS | Y | PORTFOLIO CONTACT - BOARD MEMBER SEAT | 1 | 80,000.00 | 6,120.00 | 86,120.00 |
| TAUBERMAN | N | WORKED WITH PORTFOLIO CO.'S | 5 | 27,500.00 | 2,103.75 | 29,603.75 |
| VOVAKES | N | PENN VENTURES - NO ZERO STAGE FUND ACTIVITY | 4 | 21,666.64 | 1,657.50 | 23,324.14 |
| WEINBERG | N | BACK OFFICE NO DECISION MAKING AUTHORITY REGARDING PORTFOLIO CO.'S | 3 | 0.00 | 0.00 | 0.00 |
| YAGHOUBI | Y | MANAGEMENT - NO DECISION MAKING AUTHORITY REGARDING PORTFOLIO CO.'S | 2 | 5,208.33 | 398.44 | 5,606.77 |
| TOTAL - AGREES TO W-2 LISTING | | | | 733,261.76 | 56,094.52 | 789,356.28 |

| CATEGORY | GROSS WAGES | EMPLOYMENT TAXES | TOTAL |
|---|---|---|---|
| 1 | 471,250.06 | 36,050.63 | 507,300.69 |
| 2 | 92,058.31 | 7,042.46 | 99,100.77 |
| 3 | 37,453.39 | 2,865.18 | 40,318.57 |
| 4 | 105,000.00 | 8,032.50 | 113,032.50 |
| 5 | 27,500.00 | 2,103.75 | 29,603.75 |
| | 733,261.76 | 56,094.52 | 789,356.28 |
| 1 | 64.27% | 64.27% | 64.27% |
| 2 | 12.55% | 12.55% | 12.55% |
| 3 | 5.11% | 5.11% | 5.11% |
| 4 | 14.32% | 14.32% | 14.32% |
| 5 | 3.75% | 3.75% | 3.75% |
| | 100.00% | 100.00% | 100.00% |

**EXHIBIT H – Tab 17**



**ZERO STAGE CAPITAL**

101 Main Street, 17th Floor · Cambridge, Massachusetts 02142-1519
Tel 617-876-5355 · Fax 617-876-1248 · www.ZeroStage.com

May 4, 2005

Thomas Morris
Director
Investment Division
Office of SBIC Liquidation
409 3rd Street S. W.
Suite 6300
Washington, DC 20416

Dear Tom:

As you requested, we are supplying documentation supporting the spreadsheets that were provided to you recently.

Enclosed is a letter from our independent accountants and the materials that they have reviewed.

Thank you so much for your kind consideration.

Best regards.

Sincerely,

Paul M. Kelley
Chairman and
Managing General Partner

CC: Michael Haynes
John Koenig
Matt Fong
Edwin Wang

CAMBRIDGE, MASSACHUSETTS · PROVIDENCE, RHODE ISLAND

*Zero Stage Capital V, L.P., Zero Stage Capital VI, L.P. and Zero Stage Capital SBIC VII, L.P. are Federal Licensees under the Small Business Investment Act of 1958.*



**FEELEY & DRISCOLL, P.C.**
Certified Public Accountants/Business Consultants

INDEPENDENT ACCOUNTANT'S REPORT
ON APPLYING AGREED-UPON PROCEDURES

Zero Stage Capital VI Limited Partnership ("Fund VI")

We have performed the procedures enumerated below, which were agreed to by Zero Stage Capital Company, Inc. (the "Management Company"). The procedures were performed solely to assist you with respect to the allocation reimbursement schedule ("the Schedule"), of the Company as of December 2002, 2003, 2004 and through April 2005. Management of the Management Company is responsible for the company's accounting records. The sufficiency of these procedures is solely the responsibility of the Management Company. Consequently, we make no representation regarding the sufficiency of the procedures described below either for the purpose for which this report has been requested or for any other purpose.

Our procedures are as follows:

   A.  Analyze the expenses of the Management Company submitted in Exhibits 1(A), 1(B), 1(C) and 1(D). F&D will determine if all items included in the exhibits are properly allocable to Fund VI. Any items noted that are specifically related to other funds, will be adjusted accordingly.

   B.  Calculation of a dollar value of items that will be examined 100%. F&D has elected to use sampling procedures to examine the population based on suggested accounting industry guidelines. A materiality scope will be calculated to assist in determining the items that will be sampled.

   C.  Each item above the scope as set forth in letter B above, will be traced to substantiating documentation including: cancelled checks, wire transfers, bank statements and corresponding invoice, purchase order or contract.

   D.  The total salaries and wages as reported on the Schedule, will be validated by tracing and reconciling the amounts listed in Exhibits 1(A), 1(B), 1(C) and 1(D) to payroll reports prepared by the third party payroll provider (PAYCHEX).

   E.  Summarize the amount of accrued management fees on the financial statements of Fund VI for the years ended December 31, 2003 and December 31, 2004.

200 Portland Street, Boston, Massachusetts 02114-1709 • (617) 742-7788
154 Broad Street, P.O. Box 3158, Nashua, New Hampshire 03061-3158 • (603) 889-0444
Telefax: (617) 742-0210
www.fdcpa.com

Zero Stage Capital VI Limited Partnership
Page Two
May 4, 2005

## PROCEDURE (A):

Analyze the expenses of the Management Company submitted in Exhibits 1(A), 1(B), 1(C) and 1(D). F&D will determine if all items included in the exhibits are properly allocable to Fund VI. Any items noted that are specifically related to other funds, will be adjusted accordingly.

## FINDINGS (A):

F&D noted expenditures of $834,199 that appeared to relate to funds other than Fund VI. These items were adjusted from the "Total Management Company Expenses To Be Allocated" column on the Schedule. These items have been eliminated from the pool of allocable expenses initially submitted to the SBA.

## PROCEDURE (B):

Calculation of a dollar value of items that will be examined 100%. F&D has elected to use sampling procedures to examine the population based on suggested accounting industry guidelines. A materiality scope will be calculated to assist in determining the items that will be sampled.

## FINDINGS (B):

F&D has determined that all items above $10,000 will be examined 100%. F&D traced each amount above $10,000 to supporting documentation including: cancelled checks, wire transfers, bank statements and copies of the invoice and/or purchase order. F&D noted the following exceptions:

- The Company was unable to locate the June 2003 bank statement. A formal request for a copy of this bank statement was submitted to Mellon Trust on May 4, 2005.

- F&D was unable to obtain backup substantiation for several journal entries posted to the various general ledger accounts. Nothing came to our attention that would suggest that these journal entries are not accurate.

**F&D**

Zero Stage Capital VI Limited Partnership
Page Three
May 4, 2005

## FINDINGS (B) - continued:

- F&D was unable to obtain the following invoices:
  - ✓ Legal expense – Cold Spring Advisors = $100,000
  - ✓ Consulting expense – Everynetwork = $3,411.25
  - ✓ Consulting expense – Management Consulting & PR, LLC = $400.00

F&D has not disallowed the amounts indicated above. Although invoices were not located for these items, we were able to trace the amounts above to the cancelled checks and corresponding bank statement detail.

## PROCEDURE (C):

Each item above the scope as set forth in letter B above, will be traced to substantiating documentation including: cancelled checks, wire transfers, bank statements and corresponding invoice, purchase order or contract.

## FINDINGS (C):

All items were traced to the substantiating documentation with the following exceptions:

- Several invoices were not traced to the corresponding bank statement. This was due to the fact that the Company was unable to locate the June 2003 bank statement. As indicated above, a formal request for a copy of this bank statement was submitted to Mellon Trust on May 4, 2005.

- Several selections were not traced to supporting documentation as these items related to adjusting general entries. Nothing came to our attention that would suggest that these journal entries are not accurate.

## PROCEDURE (D):

The total salaries and wages as reported on the Schedule, will be validated by tracing and reconciling the amounts listed in Exhibits 1(A), 1(B), 1(C) and 1(D) to payroll reports prepared by the third party payroll provider (PAYCHEX).

## FINDINGS (D):

F&D traced the salaries and wage amounts per the Schedule in Exhibits 1(A), 1(B), 1(C) and 1(D) to the payroll reports provided by the payroll service provider. No exceptions were noted.

**F&D**

Zero Stage Capital VI Limited Partnership
Page Four
May 4, 2005

**PROCEDURE (E):**

Summarize the amount of accrued management fees on the financial statements of Fund VI for the years ended December 31, 2003 and December 31, 2004.

**FINDINGS (E):**

See Exhibit 2 for a summary of the accrued management fees.

We were not engaged to, and did not conduct an audit, the objective of which would be the expression of an opinion on the accounting records. Accordingly, we do not express such an opinion. Had we performed additional procedures other matters might have come to our attention that would have been reported to you.

This report is intended solely for the information and use Fund VI, the Management Company and the Small Business Administration and is not intended to be and should not be used by anyone other than those specified parties.

*Feeley & Driscoll, P.C.*

May 4, 2005

**F&D**

## Exhibit 1(A) - 2002 Schedule of Expenses

**2002 EXPENSES TO BE ALLOCATED AND APPORTIONED**

| EXPENSES | TOTAL MGMT CO EXPENSES TO BE ALLOCATED | ADJUSTMENTS | EXPENSES ALLOCABLE TO FUND ACTIVITIES Y/N | ALLOCABLE EXPENSES TO BE APPORTIONED AMONG FUNDS | % OF EXPENSES TO BE APPORTIONED TO ZSC VI LP | EXPENSES APPORTIONED TO ZSC VI LP | EXPLANATION OF ANY ADJUSTMENTS |
|---|---|---|---|---|---|---|---|
| **CATEGORY A** | | | | | | | |
| Advertising & Marketing Exp. | 85,919.16 | | N | 0.00 | 0.00% | 0.00 | |
| Automobile Expense | 38,200.00 | | N | 38,200.00 | 25.00% | 9,550.00 | |
| Consulting | 467,026.47 | (57,400.00) | Y | 409,626.47 | 45.00% | 184,331.91 | All the expenses in this category were related to Fund VII (per invoices) |
| Consulting-MBDC | 75,000.00 | (75,000.00) | Y | 0.00 | 80.00% | 0.00 | |
| Dues, Subscriptions, Books | 42,884.32 | | Y | 42,884.32 | 30.00% | 12,865.30 | |
| Fund Raising Exp - ZSC VII & New Markets | 131,982.40 | | Y | 0.00 | 0.00% | 0.00 | |
| In-House meetings | 19,643.27 | | Y | 19,643.27 | 40.00% | 7,857.31 | |
| Insurance Exp | 3,951.00 | | Y | 3,951.00 | 30.00% | 1,185.30 | |
| Interest Expense | 0.00 | | Y | 0.00 | N/A | 0.00 | |
| Internet Services | 4,579.77 | | Y | 4,579.77 | 30.00% | 1,373.93 | |
| Investor Meetings | 4,252.62 | | Y | 4,252.62 | 30.00% | 1,275.79 | |
| Legal and Professional Expense | 292,094.71 | (217,471.00) | Y | 74,623.71 | 45.00% | 33,580.67 | Certain legal expenses were not related to Fund VI and have thus been removed |
| Miscellaneous | 23,693.38 | | Y | 23,693.38 | 30.00% | 7,108.01 | |
| Office Construction | 31,465.49 | | Y | 31,465.49 | 30.00% | 9,439.65 | |
| Office Equipment Expense | 15,854.50 | | Y | 15,854.50 | 30.00% | 4,756.35 | |
| Office Supplies | 64,583.96 | | Y | 64,583.96 | 30.00% | 19,375.19 | |
| Other Expense | 60,021.04 | | Y | 60,021.04 | 30.00% | 18,006.31 | |
| Other Taxes | 628.56 | | Y | 628.56 | 20.00% | 125.71 | |
| Postage & Delivery | 17,613.75 | | Y | 17,613.75 | 30.00% | 5,284.13 | |
| Recruiting Expense | 11,400.00 | | Y | 11,400.00 | 30.00% | 3,420.00 | |
| Rent/Parking/Oper. Expenses | 655,716.41 | | Y | 655,716.41 | 45.00% | 295,072.38 | |
| Repairs Expense | 10,572.22 | | Y | 10,572.22 | 25.00% | 2,643.06 | |
| Seminars/Conference | 20,324.00 | | Y | 20,324.00 | 35.00% | 7,113.40 | |
| Software Expense | 3,148.95 | | Y | 3,148.95 | 30.00% | 944.69 | |
| Telephone Expense | 50,222.63 | | Y | 50,222.63 | 35.00% | 17,577.92 | |
| Travel - Airfare, Trains, Etc. | 217,225.43 | | Y | 217,225.43 | 45.00% | 97,751.44 | |
| Utilities Exp. - Electricity | 3,624.85 | | Y | 3,624.85 | 25.00% | 906.21 | |
| | 3,371,628.89 | (349,871.00) | | 1,783,856.53 | | 741,544.65 | |
| **CATEGORY B** | | | | | | | |
| Employee Benefit Programs | 0.00 | | Y | 0.00 | 40.00% | 0.00 | |
| Employer Payroll Tax Expense | 127,891.61 | | Y | 127,891.61 | 40.00% | 51,156.64 | |
| Health & Welfare Expenses | 291,829.08 | | Y | 291,829.08 | 40.00% | 116,731.63 | |
| | 419,720.69 | 0.00 | | 419,720.69 | | 167,888.28 | |
| **CATEGORY C** | | | | | | | |
| Salaries & Wages | 3,351,354.53 | 1 | Y | 3,351,354.53 | 40.00% | 1,340,541.81 | |
| Salaries & Wages | 156,249.90 | 2 | Y | 156,249.90 | 40.00% | 62,499.96 | |
| Salaries & Wages | 312,014.45 | 3 | Y | 312,014.45 | 40.00% | 124,805.78 | |
| Salaries & Wages | 56,250.00 | 4 | Y | 56,250.00 | 40.00% | 22,500.00 | |
| Salaries & Wages | 0.00 | 5 | Y | 0.00 | 40.00% | 0.00 | |
| | 3,875,868.88 | | | 3,875,868.88 | | 1,550,347.55 | |
| **CATEGORY D** | | | | | | | |
| Penn Venture Expense | 0.00 | | N | 0.00 | 0.00% | 0.00 | |
| Penn Venture Partner Expense | 0.00 | | N | 0.00 | 0.00% | 0.00 | |
| Penn Venture O/A expenses | 0.00 | | N | 0.00 | 0.00% | 0.00 | |
| | 0.00 | | | 0.00 | | 0.00 | |
| Total Expenses | 6,667,218.46 | (349,871.00) | | 6,079,445.90 | | 2,459,780.48 | |
| Less - Category C (1 & 4) Employees | (3,407,604.53) | 0.00 | | (3,407,604.53) | | (1,363,061.81) | |
| Total Expenses - Net of Salary Removal | 3,259,613.93 | (349,871.00) | | 2,671,841.37 | | 1,096,718.67 | |

## Exhibit 1(B) - 2003 Schedule of Expenses

| EXPENSES | TOTAL MGMT CO EXPENSES TO BE ALLOCATED | ADJUSTMENTS | EXPENSES ALLOCABLE TO FUND ACTIVITIES Y/N | EXPENSES TO BE APPORTIONED AMONG FUNDS | % OF EXPENSES TO BE APPORTIONED TO ZSC VI LP | EXPENSES APPORTIONED TO ZSC VI LP | EXPLANATION OF ANY ADJUSTMENTS |
|---|---|---|---|---|---|---|---|
| **CATEGORY A** | | | | | | | |
| Advertising & Marketing Exp. | 54,742.48 | | N | 0.00 | 0.00% | 0.00 | |
| Automobile Expense | 52,350.36 | | Y | 52,350.36 | 25.00% | 13,087.59 | |
| Consulting | 373,925.45 | (100,000.00) | Y | 273,925.45 | 60.00% | 164,355.27 | Certain consulting expenses did not relate to Fund VI and were therefore removed |
| Consulting- MBDC | 0.00 | | Y | 0.00 | 80.00% | 0.00 | |
| Dues, Subscriptions, Books | 37,912.99 | | Y | 37,912.99 | 30.00% | 11,373.90 | |
| Fund Raising Exp - ZSC VII & New Markets | 992.82 | | Y | 0.00 | 0.00% | 0.00 | |
| In-House meetings | 14,334.95 | | Y | 14,334.95 | 60.00% | 8,600.97 | |
| Insurance Exp | 54,563.54 | | Y | 54,563.54 | 30.00% | 16,369.06 | |
| Interest Expense | 0.00 | | Y | 0.00 | N/A | 0.00 | |
| Internet Services | 5,826.54 | | Y | 5,826.54 | 30.00% | 1,747.96 | |
| Investor Meetings | 0.00 | | Y | 0.00 | 30.00% | 0.00 | |
| Legal and Professional Expense | 459,675.24 | (371,928.00) | Y | 78,747.24 | 60.00% | 47,248.34 | Certain legal expenses did not relate to Fund VI and were therefore removed |
| Miscellaneous | 0.00 | | Y | 0.00 | 30.00% | 0.00 | |
| Office Construction | 12,852.04 | | Y | 12,852.04 | 30.00% | 3,855.61 | |
| Office Equipment Expense | 0.00 | | Y | 0.00 | 30.00% | 0.00 | |
| Office Supplies | 59,005.64 | | Y | 59,005.64 | 30.00% | 17,701.69 | |
| Other Expenses | 91,018.12 | | Y | 91,018.12 | 30.00% | 27,305.44 | |
| Other Taxes | 9,652.53 | | Y | 9,652.53 | 20.00% | 1,930.51 | |
| Postage & Delivery | 18,761.21 | | Y | 18,761.21 | 30.00% | 5,628.36 | |
| Recruiting Expense | 0.00 | | Y | 0.00 | 30.00% | 0.00 | |
| Rent/Parking/Oper. Expenses | 395,004.57 | | Y | 395,004.57 | 50.00% | 197,502.29 | |
| Repairs Expense | 0.00 | | Y | 0.00 | 25.00% | 0.00 | |
| Seminars/Conference | 20,725.00 | | Y | 20,725.00 | 35.00% | 7,253.75 | |
| Software Expense | 6,591.07 | | Y | 6,591.07 | 30.00% | 1,977.32 | |
| Telephone Expense | 38,153.33 | | Y | 38,153.33 | 35.00% | 13,353.67 | |
| Travel - Airfare, Trains, Etc. | 75,797.64 | | Y | 75,797.64 | 60.00% | 45,478.58 | |
| Utilities Exp. - Electricity | 3,684.81 | | Y | 3,684.81 | 25.00% | 921.20 | |
| | 1,776,570.33 | (471,928.00) | | 1,248,907.03 | | 585,691.91 | |
| **CATEGORY B** | | | | | | | |
| Employee Benefit Programs | 0.00 | | Y | 0.00 | 55.00% | 0.00 | |
| Employer Payroll Tax Expense | 0.00 | | Y | 0.00 | 55.00% | 0.00 | |
| Health & Welfare Expenses | 262,581.72 | | Y | 262,581.72 | 55.00% | 144,419.95 | |
| | 262,581.72 | 0.00 | | 262,581.72 | | 144,419.95 | |
| **CATEGORY C** | | | | | | | |
| Salaries & Wages 1 | 2,352,312.34 | | Y | 2,352,312.34 | 55.00% | 1,293,771.79 | |
| Salaries & Wages 2 | 132,206.40 | | Y | 132,206.40 | 55.00% | 72,713.52 | |
| Salaries & Wages 3 | 399,951.13 | | Y | 399,951.13 | 55.00% | 219,973.12 | |
| Salaries & Wages 4 | 184,481.64 | | Y | 184,481.64 | 55.00% | 101,464.90 | |
| Salaries & Wages 5 | 0.00 | | Y | 0.00 | 55.00% | 0.00 | |
| | 3,067,951.51 | 0.00 | | 3,067,951.51 | | 1,687,373.33 | |
| **CATEGORY D** | | | | | | | |
| Venture Expense | 30,539.97 | | N | 0.00 | 0.00% | 0.00 | |
| Venture Partner Expense | 129,447.94 | | N | 0.00 | 0.00% | 0.00 | |
| Ventures O/A expenses | 0.00 | | N | 0.00 | 0.00% | 0.00 | |
| | 159,987.91 | 0.00 | | 0.00 | | 0.00 | |
| Total Expenses | 5,267,091.47 | (471,928.00) | | 4,579,440.26 | | 2,417,484.79 | |
| Less: Category C (1 & 4) Employees | (2,536,793.98) | | | (2,536,793.98) | | (1,395,236.69) | |
| Total Expenses - Net of Salary Removal | 2,730,297.49 | (471,928.00) | | 2,042,646.28 | | 1,022,248.10 | |

## Exhibit 1(C) - 2004 Schedule of Expenses

| EXPENSES | TOTAL MGMT CO EXPENSES TO BE ALLOCATED | ADJUSTMENTS | EXPENSES ALLOCABLE TO FUND ACTIVITIES Y/N | 2004 EXPENSES TO BE ALLOCATED AND APPORTIONED | | | EXPLANATION OF ANY ADJUSTMENTS |
|---|---|---|---|---|---|---|---|
| | | | | ALLOCABLE EXPENSES TO BE APPORTIONED AMONG FUNDS | % OF EXPENSES TO BE APPORTIONED TO ZSC VII P | EXPENSES APPORTIONED TO ZSC VII P | |
| **CATEGORY A** | | | | | | | |
| Advertising & Marketing Exp. | 52,259.42 | | N | 0.00 | 0.00% | 0.00 | |
| Automobile Expense | 33,944.57 | | Y | 33,944.57 | 35.00% | 11,880.60 | |
| Consulting | 162,255.77 | | Y | 162,255.77 | 75.00% | 121,691.83 | |
| Consulting - MBDC | 0.00 | | Y | 0.00 | 80.00% | 0.00 | |
| Dues, Subscriptions, Books | 12,025.47 | | Y | 12,025.47 | 20.00% | 2,405.09 | |
| Fund Raising Exp - ZSC VII & New Markets | 3,474.21 | | N | 0.00 | 0.00% | 0.00 | |
| In-House meetings | 7,841.92 | | Y | 7,841.92 | 50.00% | 3,920.96 | |
| Insurance Exp | 12,662.23 | | Y | 12,662.23 | 25.00% | 3,165.56 | |
| Interest Expense | 39,368.06 | | Y | 39,368.06 | 100.00% | 39,368.06 | |
| Internet Services | 7,596.67 | | Y | 7,596.67 | 20.00% | 1,519.33 | |
| Investor Meetings | 0.00 | | Y | 0.00 | 30.00% | 0.00 | |
| Legal and Professional Expense | 308,510.72 | (12,400.00) | Y | 296,110.72 | 75.00% | 222,083.04 | Certain legal expenses were not related to Fund VI and have thus been removed |
| Miscellaneous | 995.00 | | Y | 995.00 | 20.00% | 199.00 | |
| Office Construction | 0.00 | | Y | 0.00 | 30.00% | 0.00 | |
| Office Equipment Expense | 0.00 | | Y | 0.00 | 30.00% | 0.00 | |
| Office Supplies | 34,196.50 | | Y | 34,196.50 | 30.00% | 10,258.95 | |
| Other Expenses | 22,116.58 | | Y | 22,116.58 | 30.00% | 6,634.97 | |
| Other Taxes | 1,658.97 | | Y | 1,658.97 | 20.00% | 331.79 | |
| Postage & Delivery | 9,575.82 | | Y | 9,575.82 | 30.00% | 2,872.75 | |
| Recruiting Expense | 0.00 | | Y | 0.00 | 30.00% | 0.00 | |
| Rent/Parking/Oper. Expenses | 273,156.07 | | Y | 273,156.07 | 60.00% | 163,893.64 | |
| Repairs Expense | 0.00 | | Y | 0.00 | 25.00% | 0.00 | |
| Seminars/Conference | 10,575.00 | | Y | 10,575.00 | 35.00% | 3,701.25 | |
| Software Expense | 5,662.50 | | Y | 5,662.50 | 30.00% | 1,698.75 | |
| Telephone Expense | 41,801.52 | | Y | 41,801.52 | 35.00% | 14,630.53 | |
| Travel - Adver., Train., Etc. | 30,506.88 | | Y | 30,506.88 | 60.00% | 18,304.13 | |
| Utilities Exp. - Electricity | 4,321.43 | | Y | 4,321.43 | 25.00% | 1,080.36 | |
| | 1,074,595.31 | (12,400.00) | | 1,006,571.68 | | 629,540.60 | |
| **CATEGORY B** | | | | | | | |
| Employee Benefit Programs | 0.00 | | Y | 0.00 | 60.00% | 0.00 | |
| Employer Payroll Tax Expense | 0.00 | | Y | 0.00 | 60.00% | 0.00 | |
| Health & Welfare Expenses | 282,431.64 | | Y | 282,431.64 | 60.00% | 169,458.98 | |
| | 282,431.64 | 0.00 | | 282,431.64 | | 169,458.98 | |
| **CATEGORY C** | | | | | | | |
| Salaries & Wages  1 | 1,673,342.07 | | Y | 1,673,342.07 | 60.00% | 1,004,005.24 | |
| Salaries & Wages  2 | 300,460.20 | | Y | 300,460.20 | 60.00% | 180,276.12 | |
| Salaries & Wages  3 | 253,871.24 | | Y | 253,871.24 | 60.00% | 152,322.74 | |
| Salaries & Wages  4 | 322,835.28 | | Y | 322,835.28 | 60.00% | 193,701.17 | |
| Salaries & Wages  5 | 9,205.63 | | Y | 9,205.63 | 60.00% | 5,523.38 | |
| | 2,559,714.42 | 0.00 | | 2,559,714.42 | | 1,535,828.65 | |
| **CATEGORY D** | | | | | | | |
| ?tam Venture Expense | 113,748.01 | | N | 0.00 | 0.00% | 0.00 | |
| ?tam Venture Partner Expense | 2,304.90 | | N | 0.00 | 0.00% | 0.00 | |
| ?tam Venture O/A expenses | 10,155.00 | | N | 0.00 | 0.00% | 0.00 | |
| | 126,207.91 | 0.00 | | 0.00 | | 0.00 | |
| Total Expenses | 4,042,839.28 | (12,400.00) | | 3,848,517.74 | | 2,334,928.23 | |
| Less - Category C (1 & 4) Employees | (1,995,177.35) | 0.00 | | (1,995,177.35) | | (1,197,706.41) | |
| Total Expenses - Net of Salary Removal | 2,046,681.93 | (12,400.00) | | 1,852,340.39 | | 1,137,221.82 | |

## Exhibit 1(D) - 2005 Schedule of Expenses

| EXPENSES | TOTAL MGMT CO EXPENSES TO BE ALLOCATED | ADJUSTMENTS | EXPENSES ALLOCABLE TO FUND ACTIVITIES Y/N | ALLOCABLE EXPENSES TO BE APPORTIONED AMONG FUNDS | % OF EXPENSES TO BE APPORTIONED TO ZSC VI LP | EXPENSES APPORTIONED TO ZSC VI LP | EXPLANATION OF ANY ADJUSTMENTS |
|---|---|---|---|---|---|---|---|
| **CATEGORY A** | | | | | | | |
| Advertising & Marketing Exp. | 16,133.00 | | N | 0.00 | 0.00% | 0.00 | |
| Automobile Expense | 4,882.45 | | N | 4,882.45 | 35.00% | 1,708.86 | |
| Consulting | 8,077.50 | | Y | 8,077.50 | 75.00% | 6,058.13 | |
| Consulting- MBDC | 0.00 | | Y | 0.00 | 80.00% | 0.00 | |
| Dues, Subscriptions, Books | 640.62 | | N | 640.62 | 20.00% | 128.12 | |
| Fund Raising Exp – ZSC VII & New Markets | 0.00 | | N | 0.00 | 0.00% | 0.00 | |
| In-House meetings | 1,198.37 | | Y | 1,198.37 | 50.00% | 599.19 | |
| Insurance Exp | 0.00 | | Y | 0.00 | 20.00% | 0.00 | |
| Interest Expense | 25,833.33 | | Y | 25,833.33 | 100.00% | 25,833.33 | |
| Internet Services | 1,994.37 | | Y | 1,994.37 | 20.00% | 398.87 | |
| Investor Meetings | 0.00 | | Y | 0.00 | 30.00% | 0.00 | |
| Legal and Professional Expense | 17,541.50 | | Y | 17,541.50 | 75.00% | 13,156.13 | |
| Miscellaneous | 0.00 | | Y | 0.00 | 20.00% | 0.00 | |
| Office Construction | 0.00 | | Y | 0.00 | 30.00% | 0.00 | |
| Office Equipment Expense | 0.00 | | Y | 0.00 | 65.00% | 0.00 | |
| Office Supplies | 6,472.93 | | Y | 6,472.93 | 30.00% | 1,941.88 | |
| Other Expense | 5,440.86 | | Y | 5,440.86 | 30.00% | 1,632.26 | |
| Other Taxes | 0.00 | | Y | 0.00 | 30.00% | 0.00 | |
| Postage & Delivery | 2,211.88 | | Y | 2,211.88 | 30.00% | 663.56 | |
| Recruiting Expense | 0.00 | | Y | 0.00 | 30.00% | 0.00 | |
| Rent/Printing/Oper. Expenses | 111,652.02 | | Y | 111,652.02 | 30.00% | 33,495.61 | |
| Repairs Expense | 0.00 | | Y | 0.00 | 25.00% | 0.00 | |
| Seminars/Conference | 200.00 | | Y | 200.00 | 35.00% | 70.00 | |
| Software Expense | 0.00 | | Y | 0.00 | 30.00% | 0.00 | |
| Telephone Expense | 5,844.09 | | Y | 5,844.09 | 35.00% | 2,045.43 | |
| Travel – Airfare, Trains, Etc. | 2,030.75 | | Y | 2,030.75 | 60.00% | 1,218.45 | |
| Utilities Exp - Electricity | 775.55 | | Y | 775.55 | 25.00% | 193.89 | |
| | 210,929.22 | 0.00 | | 194,796.22 | | 89,143.70 | |
| **CATEGORY B** | | | | | | | |
| Employee Benefit Programs | 0.00 | | Y | 0.00 | 60.00% | 0.00 | |
| Employer Payroll Tax Expense | 56,094.52 | | Y | 56,094.52 | 60.00% | 33,656.71 | |
| Health & Welfare Expenses | 53,314.63 | | Y | 53,314.63 | 60.00% | 31,988.78 | |
| | 109,409.15 | 0.00 | | 109,409.15 | | 65,645.49 | |
| **CATEGORY C** | | | | | | | |
| Salaries & Wages | 471,250.06 | 1 | Y | 471,250.06 | 60.00% | 282,750.04 | |
| Salaries & Wages | 92,058.31 | 2 | Y | 92,058.31 | 60.00% | 55,234.99 | |
| Salaries & Wages | 37,453.39 | 3 | Y | 37,453.39 | 60.00% | 22,472.03 | |
| Salaries & Wages | 105,000.00 | 4 | Y | 105,000.00 | 60.00% | 63,000.00 | |
| Salaries & Wages | 27,500.00 | 5 | Y | 27,500.00 | 60.00% | 16,500.00 | |
| | 733,261.76 | 0.00 | | 733,261.76 | | 439,957.06 | |
| **CATEGORY D** | | | | | | | |
| Penn Venture Expense | 28,154.27 | | N | 0.00 | 0.00% | 0.00 | |
| Penn Venture Partner Expense | 0.00 | | N | 0.00 | 0.00% | 0.00 | |
| Penn Venture O/A expenses | 32,989.78 | | N | 0.00 | 0.00% | 0.00 | |
| | 61,144.05 | 0.00 | | 0.00 | | 0.00 | |
| Total Expenses | 1,114,744.18 | | | 1,037,467.13 | | 594,746.24 | |
| Less - Category C (1 & 4) Employees | (576,250.06) | | | (576,250.06) | | (345,750.04) | |
| Total Expenses - Net of Salary Removal | 538,494.12 | 0.00 | | 461,217.07 | | 248,996.21 | |

**ZERO STAGE CAPITAL FUND VI LIMITED PARTNERSHIP**
**EXHIBIT 2**
December 31, 2003 & 2004

Analysis of Zero Stage Capital VI Limited Partnership

|  | (Audited) 12/31/2003 | (Unaudited) 12/31/2004 |
|---|---|---|
| Accrued Management Fee | 4,729,993 | 7,271,209 |
| Waived Management Fee | (4,729,993) | (7,271,209) |
| Net Financial Statement Presentation | $ - | $ - |

**Summary:**

Zero Stage Capital VI LP has incurred cumulative management fees of $7,271,209 and $4,729,993 at December 31, 2004 and 2003, respectively.

During 2003, the audited financial statements presented the accrued management fee net of the amount waived by Zero Stage Capital Company, Inc. (the Management Company.) (See footnote #4 on the PriceWaterhouse audited financial statements for December 31, 2003.)

The accrued management fee is still carried on the balance sheet of Zero Stage Capital VI LP at December 31, 2004 and 2003 but the amount is offset 100% by the amount that the Management Company has elected to waive.

*F&D*

**EXHIBIT H – Tab 18**

**ZERO STAGE CAPITAL VI, LP**
**Reimbursable Expenses**
**FY 2002 - 2005**

**1) Section 3(A) expenses:**

Summary of reimbursable expenses per section 3(A) of the Management Agreement.

| | | |
|---|---|---|
| 2002 | $    504,257 | see tab attached |
| 2003 | 356,386 | |
| 2004 | 275,607 | |
| 2005 | 67,988 | |
| **SUBTOTAL** | **$    1,204,237** | **A** |

**2) Section 3(B) expenses:**

Summary of reimbursable expenses per section 3(B) of the Management Agreement.

| | | |
|---|---|---|
| 2002 | $    237,288 | see tab attached |
| 2003 | 229,305 | |
| 2004 | 354,034 | |
| 2005 | 21,156 | |
| **SUBTOTAL** | **$    841,783** | **B** |

**TOTAL REIMBURSABLE EXPENSES        $    2,046,020   Sum (A+B)**

ZERO STAGE CAPITAL VI, LP
Reimbursable Expenses
Section 3(A)
FY 2002

| Exhibit 1 (A) - FY 2002 |
| --- |
| Schedule of 3(A) Expenses |

| EXPENSES | TOTAL MGMT CO EXPENSES TO BE ALLOCATED | EXPENSES ALLOCABLE TO FUND ACTIVITIES Y/N | ALLOCABLE EXPENSES TO BE APPORTIONED AMONG FUNDS | % OF EXPENSES TO BE APPORTIONED TO ZSC VI LP | EXPENSES APPORTIONED TO ZSC VI LP |
| --- | --- | --- | --- | --- | --- |
| Advertising & Marketing Exp. | 85,919.16 | N | 0.00 | 0.00% | 0.00 |
| Automobile Expense | 38,200.00 | Y | 38,200.00 | 25.00% | 9,550.00 |
| Dues, Subscriptions, Books | 42,884.32 | Y | 42,884.32 | 30.00% | 12,865.30 |
| Fund Raising Exp - ZSC VII & New Markets | 151,982.40 | N | 0.00 | 0.00% | 0.00 |
| In-House meetings | 19,643.27 | Y | 19,643.27 | 40.00% | 7,857.31 |
| Insurance Exp | 3,951.00 | Y | 3,951.00 | 30.00% | 1,185.30 |
| Interest Expense | 0.00 | Y | 0.00 | N/A | 0.00 |
| Internet Services | 4,579.77 | Y | 4,579.77 | 30.00% | 1,373.93 |
| Investor Meetings | 4,252.62 | Y | 4,252.62 | 30.00% | 1,275.79 |
| Miscellaneous | 23,693.38 | Y | 23,693.38 | 30.00% | 7,108.01 |
| Office Construction | 31,465.49 | Y | 31,465.49 | 30.00% | 9,439.65 |
| Office Equipment Expense | 15,854.50 | Y | 15,854.50 | 30.00% | 4,756.35 |
| Other Expense | 60,021.04 | Y | 60,021.04 | 30.00% | 18,006.31 |
| Other Taxes | 628.56 | Y | 628.56 | 20.00% | 125.71 |
| Postage & Delivery | 17,613.75 | Y | 17,613.75 | 30.00% | 5,284.13 |
| Recruiting Expense | 11,400.00 | Y | 11,400.00 | 30.00% | 3,420.00 |
| Rent/Parking/Oper. Expenses | 655,716.41 | Y | 655,716.41 | 45.00% | 295,072.38 |
| Repairs Expense | 10,572.22 | Y | 10,572.22 | 25.00% | 2,643.06 |
| Seminars/Conference | 20,324.00 | Y | 20,324.00 | 35.00% | 7,113.40 |
| Software Expense | 3,148.95 | Y | 3,148.95 | 30.00% | 944.69 |
| Telephone Expense | 50,222.63 | Y | 50,222.63 | 35.00% | 17,577.92 |
| Travel - Airfare, Trains, Etc. | 217,225.43 | Y | 217,225.43 | 45.00% | 97,751.44 |
| Utilities Exp. - Electricity | 3,624.85 | Y | 3,624.85 | 25.00% | 906.21 |
| | $ 1,472,923.75 | | $ 1,235,022.19 | | $ 504,256.88 |

ZERO STAGE CAPITAL VI, LP
Reimbursable Expenses
Section 3(A)
FY 2003

<div style="text-align:center">

**Exhibit 1 (B) - FY 2003**
**Schedule of 3(A) Expenses**

</div>

| EXPENSES | TOTAL MGMT CO EXPENSES TO BE ALLOCATED | EXPENSES ALLOCABLE TO FUND ACTIVITIES Y/N | ALLOCABLE EXPENSES TO BE APPORTIONED AMONG FUNDS | % OF EXPENSES TO BE APPORTIONED TO ZSC VI LP | EXPENSES APPORTIONED TO ZSC VI LP | | PRE-DEFERRAL EXPENSES APPORTIONED TO ZSC VI LP |
|---|---|---|---|---|---|---|---|
| Advertising & Marketing Exp. | 54,742.48 | N | 0.00 | 0.00% | 0.00 | x 6/12 | 0.00 |
| Automobile Expense | 52,350.36 | Y | 52,350.36 | 25.00% | 13,087.59 | x 6/12 | 6,543.80 |
| Dues, Subscriptions, Books | 37,912.99 | Y | 37,912.99 | 30.00% | 11,373.90 | x 6/12 | 5,686.95 |
| Fund Raising Exp - ZSC VII & New Markets | 992.82 | N | 0.00 | 0.00% | 0.00 | x 6/12 | 0.00 |
| In-House meetings | 14,334.95 | Y | 14,334.95 | 60.00% | 8,600.97 | x 6/12 | 4,300.49 |
| Insurance Exp | 54,563.54 | Y | 54,563.54 | 30.00% | 16,369.06 | x 6/12 | 8,184.53 |
| Interest Expense | 0.00 | Y | 0.00 | N/A | 0.00 | x 6/12 | 0.00 |
| Internet Services | 5,826.54 | Y | 5,826.54 | 30.00% | 1,747.96 | x 6/12 | 873.98 |
| Investor Meetings | 0.00 | Y | 0.00 | 30.00% | 0.00 | x 6/12 | 0.00 |
| Miscellaneous | 0.00 | Y | 0.00 | 30.00% | 0.00 | x 6/12 | 0.00 |
| Office Construction | 12,852.04 | Y | 12,852.04 | 30.00% | 3,855.61 | x 6/12 | 1,927.81 |
| Office Equipment Expense | 0.00 | Y | 0.00 | 30.00% | 0.00 | x 6/12 | 0.00 |
| Other Expense | 91,018.12 | Y | 91,018.12 | 30.00% | 27,305.44 | x 6/12 | 13,652.72 |
| Other Taxes | 9,652.53 | Y | 9,652.53 | 20.00% | 1,930.51 | x 6/12 | 965.25 |
| Postage & Delivery | 18,761.21 | Y | 18,761.21 | 30.00% | 5,628.36 | x 6/12 | 2,814.18 |
| Recruiting Expense | 0.00 | Y | 0.00 | 30.00% | 0.00 | x 6/12 | 0.00 |
| Rent/Parking/Oper. Expenses | 395,004.57 | Y | 395,004.57 | 50.00% | 197,502.29 | x 6/12 | 98,751.14 |
| Repairs Expense | 0.00 | Y | 0.00 | 25.00% | 0.00 | x 6/12 | 0.00 |
| Seminars/Conference | 20,725.00 | Y | 20,725.00 | 35.00% | 7,253.75 | x 6/12 | 3,626.88 |
| Software Expense | 6,591.07 | Y | 6,591.07 | 30.00% | 1,977.32 | x 6/12 | 988.66 |
| Telephone Expense | 38,153.33 | Y | 38,153.33 | 35.00% | 13,353.67 | x 6/12 | 6,676.83 |
| Travel - Airfare, Trains, Etc. | 75,797.64 | Y | 75,797.64 | 60.00% | 45,478.58 | x 6/12 | 22,739.29 |
| Utilities Exp. - Electricity | 3,684.81 | Y | 3,684.81 | 25.00% | 921.20 | x 6/12 | 460.60 |
| **Total Expenses** | **892,964.00** | | **837,228.70** | | **356,386.21** | | **178,193.10** |
| | | | | | | | *** |

*** The pre-deferral period was January 1, 2003 through June 30, 2003. The Mgt fees were deferred effective July 1, 2003.

ZERO STAGE CAPITAL VI, LP
Reimbursable Expenses
Section 3(A)
FY 2004

## Exhibit 1 (C) - FY 2004
## Schedule of 3(A) Expenses

| EXPENSES | TOTAL MGMT CO EXPENSES TO BE ALLOCATED | EXPENSES ALLOCABLE TO FUND ACTIVITIES Y/N | ALLOCABLE EXPENSES TO BE APPORTIONED AMONG FUNDS | % OF EXPENSES TO BE APPORTIONED TO ZSC VI LP | EXPENSES APPORTIONED TO ZSC VI LP |
|---|---|---|---|---|---|
| Advertising & Marketing Exp. | 52,259.42 | N | 0.00 | 0.00% | 0.00 |
| Automobile Expense | 33,944.57 | Y | 33,944.57 | 35.00% | 11,880.60 |
| Dues, Subscriptions, Books | 12,025.47 | Y | 12,025.47 | 20.00% | 2,405.09 |
| Fund Raising Exp - ZSC VII & New Markets | 3,474.21 | N | 0.00 | 0.00% | 0.00 |
| In-House meetings | 7,841.92 | Y | 7,841.92 | 50.00% | 3,920.96 |
| Insurance Exp | 12,662.23 | Y | 12,662.23 | 25.00% | 3,165.56 |
| Interest Expense | 39,368.06 | Y | 39,368.06 | 100.00% | 39,368.06 |
| Internet Services | 7,596.67 | Y | 7,596.67 | 20.00% | 1,519.33 |
| Investor Meetings | 0.00 | Y | 0.00 | 30.00% | 0.00 |
| Miscellaneous | 995.00 | Y | 995.00 | 20.00% | 199.00 |
| Office Construction | 0.00 | Y | 0.00 | 30.00% | 0.00 |
| Office Equipment Expense | 0.00 | Y | 0.00 | 30.00% | 0.00 |
| Other Expense | 22,116.58 | Y | 22,116.58 | 30.00% | 6,634.97 |
| Other Taxes | 1,658.97 | Y | 1,658.97 | 20.00% | 331.79 |
| Postage & Delivery | 9,575.82 | Y | 9,575.82 | 30.00% | 2,872.75 |
| Recruiting Expense | 0.00 | Y | 0.00 | 30.00% | 0.00 |
| Rent/Parking/Oper. Expenses | 273,156.07 | Y | 273,156.07 | 60.00% | 163,893.64 |
| Repairs Expense | 0.00 | Y | 0.00 | 25.00% | 0.00 |
| Seminars/Conference | 10,575.00 | Y | 10,575.00 | 35.00% | 3,701.25 |
| Software Expense | 5,662.50 | Y | 5,662.50 | 30.00% | 1,698.75 |
| Telephone Expense | 41,801.52 | Y | 41,801.52 | 35.00% | 14,630.53 |
| Travel - Airfare, Trains, Etc. | 30,506.88 | Y | 30,506.88 | 60.00% | 18,304.13 |
| Utilities Exp. - Electricity | 4,321.43 | Y | 4,321.43 | 25.00% | 1,080.36 |
| **Total Expenses** | 569,542.32 | | 513,808.69 | | 275,606.78 |

ZERO STAGE CAPITAL VI, LP
**Reimbursable Expenses**
Section 3(A)
FY 2005

<div style="border:1px solid black">

## Exhibit 1 (D) - FY 2005
## Schedule of 3(A) Expenses

</div>

| EXPENSES | TOTAL MGMT CO EXPENSES TO BE ALLOCATED | EXPENSES ALLOCABLE TO FUND ACTIVITIES Y/N | ALLOCABLE EXPENSES TO BE APPORTIONED AMONG FUNDS | % OF EXPENSES TO BE APPORTIONED TO ZSC VI LP | EXPENSES APPORTIONED TO ZSC VI LP |
|---|---|---|---|---|---|
| Advertising & Marketing Exp. | 16,133.00 | N | 0.00 | 0.00% | 0.00 |
| Automobile Expense | 4,882.45 | Y | 4,882.45 | 35.00% | 1,708.86 |
| Dues, Subscriptions, Books | 640.62 | Y | 640.62 | 20.00% | 128.12 |
| Fund Raising Exp - ZSC VII & New Markets | 0.00 | N | 0.00 | 0.00% | 0.00 |
| In-House meetings | 1,198.37 | Y | 1,198.37 | 50.00% | 599.19 |
| Insurance Exp | 0.00 | Y | 0.00 | 25.00% | 0.00 |
| Interest Expense | 25,833.33 | Y | 25,833.33 | 100.00% | 25,833.33 |
| Internet Services | 1,994.37 | Y | 1,994.37 | 20.00% | 398.87 |
| Investor Meetings | 0.00 | Y | 0.00 | 20.00% | 0.00 |
| Miscellaneous | 0.00 | Y | 0.00 | 30.00% | 0.00 |
| Office Construction | 0.00 | Y | 0.00 | 30.00% | 0.00 |
| Office Equipment Expense | 0.00 | Y | 0.00 | 65.00% | 0.00 |
| Other Expense | 5,440.86 | Y | 5,440.86 | 30.00% | 1,632.26 |
| Other Taxes | 0.00 | Y | 0.00 | 20.00% | 0.00 |
| Postage & Delivery | 2,211.88 | Y | 2,211.88 | 30.00% | 663.56 |
| Recruiting Expense | 0.00 | Y | 0.00 | 30.00% | 0.00 |
| Rent/Parking/Oper. Expenses | 111,652.02 | Y | 111,652.02 | 30.00% | 33,495.61 |
| Repairs Expense | 0.00 | Y | 0.00 | 25.00% | 0.00 |
| Seminars/Conference | 200.00 | Y | 200.00 | 35.00% | 70.00 |
| Software Expense | 0.00 | Y | 0.00 | 30.00% | 0.00 |
| Telephone Expense | 5,844.09 | Y | 5,844.09 | 35.00% | 2,045.43 |
| Travel - Airfare, Trains, Etc. | 2,030.75 | Y | 2,030.75 | 60.00% | 1,218.45 |
| Utilities Exp. - Electricity | 775.55 | Y | 775.55 | 25.00% | 193.89 |
| **Total Expenses** | **178,837.29** | | **162,704.29** | | **67,987.57** |

ZERO STAGE CAPITAL VI, LP
Reimbursable Expenses
Section 3(B)
FY 2002

| Exhibit 2 (A) - FY 2002 |
| Schedule of 3(B) Expenses |

| EXPENSES | TOTAL MGMT CO EXPENSES TO BE ALLOCATED | ADJUSTMENTS | EXPENSES ALLOCABLE TO FUND ACTIVITIES Y/N | ALLOCABLE EXPENSES TO BE APPORTIONED AMONG FUNDS | % OF EXPENSES TO BE APPORTIONED TO ZSC VI LP | EXPENSES APPORTIONED TO ZSC VI LP |
|---|---|---|---|---|---|---|
| Consulting | 467,026.47 | (57,400.00) | Y | 409,626.47 | 45.00% | 184,331.91 |
| Legal and Professional Expense | 292,094.71 | (217,471.00) | Y | 74,623.71 | 45.00% | 33,580.67 |
| Office Supplies | 64,583.96 | | Y | 64,583.96 | 30.00% | 19,375.19 |
| Total Expenses | 823,705.14 | (274,871.00) | | 548,834.14 | | 237,287.77 |
| | | X | | Y | Z | |

X = Invoices that were found to be specifically related to funds other than ZSC Fund VI.

Y = Invoices that were related to services provided for ZSC VI or ZSC Mgt Company.

Z = The percentage were determined by: (1) reviewing supporting detail and (2) interviews with Management
for the purpose of estimating effort spent on behalf of ZSC VI. See Ted Tedschi memo regarding apportionment allocations.

ZERO STAGE CAPITAL VI, LP
Reimbursable Expenses
Section 3(B)
FY 2003

| Exhibit 2 (B) - FY 2003 |
| :-: |
| Schedule of 3(B) Expenses |

| EXPENSES | TOTAL MGMT CO EXPENSES TO BE ALLOCATED | ADJUSTMENTS | EXPENSES ALLOCABLE TO FUND ACTIVITIES Y/N | ALLOCABLE EXPENSES TO BE APPORTIONED AMONG FUNDS | % OF EXPENSES TO BE APPORTIONED TO ZSC VI LP | EXPENSES APPORTIONED TO ZSC VI LP |
| :-- | --: | --: | :-: | --: | --: | --: |
| Consulting | 373,925.45 | (100,000.00) | Y | 273,925.45 | 60.00% | 164,355.27 |
| Legal and Professional Expense | 450,675.24 | (371,928.00) | Y | 78,747.24 | 60.00% | 47,248.34 |
| Office Supplies | 59,005.64 | | Y | 59,005.64 | 30.00% | 17,701.69 |
| TOTAL EXPENSES | 883,606.33 | (471,928.00) | | 411,678.33 | | 229,305.31 |
| | | X | | Y | Z | |

X = Invoices that were found to be specifically related to funds other than ZSC Fund VI.

Y = Invoices that were related to services provided for ZSC VI or ZSC Mgt Company.

Z = The percentage were determined by: (1) reviewing supporting detail and (2) interviews with Management
for the purpose of estimating effort spent on behalf of ZSC VI. See Ted Tedschi memo regarding apportionment allocations.

ZERO STAGE CAPITAL VI, LP
Reimbursable Expenses
Section 3(B)
FY 2004

| Exhibit 2 (C) - FY 2004 |
| :---: |
| Schedule of 3(B) Expenses |

| EXPENSES | TOTAL MGMT CO EXPENSES TO BE ALLOCATED | ADJUSTMENTS | EXPENSES ALLOCABLE TO FUND ACTIVITIES Y/N | ALLOCABLE EXPENSES TO BE APPORTIONED AMONG FUNDS | % OF EXPENSES TO BE APPORTIONED TO ZSC VI LP | EXPENSES APPORTIONED TO ZSC VI LP |
| --- | --- | --- | --- | --- | --- | --- |
| Consulting | 162,255.77 | | Y | 162,255.77 | 75.00% | 121,691.83 |
| Legal and Professional Expense | 308,510.72 | (12,400.00) | Y | 296,110.72 | 75.00% | 222,083.04 |
| Office Supplies | 34,196.50 | | Y | 34,196.50 | 30.00% | 10,258.95 |
| TOTAL EXPENSES | 504,962.99 | (12,400.00) | | 492,562.99 | | 354,033.82 |
| | | X | | Y | Z | |

X = Invoices that were found to be specifically related to funds other than ZSC Fund VI.

Y = Invoices that were related to services provided for ZSC VI or ZSC Mgt Company.

Z = The percentage were determined by: (1) reviewing supporting detail and (2) interviews with Management
for the purpose of estimating effort spent on behalf of ZSC VI. See Ted Tedschi memo regarding apportionment allocations.

ZERO STAGE CAPITAL VI, LP
Reimbursable Expenses
Section 3(B)
FY 2005

| Exhibit 2 (D) - FY 2005 |
| :---: |
| Schedule of 3(B) Expenses |

| EXPENSES | TOTAL MGMT CO EXPENSES TO BE ALLOCATED | ADJUSTMENTS | EXPENSES ALLOCABLE TO FUND ACTIVITIES Y/N | ALLOCABLE EXPENSES TO BE APPORTIONED AMONG FUNDS | % OF EXPENSES TO BE APPORTIONED TO ZSC VI LP | EXPENSES APPORTIONED TO ZSC VI LP |
|---|---|---|---|---|---|---|
| Consulting | 8,077.50 | | Y | 8,077.50 | 75.00% | 6,058.13 |
| Legal and Professional Expense | 17,541.50 | | Y | 17,541.50 | 75.00% | 13,156.13 |
| Office Supplies | 6,472.93 | | Y | 6,472.93 | 30.00% | 1,941.88 |
| TOTAL EXPENSES | 32,091.93 | 0.00 | | 32,091.93 | | 21,156.13 |
| | X | | | Y | Z | |

X = Invoices that were found to be specifically related to funds other than ZSC Fund VI.

Y = Invoices that were related to services provided for ZSC VI or ZSC Mgt Company.

Z = The percentage were determined by: (1) reviewing supporting detail and (2) interviews with Management
for the purpose of estimating effort spent on behalf of ZSC VI. See Ted Tedschi memo regarding apportionment allocations.

**EXHIBIT H – Tab 19**

# McNamara Koenig & McCarthy, PC

## ATTORNEYS AT LAW

Telephone (781) 431-1700
www.mkmlegal.com

65 WILLIAM STREET
WELLESLEY, MASSACHUSETTS 02481

Facsimile (781) 237-8120

## MEMORANDUM

TO:     Christopher P. Hines, Feeley & Driscoll, P.C.
FROM:   T. Tedeschi
DATE:   April 22, 2005
RE:     Zero Stage Fund VI / SBA

As you requested, I am providing you with this memorandum to provide some additional context for your review of the Fund VI expense allocation being prepared by Zero Stage for submission to SBA. For a number of years I have been the primary independent attorney for Zero Stage Capital Company, Inc., and am familiar with its affiliated funds, management, personnel, and practices. In particular, I am intimately familiar with Fund VI, its impact upon the management and overhead of ZSC, and the efforts of the management company to salvage this problem fund.

My attention began to become increasingly focused on Fund VI in late 2002 and early 2003, when it became obvious that this fund was in distress. Among the matters that ZSC undertook was an immediate and comprehensive review of the (i) management of each portfolio company, and (ii) internal monitoring of the investments by various ZSC professionals. Both were found to be lacking in material respects, necessitating wholesale internal changes at ZSC, and a number of changes at the portfolio companies.

As to the latter, as ZSC was not in control of all of the companies, changes were complicated, difficult and very time-consuming. Such changes, to the (great) extent that they required internal changes at Zero Stage, were increasingly resource and time consuming over the period 2002-2005. During the relevant period, at Zero Stage, personnel changes were made to delete from the staff Brian Johnson (CFO), Ben Bronstein (a partner), Stan Fung (a partner), Frank Pinto (a partner), Bic Stevens, (a partner), and Ron Finlayson (consultant/venture advisor). Although these persons were not partners in Fund VI, the practice of the firm was to deploy all human resources from across the firm to the problem area, in this case Fund VI, and to root out the human and other identifiable causes of asset dysfunction and dislocation.

Numerous external and internal resources had to be brought to bear on the situation. I was personally involved in the substantial efforts to clarify, quantify, and remedy the problems with the Fund VI portfolio. During this entire period very minimal time and effort was expended on the other, non-problematic, affiliated funds (Fund V, Fund VII and its affiliates, and Penn Venture Partners). During this period some effort was devoted, almost exclusively by Matthew Kelley, to raising the next Zero Stage Fund. Thus, at most times during the period, well in excess of half, and at times close to all, of the firm's energies and resources were devoted to Fund VI. Certainly, third party expenses, such as consultants and attorneys, were very much skewed toward Fund VI.

Finally, I will personally review the figures prepared by for presentation to SBA by Mr. Carmisciano so that I can impart to you my sense of the reasonableness of the allocations to Fund VI. If you have any questions about this matter, please let me know.

**EXHIBIT H – Tab 20**

### Zero Stage Capital Company, Inc.

### Staff Base Salary and Fund VI Allocations

### May 2005

| Name | Monthly Base Comp. | % to VI / Portfolio Cos. | Monthly Amount |
|---|---|---|---|
| Edwin Wang | $30,000 | 50% | 15000 |
| Van Chu | 7,500 | 50% | 3,750 |
| Matthew Kelley | 30,000 | 50% | 15000 |
| Matthew Fong | 20,000 | 50% | 10000 |
| Michelle Tauberman | 7,533 | 25% | 1,833 |
| Anita Caulfield | 5,116 | 50% | 2,583 |

Total: $48,166

Above figures do not include indirect or allocated costs such as benefits, rent/utility or other occupancy costs.

**EXHIBIT H – Tab 21**

<u>Zero Stage Capital Company, Inc.</u>

<u>Fund VI Compensation Allocations</u>

<u>June 2005</u>

| Name | Monthly Base Comp. | % to VI / Portfolio Cos. | Monthly Amount |
|------|--------------------|--------------------------|----------------|
| Paul Kelley | $48,750 | 20% | $ 9,550 |
| Edwin Wang | 30,000 | 50% | 15,000 |
| Van Chu | 7,500 | 50% | 3,750 |
| Matthew Kelley | 30,000 | 50% | 15,000 |
| Matthew Fong | 20,000 | 50% | 10,000 |
| Michelle Tauberman | 7,533 | 25% | 1,833 |
| Anita Caulfield | $5,116 | 50% | 2,583 |
| | | Total: | $57,716 |

Above figures do not include indirect or allocated costs such as benefits, rent/utility or other occupancy costs.

# EXHIBIT I



U.S. Small Business Administration

*Championing America's Entrepreneurs*

February 15, 2006

Donald K. Stern, BBO #479420
Julia Frost-Davies BBO #630590
Jason L. Watkins BBO # 658560
Bingham McCutchen LLP
150 Federal Street
Boston, Massachusetts 02110

and

John L. Koenig, BBO #565620
McNamara Koenig & McCarthy, PC
65 Williams Street
Wellesley, Massachuetts 024381

RE:     *United States of America v. Zero Stage Capital VI, L.P.*,
        Case No. 05-10887 (JLT), USDC for the District of Massachusetts

Gentlepersons:

I have received the "Receivership Claim" of your client Zero Stage Capital Company, Inc. ("ZSC") against Zero Stage Capital VI LP ("Fund VI") dated January 19, 2006 for management fees and expenses aggregating $4,873,000.71.

Upon completion of it's preliminary review, the Receiver has found the documentation and other information provided in support of this claim to be significantly deficient. To allow the Receiver to properly review the substance and propriety of the ZSC claim, please provide us with copies of any and all documents, not already submitted with the claim, and other information supporting this claim including, but not limited to, the following:

1.  Any and all documents and other information relied upon in support of the claim that accrued management fees of $7,941,477.00 minus waived fees of $4,016,141.29 or $3,925,335.71 of accrued fees are payable to ZSC by Fund VI;

2.  Any and all documents, and other information relied upon in support of the apparent position that numbered paragraph 2 of the April 28, 2005 Resolution Agreement letter does not constitute an agreement to defer any balance of accrued management fees "until such time as SBA is paid in full Licensee's Participating Securities and all accrued Prioritized Payments";

3.  Any and all documents and other information relied upon in support of the position that "the Management Agreement therefore contemplates that Zero Stage (ZSC) would pay such "Management Expenses" incurred in connection with management services provided to Fund VI (the "3(a) Expenses") from the earned Management Fee", whereas Section 3(a) actually calls for ZSC to bear all costs and expenses of providing the agreed services "without limitation";

4.  Any and all documents and other information relied upon in support of the statement that "the allocation of expenses under section 3 of the management agreement is typical of the relationships established by SBIC companies and their investment advisors or managers";

5.  Any and all documents and other information relied upon in support of the suggestion that ZSC participated in any way in the "liquidity events occurring after Zero Stage was moved into the Office of Liquidation that have resulted in approximately $14,906,743 in actual or prospective cash flowing into Fund VI...";

6.  Any and all documents and other information evidencing the details of the reported comprehensive review of the managements of each Fund VI portfolio company and the internal monitoring of the investments by various ZSC personnel conducted by ZSC once Fund VI was found to be "in distress" and both were found to be lacking in material respects necessitating wholesale internal changes at ZSC;

7.  Any and all documents and other information relied upon in support of the claim that Fund VI should reimburse ZSC for expenses incurred by ZSC in attempting to correct material deficiencies caused by ZSC in its performance under the terms of the Fund VI management Agreement;

8.  Any and all documents and other information evidencing that "during the relevant period very minimal effort was expended on the other affiliated funds, and that at times well in excess of half, and at times close to all, of the firm's energies and resources were devoted to Fund VI";

9.  Any and all documents and other information tabulating the management fees collected by ZSC from the other affiliated funds during this period;

2

10. Any and all documents and other information relied upon in support of the claim that section 3(a) expenses are "... "third party" or "out-of-pocket" expenses incurred by Zero Stage in providing management services to Fund VI", rather than normal fixed operating expenses of ZSC, for which ZSC is responsible under section 3(a) "without limitation";

11. Any and all documents and other information relied upon in support of the propriety of allocating portions of Section 3(a) expenses to Fund VI;

12. Any and all documents and other information relied upon in support of the reasonableness of the allocation percentages used in apportioning the aforesaid ZSC operating expenses to Fund VI;

13. Any and all documents and other information relied upon in support of the propriety of using the reimbursement of section 3(a) and section 3(b) expenses in fact as a partial reimbursement of the accrued management fees deferred under the terms of the April 28, 2005 Resolution Agreement;

14. Any and all documents and other information relied upon in support of the claim for Section 3(b) expenses for the years 2002 through May 2005, being consulting, legal and professional expenses and office supplies actually incurred by ZSC and allocated to Fund VI at rates ranging from 30%, through 60% to as high as 75%;

15. Any and all documents and other information relied upon in support of the propriety of allocating to Fund VI portions of Section 3(b) expenses, otherwise not directly chargeable to Fund VI;

16. Any and all documents and other information relied upon in support of the reasonableness of the allocation percentages used in apportioning the aforesaid Section 3(b) expenses to Fund VI;

17. Any and all additional documents and other information relied upon in support of apportioning Section 3(b) expenses to Fund VI, including detail support for whether said expenses "...were related to services provided for ZSC VI..." and for the "supporting detail and interviews with management" relied upon in determining the relevance and propriety of the allocation percentages;

18. Any and all documents and other information relied upon in support of the claim that "Zero Stage personnel have expended significant time and effort assisting the Receiver in taking over Fund VI";

19. Any and all documents and other information relied upon in support of the use of allocation percentages in determining amounts charged to Fund VI for "post-receivership expenses;

3

20. Any and all documents and other information relied upon in support of the reasonableness of the allocation percentages used in determining amounts charged to Fund VI for "post-receivership expenses;

21. Any and all documents and other information, not already provided, itemizing services requested by the Receiver and performed by ZSC for the receivership in assistance to the Receiver.

Please also provide a copy of the financial statements of ZSC as of a recent date and for the year ended December 31, 2005 and the interim period through a recent date.

Please provide this information as promptly as possible and in any event no later than March 15, 2006 to:

> Maurice J. Whalen
> Principal Agent for the Receiver
> U.S. Small Business Administration as Receiver
>   for Zero Stage Capital VI, L.P.
> 666 Eleventh Street, N.W., Suite 200
> Washington, D.C.  20001
> Direct Dial:  (202) 638-0902
> mwhalen@etnet.com

Failure to properly and timely respond to this request could cause the Receiver to recommend to the Court that this claim be denied. You should also remember that the Court has established January 20, 2006 as the claims bar date, and the Receiver has no power to extend it. Finally, it should be clearly understood that the mere receipt of a response to this request shall not cause the Receiver to recommend to the Court that all or any part of this claim be paid in full or in part.

Thank you.

Very truly yours,

U.S. SMALL BUSINESS ADMINISTRATION
  as Receiver for Zero Stage Capital VI, L.P.


By: _____
      MAURICE J. WHALEN
      Principal Agent for the Receiver

4

# EXHIBIT J

BINGHAM McCUTCHEN

Donald K. Stern
Direct Phone: (617) 951-8250
Direct Fax:    (617) 951-8736
donald.stern@bingham.com

March 15, 2006

**By Hand**

Bingham McCutchen LLP
150 Federal Street
Boston, MA
02110-1726

617.951.8000
617.951.8736 fax

bingham.com

Boston
Hartford
London
Los Angeles
New York
Orange County
San Francisco
Silicon Valley
Tokyo
Walnut Creek
Washington

Mr. Maurice J. Whalen
Principal Agent for the Receiver
U.S. Small Business Administration as Receiver
    for Zero Stage Capital VI, L.P.
666 Eleventh Street, NW, Suite 200
Washington, DC  20001

Re:  *United States v. Zero Stage Capital VI, L.P.*
     <u>**Case No. 05-10887 (JLT), USDC for the District of Massachusetts**</u>

Dear Mr. Whalen:

This letter is submitted by Zero Stage Capital ("Zero Stage") in response to your letter of February 15, 2006 (the "Information Request") and your telephone conversation with my partner, Julia Frost-Davies.

Please note that, to facilitate your review of Zero Stage's claim, we have not only responded to your Information Request, but we have also provided you with details as to the context in which much of the claim must be viewed: in connection with discussions among Zero Stage and Thomas Morris of the SBA and representations made by Mr. Morris to Zero Stage, on which my client relied in proceeding with the receivership. This context should provide you with a helpful framework in reviewing the claim.

Although there is no formal procedure in place for the Receiver to seek discovery of the sort set forth in your Information Request, Zero Stage desires to cooperate fully with the Receiver in the resolution of its claim. We trust that the Receiver will proceed in like fashion. Accordingly, we shall shortly provide you with a request for information directed to the Receiver.

We ask that within 30 days of receipt of the enclosed response to your Information Request, you advise us as to the Receiver's position with regard to allowance of the Zero Stage claim. Should you be inclined to recommend any course of action other than full allowance of the Zero Stage claim, please provide this office, within 45 days of the enclosed response, a full and complete response to our request for information. We and our client then request a meeting with

Mr. Maurice J. Whalen
March 15, 2006
Page 2

you, Mr. Morris, and any other appropriate SBA representative, within 20 days of your submission of the response to our request for information. We would be glad to host this meeting in our offices in Washington, D.C.

I trust that the supplemental information provided to you in this response – much, if not all, of which has been previously provided to the SBA through invoices, meetings, and discussions with you and Mr. Morris – will permit you to recommend allowance of the Zero Stage claim in full.

Bingham McCutchen LLP
bingham.com

I look forward to speaking with you.

Very truly yours,

Donald K. Stern

Enclosure

cc:    Mr. Thomas G. Morris
       Mr. Paul M. Kelley
       Theodore J. Tedeschi, Esq.
       John L. Koenig, Esq.
       Julia Frost-Davies, Esq.

**RESPONSE TO RECEIVER'S FEBRUARY 15, 2006 LETTER**

1.    **Any and all documents and other information relied upon in support of the claim that accrued management fees of $7,941,477.00 minus waived fees of $4,016,141.29 or $3,925,335.71 of accrued fees are payable to ZSC by Fund VI.**

**Response:**    Please refer to Zero Stage's Memorandum in Support of Claim dated January 19, 2006 (the "Claim Memorandum") at 1-4, and the Exhibits referred to therein.

2.    **Any and all documents, and other information relied upon in support of the apparent position that numbered paragraph 2 of the April 28, 2005 Resolution Agreement letter does not constitute an agreement to defer any balance of accrued management fees "until such time as SBA is paid in full Licensee's Participating Securities and all accrued Prioritized Payments".**

**Response:**    Please refer to Claim Memorandum at 3-4 and note 9. The April 2005 Letter does not constitute an irrevocable deferral of all amounts in excess of the amount of the ImproveNet Waiver.[1]

The phrase "may be deferred" as used in the April 2005 Letter is not an irrevocable waiver of Management Fees accrued in excess of the ImproveNet Waiver, nor does it represent a definitive agreement to defer such amounts. As suggested in the attached email dated April 26, 2005 from Thomas W. Rigby of the SBA to Michael Haynes, SBIC counsel to Zero Stage, the waiver contemplated by the April 2005 Letter is limited to the resolution of the ImproveNet matter: "The only item that I believe Tom Morris agreed to resolve was the ImproveNet issue through the waiver of fees, which is the reason for the letter in the first place . . . ." Zero Stage representatives are willing to explain this position in more detail at a meeting with SBA representatives, to be scheduled at your convenience.

Moreover, the April 2005 Letter does not constitute a deferral of out-of-pocket expenses. These expenses were discussed during a number of communications with Thomas G. Morris of the SBA that occurred in early 2005. In particular, in a March 4, 2005 meeting at SBA Headquarters in Washington, D.C., representatives from Zero Stage and the SBA, including Mr. Morris, discussed the SBA's decision to put Fund VI into receivership. On the issue of Zero Stage's cooperation during the transition period, Zero Stage proposed a look-back to recoup a reasonable portion of unpaid Management Fees otherwise attributable to out-of-pocket expenses, depending upon availability of monies from liquidity events. Mr. Morris represented that a look-back would be appropriate.

On March 30, 2005, in a meeting with Mr. Haynes, Mr. Morris stated that to the extent that Fund VI had paid expenses to outside parties, he approved having those expenses

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Claim and Claim Memorandum.

reimbursed by Fund VI; and that if there were insufficient cash in Fund VI to pay for those expenses, Zero Stage would have a claim in receivership for those out-of-pocket expenses.

During an April 25, 2005 conference call, Mr. Haynes told Mr. Morris that Zero Stage would deliver expense allocations to Mr. Morris that afternoon. Mr. Morris responded that the SBA would turn that around quickly. These expense allocations were provided to Mr. Morris under cover of a letter dated April 27, 2005, a copy of which is Exhibit 16 to the Claim Memorandum. In an April 27, 2005 meeting with Mr. Haynes, Mr. Morris again confirmed his intention to cause or to authorize reimbursement of third-party expenses. Based on these representations by Mr. Morris, upon which Zero Stage relied, it was Zero Stage's understanding in executing the April 2005 Letter that, while the ImproveNet issue would be resolved by the ImproveNet Waiver, Zero Stage would be reimbursed at least for the out-of-pocket expenses it paid in connection with managing Fund VI.

In fact, there were several discussions subsequent to the April 2005 Letter in which Mr. Morris reaffirmed his representations regarding reimbursement to various Zero Stage employees and representatives. On May 2, 2005, Mr. Haynes spoke with Mr. Morris about Zero Stage's expense spreadsheet. Mr. Morris said that he would need proof of payment for the expenses shown: cancelled checks, bills, or other documentation evidencing that payments had been made. He further advised that if there were legitimate third-party expenses within the accrued management fee above the amount needed to resolve the ImproveNet matter, he would allow them if properly substantiated. Zero Stage promptly provided this supporting documentation in the form of four binders under cover of a letter dated May 4, 2005, a copy of which is Exhibit 17 to the Claim Memorandum; enclosed with that letter was a letter from Zero Stage's independent accountants describing in detail the expense allocation analysis.

Furthermore, Section 4.11(b) of the Partnership Agreement (Exhibit 1 to the Claim Memorandum) contemplates precisely this sort of reimbursement:

> The provisions of this Agreement . . . and the Management Agreement shall <u>not</u> be construed . . . subject to compliance with the SBIC Act, to prohibit the General Partner [ZSCA VI] or the Management Company [Zero Stage] and their respective Affiliates [as defined in the Partnership Agreement] from receiving and retaining reimbursement for out-of-pocket expenses paid by them [emphasis added].

**3.    Any and all documents and other information relied upon in support of the position that "the Management Agreement therefore contemplates that Zero Stage (ZSC) would pay such "Management Expenses" incurred in connection with management services provided to Fund VI (the "<u>3(a) Expenses</u>") from the earned Management Fee", whereas Section 3(a) actually calls for ZSC to bear all costs and expenses of providing the agreed services "<u>without limitation</u>".**

**Response:**    The phrase "without limitation" is taken out of context in this question: the phrase does not have any bearing whatsoever on the <u>amount</u> or <u>extent</u> of expenses for which the management company may be liable under Section 3(a) of the Management Agreement. Rather, the phrase precedes and qualifies as non-exhaustive the list of categories of expenses that

immediately follows, which includes (i) salaries and expenses; (ii) office, travel, business development, equipment rental, bookkeeping, and supplies as may reasonably be required; and (iii) expenses associated with the development, investigation, and monitoring of investments.

**4.     Any and all documents and other information relied upon in support of the statement that "the allocation of expenses under Section 3 of the management agreement is typical of the relationships established by SBIC companies and their investment advisors or managers".**

**Response:**     Please refer to 13 CFR § 107.520.  Section 3(a) of the Management Agreement generally tracks section 107.520(a).  Section 107.520(b) makes clear that expenses that are not those "generally performed by a venture capital company" are excluded from section 107.520(a).  The allocation of 3(a) and 3(b) Expenses contained in the Management Agreement mirrors this regulatory distinction.  (Please refer also to Claim Memorandum at 1-2 and note 1.)

This statement is also based on Zero Stage's experience, having managed several SBIC funds over the course of many years, that the allocation is indeed typical, as representatives of Zero Stage would be willing to explain in greater depth at a meeting.  As noted in the Claim Memorandum, the SBA approved the allocation through its approval of the Management Agreement pursuant to 13 CFR § 107.510.

In addition, as you are undoubtedly aware, though drafted prior to its publication, Section 3(a) of the Management Agreement tracks nearly verbatim Section 3.09(a) of the Model Participating Security SBIC, L.P. Version 2.0 (SBA Model Form of Agreement of Limited Partnership for an SBIC Issuing Participating Securities) (the "Model Agreement").  The Model Agreement was prepared by the SBA to assist both the SBA and applicants for SBIC licenses.  The Model Agreement is designed primarily to assist the SBA in insuring that partnership agreements filed by SBIC applicants incorporate a number of critical SBA regulatory requirements, and to provide a basic form of agreement an applicant can use by adding a number of provisions to adapt to individual circumstances.  The SBA, only after substantial review and discussions, both internally and with numerous participants in the SBIC and venture industry, adopted Section 3.09(a) of the Model Agreement (along with the other provisions of the Agreement) because it determined that the allocation of expenses set forth in Section 3.09(a) were typical of the venture industry and acceptable to the SBA.

**5.     Any and all documents and other information relied upon in support of the suggestion that ZSC participated in any way in the "liquidity events occurring after Zero Stage was moved into the Office of Liquidation that have resulted in approximately $14,906,743 in actual or prospective cash flowing into Fund VI...".**

**Response:**    We understand this question to relate to Exhibit 15 of the Claim Memorandum. While we believe the Receiver to be in possession of the facts relating to and supporting Exhibit 15, we note as follows:[2]

During the relevant period (and at other times), Zero Stage participated in and contributed materially, and in some cases virtually single-handedly, to the successful monetization of the several investments listed in Exhibit 15. The record is clear that Zero Stage was instrumental in initiating and implementing changes, and taking or forcing actions at those companies that led directly to the positive results noted in the Exhibit.

*Digital Angel (Outerlink)*

During the relevant period, through substantial hard work and creativity, Zero Stage completely turned around Outerlink Corporation. These efforts resulted in a very profitable exit within a period of approximately eighteen months. Among other things, Zero Stage (i) installed a new CEO, (ii) repositioned the company's strategy and product to focus on homeland security applications (completely shifting the company's market position), and (iii) concurrently searched for strategic partners and acquirers, resulting in the merger of the company with Digital Angel Corporation, an AMEX-listed company. These efforts led to a return multiple of over 13 times the capital invested during the period, and a total exit value of approximately $35 million.

Zero Stage continues to be willing to make any files not already in your or the SBA's possession available for inspection, discussion, and copying at its offices should you so desire.

*LiveWave*

LiveWave's technology was developed to allow oceanographers to operate underwater cameras through wireless software and communications. During the relevant period, Zero Stage correctly concluded that neither this, nor the broadcast media space, presented a sufficiently large market for the application of the technology. Consequently, Zero Stage advised the company to reposition its technology for intelligent digital video surveillance and access control solutions. With the hands-on guidance of Zero Stage's representatives on the company's board of directors, and other Zero Stage personnel and consultants, the company shifted focus and developed advanced intrusion detection software and provided engineering and integration services for enterprise-level physical security.

Zero Stage also worked to introduce the company to potential governmental customers, including the United States Departments of Defense, Energy and Homeland Security, the Massachusetts Bay Transportation Authority and the Washington Metropolitan Area Transit Authority (WMATA). LiveWave was chosen as a security surveillance vendor of choice for (i) the Democratic and Republican National Conventions, (ii) the U.S. Department of Homeland

---

[2] In addition to providing the Claim and related Exhibits, and providing Tom Morris of the SBA with substantial documentation on or about May 4, 2005, Zero Stage has turned over to the SBA all relevant files concerning Fund VI.

Security's Immigration and Customs Enforcement, and (iii) the Federal Protective Service for the 2005 Presidential Inauguration in Washington, D.C.[3]

Zero Stage's efforts with LiveWave were primary contributors to the company's acquisition, finalized in October 2005, by the United Kingdom conglomerate Smith's Detection, for an aggregate price of approximately $18 million, and a realization for Fund VI of well over $8 million, as reflected in Exhibit 15.

## ViaCell

ViaCell was organized in the mid-1990s as a stem cell research and production company known as "t.breeders." Zero Stage helped nurture this company while focusing the other investors and management on the near-impossible chances of achieving revenue, scale and viability in stem cell research and production in a difficult and complex political environment. Zero Stage convinced the company to shift its attention entirely and to become a cord blood banking company. Zero Stage then identified the platform company VIACORD to merge with t.breeders, with the resulting company being ViaCell. This merger produced a revenue-generating, scalable production company leading to an initial public offering of approximately $60 million in January 2005. As a result of the IPO, Fund VI received well over $5 million, as indicated in Exhibit 15.

## WorldWinner

The "Note" to Exhibit 15 points out that in addition to the monies reflected as a result of transactions involving Digital Angel (Outerlink), LiveWave and ViaCell, there are six other operating companies that could return additional capital to the SBA in the future. As predicted, one of the six companies mentioned in the Note, WorldWinner, is scheduled to be sold this March for close to $29 million. The sale should return over $4 million to the SBA.

Although the company was a leading global provider of online games of skill for cash and prizes, it became apparent to Zero Stage several years ago that because of legal and structural obstacles, the company could not continue to stand alone. This was not apparent to management at the time, or to co-investors. However, during the relevant period, through the efforts of its representatives on the company's board of directors and consultants affiliated with Zero Stage, Zero Stage worked hard to cause a shift in this view.

Zero Stage engaged in numerous discussions with management and co-investors in order to convince them that the only viable option for this company was merger or sale. To prove the viability of this strategy to management and co-investors, Zero Stage brought strong potential acquirers to the table, such as Shanda Interactive Entertainment and Netease, Inc., both NASDQ-listed companies, the latter boasting a market capitalization of several billion dollars. Through

---

[3] WMATA now uses the company's technology in the "Protect" System, which combines video and chemical agent sensors for early warning and facility management in the Washington, D.C. Metro subway system. The company's "FirstView" digital video encoder and server system is also used in the National Counterterrorism Center.

these efforts, Zero Stage effected a quantum shift in the approach and attitude of management and co-investors, bringing about a consensus to make a strategic exit by merger or sale of the company, all leading to the current transaction.[4]

6.    **Any and all documents and other information evidencing the details of the reported comprehensive review of the managements of each Fund VI portfolio company and the internal monitoring of the investments by various ZSC personnel conducted by ZSC once Fund VI was found to be "in distress" and both were found to be lacking in material respects necessitating wholesale internal changes at ZSC.**

**Response:**    This question appears related to Exhibit 19 to the Claim Memorandum. As you are aware, and as explained on page six of the Claim Memorandum, Fund VI was a vintage 1999 venture capital fund whose failure was due in large part to "the decelerating business climate that accompanied the bursting of the 'dot com' bubble [which] resulted in lower company valuations, few exit opportunities, and longer time frames (7-10 years as opposed to 3-5 years) from initial investment to exit." Information supporting this description of the "bursting bubble" is in the public domain, but we are willing to discuss with you at greater length the economic and financial conditions pertaining to the relevant period.

The SBA already has in its possession or control a number of items of correspondence and documents, including but not limited to (i) multiple communications between Zero Stage and the SBA regarding and reflecting Zero Stage's concerns (and the SBA's) with Fund VI's performance, and the aggressive steps being taken by Zero Stage to address them, and (ii) separation agreements between Zero Stage and several separated Zero Stage investment professionals, the latter reflecting but a few of the internal changes to which you refer.

7.    **Any and all documents and other information relied upon in support of the claim that Fund VI should reimburse ZSC for expenses incurred by ZSC in attempting to correct material deficiencies caused by ZSC in its performance under the terms of the Fund VI management Agreement.**

**Response:**    It is unclear what is meant by the assertion that there were "material deficiencies caused by ZSC in its performance under the terms of the Fund VI management [sic] Agreement." Zero Stage is therefore unable to respond to this statement and requests that you clarify what information this part of the question aims to elicit. To the extent it may be responsive, please refer to Response No. 6 above. We are unaware of any allegation that the financial performance of Fund VI resulted from any alleged failure by Zero Stage to comply with SBA regulations. To the extent this question relates to the ImproveNet matter, please refer also

---

[4] Although neither of these companies was the ultimate buyer (which confidentiality requirements prevent us from identifying), the interest and interaction of these companies with WorldWinner was important proof of the Zero Stage thesis that not only was an exit the best strategy, but that viable exit partners were available. Zero Stage Capital VII, LP and parallel funds are also investors in WorldWinner, and will benefit from its sale.

to note 10 of the Claim Memorandum for the soundness of Fund VI's decision to invest in that portfolio company.

As to why Fund VI should reimburse Zero Stage for the expenses it incurred as it continued to work on the Fund VI portfolio during the time it was no longer receiving a Management Fee on a current basis, Mr. Morris of the SBA represented on several occasions that Zero Stage should at least be paid for expenses incurred in connection with its management of Fund VI (see Response No. 2 above). As further noted in Response No. 2 above, Section 4.11 of the Partnership Agreement expressly contemplates such reimbursement.

**8.    Any and all documents and other information evidencing that "during the relevant period very minimal effort was expended on the other affiliated funds, and that at times well in excess of half, and at times close to all, of the firm's energies and resources were devoted to Fund VI."**

**Response:**    Please refer to Exhibit 19 of the Claim Memorandum. Please refer also to the several binders that were provided to Mr. Morris of the SBA on or about May 4, 2005, under cover of the letter attached as Exhibit 17 to the Claim Memorandum. Like many other venture capital firms, Zero Stage does not create or maintain time records of the work performed by its professionals and affiliated consultants. Should you wish, representatives of Zero Stage are willing to discuss this question in greater detail at a meeting scheduled at your convenience.

**9.    Any and all documents and other information tabulating the management fees collected by ZSC from the other affiliated funds during this period.**

**Response:**    Please refer to Exhibits 5 through 7 of the Claim Memorandum; the quarterly and audited annual Forms 468 provided to the SBA during the relevant period for each of the SBIC Affiliated Funds; the management agreements for each of the SBIC Affiliated Funds, which are already in the SBA's possession; and the SBA's annual audit report of each of the SBIC Affiliated Funds. Zero Stage is willing to provide copies of any of the above documents (with the exception of the last, which is not provided to Zero Stage) if you are unable to locate them in the SBA's files.

**10.    Any and all documents and other information relied upon in support of the claim that section 3(a) expenses are "... "third party" or "out-of-pocket" expenses incurred by Zero Stage in providing management services to Fund VI", rather than normal fixed operating expenses of ZSC, for which ZSC is responsible under section 3(a) "without limitation".**

**Response:**    As noted in Response No. 3 above, the phrase "without limitation" in Section 3(a) of the Management Agreement is taken out of context and has no bearing on the amount or extent of expenses for which the management company may be liable. Rather, the phrase precedes and qualifies as non-exhaustive the list of categories of expenses that immediately follows.

The list of expenses in Section 3(a) of the Management Agreement comprises many types of expenses, some "out-of-pocket" and some not. Mr. Morris represented that Zero Stage would be reimbursed, either prior to or as part of the receivership process, for out-of-pocket expenses advanced by Zero Stage in connection with its management of Fund VI (see Response No. 2 above). Based on these representations, upon which Zero Stage relied, it was Zero Stage's understanding that reimbursement for out-of-pocket expenses, including qualifying expenses listed in Section 3(a) of the Management Agreement, would be forthcoming from the SBA. As noted in Response No. 2 above, reimbursement for such expenses is consistent with Section 4.11 of the Partnership Agreement.

**11.    Any and all documents and other information relied upon in support of the propriety of allocating portions of Section 3(a) expenses to Fund VI.**

**Response:**    As noted in Response Nos. 2, 7 and 10 above, Mr. Morris on several occasions represented that Zero Stage would be reimbursed for out-of-pocket expenses related to the management of Fund VI.

**12.    Any and all documents and other information relied upon in support of the reasonableness of the allocation percentages used in apportioning the aforesaid ZSC operating expenses to Fund VI.**

**Response:**    Please refer to Exhibit 19 of the Claim Memorandum. Please refer also to the several binders that were provided to Mr. Morris of the SBA on or about May 4, 2005, under cover of the letter attached as Exhibit 17 to the Claim Memorandum, which include invoices to support calculation of these expenses. The figures provided in Exhibit 18 of the Claim Memorandum are the result of Zero Stage's good faith and extensive efforts, in conjunction with its outside accountants, to determine what percentage of expenses is attributable to the services Zero Stage provided Fund VI in relation to those provided Affiliated Funds during the applicable time period. The allocation percentages applied and the resulting figures are indeed reasonable. As noted in Response No. 8 above, Zero Stage does not create or maintain time records of the work performed by its professionals or affiliated consultants. In light of this industry custom, an allocation based on the time and effort expended by the management company's professionals and consultants in managing a fund is a fair way to reflect the distribution of expenses across the funds managed by Zero Stage.

Moreover, in response to this and other questions, we employed an alternative approach to the allocation of operating expenses to Fund VI. The attached analysis of 3(a) Expenses reflects an allocation of management company fee revenue fund-by-fund during the relevant period. The result is a percentage to be allocated to Fund VI for management company expenses based on Fund VI's size relative to the other funds. This analysis provides a total allocation of 3(a) Expenses to Fund VI in the amount of $927,307, which is reflected in the analysis summary, as supported by the analyses of individual years which follows.

It is important to keep in mind that these alternative calculations underestimate the actual time and effort which Fund VI disproportionately consumed during the period in question. While the figure quoted above from the most recent alternative analysis is lower than that

provided in the Claim, the figure in the Claim, based on the methodology described in Exhibit 19 to the Claim, better reflects the time and effort expended by Zero Stage professionals and consultants in managing Fund VI.

**13.    Any and all documents and other information relied upon in support of the propriety of using the reimbursement of section 3(a) and section 3(b) expenses in fact as a partial reimbursement of the accrued management fees deferred under the terms of the April 28, 2005 Resolution Agreement.**

**Response:**    As noted in Response Nos. 2, 7, 10 and 11 above, on several occasions Mr. Morris represented that Zero Stage would be reimbursed for its out-of-pocket expenses. Such reimbursement is provided for in Section 4.11 of the Partnership Agreement. In addition, as more fully developed in Response No. 2, such reimbursement is not inconsistent with the April 2005 Letter.

Setting aside for the moment those out-of-pocket expenses that would qualify as "3(a) Expenses" (and that Mr. Morris has repeatedly represented would be reimbursed), Section 4(a) of the Management Agreement makes clear that 3(b) Expenses are unrelated to the Management Fee.[5]  3(b) Expenses cannot be deemed affected by the April 2005 Letter or included in any reference to Management Fees.  In other words, not only did the April 2005 Letter not irrevocably defer Management Fee payments, but the letter also has no bearing whatsoever on Zero Stage's entitlement to reimbursement for 3(b) Expenses.  There is no contractual or other basis for your suggestion that reimbursement of 3(b) Expenses would effect a "partial reimbursement of the accrued management fees" – whether Management Fees were deferred or not.

**14.    Any and all documents and other information relied upon in support of the claim for Section 3(b) expenses for the years 2002 through May 2005, being consulting, legal and professional expenses and office supplies actually incurred by ZSC and allocated to Fund VI at rates ranging from 30%, through 60% to as high as 75%.**

**Response:**    Please refer to Exhibit 19 to the Claim Memorandum.  In addition, Zero Stage entered into a consulting agreement with Bain & Company, Inc. ("Bain") whereby Bain

---

[5] Section 4(a) of the Management Agreement (which was approved by the SBA pursuant to 13 CFR § 107.510) provides that "The Partnership will pay to ZSC, as full compensation for the services rendered and expenses borne by ZSC pursuant to this Agreement, a management fee . . ." (emphasis added). Section 3(a) states that "ZSC will bear all costs and expenses in connection with the services described in Section 2 . . ." (emphasis added).  Section 2 of the Management Agreement describes services to be provided by Zero Stage as management company.  Thus, it is clear that the Management Fee to be paid pursuant to Section 4 of the Management Agreement contemplates that the Management Fee is to be used to cover the "costs and expenses" borne by Zero Stage pursuant to Section 3(a) in performing the services described in Section 2.  This compensation (i.e., management fee) provision does not address 3(b) Expenses, "all of which shall be borne by the Partnership [i.e., Fund VI]."  Therefore, any reference to the management fee cannot encompass payments of 3(b) Expenses by Zero Stage on behalf of Fund VI.

was to provide services on behalf of various portfolio companies. This contract was designed to synergistically facilitate and expedite profitable exits from investments. Bain had certain in-house expertise either not available at Zero Stage or supplemental to that available at Zero Stage. Bain also had extensive relationships across multiple industries that were seen as enhancing merger or sale possibilities for these companies. Approximately nine Fund VI portfolio companies were among those addressed by Bain. The aggregate paid to Bain by Zero Stage for these consulting services was $1,335,248. Zero Stage will supplement this response to provide the portion allocable to Fund VI for these payments.

**15.    Any and all documents and other information relied upon in support of the propriety of allocating to Fund VI portions of Section 3(b) expenses, otherwise not directly chargeable to Fund VI.**

**Response:**    The expenses categorized as 3(b) Expenses are, by the definition in Section 3(b) of the Management Agreement, "directly chargeable to Fund VI." To the extent an expense would be chargeable to Fund VI under Section 3(b) of the Management Agreement but is unclear from its invoice, Exhibit 19 of the Claim Memorandum explains the rationale for allocating such expenses in the manner reflected in the summaries at Exhibit 18. Zero Stage believes such allocation is consistent with both the representations made by Mr. Morris and Section 4.11 of the Partnership Agreement.

**16.    Any and all documents and other information relied upon in support of the reasonableness of the allocation percentages used in apportioning the aforesaid Section 3(b) expenses to Fund VI.**

**Response:**    Please refer to Response Nos. 14 and 15 above.

**17.    Any and all additional documents and other information relied upon in support of apportioning Section 3(b) expenses to Fund VI, including detail support for whether said expenses "...were related to services provided for ZSC IV..." and for the "supporting detail and interviews with management" relied upon in determining the relevance and propriety of the allocation percentages.**

**Response:**    Please refer to Response Nos. 14 and 15 above.

**18.    Any and all documents and other information relied upon in support of the claim that "Zero Stage personnel have expended significant time and effort assisting the Receiver in taking over Fund VI".**

**Response:**    Please refer to Exhibit 19 of the Claim Memorandum, note 2 above, and the documents referred to therein. In addition, please refer to Exhibits 17 and 18 of the Claim Memorandum, and in particular to the "Independent Accountant's Report on Applying Agreed-Upon Procedures", which is a part of Exhibit 17. Zero Stage support and professional staff provided substantial transitional and other services over a number of months.

Further, both Theodore Tedeschi and Christopher Hines, the latter of the accounting firm Feeley & Driscoll, P.C., met with you at some length on June 15, 2005 at the Zero Stage offices in Cambridge, Massachusetts to address the request contained in item 19 of your letter, as well as many of the other matters referred to in the other numbered paragraphs of the letter, including your questions 7, 8, 10, 11, 12, 13, 14, 15, 17, and 20. In addition, Mr. Morris has consistently agreed that Zero Stage is entitled to reimbursement of its out-of-pocket expenses.

Further with regard to reimbursement of expenses during the transition of Fund VI management to the Receiver, at a March 4, 2005 meeting at SBA Headquarters in Washington, D.C., including Paul Kelley, Ed Wang, Mike Haynes, Tom Morris, Tom Rigby and Elaine Hruschka, Mr. Morris announced that the SBA had decided to pursue receivership for Fund VI. Mr. Morris instructed the Zero Stage personnel present that the Receiver would require the timely assistance and cooperation of Zero Stage for three to six months during the handover to the Receiver, after which period the Receiver would elect either to continue or discontinue utilizing Zero Stage's services. When told that Zero Stage would expect and require compensation for its continuing efforts to manage and monetize the portfolio, Mr. Morris stated that all parties involved in workout, liquidation, dissolution or windup of the portfolio are entitled to receive compensation for the continuing management and monetizing of the portfolio. Mr. Morris also represented – during the March 4, 2005 meeting with Zero Stage and SBA representatives and again during his March 30, 2005 meeting with Mr. Haynes – that he had the authority to provide an immediate $500,000 (or more) to cover ongoing and projected expenses that were given proper attribution and accounting.[6] In the March 30, 2005 meeting with Mr. Haynes, Mr. Morris represented that once the receivership was entered into, he expected that Zero Stage officials would be paid for management expenses going forward for at least six weeks, and probably longer.

As Zero Stage previously advised – both in the meeting in Cambridge and in other communications – several Feeley & Driscoll accounting professionals worked continuously for a week on-site at Zero Stage to prepare and or confirm the figures and tables provided to you and referred to in Exhibit 17 (and elsewhere). Among their tasks was to confirm the reasonableness, under the circumstances, of the use of allocation percentages and the actual allocations made. Should you wish, Zero Stage is willing to meet with SBA representatives to discuss any remaining concerns on this and other topics raised in your letter.

All files, financing closing documents and other materials relating to Fund VI were, as requested by your staff, collected and organized for delivery to your personnel. This was a very time-consuming and labor-intensive process. Zero Stage's efforts were graciously acknowledged by Christine Rishty, Mr. Morris, Attorney Thomas Rigby of the SBA and others (all of whom were directly involved with the handover of Fund VI to the SBA). They indicated that the files, books and records Zero Stage organized and delivered were "bank quality," and among the best they had seen in this type of process.

---

[6] Zero Stage responded to Mr. Morris's representation regarding the availability of such an amount in a letter from Paul Kelley dated March 25, 2005, a copy of which is attached.

19.    Any and all documents and other information relied upon in support of the use of allocation percentages in determining amounts charged to Fund VI for "post-receivership expenses".

Response:    Please refer to Response No. 18 above.

20.    Any and all documents and other information relied upon in support of the reasonableness of the allocation percentages used in determining amounts charged to Fund VI for "post-receivership expenses".

Response:    As noted in Response No. 8 above, like many other venture capital firms, Zero Stage does not create or maintain time records of the work performed by its professionals and affiliated consultants.  The percentages used for the allocation of time and effort as reflected in Exhibits 20 and 21 of the Claim Memorandum are a reasonable estimate of the work performed by Zero Stage personnel in assisting the Receiver in assuming management of Fund VI.  Zero Stage personnel were eager to, and did, demonstrate the utmost cooperation and responsiveness in assisting you and your staff in the two months following the Receivership Date.

21.    Any and all documents and other information, not already provided, itemizing services requested by the Receiver and performed by ZSC for the receivership in assistance to the Receiver.

Response:    The long and cordial relationship shared by Zero Stage and the SBA, especially between Paul Kelley of Zero Stage and Mr. Morris, is touched upon beginning on page 3 of the Claim Memorandum.  Thus, one might expect that in the course of conversations between the parties regarding the receivership, Zero Stage would express its willingness and desire to cooperate fully with the SBA and its agent in any way possible.  For his part, Mr. Morris represented that he would expect Zero Stage to work on the transition for several months and that Zero Stage would be compensated for its efforts (see Response No. 18).

Zero Stage relied on this relationship and these representations, and understood that it would be compensated in accordance with them.  In addition, the Receiver requested specific information and assistance from Zero Stage, which Zero Stage provided on a number of occasions, in addition to the continuing work performed for and cooperation provided the SBA by Zero Stage for the benefit of Fund VI.  Attached are some records of correspondence and some other documentation reflecting assistance by Zero Stage personnel both during the transition to receivership and after the Receivership Date.

* * * * * *

You requested a copy of the Zero Stage Capital financial statements as of December 31, 2005.  These financial statements are currently in process and will be forwarded to you as soon as they become available.

# EXHIBIT K

**Maurice Whalen**

**From:**     Ted Tedeschi [ttedeschi@mkmlegal.com]
**Sent:**     Wednesday, June 29, 2005 2:43 PM
**To:**       Maurice Whalen
**Subject:** RE: Services to the Zero Stage VI Receivership

Hi, Moe,

A couple of comments.

Subject to confirming my views with the folks at Zero Stage... I don't think that it makes much sense at this point to spend the time doing an agreement that only has a life through June 30, or for me to re-canvass the folks at Zero Stage to submit another invoice. This is not to say that we will not continue to help out in any way we can, just that we can't justify spending any more time and energy quantifying, justifying, and documenting our May / June involvement. As you can imagine, we have many other things going on, as I know you do.

Management company financials are not audited. I will check with Zero Stage tomorrow to find out what they have and when they can get it to you. It might help if you would clarify the relevance of this information.

Thanks for your continuing cooperation.

Best regards.

Theodore Tedeschi
McNamara Koenig & McCarthy, PC
65 William Street, Suite 250
Wellesley Ma. 02481
781- 431 - 1700
Fax 781- 431 - 1304
ttedeschi@mkmlegal.com

**From:** Maurice Whalen [mailto:mwhalen@etnet.com]
**Sent:** Wednesday, June 29, 2005 2:01 PM
**To:** ttedeschi@zerostage.com
**Cc:** PK@ZeroStage.com; gail.green@sba.gov; thomas.morris@sba.gov; thomas.rigby@sba.gov; matt@zerostage.com
**Subject:** Services to the Zero Stage VI Receivership

Ted:

I met at the SBA this morning and, among other things, we discussed the issue of services provided to the Fund VI receivership by ZSC personnel since May 4 2005 and appropriate compensation for those services.   We came to a couple of conclusions:

1.   We need to finalize a formal contractual agreement between the receivership and ZSC for support services rendered to the receivership and we will draft such an agreement over the next couple of weeks. (I shall be off on vacation next week)
2.   We agreed that the contractual agreement should incorporate payments to ZSC for time and expenses of its personnel while performing specific requested services for Fund VI and any related incurred documented out-of-pocket expenses.
3.   We agreed that such services, other than those required by the Receivership Order, will no longer be required and the agreement will terminate effective June 30, 2005.

In anticipation of our finalizing that agreement, it would be useful for you to review the services actually performed by ZSC personnel in support of the Fund VI receivership since May 4, 20005 and the related draft invoice for May

9/11/2006

that you previously shared with me. Please revise and resubmit the draft invoice for May and prepare an invoice for June containing significantly more detailed explanations of each of the services rendered and revise those of the time charges that may be overstated in the draft (e.g., "portfolio work" and "consulting" are not only insufficient detail explanations but no "portfolio work" was actually requested by the receivership). Please also provide support for the reasonableness of the hourly billing rates being charged.

Let me know if you have any questions on this matter.

We are also continuing to consider the waived fees/ past years' expense reimbursement issue and in that connection it would be most helpful if you would forward to me copies of the ZSC audited annual financial statements for the last few years, more specifically, 2002, 2003 and 2004.

Thanks and best regards

Moe

9/11/2006

**Maurice Whalen**

| | |
|---|---|
| **From:** | Maurice Whalen |
| **Sent:** | Tuesday, July 26, 2005 4:42 PM |
| **To:** | 'Edwin J. Wang'; ttedeschi@zerostage.com |
| **Cc:** | matt@zerostage.com; PK@ZeroStage.com; Gail G Green (gail.green@sba.gov); Tom Morris (thomas.morris@sba.gov) |
| **Subject:** | RE: Services to the Zero Stage VI Receivership |

Ed:
 I can't answer your question.  You will need talk to your cranky counsel as to any contract and whether he believes it worthwhile to negotiate one.  This little issue has gotten a little out of hand.   Maybe you can get people refocused.

From my perspective, the ZSC administrative staff provided the receivership some good assistance gathering, inventorying and shipping documents as well as other administrative assistance responding to requests from Gail Green and Christine Rishty.  (I may have had a couple requests in there too, I just don't recall).  Those requested services, and any related out-of-pocket expenses, deserve compensation at a reasonable rate.   It seems to me relatively easy to determine the time and expense involved and I look forward to discussing a proposal for payment on those services rendered.

With respect to any management time, other than the two meeting we had in your offices, I can not recall any services requested of the management team.  I questioned through Ted the draft billing, including some 49 hours of your time for "portfolio services" and consulting, pointing out I knew of no request for any such services and could not determine what you actually were doing in those 49 hours.  I believe the two meetings we had were more as required by the receivership order than any service request by the Receivership.

Let me know what you think.  I am not intentionally being unreasonable but I do have a responsibility to justify and properly document any disbursements made from the receivership estate.

Also, see the next "co-investment" message which is a re-sending of a previous email to which I have not had any response.  It seems to me we might work together on certain investments where both the receivership and other ZSC funds have investments (as an example, I think I am indeed carrying a load on LiveWave on behalf of ZSC VII as well as VI)  and would like to do that but I have no interest in paying any fee for cooperation any more than you would appreciate a billing from me on LiveWave.

Moe

---

**From:** Edwin J. Wang [mailto:ewang@zerostage.com]
**Sent:** Tuesday, July 26, 2005 4:08 PM
**To:** Maurice Whalen; ttedeschi@zerostage.com
**Cc:** matt@zerostage.com; PK@ZeroStage.com
**Subject:** Re: Services to the Zero Stage VI Receivership

Moe,

Whenever you have had a question of relevance to my domain, I always have responded with alacrity and diligence, in fact 24X7.  My cleaning lady should labor so assiduously.  Therefore, reference your

4/6/2006

comments below is it safe to believe that your conclusions (enumerated 1,2,3) of June 29, 2005 email date will be memorialized in a contract that should govern how ZSC is compensated for services rendered through June 30, 3005?

Thank you.

Ed

Edwin J. Wang
Managing General Partner
Zero Stage Capital
101 Main St., 17th Fl.
Cambridge, MA 02142-1519
Tel: 617-876-5355, x120
Fax: 617-876-1248
Cell: 646-505-8519
Email: ewang@zerostage.com

----- Original Message -----
**From:** Maurice Whalen
**To:** ttedeschi@zerostage.com
**Cc:** matt@zerostage.com ; PK@ZeroStage.com ; EWang@zerostage.com
**Sent:** Tuesday, July 26, 2005 3:27 PM
**Subject:** FW: Services to the Zero Stage VI Receivership

Ted:
Have you forgotten this exchange?  Scroll down and read up
Moe

**From:** Maurice Whalen
**Sent:** Monday, July 11, 2005 4:14 PM
**To:** 'Ted Tedeschi'
**Subject:** RE: Services to the Zero Stage VI Receivership

Hi Ted!

I ran off on vacation and therefore haven't had an opportunity to respond until now.
With respect to the receivership services issue and any agreements, etc., do as you think best knowing the government does have it's requirements to document what we do and why we do it.

With respect to the audited financials, I asked for audited by habit, assuming they would be readily available, since audited statements make a much better record for the file than unaudited.  However, I will take what I can get.  The relevance is simple.  It is merely part of my investigation into the reasonableness and propriety of the waived fee/expense reimbursement issue.   Let me know when you learn what they will be willing to provide me.
Thanks
Moe

**From:** Ted Tedeschi [mailto:ttedeschi@mkmlegal.com]
**Sent:** Wednesday, June 29, 2005 2:43 PM
**To:** Maurice Whalen
**Subject:** RE: Services to the Zero Stage VI Receivership

Hi, Moe,

4/6/2006

A couple of comments.

Subject to confirming my views with the folks at Zero Stage... I don't think that it makes much sense at this point to spend the time doing an agreement that only has a life through June 30, or for me to re-canvass the folks at Zero Stage to submit another invoice. This is not to say that we will not continue to help out in any way we can, just that we can't justify spending any more time and energy quantifying, justifying, and documenting our May / June involvement. As you can imagine, we have many other things going on, as I know you do.

Management company financials are not audited. I will check with Zero Stage tomorrow to find out what they have and when they can get it to you. It might help if you would clarify the relevance of this information.

Thanks for your continuing cooperation.

Best regards.


Theodore Tedeschi
McNamara Koenig & McCarthy, PC
65 William Street, Suite 250
Wellesley Ma. 02481
781- 431 - 1700
Fax 781- 431 - 1304
ttedeschi@mkmlegal.com

---

**From:** Maurice Whalen [mailto:mwhalen@etnet.com]
**Sent:** Wednesday, June 29, 2005 2:01 PM
**To:** ttedeschi@zerostage.com
**Cc:** PK@ZeroStage.com; gail.green@sba.gov; thomas.morris@sba.gov; thomas.rigby@sba.gov; matt@zerostage.com
**Subject:** Services to the Zero Stage VI Receivership

Ted:

I met at the SBA this morning and, among other things, we discussed the issue of services provided to the Fund VI receivership by ZSC personnel since May 4 2005 and appropriate compensation for those services. We came to a couple of conclusions:

1. We need to finalize a formal contractual agreement between the receivership and ZSC for support services rendered to the receivership and we will draft such an agreement over the next couple of weeks. (I shall be off on vacation next week)
2. We agreed that the contractual agreement should incorporate payments to ZSC for time and expenses of its personnel while performing specific requested services for Fund VI and any related incurred documented out-of-pocket expenses.
3. We agreed that such services, other than those required by the Receivership Order, will no longer be required and the agreement will terminate effective June 30, 2005.

In anticipation of our finalizing that agreement, it would be useful for you to review the services actually performed by ZSC personnel in support of the Fund VI receivership since May 4, 20005 and the related draft invoice for May that you previously shared with me. Please revise and resubmit the draft invoice for May and prepare an invoice for June containing significantly more detailed explanations of each of the services rendered and revise those of the time charges that may be overstated in the draft (e.g., "portfolio work" and "consulting" are not only insufficient detail explanations but no "portfolio work" was actually requested by the receivership). Please also provide support for the reasonableness of the hourly billing rates being charged.

Let me know if you have any questions on this matter.

We are also continuing to consider the waived fees/ past years' expense reimbursement issue and in that connection it would be most helpful if you would forward to me copies of the ZSC audited annual financial statements for the last few years, more specifically, 2002, 2003 and 2004.


4/6/2006

Thanks and best regards

Moe

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to which they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

4/6/2006

# EXHIBIT L

# McNamara Koenig & McCarthy, PC

## ATTORNEYS AT LAW

Telephone (781) 431-1700
www.mkmlegal.com

65 WILLIAM STREET
WELLESLEY, MASSACHUSETTS 02481

Facsimile (781) 237-8120

December 30, 2005

**BY FEDERAL EXPRESS**

SBA, Receiver for Zero Stage Capital VI, L.P.
Attention: Maurice J. Whalen, Principal Agent
666 11th Street, N.W., Suite 200
Washington, D.C. 20001-4542

Re:    <u>Civil Action No. 05 10887JLT, U.S.A. v. Zero Stage Capital VI, L.P.</u>

Dear Mr. Whalen:

In connection with the above-captioned action, we submit the following claim:

1.    <u>Full Name, Address and Telephone Number of Claimant</u>

McNamara Koenig & McCarthy, PC
65 William Street, Suite 250
Wellesley, MA 02481
Attn: John L. Koenig
781-431-1700

2.    <u>Amount of Claim</u>

$111,165.87

3.    <u>Specific Grounds for Claim</u>

This claim is based on fees for legal services provided to, and expenses incurred on behalf of, Zero Stage Capital VI, L.P. during the period from February 1, 2005 through May 31, 2005.

4.    <u>Date on which the Obligation was Incurred</u>

February 1, 2005 through May 31, 2005, as shown on the enclosed legal bills.

MᴄNᴀᴍᴀʀᴀ Kᴏᴇɴɪɢ & MᴄCᴀʀᴛʜʏ, ᴘᴄ          SBA, Receiver for Zero Stage Capital VI, L.P.
December 30, 2005
Page 2

5.    Supporting Documents for Claim

Statements for services rendered and expenses incurred are attached:

| Statement Date | Type | Amount |
|---|---|---|
| April 11, 2005: | Services | $37,019.50 |
| " | Expenses | 433.00 |
| May 10, 2005: | Services | 39,010.00 |
| June 7, 2005: | Services | 33,923.00 |
| " | Expenses | 780.37 |

TOTAL                    $111,165.87

The statements dated April 11, 2005 and May 10, 2005 are addressed to Zero Stage Capital Company, Inc., the management company of Zero Stage Capital VI, L.P. All services provided and expenses incurred during the periods shown on those statements are allocated to the Zero Stage Funds responsible for payment for the services, to specific portfolio companies, or to the Zero Stage management company. Services allocated to Zero Stage Capital VI, L.P. are shown on pages 1-5 of the April 11, 2005 statement, and on pages 1-7 of the May 10, 2005 statement. Expenses incurred on behalf of Zero Stage Capital VI, L.P. are shown on pages 12-13 of the April 11, 2005 statement.

The statement dated June 2, 2005 is addressed directly to Zero Stage Capital VI, LP, and shows only legal services provided to, and expenses incurred on behalf of, Zero Stage Capital VI, L.P. and its portfolio companies.

If you have any questions about this claim, or if you find this submission to be deficient in any way, please let us know as soon as possible.

Yours sincerely,

John L. Koenig

Encls.

ATTORNEYS AT LAW

Telephone (781) 431-1700

65 WILLIAM STREET
WELLESLEY, MASSACHUSETTS 02481

Facsimile (781) 237-8120

April 11, 2005

Zero Stage Capital Company, Inc.
Attn: David M. Carmisciano, CFO
101 Main Street, 17th Floor
Cambridge, MA 02142

## Statement

**For professional services described as follows :**

### Fund VI

| Date | | Description | | |
|------|------|-------------|------|--------|
| 2/1/2005 | JJM | Digital Angel - Telephone conference with J. McGinnis; conference with T. Tedeschi. | 0.20 | 65.00 |
| 2/2/2005 | JJM | Digital Angel - Letter from J. McGinnis regarding S-3; review registration rights; conference with M. Robbat. | 0.30 | 97.50 |
| 2/3/2005 | JJM | Digital Angel - Letter from A. Miles regarding S-3 and trade; letter from A. Miles. | 0.40 | 130.00 |
| 3/1/2005 | JLK | Review SBA forms completed by E. Wang; revise forms. | 0.60 | 195.00 |
| | JLK | SBA - Telephone conference with MJR regarding Worldwinner; email regarding same. | 0.30 | 97.50 |
| | MJR | Conversation with R. Finlayson regarding SBA issues; follow-up with J. Koenig. | 0.40 | 100.00 |
| | JJM | Conference with T. Tedeschi; review correspondence. | 1.00 | 325.00 |
| | TT | Worldwinner - Talk with R. Finlyason; e-mails. | 0.50 | 177.50 |
| | TT | SBA - E-mails; misc.; talk with P. Kelley; talk with J. Koenig. | 0.50 | 177.50 |
| | TT | Address partnership issues regarding Van Chu, B. Bronstein & F. Pinto. | 1.50 | 532.50 |
| 3/2/2005 | JLK | SBA - Telephone call from S. Bartz regarding SBA documents; telephone conference with M. Haynes; telephone conference with D. Carmisciano regarding Spherics and 1031 for FurnitureFan | 0.20 | 65.00 |
| | MJR | Review correspondence regarding SBA matters. | 0.40 | 100.00 |
| | TT | FurnitureFan - e-mails. | 0.30 | 106.50 |

MCNAMARA KOENIG & MCCARTHY, PC

| | | | Hours | Amount |
|---|---|---|---|---|
| 3/2/2005 | TT | Calls, misc.; e-mails. | 0.30 | 106.50 |
| | TT | Worldwinner - Calls; misc.; e-mails. | 0.30 | 106.50 |
| 3/3/2005 | JLK | Telephone conference at ZSC to prepare for SBA meeting. | 5.10 | 1,657.50 |
| | TT | First Service Networks - negotiate sale of interests; misc. | 1.00 | 355.00 |
| | TT | SBA - Meeting at ZSC; work on status report. | 4.50 | 1,597.50 |
| | TT | Bluestreak - E-mails; call. | 0.80 | 284.00 |
| 3/4/2005 | JLK | SBA - Telephone conferences with E. Wang; review Maffei letter; meeting with Tom Maffei. | 2.30 | 747.50 |
| | MJR | Prepare for meeting with, and attend meeting with, T. Maffei regarding letter to SBA regarding ImproveNet. | 1.70 | 425.00 |
| | TT | LiveWave - Meeting at the Company. | 3.00 | 1,065.00 |
| | TT | Healthvision - Misc. | 0.40 | 142.00 |
| 3/7/2005 | JJM | FSN - Letter from T. Tedeschi; conference with T. Tedeschi; review cap table; telephone conference with B. Swirsky of AMC Group; telephone conference with R. Finlayson; review voting agreement; telephone conference with D. McPherson (co-counsel); misc. matters. | 2.30 | 747.50 |
| | JJM | Letter from T. Tedeschi regarding B. Bronstein; conference with M. Robbat regarding D. Shlansky. | 0.50 | 162.50 |
| | MJR | LiveWave - conversations with J. Koenig, T. Tedeschi, J. McCarthy, and R. Finlayson. | 0.40 | 100.00 |
| | MJR | FSN - Conversations with T. Tedeschi, J. McCarthy regarding sale of company. | 0.50 | 125.00 |
| | TT | LiveWave - Address issues regarding sale. | 1.30 | 461.50 |
| | TT | LiveWave  - Address Mahoney complaint. | 1.00 | 355.00 |
| | TT | Conference call with M. Haynes, J. Koenig; e-mails; review receivership documents. | 2.30 | 816.50 |
| | TT | Axxis, Inc. - Occupancy issues; misc. | 0.50 | 177.50 |
| 3/8/2005 | JLK | Telephone conference with M. Haynes regarding SBA receivership documents. | 0.40 | 130.00 |
| | MJR | LiveWave - Conversation with R. Finlayson regarding sale of company; draft answer to Mahoney complaint. | 2.00 | 500.00 |
| | JJM | Bluestreak - Letter from T. Tedeschi; review liquidation plan and agreement; review Board consent. | 1.60 | 520.00 |
| | TT | Bluestreak - Review carve-out documents. | 1.00 | 355.00 |
| | TT | LiveWave - PSI Net - Series B - E-mails; possible sale; misc. | 0.80 | 284.00 |
| 3/9/2005 | JLK | Conference with MJR regarding letter to limited partners; telephone conference with M. Haynes regarding SBA receivership papers; respond to email regarding receivership and litigation; review revised letter from Maffei. | 1.00 | 325.00 |
| | JJM | Axxis, Inc,  - Conference with T. Tedeschi regarding managment carve-out; review memorandum regarding same. | 0.40 | 130.00 |

McNamara Koenig & McCarthy, PC                    Zero Stage Capital Company, Inc.
                                                                    April 11, 2005
                                                                         Page   3

|  | | | Hours | Amount |
|---|---|---|---|---|
| 3/9/2005 | JJM | FSN - Prepare stock transfer documents; telephone conference with D. Carmisciano; conference with T. Tedeschi; telephone conference with B. Swirsky of AMC; telephone conference with R. Finlayson; review Series D documents; prepare stock purchase agreement; misc. | 3.40 | 1,105.00 |
|  | MJR | LiveWave - Conversations with R. Finlayson, P. Mottur regarding cap table. | 3.00 | 750.00 |
|  | MJR | FSN - Conversation with T. Tedeschi regarding sale of ZSC interests in FSN to AMC; edit letter agreement. | 0.50 | 125.00 |
|  | TT | LiveWave - Review AMC letter; misc. | 0.30 | 106.50 |
|  | TT | SBA - Regarding Syncra - Misc. | 0.40 | 142.00 |
|  | JJM | Axxis - Conference with T. Tedeschi regarding mangement carve-out; memorandum regarding same. | 0.20 | 65.00 |
| 3/10/2005 | JJM | First Service Networks - Telephone conference with D. Carmisciano; review roll-forwards regarding FSN positions; telephone conference with D.C.; letter from B. Swirskty regarding SPA comments; telephone conference with D.Carmisciano; telephone conference with D. McPherson; prepare stock powers; review stock purchase; telephone conference with G. Nemphos; telephone conference with B. Swirsky; follow-on and miscellaneous related matters. | 4.30 | 1,397.50 |
|  | JJM | Bluestreak - Letter from T. Tedeschi regarding board meeting; review carve-out agreement. | 0.50 | 162.50 |
| 3/11/2005 | JLK | SBA - E-mails regarding ImproveNet letter; telephone conference with M. Haynes regarding management fee issue. | 0.70 | 227.50 |
|  | JLK | Review and respond to email and memorandum regarding management fees. | 0.10 | 32.50 |
|  | JJM | FSN - Prepare indemnity agreement; letter to B. Swirsky; attention to closing; telephone conference with D. Carmisciano; telephone conference with B. Swirsky; letter to AMC with all closing docs.; review closing documents. | 3.50 | 1,137.50 |
| 3/13/2005 | TT | LiveWave - Review and revise Answer to Mahoney Complaint. | 1.30 | 461.50 |
|  | TT | SBA - Review T. Maffei opinion; misc.; revise M.K. letter. | 1.50 | 532.50 |
|  | TT | Worldwinner - Review management proposals. | 0.50 | 177.50 |
| 3/14/2005 | JLK | FSN - Telephone conference with R. Finlayson regarding board seat. | 0.10 | 32.50 |
|  | JLK | SBA - E-mail to M. Haynes. | 0.10 | 32.50 |
|  | TT | LiveWave - Meeting with R. Finlayson; misc. calls; e-mails. | 0.70 | 248.50 |
|  | TT | WorldWinner - Meeting with R. Finlayson; related matters. | 0.30 | 106.50 |
|  | TT | Axxis, Inc. - Talk with R. Finlayson; e-mails; misc. | 0.30 | 106.50 |
| 3/15/2005 | JLK | Review letter to SBA regarding management fee. | 0.30 | 97.50 |
| 3/16/2005 | JLK | Telephone call to D. Carmisciano; telephone conference with M. Haynes. | 0.30 | 97.50 |

McNamara Koenig & McCarthy, PC                    Zero Stage Capital Company, Inc.
                                                                 April 11, 2005
                                                                   Page    4

| | | | Hours | Amount |
|---|---|---|---|---|
| 3/18/2005 | TT | Axxis - Talk with P. Kelley; D. Carmisciano; misc. | 1.30 | 461.50 |
| | TT | FurnitureFan - Prepare for and attend meeting with OBEO; follow-up matters. | 5.50 | 1,952.50 |
| | TT | LiveWave - Conference call; misc. | 1.30 | 461.50 |
| | TT | Axxis, Inc. - Talk with P. Kelley; D. Carmisciano; misc. | 0.70 | 248.50 |
| 3/19/2005 | TT | FurnitureFan - E-mails; misc. | 1.00 | 355.00 |
| | TT | Aprilis - Review e-mail; CrossMatch offer letter; misc. | 0.50 | 177.50 |
| 3/21/2005 | JJM | First Service Networks - Letter from P. Kelley regarding closing documents; letter from B. Swirsky regarding closing documents; telephone conference with D. Carmisciano. | 1.40 | 455.00 |
| | TT | FurnitureFan - Review OBEO document; talk with R. Finlayson. | 1.30 | 461.50 |
| | TT | Hydrocision - E-mail. | 0.30 | 106.50 |
| | TT | LiveWave - Talk with R. Finlayson; misc. | 0.30 | 106.50 |
| | TT | WorldWinner - Talk with R. Finlayson. | 0.30 | 106.50 |
| | TT | SBA - Review final Maffei letter; misc. | 0.50 | 177.50 |
| | MJR | Review T. Maffei letter to SBA regarding ImproveNet; address issues regarding SBA documentation for M. Kelley, M. Fong, E. Wang. | 0.70 | 175.00 |
| | MJR | FurnitureFan - Review OBEO PPM; review correspondence regarding sale of company. | 1.30 | 325.00 |
| | MJR | FSN - Review correspondence. | 0.40 | 100.00 |
| | MJR | Apex - Review correspondence regarding sale of Apex IP. | 0.20 | 50.00 |
| | MJR | Axxis, Inc. - Review correspondence. | 0.10 | 25.00 |
| 3/22/2005 | MJR | LiveWave - Edit draft Answer to Mahoney Complaint. | 0.30 | 75.00 |
| | JJM | Apex - Letter from T. Tedeschi regarding sale of IP; review correspondence from N. Yahoubi; review Patent Assignment. | 0.50 | 162.50 |
| | JJM | Apex - Letter from T. Tedeschi regarding sale of IP; review correspondence from N. Yaghoubi; review Patent Assignment. | 0.50 | 162.50 |
| | TT | SBA - E-mails. | 0.30 | 106.50 |
| | TT | LiveWave - Address Mahoney litigation matters. | 0.50 | 177.50 |
| 3/23/2005 | MJR | LiveWave - Conversation with T. Tedeschi, J. McCarthy regarding sale of company. | 0.20 | 50.00 |
| | TT | Aprilis - Various matters. | 1.50 | 532.50 |
| | TT | Furniture Fan - various matters. | 1.00 | 355.00 |
| | TT | First Service Networks - Review final sale documents; e-mails; pick up of accumlated time, including previously unrecorded time for meetings, telephone conferences, document preparation and review. | 1.30 | 461.50 |
| | TT | Syncra - various matters. | 0.80 | 284.00 |
| 3/24/2005 | MJR | LiveWave -Conversation with R. Finlayson regarding sale of company; follow-up with J. McCarthy. | 0.30 | 75.00 |

MCNAMARA KOENIG & MCCARTHY, PC

Zero Stage Capital Company, Inc.
April 11, 2005
Page   5

| | | | Hours | Amount |
|---|---|---|---|---|
| 3/24/2005 | MJR | LiveWave - Finalize Answer to Mahoney Complaint. | 0.50 | 125.00 |
| | MJR | Review SBA regulations, conduct additional research, regarding whether Fund VI must notify its LPs of SBA action against the Fund. | 1.90 | 475.00 |
| | JJM | First Service Networks - Telephone conference with M. Kelley regarding FSN proceeds; telephone conference with D. Carmisciano; letter to D. Carmisciano. | 0.40 | 130.00 |
| | TT | LiveWave - Address sale and other issues. | 0.80 | 284.00 |
| | TT | Axxis - Calls; discussions with P. Kelley and Ed Wang. | 0.80 | 284.00 |
| | TT | Tazz - Meeting at ZSC. | 0.50 | 177.50 |
| | TT | SBA - E-mails; misc., review docs. | 1.30 | 461.50 |
| | TT | Apex - Review docs. | 0.50 | 177.50 |
| | TT | First Service Networks - Misc.; discussions with Van Chu, M. Kelley & Ed Wang. | 0.30 | 106.50 |
| | TT | WorldWinner - Misc. | 0.50 | 177.50 |
| 3/25/2005 | TT | LiveWave, Inc. - Various matters. | 2.00 | 710.00 |
| 3/28/2005 | JLK | SBA - Review letter to T. Morris and revised receivership documents; telephone conference with M. Haynes regarding same. | 1.20 | 390.00 |
| | MJR | SBA - Draft correspondence to, and conversation with, M. Haynes regarding whether SBA regs. require certain actions by funds referred to the Office of Liquidation; draft follow-up correspondence to T. Tedeschi, J. Koenig. | 1.40 | 350.00 |
| | MJR | LiveWave - Finalize Answer to Mahoney Complaint. | 0.80 | 200.00 |
| 3/29/2005 | JLK | SBA - Telephone conference with M. Haynes. | 0.30 | 97.50 |
| | MJR | LiveWave - Finalize Answer to Mahoney Complaint. | 0.70 | 175.00 |
| | TT | FurnitureFan - Misc. matters. | 0.80 | 284.00 |
| | TT | LiveWave - Misc. matters; discussions with R. Finlayson & Ed Wang; review and sign Answer to Mahoney Complaint. | 1.30 | 461.50 |
| 3/30/2005 | JLK | SBA - Telephone conference with M. Haynes regarding SBA; telephone conference with D. Carmisciano. | 1.10 | 357.50 |
| | TT | Axxis, Inc. - misc. | 0.40 | 142.00 |
| | TT | SBA matters. | 0.50 | 177.50 |
| 3/31/2005 | JLK | SBA - E-mail regarding management fees. | 0.50 | 162.50 |
| | TT | Intersense - Meeting with Ed Wang; G. Baty & CEO; review multiple financing documents. | 5.00 | 1,775.00 |
| | JJM | FSN - Conference with T. Tedeschi; letter to D. Carmisciano. | 0.50 | 162.50 |

SUBTOTAL:  [  112.60   37,019.50]

Fund VII

MCNAMARA KOENIG & MCCARTHY, PC

**Additional Charges :**

    Fund VI

| | | |
|---|---|---|
| 03/15/05 | Aprilis Meeting - 1/2 hotel (other 1/2 charged to VII). | 79.50 |
| | Aprilis Meeting - 1/2 air fare (other 1/2 charged to VII). | 287.00 |
| | Aprilis Meeting in Florida - 1/2 meals, misc. expenses. | 36.50 |
| | (Other 1/2 charged to Fund VII). | |

MCNAMARA KOENIG & MCCARTHY, PC                    Zero Stage Capital Company, Inc.
                                                              April 11, 2005
                                                                Page  13

|  |  | Amount |
|---|---|---:|
| 03/15/05 | Parking - Aprilis Meeting in Florida (1/2, other 1/2 charged to Fund VII). | 24.00 |
|  | Mileage - Travel to Maynard, MA from Wellesley, MA and back = 32.5 miles @ .37 per mile. | 6.00 |
|  | (1/2 cost, other 1/2 charged to Fund VII). |  |
|  | SUBTOTAL: | [    433.00] |

# McNamara Koenig & McCarthy, PC

### ATTORNEYS AT LAW

Telephone  (781) 431-1700                    65 William Street                    Facsimile  (781) 237-8120
WELLESLEY, MASSACHUSETTS 02481

May 10, 2005

Zero Stage Capital Company, Inc.
Attn:  David M. Carmisciano, CFO
101 Main Street, 17th Floor
Cambridge, MA 02142

## Statement

**For professional services described as follows :**

Fund VI

| | | | | |
|---|---|---|---|---|
| 4/1/2004 | JJM | Telephone conference with D. Carmisciano regarding MBDC Guaranty; review file regarding loan. | 1.30 | 422.50 |
| | JJM | Apex - Conference with M. Robbat regarding HeartWare deal. | 0.30 | 97.50 |
| 4/5/2004 | JJM | FSN - Letter from B. Swirsky; review Amendment to Performance Bond Warrant Agreement. | 0.30 | 97.50 |
| 4/6/2004 | JJM | FSN - Letter to P. Kelley regarding First Amendment to Bond Agreement; letter to B. Swirsky; letter from B. Swirsky. | 0.30 | 97.50 |
| 4/12/2004 | JJM | Conference with T. Tedeschi regarding sale of Series D shares; review proposal; telephone conference with. P. Tarca; review cap table; telephone conference with Ed Wang; prepare stock purchase agreement, stock power and term sheet; letter to client. | 3.50 | 1,137.50 |

MCNAMARA KOENIG & MCCARTHY, PC

Zero Stage Capital Company, Inc.
May 10, 2005
Page   2

| | | | Hours | Amount |
|---|---|---|---|---|
| 4/12/2004 | JJM | Apex - Review Loan Agreement; conference with M. Robbat. | 0.30 | 97.50 |
| | TT | Axxis - Address possible sale issues. | 0.50 | 177.50 |
| | TT | Worldwinner - Issues relating to posible liquidity event. | 1.50 | 532.50 |
| 4/13/2004 | JJM | Telephone conference with Ed Wang, P. Kelley and T. Tedeschi; telephone conference with P. Tarca; conference with T. Tedeschi; review Purchase Agreement; telephone conference with P. Tarca; letter to P. Tarca. | 3.30 | 1,072.50 |
| 4/14/2004 | TT | Review and finalize audit response letter. | 0.50 | 177.50 |
| | JJM | Telephone conference with G. Moore of Ropes & Gray; conference with J. Koenig; telephone conference with P. Tarca. | 2.70 | 877.50 |
| 4/15/2004 | TT | Bluestreak - discussions. | 0.50 | 177.50 |
| | TT | SBA - Meetings and discussions; analysis. | 3.50 | 1,242.50 |
| | TT | Worldwinner - possible sale issues; e-mails; discussions. | 1.80 | 639.00 |
| | TT | Intersense - Meeting; calls; review docs.; misc. regarding sale. | 1.30 | 461.50 |
| | JJM | Worldwinner - Telephone conference with M. Kelley regarding stock repurchase; telephone conference with P. Lipson of HarborVest; telephone conference with R. Chow of Greenberg Traurig, LLP; review cap table. | 1.00 | 325.00 |
| | JJM | Conference with T. Tedeschi and J. Koenig regarding SBA matters. | 0.80 | 260.00 |
| | JJM | Telephone conference with M. Kelley; telephone conference with P. Tarca; prepare execution copies; letter to P. Kelley; letter to P. Tarca; telephone conference with T. Tedeschi; telephone conference with P. Tarca. | 5.20 | 1,690.00 |
| | JJM | WorldWinner - Telephone conference with M. Kelley regarding stock repurchase; telephone conference with P. Lipson of HarborVest; telephone conference with R. Chow of Greenberg, Traurig, LLP; review cap table. | 0.60 | 195.00 |
| 4/18/2004 | JJM | Letter to P. Tarca regarding closing documents; letter from P. Tarca; letter to D.C. regarding sale proceeds. | 0.50 | 162.50 |
| | JJM | Worldwinner - Review financing documents; prepare sale documents; telephone conference with R. Chow. | 1.30 | 422.50 |
| | JJM | Letter from T. Tedeschi regarding sale of VI interests; telephone conference with T. Tedeschi. | 0.20 | 65.00 |
| 4/19/2004 | JJM | Letter from P. Tarca regarding escrow release; letter to D. Carmisciano; letter from Ed Wang regarding invoice and investment memorandum; review same. | 0.80 | 260.00 |
| | JJM | Worldwinner - Telephone conference with R. Chow; prepare stock purchase agreement; stock powers; assignment and exhibits; review charter; letter to client; letter from R. Chow. | 1.70 | 552.50 |
| 4/1/2005 | MJR | Apex - Discuss sale of IP assets with J. McCarthy; review file regarding sale of assets. | 1.20 | 300.00 |
| | MJR | LiveWave - Conversation with P. Mottur regarding G. Mahoney case. | 0.20 | 50.00 |

McNamara Koenig & McCarthy, PC

Zero Stage Capital Company, Inc.
May 10, 2005
Page    3

|  |  |  | Hours | Amount |
|---|---|---|---|---|
| 4/3/2005 | TT | CellTech - E-mails; talk with Ed Wang. | 0.30 | 106.50 |
|  | TT | Konarka - E-mails; talk with Ed Wang. | 0.30 | 106.50 |
|  | TT | Imaging Automation / Viisage:  Review E-mails. | 0.10 | 35.50 |
| 4/4/2005 | TT | FurnitureFan : follow-up matters. | 0.80 | 284.00 |
|  | TT | LiveWave - E-mails; discussion with Ed Wang. | 0.30 | 106.50 |
|  | TT | Intersense - E-mail; review agreements again. | 1.30 | 461.50 |
| 4/5/2005 | JLK | Review and revise investor letters; prepare financial statement disclosure for Fund VI; review expense allocation; telephone conferences regarding same. | 1.50 | 487.50 |
|  | JLK | Telephone conference with M. Haynes regarding receivership. | 0.40 | 130.00 |
| 4/7/2005 | JLK | Telephone conference with M. Haynes regarding receivership status; e-mail regarding management fees spreadsheet. | 0.20 | 65.00 |
|  | MJR | Apex - Conversation with Delaware Secretary of State regarding outstanding tax liability; follow-up with J. McCarthy. | 0.40 | 100.00 |
| 4/8/2005 | JLK | Axxis - Conference with JJM regarding management incentive plan. | 0.10 | 32.50 |
|  | TT | LiveWave - Talk with P. Kelley; misc. | 0.40 | 142.00 |
|  | TT | Sonexis - Matters relating to write off; e-mails. | 0.30 | 106.50 |
|  | TT | SBA - Talk with J. Koenig; review e-mails; misc. | 0.50 | 177.50 |
|  | TT | Review and revise correspondence. | 0.50 | 177.50 |
|  | TT | Imaging Automation - Talk with M. Kelley; Ed Wang; review e-mails regarding Neo Carta; respond; misc. | 0.30 | 106.50 |
|  | MJR | Conversation with R. Finlayson regarding exits of Fund VI portfolio companies. | 0.20 | 50.00 |
| 4/11/2005 | JLK | FSN - Inquire about funds; trademark letter regarding url. | 0.20 | 65.00 |
|  | TT | Discussion with Peter Tarca, Ed Wang and Paul Kelley.  Call to J. McCarthy from ZSC. | 1.30 | 461.50 |
|  | TT | LiveWave - Discussion with Ed Wang; misc. | 0.40 | 142.00 |
|  | TT | Axxis - Discussion with Ed Wang; misc. | 0.40 | 142.00 |
|  | MJR | Review and respond to correspondence regarding Funds audit letter. | 0.30 | 75.00 |
| 4/12/2005 | MJR | Conversation with T. Tedeschi, review and respond to correspondence, regarding various matters. | 0.50 | 125.00 |
|  | MJR | Apex - Review 2002 financing binder to determine whether ZSC has a security interest in Apex's intellectual property; discuss with J. McCarthy; draft correspondence to D. Gammel (former Apex counsel) regarding same. | 0.80 | 200.00 |
|  | MJR | Netkey - Draft letter to company nominating M. Kelley as ZSC director. | 0.10 | 25.00 |
|  | MJR | Bluestreak - Draft letter to company nominating M. Kelley as ZSC director. | 0.20 | 50.00 |
| 4/13/2005 | JLK | Telephone conference with M. Haynes regarding publicity and receivership. | 0.50 | 162.50 |

MCNAMARA KOENIG & MCCARTHY, PC                    Zero Stage Capital Company, Inc.
                                                                        May 10, 2005
                                                                          Page    4

| | | | Hours | Amount |
|---|---|---|---|---|
| 4/13/2005 | TT | SBA - Misc. matters; meetings and calls. | 2.50 | 887.50 |
| 4/14/2005 | JLK | Conference with J. McCarthy regarding stock sale; review and revise audit response letter. | 1.60 | 520.00 |
| | JLK | E-mail regarding SBA; discuss Livewave sale; telephone conference with M. Kelley and E. Wang regarding stock sales; respond to emails regarding expense reimbursement and management fee waiver. | 2.10 | 682.50 |
| | MJR | Conversation with R. Finlayson regarding sale of Fund VI interest in the company; follow-up conversation with J. McCarthy, J. Koenig. | 0.70 | 175.00 |
| 4/15/2005 | JLK | Conference with TT and JJM regarding Aprilis and SBA matters; telephone conference with D. Carmisciano regarding expense schedule | 1.80 | 585.00 |
| 4/16/2005 | JLK | Conference with TT regarding expense allocation. | 0.40 | 130.00 |
| | TT | Axxis - Review file; talk; discussions with P. Kelley; call to R. Lisauskas. | 0.50 | 177.50 |
| | TT | LiveWave - Discussion with P. Kelley. | 0.30 | 106.50 |
| | TT | WorldWinner - Discussion with P. Kelley; misc. matters regarding possible sale. | 0.40 | 142.00 |
| 4/18/2005 | MJR | LiveWave - Scan and e-mail to P. Mottur the G. Mahoney pleadings. | 0.40 | 100.00 |
| | MJR | Review Fund VI 4Q04 Report to Limited Partners. | 0.30 | 75.00 |
| | TT | Aprilis - Meeting with Ed Wang and M. Kelley. | 0.50 | 177.50 |
| | TT | Axxis - Meeting with R. Lisauskas and Ed Wang; discussion with M. Kelley. | 0.50 | 177.50 |
| 4/19/2005 | JLK | Review Jefferies-Livewave agreement | 0.20 | 65.00 |
| | JLK | Review and respond to e-mail from SBA regarding management fees; telephone conference with M. Haynes regarding same. | 0.60 | 195.00 |
| 4/20/2005 | JLK | Review memorandum from E. Wang; telephone conference with TT regarding SBA issues; review email regarding employee categorization; telephone conference with D. Carmisciano regarding same. | 1.00 | 325.00 |
| | JLK | WorldWinner - Conference with JJM regarding stock sale and indemnification. | 0.10 | 32.50 |
| | JJM | Telephone conference with M. Kelley regarding Industry Ventures; letter to T. Tedeschi; letter from D. Carmisciano regarding Fund VI holdings. | 0.50 | 162.50 |
| | MJR | Review Wilson letter expressing interest in acquiring ZSC's Fund VI position; conversation with R. Finlayson regarding sale of company, follow-up correspondence to T. Tedeschi, P. Mottur. | 0.80 | 200.00 |
| | MJR | WorldWinner - Draft resignation letter for R. Finlayson from Worldwinner Board, review stockholder agreement regarding same. | 0.70 | 175.00 |

MCNAMARA KOENIG & MCCARTHY, PC

Zero Stage Capital Company, Inc.
May 10, 2005
Page   5

| | | | Hours | Amount |
|---|---|---|---|---|
| 4/20/2005 | MJR | Confirm status of Certificate with Delaware Division of Corporations. | 0.80 | 200.00 |
| | MJR | Axxis - Review drafts of R. Lisauskas employment agreement, management incentive plan. | 0.20 | 50.00 |
| | JJM | WorldWinner - Letter from R. Chow; review comments; review amended charter; review amended stockholders agreement; conference with T. Tedeschi. | 1.90 | 617.50 |
| 4/21/2005 | JLK | Review offer to buy Fund VI; meeting at ZSC with D. Carmisciano regarding expense allocation and with M. Kelley regarding offer; telephone conference with M. Haynes regarding offer. | 5.10 | 1,657.50 |
| | MJR | Review correspondence regarding possible sale of Fund VI portfolio to Industry Ventures; address issues concerning SBA approval of potential sale of Fund VI portfolio to Industry Ventures; meeting with D. Carmisciano, J. Koenig, C. Harris (from Feeley and Driscoll) regarding allocation of Fund VI expenses to be submitted to SBA for reimbursement; conference call with M. Haynes, T. Tedeschi, J. Koenig regarding potential sale. | 5.90 | 1,475.00 |
| | TT | SBA - Meetings and other matters regarding expenses; meeting with C. Hines; J. Koenig and D. Carmisciano; review documents, etc.; conference call with M. Haynes, et al. | 4.00 | 1,420.00 |
| | TT | Axxis - Review proposed agreements; talk with R. Lisauskas and J. McCarthy. | 1.00 | 355.00 |
| | JJM | WorldWinner - Letter from R. Chow regarding closing agenda; telephone conference with R. Chow; review stockholder agreement regarding Right of First Refusal; telephone conference with T. Tedeschi. | 0.80 | 260.00 |
| 4/22/2005 | JLK | E-mail to D. Carmisciano regarding expense allocation; review memorandum from TT regarding same; research issue of management expenses; review Fund VI LP agreement and management agreement. | 3.70 | 1,202.50 |
| | TT | SBA matters; prepare memorandum; discussions. | 2.30 | 816.50 |
| | TT | Axxis - Calls; misc. | 0.50 | 177.50 |
| | TT | Imaging Automation - Pick up time for e-mails and discussions regarding Viisage. | 0.50 | 177.50 |
| | MJR | Conversations with P. Kelley, J. McCarthy & J. Koenig regarding SBA matters; conversation with D. Carmisciano. | 1.40 | 350.00 |
| | JJM | Conference with M. Robbat; conference with J. Koenig; conference with T. Tedeschi. | 0.70 | 227.50 |
| | JJM | WorldWinner - Telephone conference with R. Chow; telephone conference with P. Lipson of HarbourVest; conference with T. Tedeschi; conference with J. Koenig. | 0.40 | 130.00 |

MCNAMARA KOENIG & MCCARTHY, PC

Zero Stage Capital Company, Inc.
May 10, 2005
Page   6

| | | | Hours | Amount |
|---|---|---|---|---|
| 4/24/2005 | MJR | Assemble analysis of Fund VI value projected to SBA as adjusted for portfolio companies exited. | 0.80 | 200.00 |
| 4/25/2005 | JLK | Telephone conference with M. Haynes; telephone conference with ZSC and SBA; review letter from SBA. | 3.40 | 1,105.00 |
| | JJM | SBA - Review expense allocation spreadsheet. | 0.30 | 97.50 |
| | MJR | Review correspondence regarding Fund VI expense breakdown; assemble analysis of Fund VI value projected to SBA as adjusted for portfolio companies exited. | 4.00 | 1,000.00 |
| | MJR | Apex - Draft correspondence to P. Kelley regarding sale of intellectual property assets; review correspondence. | 0.60 | 150.00 |
| 4/26/2005 | JLK | Review and respond to revised expense allocations; review revised letter from SBA; telephone conferences regarding same; prepare letter to T. Morris regarding same. | 3.50 | 1,137.50 |
| | TT | SBA - Finalize expense report; correspondence; conference calls; discussions with E. Wang, etc. | 4.00 | 1,420.00 |
| | TT | Sonexis - E-mail traffic regarding financing. | 0.40 | 142.00 |
| | JJM | Telephone conference with T. Tedeschi; letter to D. Carmisciano regarding wire instructions; letter from Ed Wang regarding invoice. | 0.40 | 130.00 |
| | MJR | Conversations with P. Mottur regarding general corporate matters; follow-up with T. Tedeschi. | 1.30 | 325.00 |
| | MJR | LiveWave - Conversations with P. Mottur regarding Mahoney case, follow-up with T. Tedeschi; conversation with R. Kerr (Mahoney's attorney) regarding settlement of case. | 0.40 | 100.00 |
| 4/27/2005 | JLK | Telephone conferences with M. Haynes; revise cover letter and expense analysis and forward. | 1.30 | 422.50 |
| | JLK | Sonexis - Review financing documents regarding ZSC consent. | 0.40 | 130.00 |
| | TT | SBA - Follow up matters. | 1.80 | 639.00 |
| | TT | Axxis - Pick up time for talks with R. Lisauskas; e-mails; etc. | 1.00 | 355.00 |
| | JJM | Letter from/letter to M. Kelley regarding proceeds. | 0.20 | 65.00 |
| | JJM | LiveWave - Letter from T. Tedeschi; telephone conference with T. Tedeschi; review financing documents regarding board seats. | 0.60 | 195.00 |
| | MJR | LiveWave - Conversation with T. Tedeschi regarding various issues; prepare files to be sent to Ken Itrato at WCP Hale & Dorr. | 0.40 | 100.00 |
| 4/28/2005 | JLK | LiveWave - Conference with JJM and MJR regarding makeup of board of directors. | 0.10 | 32.50 |
| | MJR | LiveWave - Review Series D financing binder and minute books regarding Board of Directors, Board seats controlled by ZSC, implications regarding ZSC control of Board seats if SBA receiver takes over management of Fund VII; conversation with J. McCarthy, draft memorandum regarding same. | 3.50 | 875.00 |

MᶜNᴀᴍᴀʀᴀ Kᴏᴇɴɪɢ & McCᴀʀᴛʜʏ, ᴘᴄ

Zero Stage Capital Company, Inc.
May 10, 2005
Page   7

|  |  |  | Hours | Amount |
|---|---|---|---|---|
| 4/29/2005 | JLK | LiveWave - Conference with JJM regarding Fund VI board seat. | 0.10 | 32.50 |
|  | JJM | SBA - Review and revise memorandum regarding LiveWave board seats; letter to E. Wang, T. Tedeschi; review Series D documents. | 0.80 | 260.00 |
|  | MJR | LivewWave - Review Series D financing materials; draft memorandum regarding Board seats, consequences to ZSC of SBA taking over management of Fund VI. | 0.70 | 175.00 |
| | SUBTOTAL: | | [   122.80 | 39,010.00] |

# MᴄNᴀᴍᴀʀᴀ Kᴏᴇɴɪɢ & MᴄCᴀʀᴛʜʏ, ᴘᴄ

### Aᴛᴛᴏʀɴᴇʏs ᴀᴛ Lᴀᴡ

Telephone (781) 431-1700          65 Wɪʟʟɪᴀᴍ Sᴛʀᴇᴇᴛ          Facsimile (781) 237-8120
WᴇʟʟᴇsʟᴇY, Mᴀssᴀᴄʜᴜsᴇᴛᴛs 02481

June 07, 2005

Fund VI
c/o Zero Stage Capital Company, Inc.
ATTN: Ms. Michelle Tauberman
101 Main Street, 17th Floor
Cambridge MA 02142

## Statement

**For professional services described as follows :**

| Date | | Description | Hours | Amount |
|---|---|---|---|---|
| 5/2/2005 | JLK | Telephone conference with M. Haynes. | 0.90 | 292.50 |
| 5/3/2005 | JLK | Telephone conference with M. Haynes; meeting at ZSC. | 4.80 | 1,560.00 |
| | TT | SBA matters. | 3.00 | 1,065.00 |
| 5/4/2005 | JLK | Telephone conference with accountant C. Hines from F&D. | 0.50 | 162.50 |
| | MJR | Work with accountants from Feeley & Driscoll, ZSC personnel regarding SBA . | 6.20 | 1,550.00 |
| | TT | Work with accountants at ZSC regarding SBA; misc. | 6.50 | 2,307.50 |
| 5/5/2005 | JLK | Follow up on SBA regulatory letter; review report of Feeley & Driscoll; email regarding same and need for information. | 1.10 | 357.50 |
| | JJM | SBA - review memorandum. | 0.40 | 130.00 |
| | TT | SBA issues. | 0.50 | 177.50 |
| 5/6/2005 | TT | SBA - Study Order; e-mails; memorandum; calls. | 2.30 | 816.50 |
| 5/8/2005 | TT | SBA - Review Order; prepare talking points for telephone conference with Mr. Morris. | 1.30 | 461.50 |
| 5/9/2005 | JLK | Review receivership order and respond. | 0.70 | 227.50 |
| | TT | Conference call with SBA, P. Kelley, M. Kelley, talk with J. Koenig; misc. | 1.00 | 355.00 |
| 5/10/2005 | JLK | Telephone conference with M. Haynes; email regarding same; forward waiver letter to C. Hines; telephone conference with E. Wang and T. Tedeschi. | 1.80 | 585.00 |
| 5/11/2005 | MJR | Conversations with R. Finlayson, T. Tedeschi regarding SBA . | 0.80 | 200.00 |
| 5/12/2005 | MJR | Work at ZSC in preparation for SBA visit. | 6.00 | 1,500.00 |
| 5/13/2005 | JLK | E-mails regarding Fund VI financials. | 0.30 | 97.50 |
| | JLK | Telephone conference with M. Haynes. | 0.30 | 97.50 |
| | MJR | Work at ZSC in preparation for SBA visit. | 8.60 | 2,150.00 |
| 5/16/2005 | MJR | Obtain T. Tedeschi memorandum regarding preparation for visit to ZSC from SBA; address issues regarding SBA receivership; conversations with E. Wang, M. Tauberman, R. Finlayson; prepare list of Fund VI ZSC board seats; draft correspondence, on-line research, regarding same. | 2.20 | 550.00 |
| 5/17/2005 | JLK | Research and draft memorandum regarding distributions from liquidity events. | 1.60 | 520.00 |

MCNAMARA KOENIG & MCCARTHY, PC

Fund VI
June 07, 2005
Page   2

| | | | Hours | Amount |
|---|---|---|---|---|
| 5/17/2005 | MJR | Arrange financing binders, review organization of Fund VI files in preparation for SBA visit. | 3.50 | 875.00 |
| 5/18/2005 | MJR | Organize Fund VI documents in preparation for SBA visit; draft list of Fund VI controlled board seats, review documents regarding same. | 7.00 | 1,750.00 |
| 5/19/2005 | MJR | Organize Fund VI documents in preparation for SBA visit; oversee preparation of offices, workstations; meetings with T. Tedeschi, E. Wang, M. Kelley, review and respond to correspondence, regarding same. | 9.80 | 2,450.00 |
| 5/20/2005 | MJR | Organize Fund VI documents in preparation for SBA visit; oversee preparation of offices, workstations; conversations with T. Tedeschi regarding same. | 12.10 | 3,025.00 |
| | MJR | Prepare for meeting with SBA representatives; meeting with C. Rishty, G. Green, T. Rigby, T. Tedeschi, E. Wang, M. Kelley, D. Carmisciano regarding Fund VI portfolio. | 8.20 | 2,050.00 |
| | MJR | Draft correspondence regarding SBA visit; organizational. | 1.00 | 250.00 |
| | JJM | SBA - telephone conference with M. Robbat regarding Digital Angel. | 0.30 | 97.50 |
| 5/24/2005 | MJR | Assist in compiling list of attorneys who represented portfolio companies and Fund VI in financings; finalize list of Fund VI board seats, conversation with T. Tedeschi, review documents regarding same; conversation with R. Finlayson regarding resigning from Fund VI boards; conversations with ZSC employees regarding preparing list of activities attributable to Fund VI matters. | 3.50 | 875.00 |
| | JT | Review of transaction documents to obtain info. for SBA. | 7.00 | 105.00 |
| 5/25/2005 | JLK | Telephone call from M. Haynes. | 0.20 | 65.00 |
| | MJR | Assist in compiling list of counsel for ZSC and Fund VI companies on portfolio company financings; conversation with R. Finlayson regarding resigning from Fund VI boards, follow-up with T. Tedeschi regarding same. | 1.90 | 475.00 |
| | JT | Review transaction documents to obtain info. required by SBA. | 10.00 | 150.00 |
| 5/26/2005 | MJR | Conversations regarding list of counsel for portfolio company financings being compiled for SBA. | 0.30 | 75.00 |
| | JT | Review transaction documents to obtain info. required by SBA. | 9.50 | 142.50 |
| 5/27/2005 | JT | Review of transaction documents to obtain info. required by SBA. | 9.50 | 142.50 |
| 5/31/2005 | MJR | Review and respond to correspondence regarding list of LPs. | 0.20 | 50.00 |
| | JT | Review of transaction documents to obtain information required by SBA. | 7.50 | 112.50 |

SUBTOTAL:                                                        [    142.30   27,853.00]

McNamara Koenig & McCarthy, PC

Fund VI
June 07, 2005
Page 3

|  |  |  | Hours | Amount |
|---|---|---|---|---|
| **Axxis** |  |  |  |  |
| 5/3/2005 TT | Various matters. |  | 0.40 | 142.00 |
|  | SUBTOTAL: | [ | 0.40 | 142.00] |
| **Bluestreak** |  |  |  |  |
| 5/3/2005 TT | Talk with E. Wang. |  | 0.30 | 106.50 |
|  | SUBTOTAL: | [ | 0.30 | 106.50] |
| **LiveWave** |  |  |  |  |
| 5/2/2005 JLK | Review Smith's letter of intent; revise liquidation model spreadsheet; telephone conference with Paul, Matt and Ed regarding board meeting and communications with SBA; prepare memorandum regarding same. |  | 2.20 | 715.00 |
| JJM | Letter from M. Kelley regarding Smiths Letter of intent; review Letter of intent; conference with M. Robbat; telephone call from M. Kelley. |  | 0.50 | 162.50 |
| MJR | Review minute books regarding director seats; conversations with R. Finlayson, J. Koenig regarding sale of company. |  | 1.50 | 375.00 |
| MJR | Review correspondence, conversation with D. Kerr, regarding Mahoney settlement proposals. |  | 0.40 | 100.00 |
| 5/3/2005 JJM | Attention to files; conference with M. Robbat. |  | 0.40 | 130.00 |
| MJR | Review correspondence regarding sale of company. |  | 0.30 | 75.00 |
| MJR | Address Mahoney settlement issues. |  | 0.20 | 50.00 |
| 5/4/2005 MJR | Conversation with P. Mottur regarding LiveWave settlement. |  | 0.20 | 50.00 |
| 5/6/2005 MJR | Conversation with P. Mottur regarding Mahoney matter; follow-up conversation with T. Tedeschi. |  | 0.30 | 75.00 |
| 5/10/2005 MJR | Draft letter to counsel for G. Mahoney regarding settlement proposal; conversations with P. Mottur, T. Tedeschi, D. Kerr regarding same. |  | 2.10 | 525.00 |
| 5/12/2005 MJR | Draft correspondence to P. Mottur regarding Mahoney matter. |  | 0.40 | 100.00 |
| 5/16/2005 JLK | Conference with T. Tedeschi regarding Smiths. |  | 0.50 | 162.50 |
| MJR | Conversation with P. Mottur, K. Itrato regarding results of negotiations with Mahoney, transferring representation in Mahoney matter from MKM to new counsel, draft follow-up correspondence to P. Mottur regarding same. |  | 0.50 | 125.00 |
| MJR | Meeting with T. Tedeschi, J. Koenig, J. McCarthy regarding Smiths; correspondence to R. Finlayson regarding Management Incentive Plan. |  | 1.10 | 275.00 |
| 5/17/2005 TT | Review draft docs. and e-mails; review auditor request letter; misc. |  | 2.30 | 816.50 |

MCNAMARA KOENIG & MCCARTHY, PC

Fund VI
June 07, 2005
Page    4

| | | | Hours | Amount |
|---|---|---|---|---|
| 5/17/2005 | JJM | Letter from M. Kelley; review Heads of Agreement with Smiths Detection; telephone conference with T. Tedeschi. | 0.70 | 227.50 |
| 5/18/2005 | MJR | Address issues regarding Smiths Heads of Agreement draft. | 0.30 | 75.00 |
| | JJM | Letter from E. Wang regarding SBA; letter from T. Tedeschi. | 0.20 | 65.00 |
| 5/25/2005 | JLK | Review and revise audit opinion response letter. | 1.20 | 390.00 |
| | | SUBTOTAL: | [ 15.30 | 4,494.00] |

### Resinate

| | | | | |
|---|---|---|---|---|
| 5/5/2005 | MJR | Review correspondence regarding insurance policy refunds. | 0.40 | 100.00 |
| 5/16/2005 | MJR | Address issues regarding storage unit for Resinate items; conversations with Patriot Storage, A. Caulfield, T. Tedeschi regarding same. | 0.80 | 200.00 |
| 5/31/2005 | MJR | Review insurance policy documents; conversation with G. Cragg at Fred C. Church regarding same. | 0.60 | 150.00 |
| | | SUBTOTAL:    - | [ 1.80 | 450.00] |

### U.S. Genomics

| | | | | |
|---|---|---|---|---|
| 5/5/2005 | JJM | E-mail from T. Tedeschi; review bridge note; review warrant agreement. | 0.80 | 260.00 |
| 5/9/2005 | JJM | Review Promissory Note and Warrant to Purchase Preferred Stock; telephone conference with T. Tedeschi. | 1.00 | 325.00 |
| 5/10/2005 | JLK | Conference with JJM regarding investment warrant terms. | 0.20 | 65.00 |
| | JJM | Conference with J. Koenig; telephone conference with J. Barmel; review warrant and note. | 0.50 | 162.50 |
| 5/12/2005 | JJM | Telephone conference with J. Baumel; telephone conference with P. Kelley; telephone conference with T. Tedeschi. | 0.20 | 65.00 |
| | | SUBTOTAL: | [ 2.70 | 877.50] |
| | | For professional services rendered | 162.80 | $33,923.00 |

## Additional Charges :

### LiveWave

| | | |
|---|---|---|
| 05/14/05 | Mahoney v. LiveWave -  Review pleadings; make comments (D. Kelston, Esq.). | 250.00 |
| | N. Rosmarin - outside counsel fee. | 530.37 |

McNamara Koenig & McCarthy, PC

Fund VI
June 07, 2005
Page   5

|  | Amount |
|---|---|
| SUBTOTAL: | [     780.37] |
| Total costs | $780.37 |
| CURRENT PERIOD BILLINGS | $34,703.37 |
| BALANCE DUE | $34,703.37 |

**Timekeeper Summary**

| Name | Hours | Rate |
|---|---|---|
| John J. McCarthy | 5.00 | 325.00 |
| John L. Koenig | 16.30 | 325.00 |
| Theodore Tedeschi | 17.60 | 355.00 |
| Michael Robbat | 80.40 | 250.00 |
| Joseph Tedeschi | 43.50 | 15.00 |

*Please call us with any questions regarding this statement. Thank you.*
*Employer identification number: 04-3112656*

# EXHIBIT M

# MCNAMARA KOENIG & MCCARTHY, PC

ATTORNEYS AT LAW

Telephone (781) 431-1700
www.mkmlegal.com

65 WILLIAM STREET
WELLESLEY, MASSACHUSETTS 02481

Facsimile (781) 237-8120

September 19, 2006

Thomas W Rigby, Esq.
Small Business Administration
Office of General Counsel
409 3rd Street S.W. Suite 7200
Washington, DC 20416

      Re:   Zero Stage Capital VI. L.P.

Dear Tom:

I am in receipt of your letter dated August 11, 2006. Please excuse my delay in responding.

Your letter is based on a mistaken assumption. This firm never represented Zero Stage Capital VI, L.P. ("Fund VI"). We were not involved with the formation of Fund VI. Nor did we represent Fund VI in any of its operations or in connection with dealings between Fund VI and its partner. Our only Zero Stage client in connection with SBA matters has been Zero Stage Capital Company, Inc., in its capacity as manager of Fund VI. Other work that we performed in connection with Fund VI portfolio companies was performed on behalf of, and at the request of, Zero Stage Capital Company, Inc., in that same capacity.

As you know, Zero Stage Capital Company, Inc., as manager of Fund VI, was to have no responsibility for, among other things, charges for outside lawyers. Accordingly, charges for our services to Zero Stage Capital Company, Inc. relating to Fund VI. were paid by Fund VI. Additionally, at the request of Zero Stage Capital Company, Inc., we sometimes billed Fund VI directly for those services. This separate billing was for administrative convenience only, but did not create an attorney-client relationship.

With respect to information which may be considered confidential information of Fund VI, the only information regarding Fund VI that we received was information in the possession of Zero Stage Capital Company, Inc. by virtue of its management of Fund VI. If you are aware of specific confidential Fund VI information that should not have been in the possession of the management company, please let me know.

I hope this letter responds satisfactorily to your request. If not, please let me know.

Yours sincerely,

John L. Koenig

cc:    Paul M. Kelley

**EXHIBIT H – Tab 7**

**Zero Stage Capital Co., Inc.**
**Balance Sheet**
**December 31, 2004**

## ASSETS

| | |
|---|---:|
| **Current Assets** | |
| Mellon Checking Account | 12,790.61 |
| Mellon Money Market Savings | 289,592.57 |
| Accounts Receivable | 93,054.08 |
| Rec. Mgmt Fee ZSC V | (2.00) |
| Rec. Mgmt. Fee ZSC VI | 7,271,208.00 |
| Zero Stage VI Mgmt Fee Reserve | (7,271,208.00) |
| Rec Mgmt. Fee VII | 436,009.01 |
| Rec Mgmt. Fee Cayman | 568,876.01 |
| Rec Mgmt. Fee SBIC | 100,000.01 |
| Receivable Fund Raising Exp. | 926,019.79 |
| Rec. Penn Ventures Fund | 67,750.86 |
| Prepaid Expenses | 2,916.05 |
| Employee Advances | 1,342.31 |
| | |
| **Total Current Assets** | ######## |
| | |
| **Property and Equipment** | |
| Furniture and Fixtures | 88,555.01 |
| Equipment | 351,949.00 |
| Leasehold Improvements | 7,945.65 |
| Accum. Depreciation-Furniture | (59,025.55) |
| Accum. Depreciation-Equipment | (285,079.27) |
| Accum. Depreciation-Leasehold | (2,194.51) |
| | |
| **Total Property and Equipment** | 102,150.33 |
| | |
| **Other Assets** | |
| Rec. ZSC VI GP 1% Contribution | 382,402.00 |
| FundRaisingRec.potential Portf | 52,017.93 |
| Rec ZSC ASSOC. VII | 349,790.61 |
| Rec. Zero Stage Assoc. VII | (365,772.46) |
| Inv in Penn Venture Assoc. LLC | 50,000.00 |

**Zero Stage Capital Co., Inc.**
**Balance Sheet**
**December 31, 2004**

| | | |
|---|---|---|
| Rec ZSC SBIC VII Assoc. LP | (195,999.44) | |
| Investment in Main Street Inv. | 266,989.00 | |
| Total Other Assets | | 539,427.64 |
| Total Assets | | ############ |

## LIABILITIES AND CAPITAL

| | | |
|---|---|---|
| Current Liabilities | | |
| Accounts Payable | 115,677.35 | |
| Accrued Expenses | 65,218.25 | |
| Payable Zero Stage Capital LLC | 358,519.00 | |
| Accrued Bonus | 137,500.00 | |
| Total Current Liabilities | | 676,914.60 |
| Long-Term Liabilities | | |
| Loans Payable | 1,000,000.00 | |
| Total Long-Term Liabilities | | ############ |
| Total Liabilities | | ############ |
| Capital | | |
| Treasury Stock | (35,250.00) | |
| Common Stock | 1,000.00 | |
| Paid-in Capital | 60,981.45 | |
| Retained Earnings | 334,204.15 | |
| Net Income | 1,102,077.07 | |
| Total Capital | | ############ |

Page: 3

Zero Stage Capital Co., Inc.
Balance Sheet
December 31, 2004

##########

Total Liabilities & Capital

1/11/2006 at 5:15 PM

8

Zero Stage Capital Co., Inc.
Income Statement
For the Twelve Months Ending December 31, 2004

| | Current Month | | Year to Date | |
|---|---|---|---|---|
| **Revenues** | | | | |
| Mgmt. Fee Inc.- ZSC V L.P | 464,432.00 | 9.08 | 464,432.00 | 9.08 |
| Mgmt. Fee Inc. -Penn Ventures | 640,372.96 | 12.52 | 640,372.96 | 12.52 |
| Penn Ventures Org. Cost Reimb. | 0.00 | 0.00 | 0.00 | 0.00 |
| Mgmt. Fee Income - ZSC VI | 0.00 | 0.00 | 0.00 | 0.00 |
| Management Fees Reserved ZS VI | 0.00 | 0.00 | 0.00 | 0.00 |
| Mngt fee income - ZSC VII | 2,513,991.00 | 49.15 | 2,513,991.00 | 49.15 |
| Mngt fee inc - ZSC VII CAYMAN | 931,124.00 | 18.20 | 931,124.00 | 18.20 |
| Mngt fee income - ZSC VII SBIC | 500,000.00 | 9.77 | 500,000.00 | 9.77 |
| Managment Fee Income - ZSC LLC | 0.00 | 0.00 | 0.00 | 0.00 |
| Management Fee ZSC VII LLC | 0.00 | 0.00 | 0.00 | 0.00 |
| Mngt Fee Income PA Venture Mng | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest & Dividend Income | 592.57 | 0.01 | 592.57 | 0.01 |
| Transaction Fees - Portfolio | 0.00 | 0.00 | 0.00 | 0.00 |
| Board of Direct. - Exp. Reimb. | 0.00 | 0.00 | 0.00 | 0.00 |
| Investor Reports/Meeting Reimb | 0.00 | 0.00 | 0.00 | 0.00 |
| Other Income | 64,850.88 | 1.27 | 64,850.88 | 1.27 |
| Sub Rental - Income 101 Main | 0.00 | 0.00 | 0.00 | 0.00 |
| Syndication Cost Reimb- ZSC VI | 0.00 | 0.00 | 0.00 | 0.00 |
| Consulting Fees | 0.00 | 0.00 | - | 0.00 |
| Gain on sale of securities | 0.00 | 0.00 | 0.00 | 0.00 |
| Short Term Capital Gain | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Revenues** | 5,115,363.41 | 100.00 | 5,115,363.41 | 100.00 |
| **Cost of Sales** | | | | |
| Total Cost of Sales | 0.00 | 0.00 | 0.00 | 0.00 |
| Gross Profit | 5,115,363.41 | 100.00 | 5,115,363.41 | 100.00 |
| **Expenses** | | | | |
| Advertising & Marketing Exp. | 52,259.42 | 1.02 | 52,259.42 | 1.02 |

1/11/2006 at 5:15 PM

8

**Zero Stage Capital Co., Inc.**
**Income Statement**
**For the Twelve Months Ending December 31, 2004**

| | | | | |
|---|---:|---:|---:|---:|
| Accounting & Tax Services | 0.00 | 0.00 | 0.00 | 0.00 |
| Marketing - Zero Stage Summit | 0.00 | 0.00 | 0.00 | 0.00 |
| Amortization Expense | 0.00 | 0.00 | 0.00 | 0.00 |
| Auto Expenses | 0.00 | 0.00 | 0.00 | 0.00 |
| Bad Debt Expense | 0.00 | 0.00 | 0.00 | 0.00 |
| Bank Charges | 0.00 | 0.00 | 0.00 | 0.00 |
| Board of Directors | 0.00 | 0.00 | 0.00 | 0.00 |
| Charitable Contributions Exp | 50.00 | 50.00 | 50.00 | 0.00 |
| Consulting - NH Business Devel | 0.00 | 0.00 | 0.00 | 0.00 |
| Consulting - Computers/Network | 0.00 | 0.00 | 0.00 | 0.00 |
| Consult - B. Stevens T&E Exp. | 0.00 | 0.00 | 0.00 | 0.00 |
| Consulting MBDC | 0.00 | 0.00 | 0.00 | 0.00 |
| Consulting - Nancy McDonald | 0.00 | 0.00 | 0.00 | 0.00 |
| Consulting - Seaflower Assoc. | 0.00 | 0.00 | 0.00 | 0.00 |
| Consulting - Pillar Financial | 0.00 | 0.00 | 0.00 | 0.00 |
| Consulting- Cold Spring Adviso | 0.00 | 0.00 | 0.00 | 0.00 |
| Consulting - Bain & Co. | 0.00 | 0.00 | 0.00 | 0.00 |
| Consulting - BDCRI | 0.00 | 0.00 | 0.00 | 0.00 |
| Rutkowski & Partners | 0.00 | 0.00 | 0.00 | 0.00 |
| Consulting | 162,255.77 | 3.17 | 162,255.77 | 3.17 |
| DBAB Placement Fee | 0.00 | 0.00 | 0.00 | 0.00 |
| Fund Raising Expense - ZSC VII | 2,856.98 | 0.06 | 2,856.98 | 0.06 |
| Fund Raising Exp - New Markets | 617.23 | 0.01 | 617.23 | 0.01 |
| Depreciation Expense | 0.00 | 0.00 | 0.00 | 0.00 |
| Dues, Subscriptions, Books | 12,025.47 | 0.24 | 12,025.47 | 0.24 |
| Due Diligence Expense | 0.00 | 0.00 | 0.00 | 0.00 |
| Due Diligence RiboAssembly | 0.00 | 0.00 | 0.00 | 0.00 |
| Payroll Tax Exp - FICA | 0.00 | 0.00 | 0.00 | 0.00 |
| Payroll Tax Expense - Medicare | 0.00 | 0.00 | 0.00 | 0.00 |
| Payroll Tax Expense - FUTA | 0.00 | 0.00 | 0.00 | 0.00 |
| Payroll Tax Expense - PA SUI | 0.00 | 0.00 | 0.00 | 0.00 |
| Payroll Tax Expense - MA SUI | 0.00 | 0.00 | 0.00 | 0.00 |
| Payroll Tax Exp - MA Hlth Ins. | 0.00 | 0.00 | 0.00 | 0.00 |
| Investor Meetings | 0.00 | 0.00 | 0.00 | 0.00 |
| Penn Venture Partner Expense | 2,304.90 | 0.05 | 2,304.90 | 0.05 |

Page: 3

8

Zero Stage Capital Co., Inc.
Income Statement
For the Twelve Months Ending December 31, 2004

| | | | | |
|---|---|---|---|---|
| Insurance Exp | 264,225.69 | 5.17 | 264,225.69 | 5.17 |
| Life Insurance | 0.00 | 0.00 | 0.00 | 0.00 |
| Health Insurance | 0.00 | 0.00 | 0.00 | 0.00 |
| Dental Insurance | 0.00 | 0.00 | 0.00 | 0.00 |
| Prescription Reimbursement | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance - Disability | 0.00 | 0.00 | 0.00 | 0.00 |
| Health Insurance Reimbursement | 30,868.18 | 0.60 | 30,868.18 | 0.60 |
| Dental Insurance Reimbursement | 0.00 | 0.00 | 0.00 | 0.00 |
| Long Term Care Insurance | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Expense | 39,368.06 | 0.77 | 39,368.06 | 0.77 |
| Employment Placement Fees | 0.00 | 0.00 | 0.00 | 0.00 |
| Temporary Help | 0.00 | 0.00 | 0.00 | 0.00 |
| Legal and Professional Expense | 308,510.72 | 6.03 | 308,510.72 | 6.03 |
| Maintenance Expense | 995.00 | 0.02 | 995.00 | 0.02 |
| Meals and Entertainment Exp | 0.00 | 0.00 | 0.00 | 0.00 |
| Office Supplies | 34,196.50 | 0.67 | 34,196.50 | 0.67 |
| Office Equipment - Expense | 0.00 | 0.00 | 0.00 | 0.00 |
| Office Supplies -Water | 0.00 | 0.00 | 0.00 | 0.00 |
| Software Expense | 5,662.50 | 0.11 | 5,662.50 | 0.11 |
| Other Taxes | 1,658.97 | 0.03 | 1,658.97 | 0.03 |
| Employer P/R Taxes | 0.00 | 0.00 | 0.00 | 0.00 |
| Payroll Tax Exp. - FUTA | 0.00 | 0.00 | 0.00 | 0.00 |
| Payroll Tax Exp. - SUI | 0.00 | 0.00 | 0.00 | 0.00 |
| Payroll Processing Service | 0.00 | 0.00 | 0.00 | 0.00 |
| 401 K Administration Expense | 0.00 | 0.00 | 0.00 | 0.00 |
| 401 K Discretionary Contrib. | 159,232.34 | 3.11 | 159,232.34 | 3.11 |
| Money Purchase Plan Admin Exp. | 0.00 | 0.00 | 0.00 | 0.00 |
| Money Purchase Plan Contributi | 0.00 | 0.00 | 0.00 | 0.00 |
| Postage Expense | 9,575.82 | 0.19 | 9,575.82 | 0.19 |
| Hand Courier Expense | 0.00 | 0.00 | 0.00 | 0.00 |
| Recruiting Expense | 0.00 | 0.00 | 0.00 | 0.00 |
| Seminars/Conference | 10,575.00 | 0.21 | 10,575.00 | 0.21 |
| In-House meetings | 7,841.92 | 0.15 | 7,841.92 | 0.15 |
| Miscellaneous | 0.00 | 0.00 | 0.00 | 0.00 |
| Overnight Mail Expense | 0.00 | 0.00 | 0.00 | 0.00 |

8

## Zero Stage Capital Co., Inc.
### Income Statement
#### For the Twelve Months Ending December 31, 2004

| | | | | |
|---|---|---|---|---|
| Rent/Parking/Oper. Exp - Cambr | 273,156.07 | 5.34 | 273,156.07 | 5.34 |
| Rent - Rhode Island | 0.00 | 0.00 | 0.00 | 0.00 |
| Other RI Related Expenses | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent - Maine | 0.00 | 0.00 | 0.00 | 0.00 |
| Other Maine Related Expenses | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent - New Haven | 0.00 | 0.00 | 0.00 | 0.00 |
| New Haven Related Expenses | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent - Stamford | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent - Level 3 Sublease Camb. | 0.00 | 0.00 | 0.00 | 0.00 |
| Repairs Expense | 0.00 | 0.00 | 0.00 | 0.00 |
| Maintenance Contracts | 0.00 | 0.00 | 0.00 | 0.00 |
| Office Construction | 0.00 | 0.00 | 0.00 | 0.00 |
| Salaries & Wages Expense | 2,370,859.14 | 46.35 | 2,370,859.14 | 46.35 |
| Bonus Expense | 0.00 | 0.00 | 0.00 | 0.00 |
| Bonus-Fund Closing ZSC Employ. | 0.00 | 0.00 | 0.00 | 0.00 |
| Bonus- Fund Closing-Consultant | 0.00 | 0.00 | 0.00 | 0.00 |
| Bonus - Consultants | 0.00 | 0.00 | 0.00 | 0.00 |
| Storage Space | 0.00 | 0.00 | 0.00 | 0.00 |
| Printing, Stationery & Copying | 0.00 | 0.00 | 0.00 | 0.00 |
| Telephone Expense | 41,801.52 | 0.82 | 41,801.52 | 0.82 |
| America On-Line | 0.00 | 0.00 | 0.00 | 0.00 |
| Telephone - Lease | 0.00 | 0.00 | 0.00 | 0.00 |
| Telephone- Cellular | 0.00 | 0.00 | 0.00 | 0.00 |
| Telephone - Prepaid Card | 0.00 | 0.00 | 0.00 | 0.00 |
| Internet Services | 7,596.67 | 0.15 | 7,596.67 | 0.15 |
| Automobile Expense | 33,944.57 | 0.66 | 33,944.57 | 0.66 |
| Travel - Auto Mileage | 0.00 | 0.00 | 0.00 | 0.00 |
| Travel - Airfare, Trains, Etc. | 12,729.62 | 0.25 | 12,729.62 | 0.25 |
| Travel - Hotels/Lodging/Room | 5,424.20 | 0.11 | 5,424.20 | 0.11 |
| Travel - Meals & Entertainment | 8,162.45 | 0.16 | 8,162.45 | 0.16 |
| Travel - Taxi/Bus/Train/Limo | 4,190.61 | 0.08 | 4,190.61 | 0.08 |
| Travel - Expense Report Misc. | 0.00 | 0.00 | 0.00 | 0.00 |
| Travel - Parking, Tolls | 0.00 | 0.00 | 0.00 | 0.00 |
| Travel - Phone/Fax | 0.00 | 0.00 | 0.00 | 0.00 |
| Tuition Reimbursement | 0.00 | 0.00 | 0.00 | 0.00 |

8

Zero Stage Capital Co., Inc.
Income Statement
For the Twelve Months Ending December 31, 2004

| | | | | |
|---|---|---|---|---|
| Utilities Exp. - Electricity | 4,321.43 | 0.08 | 4,321.43 | 0.08 |
| Wages Expense | 0.00 | 0.00 | 0.00 | 0.00 |
| Other Expense | 22,116.58 | 0.43 | 22,116.58 | 0.43 |
| Penn Venture exps | 113,748.01 | 2.22 | 113,748.01 | 2.22 |
| Penn Ventures O/A expenses | 10,155.00 | 0.20 | 10,155.00 | 0.20 |
| Gain/Loss on Sale of Assets | 0.00 | 0.00 | 0.00 | 0.00 |
| Gain/Loss Main St. Investor VI | 0.00 | 0.00 | 0.00 | 0.00 |
| Portfolio Expenses | 0.00 | 0.00 | 0.00 | 0.00 |
| Mass. Annual Report | 0.00 | 0.00 | 0.00 | 0.00 |
| Mass. Income Taxes | 0.00 | 0.00 | 0.00 | 0.00 |
| Federal Income Taxes | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Expenses | 4,013,286.34 | 78.46 | 4,013,286.34 | 78.46 |
| Net Income | 1,102,077.07 | 21.54 | 1,102,077.07 | 21.54 |

**EXHIBIT H – Tab 11**

----- Original Message -----
From: Rigby, Thomas W.
To: 'Haynes, Michael, Esq. (SBIC Counsel)'
Cc: Morris, Thomas G. ; Hruschka, Elaine ; Messingerlerner, Arlene P.
Sent: Tuesday, April 19, 2005 10:26 AM
Subject: Zero Stage VI - ImproveNet

Mike -

As we discussed earlier, as part of the consensual arrangement for a receivership, SBA is willing to agree to a resolution of the ImproveNet issue. As Mr. Kelley stated in our recent meetings, Zero Stage VI has been recording on its 468's that its management fees have been "waived" in an amount that exceeds the amount necessary to correct the ImproveNet matter. However, on some of Zero Stage's reports there appears an asterisk with respect to "waived" fees that seems to contradict the 468's by suggesting that the fees have not been waived, i.e., relinquished or abandoned, but rather only deferred. SBA believes that the statement of waiver in the 468's controls and constitutes complete relinquishment and abandonment. Nevertheless, we would like to tidy up this issue.

Therefore, so that there is no later misunderstanding and in order to allow SBA to resolve fully the ImproveNet matter as part of the consent receivership arrangement, SBA will need a written acknowledgement from Zero Stage that its "waiver" of fees is complete and irrevocable up to the amount of $4,016,141.29 (the original ImproveNet investment amount of $3,001,010, plus interest based upon Series C, D and E 5-year T-Bill rates in 1999 of 5.15%, 5.78% and 6.02%, and then less the $56,002 realized from the investment) in management fees that otherwise would have been due as of April 15, 2005. This amount must be waived permanently, and in its entirety. Management fees accrued in excess of this amount may be "waived" (in a deferral sense) until such time as SBA is paid in full of Zero Stage VI's: (i) Participating Securities; and (ii) all accrued Prioritized Payments.

Please confirm with Mr. Kelley that this comports with our mutual understanding from the recent meetings here in Washington. SBA will prepare a letter with a "seen and agreed" block for Mr. Kelley to sign on behalf of the General Partner.

Of course, the issues of the unapproved add-on financings of Furniture Fan during Restricted Operations and post-approval in prior changes in management disclosed to SBA would also be resolved at the same time as part of this consent arrangement.

Please do not hesitate to contact me at 619-1610 with any questions.

Thanks - Tom

4/20/2005